**KESSLER TOPAZ MELTZER & CHECK, LLP**
Stacey M. Kaplan (Bar No. 241989)
(skaplan@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:    (415) 400-3000
Fax:    (415) 400-3001

-and-

Gregory M. Castaldo (admitted *pro hac vice*)
(gcastaldo@ktmc.com)
Johnston de F. Whitman (admitted *pro hac vice*)
(jwhitman@ktmc.com)
Joshua A. Materese (admitted *pro hac vice*)
(jmaterese@ktmc.com)
Daniel B. Rotko (admitted *pro hac vice*)
(drotko@ktmc.com)
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056

*Counsel for Lead Plaintiff Sjunde AP-Fonden and
Lead Counsel for the Putative Class*

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re Lucid Group, Inc. Securities Litigation | Case No. 3:22-cv-02094-JD |
| This Document Relates to: All Actions | **CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................................1

II. JURISDICTION AND VENUE ........................................................................................9

III. PARTIES ...........................................................................................................................10

    A. Lead Plaintiff ..........................................................................................................10

    B. Corporate Defendant ...............................................................................................10

    C. Individual Defendants .............................................................................................11

IV. RELEVANT NON-PARTIES ...........................................................................................12

    A. Relevant Non-Party Lucid Management .................................................................12

    B. Relevant Non-Party Related Entities ......................................................................14

    C. Former Lucid Employees or Contractors ................................................................15

V. OVERVIEW OF DEFENDANTS' FRAUD .....................................................................17

    A. Lucid's Background And Corporate History ...........................................................17

    B. The Lucid Air ..........................................................................................................18

    C. It Was Well-Known That Lucid's Success Hinged On Its Ability To Quickly Mass Produce The Lucid Air ...............................................................................................20

    D. Lucid Continually Struggled To Raise Sufficient Capital To Fund Production Of The Air, Causing Production Delays ........................................................................25

    E. To Drum Ip Interest In The Merger—And Secure A Much-Needed Capital Infusion—Lucid Released An Aggressive Production Timeline, Including 20,000 Airs In 2022 ...........................................................................................................26

    F. By Taking Lucid Public, Rawlinson Knew He Would Secure A Multimillion Dollar Bonus And Lucrative Compensation Package .........................................................27

    G. In The Run-Up To The Merger And Class Period, Defendants Continued To Assure Investors That Lucid Would Meet Its 2022 Production Target ..............................28

    H. After Beginning Customers Deliveries OF THE Air, Defendants Reiterated Lucid's Production Guidance ................................................................................................30

    I. Lucid's Entire Production Process Took Place From The Company's Facilities In Casa Grande And Sole Warehouse In Tempe .........................................................31

    J. Defendants Knew That Lucid Suffered From Severe Internal Logistics Issues And Would Not Meet Its Production Targets ....................................................................34

        1. Defendants Knew About Lucid's Widespread Internal Logistics Issues ..............34

a.   Lucid Did Not Have A Functional Inventory System ...............................35

b.   Defendants Had No Idea How Much Inventory Lucid Had .....................39

c.   Lucid's Inaccurate Inventory Had Significant Negative Impacts On Its Business .................................................................................................40

d.   Defendants Knew Lucid Desperately Needed To Conduct A Full Physical Inventory, But Denied Numerous Requests To Do So ...............41

e.   Lucid's Warehouse Was Operating Significantly Above Capacity...........44

f.   Lucid Could Not Get Parts To The Production Line Because The Warehouse Was A Complete Mess.............................................................46

g.   Lucid's Internal Inventory Logistics Issues Prevented It From Receiving Parts ........................................................................................48

h.   Issues With Reflashing, Sequencing, And Quality Checks At Lucid's Warehouse Resulted In Additional Production Delays ...............49

i.   As A Result Of The Substantial Issues In Its Warehouse, Lucid Scrapped Millions Of Dollars In Parts........................................................50

j.   Internal Logistics Inefficiencies At The Plant Resulted In Delays In Getting Parts To The Production Line .......................................................52

k.   Lucid's Internal Logistics Issues Were Known Within The Company ...................................................................................................53

2.   Defendants Knew That Lucid's Ability to Produce Cars Was Adversely Impacted by Parts Design Issues.....................................................................59

a.   Cantrail Applique.......................................................................................61

b.   Glass...........................................................................................................62

c.   Door Seals...................................................................................................63

d.   Body in White Panels..................................................................................63

e.   Carpets........................................................................................................64

3.   Defendants Knew Lucid's Internal Problems Significantly Impacted Its Ability To Produce The Air ...............................................................................64

a.   Because Of Internal Logistics Problems, Lucid Could Not Get Parts To The Production Line ...............................................................................64

b.   Lucid's Production Line Was Consistently Shut Down ...........................67

c.   Rawlinson Was Regularly at the Plant, Including During Line Shutdowns...................................................................................................70

4.   Defendants Knew That Lucid Would Not Meet Its Production Guidance ...........70

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

K.  To Begin The Class Period, Defendants Misled Investors About Lucid's Production And Concealed The Severe Internal Problems That Were Impacting The Company's Ability To Produce Vehicles ...................................................................72

L.  Defendants Capitalized On Lucid's Inflated Stock Price And Market Capitalization ......75

M.  Fresh Off The Multi-Billion Dollar Offering, Defendants Falsely Re-Affirmed Lucid's 2022 Production Guidance, Only To Slash It Weeks Later................................76

N.  Despite The Drastic, Unexpected Guidance Cut, Lucid's Stock Remained Artificially Inflated Because Defendants Continued To Mislead Investors .....................78

O.  The Relevant Truth Concealed By Defendants' Misrepresentations and Omissions Was Finally Revealed to Investors on August 3, 2022 ....................................................83

VI.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT .......................................................................................86

A.  November 15, 2021 .......................................................................................................86

B.  November 16, 2021 .......................................................................................................89

C.  February 14, 2022 .........................................................................................................91

D.  February 28, 2022 .........................................................................................................92

E.  March 17, 2022 .............................................................................................................98

F.  April 28, 2022 ...............................................................................................................99

G.  May 5, 2022 ................................................................................................................100

H.  May 20, 2022 ..............................................................................................................104

I.  May 26, 2022 ..............................................................................................................107

VII.  ADDITIONAL ALLEGATIONS OF SCIENTER...............................................................107

A.  Defendants Knew Lucid Would Not Achieve Its Production Guidance .......................108

B.  Defendants Knew Of The Widespread, Internal Problems At Lucid And Their Adverse Impact on Lucid's Production ...........................................................................108

C.  The Production And Sale Of The Lucid Air Was Critical To Lucid's Operations.........112

D.  Defendants Repeatedly Spoke About The Issues At The Center Of The Fraud.............112

E.  Defendants Controlled The Contents of Lucid's Public Statements and Had Unfettered Access To Information Contrary To Their Statements..................................113

F.  The Temporal Proximity Between Defendants' Material Misrepresentations And Partial Revelations Of The Relevant Truth Supports A Strong Inference Of Scienter ......................................................................................................................114

G.  Defendants Had Motive And Opportunity To Mislead Investors...................................115

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1.    By Inflating Lucid's Stock Price And/Or Maintaining That Artificial Inflation, Defendant Rawlinson Increased His Compensation By Hundreds Of Millions Of Dollars ................................................................................. 115

2.    Lucid Capitalized On Its Fraud By Releasing Convertible Notes in a Private Offering, Reaping $2 Billion In Proceeds ................................. 117

VIII.    LOSS CAUSATION ........................................................................................ 117

A.    February 28, 2022 ................................................................................. 118

B.    August 3, 2022 ...................................................................................... 124

IX.    CLASS ACTION ALLEGATIONS .................................................................. 130

X.    A PRESUMPION OF RELIANCE APPLIES .................................................. 132

XI.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY ................................................................................................... 133

XII.    CAUSES OF ACTION ..................................................................................... 134

COUNT I  Violation of Section 10(b) of the Exchange Act and  SEC Rule 10b-5 Promulgated Thereunder Against All Defendants ........................................... 134

COUNT II  Violation of Section 20(a) of the Exchange Act Against the Individual Defendants .......................................................................................................... 135

XIII.    PRAYER FOR RELIEF ................................................................................... 136

XIV.    DEMAND FOR JURY TRIAL ........................................................................ 137

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Court-appointed Lead Plaintiff Sjunde AP-Fonden ("AP7" or "Lead Plaintiff"), by and through counsel, brings this federal securities action individually and on behalf of a class ("Class") consisting of all persons and entities who purchased or otherwise acquired the common stock of Lucid Group, Inc. ("Lucid" or the "Company") between November 15, 2021, and August 3, 2022, inclusive (the "Class Period"), and were damaged thereby. Lead Plaintiff asserts claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and the rules and regulations promulgated thereunder, including United States Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendants (defined below).

Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief are based on the ongoing investigation of its undersigned counsel. This investigation includes review and analysis of, among other things: (i) Lucid's filings with the SEC; (ii) transcripts of Lucid's conference calls with analysts and investors; (iii) Company presentations, press releases, and reports; (iv) research reports by securities and financial analysts; (v) news and media reports concerning Lucid and other facts related to this action; (vi) price and volume data for Lucid's securities; and (vii) information provided by former Lucid employees and contractors. Lead Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    **INTRODUCTION**

1.     This securities fraud class action arises from Defendants' material misrepresentations and omissions about Lucid's production of the Company's only commercially-available electric vehicle ("EV"), the Lucid Air (the "Air"), and the factors impacting that production.

2.     At all times, Defendants concealed the severe, internal, Company-specific problems that were actually slowing production, including internal logistics issues, design flaws, and the key drivers of parts shortages. Instead, Defendants blamed Lucid's woes on the purported impact of external, industry-wide supply chain problems and repeatedly assured investors that the Company was "mitigating" that

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

global impact. These misrepresentations left investors with a materially false and misleading impression about Lucid's actual production and internal ability and readiness to mass produce its vehicles. Against that backdrop, Defendants then lied, time and again, about the number of vehicles Lucid would produce. When the relevant truth about Lucid's disastrous internal logistics and production issues was finally revealed to the market over two partial corrective disclosures, Lucid's common stock price cratered, causing substantial damage to the Company's investors.

3.      Defendant Lucid designs, produces, and sells luxury EVs. The Company evolved from a startup called Atieva, Inc. ("Atieva"), which initially produced and sold EV batteries and electric powertrains to EV companies. In 2013, Atieva decided to shift its business model and produce its own EVs. To spearhead the transformation, Atieva hired industry-veteran Peter Rawlinson ("Rawlinson"), who had overseen the development of Tesla, Inc.'s ("Tesla") Model S from 2009 to 2012.

4.      Atieva changed its name to Lucid in 2016. That same year, the Company unveiled a prototype of its first vehicle—a luxury EV sedan it dubbed the Lucid Air. It also announced plans to build a factory in Casa Grande, Arizona, and said it would begin producing the Air by 2018.

5.      Since it was unveiled, the Air's design has garnered high praise. Market commentators called it "a technological breakthrough" and heralded it as one of "the most compelling automotive launches in recent years." But as one commentator noted, "a prototype, no matter how lovely, does not make a[n] automaker," and "there's quite a gulf between designing a great car and producing and selling that car." Ultimately, Lucid's success hinged entirely on its ability to ramp up commercial production of the Lucid Air. That is because the Air was essentially Lucid's only source of potential revenue, and the Company could not recognize significant revenue from sales of the Air until it was able to mass produce vehicles and deliver them to paying customers.

6.      The speed at which Lucid ramped production was also critical, for at least three reasons. *First*, although the Company boasted a substantial book of preorders for the Air, it had to get vehicles to customers before they got tired of waiting and cancelled their refundable orders. *Second*, while the EV market still had relatively few players, it was imperative for Lucid to quickly get production off the ground and grab market share before additional competitors entered the market. *Third*, the Company was burning through billions of dollars in cash getting production off the ground, and the longer it took to

start bringing in substantial revenues from the Air, the greater the chances that it would run out of funds. Simply put, Lucid's ability to quickly ramp production would determine the Company's future. And in that realm, as commentators noted, Lucid "remain[ed] entirely unproven."

7.    In the years that followed the Company's unveiling of the Lucid Air prototype, Lucid struggled to raise much-needed cash as a private company, leading it to repeatedly delay the start of production. In 2018, desperate for capital, Lucid inked a deal with Saudi Arabia's sovereign wealth fund, the Public Investment Fund ("PIF"), to provide $1 billion in funds in exchange for the majority interest in the Company. Despite this infusion, by the beginning of 2021, Lucid still had not commenced commercial production of the Air and was again running low on cash. As a result, Lucid decided to seek funding from a new source—investors on the public market.

8.    On February 22, 2021, Lucid announced plans to merge with Churchill Capital Corp IV ("Churchill") in order to bring the Company public through a special purpose acquisition company ("SPAC") transaction (the "Merger").[1] At the time, the Merger was the largest proposed SPAC transaction in history, and would provide Lucid with $4.4 billion in cash. Rawlinson was desperate to close the Merger, as he knew that cash was critical to Lucid's ability to continue growing as a company. Indeed, when the Merger was announced, Lucid disclosed that it was so cash-strapped that it would require $600 million in bridge funding to continue its operations until the Merger closed.

9.    Rawlinson was also highly motivated to close the Merger because he knew that, in doing so, he would not only earn a $2 million bonus, but would lock down a lucrative compensation package with a potential value of approximately $556 million. Lucid's Board of Directors had approved the framework for Rawlinson's compensation package before the Merger was announced, but made clear that "[s]uccessful merger completion" was necessary "to receive the grant at all."

10.    As the Merger approached, Rawlinson knew that investors were laser-focused on whether Lucid would finally be able to ramp up production of the Air after years of delay. To ensure that the Merger went through and provided Lucid with critical funding, he and the Company took a number of

---

[1]    A SPAC—also known as a "blank check company"—is a publicly traded company created for the purpose of acquiring or merging with an existing private company. By merging with the publicly traded SPAC, the existing company "goes public" and begins trading on public markets.

steps to convince investors that it would, in fact, quickly ramp up production of the Air and begin generating substantial revenues. For example, in a February 22, 2021 investor presentation announcing the Merger, Rawlinson and Lucid told investors that the Company would produce 20,000 vehicles by the end of 2022, thus garnering more than $2 billion in 2022 revenues. Rawlinson continued to drive investor interest in Lucid by reiterating its 2022 production guidance in the run-up to the July 2021 Merger, assuring investors in May 2021 and July 2021 that Lucid would produce 20,000 EVs in 2022.

11.     Even with the investor interest generated by Defendants' repeated production promises, on the day the Merger was scheduled to close (July 22, 2021), Defendants had yet to garner the necessary votes from Churchill shareholders. So, that day, Rawlinson implored investors to "please, please vote," and again reiterated that Lucid was "'energized about going into full production mode' later this year."

12.     A day later, on July 23, 2021, the Merger closed. Lucid's common stock began trading on the Nasdaq on July 26, 2021. By going public through the SPAC Merger, Lucid secured $4.4 billion in additional funding and Rawlinson secured a $2 million bonus and a staggering $556 million in potential stock option compensation. Furthermore, because of the structure of Rawlinson's stock option package— more than half of his options would only vest if the Company hit certain market capitalization targets within five years of going public—he remained highly motivated to keep Lucid's common stock price inflated. As Rawlinson admitted, "I'm all in on stock options[,] *that's what motivates and drives me*."[2] Thus, in the months that followed the Merger, Rawlinson continued to try and prop up Lucid's stock price by assuring investors that Lucid was on track to meet its production targets.

13.     On September 28, 2021, Lucid announced that—after multiple delays—it had finally begun production of the Air. Lucid made its first deliveries of the Air to customers on October 30, 2021.

14.     The Class Period begins on November 15, 2021—the day that Lucid announced its first quarterly results as a public company. On that day, Defendants told investors that they were "confident in [their] ability to achieve 20,000 units in 2022." As for potential risks to that production, Defendants expressly directed investors only to then-existing "ongoing challenges facing the automotive industry,

---

[2] All emphasis is added and all original emphasis is omitted unless otherwise noted.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

with global disruptions to supply chains and logistics," but, in the same breath, assured investors that "[w]e are taking steps to mitigate these challenges."

15.     These statements were blatantly false. In the weeks leading up to November 15, 2021, *Rawlinson himself admitted internally that Lucid would miss its production targets*. In particular, according to former employee ("FE")-2, during a meeting in October 2021 or the first week of November 2021, Rawlinson told a small group of Lucid employees that the Company would miss its targets and *would produce less than 10,000 vehicles in 2022*. Rawlinson further instructed the employees at the meeting to keep the fact that Lucid would miss its 2022 production target confidential.

16.     Moreover, multiple former Lucid employees confirm that prior to Defendants' November 2021 statements, Rawlinson was told that Lucid would not meet its 2022 production targets, and that the fact that Lucid would not meet this target was widely understood and discussed within the Company, including by Lucid's top executive management.

17.     Defendants also knew at all times leading up to and throughout the Class Period that Lucid was suffering from severe and pervasive *internal* problems unique to Lucid that made it impossible for the Company to mass produce vehicles. Thus, contrary to Defendants' assurances, the then-existing headwinds Lucid was experiencing were neither transient nor borne by the industry as a whole, but were internal, structural in nature, widespread, and ongoing.

18.     Nevertheless, when analysts pressed Defendants for answers concerning the status of Lucid's production of the Air, they lied. Specifically, Defendants claimed that the main sticking point was whether the Company would be impacted by *global* supply-chain and logistics challenges impacting the automotive market as a whole, and that Lucid was already taking steps to mitigate these issues.

19.     In truth, Defendants knew or were reckless in disregarding that Lucid suffered from severe internal, Lucid-specific issues that were significantly hampering its ability to produce vehicles. To start, Lucid's inventory management systems were entirely ineffective and inoperable. This meant that the Company's employees and other workers in Lucid's Warehouse (defined below) lacked even the most basic information necessary to run the Warehouse, including that they had little or no information about how many parts the Company actually had at any given time, or even where parts were, and thus could not locate them when the production line requested them. This, in turn, negatively impacted

Lucid's ability to efficiently reorder parts because it was unable to tell when inventory was low on or when it had run out of a particular part.

20.     This chaos was compounded by the fact that Lucid's Warehouse was operating significantly above capacity, which not only made it difficult to locate parts in piles stacked up to the ceiling, but also resulted in tens of millions of dollars in parts being smashed and destroyed. As a result of these and other significant internal logistics issues, the Company was unable to get parts from its Warehouse to its production line in a timely manner, which resulted in frequent production shutdowns. Indeed, former Lucid employees described the Warehouse as "a complete mess" and "utter chaos," and confirmed that the vast majority of the Company's production delays resulted from its failing internal logistics systems. These severe internal logistics issues were plaguing Lucid by no later than the summer of 2021, and persisted until at least the summer of 2022.

21.     Even when Lucid's production was slowed by actual parts shortages—as opposed to an inability to find the parts or get them to the production line—former employees confirmed that many such shortages were problems of Lucid's own making. This was because the design of the Lucid Air was not sufficiently developed before production was launched and certain parts were not designed for manufacturability. That meant that suppliers were not able to produce parts to meet Lucid's specifications, causing Lucid to rush to make multiple design changes even after production of the Air had already commenced, or labor to build vehicles with out of spec parts. This, in turn, led to production delays.

22.     These facts were well-known by Defendants from day one of the Class Period. Prior to November 2021, Rawlinson and his top lieutenants were directly told about the severe issues in the Warehouse, and the negative impact that they were having on Lucid's ability to produce vehicles. In addition, Rawlinson knew, based on discussions at internal meetings, that the Air's design was not where it needed to be before Lucid launched production, which caused parts shortages and last minute design changes.

23.     Still, beginning on November 15, 2021, Defendants concealed all of these internal issues that were ***already*** having a severe and negative impact on Lucid's production, and instead told investors that the main risk to the Company's targets was ***industry-wide*** supply chain issues, and that they were

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*already* mitigating those risks. This gave investors the false and misleading impression that internally Lucid was ready and able to quickly ramp up production, when in truth it was anything but.

24.     Analysts and the financial media reacted positively to Defendants' assurances. For example, the following day, CNBC reported that "[Lucid's] market capitalization surpassed that of Ford Motor on Tuesday as investors reacted to management confirming production plans for 2022[.]" Bloomberg similarly wrote that Lucid shares "closed up 24% in New York, bringing its value to over $91 billion. . . . The surge in the shares came after Lucid said Monday it remained confident in its ability to produce 20,000 vehicles in 2022."

25.     Defendants proceeded to then take full advantage of Lucid's artificially inflated stock price. *First*, on December 8, 2021, Lucid announced a public offering of convertible senior notes. As market commentators noted, by using "[o]pportunistic timing" and "[t]aking advantage of a strong stock price," Lucid was able to raise over $2 billion in gross proceeds to fund its business. *Second*, by January 25, 2022, Rawlinson had maintained Lucid's high market capitalization for long enough to trigger four out of the five tranches of his performance-based stock options. As a result, Rawlinson received nearly 14 million Lucid stock options that were valued at approximately ***$263 million*** as of April 28, 2022.

26.     Despite having known for months that Lucid would produce less than 10,000 units in 2022, even in mid-February 2022, Defendants still falsely assured investors that Lucid would produce 20,000 cars by year-end. Just two weeks later, however, on Lucid's February 28, 2022 earnings call, Defendants did an abrupt about-face, admitting that Lucid would miss its 20,000 vehicle target by up to 40%, and slashing the Company's 2022 production guidance to 12,000 to 14,000 vehicles. On this news, Lucid's stock price fell more than 13%, from a close of $28.98 per share on February 28, 2022, to a close at $24.99 per share on March 1, 2022. Market commentators likewise reacted negatively, calling Lucid's "massive" guidance cut "particularly disappointing," a "clear disappointment," "jarring," and a "[f]all from grace," and noting that it "sen[t] shares . . . tumbling" and "plunged Lucid into an uphill battle to regain investor trust." They further noted that "[t]he biggest threat to Lucid is that it misses on its already lower guidance and further slashes guidance in the coming quarters."

27.     Defendants, of course, knew that Lucid would miss even its reduced guidance figures as a result of the severe internal issues it was facing. Lucid's internal logistics issues had not improved but, rather, as Rawlinson knew, were only getting worse. As a result, Defendants' statements on February 28, 2022, were materially false or misleading, and Lucid's stock price remained artificially inflated.

28.     Lucid's stock price also remained artificially inflated because Defendants continued to conceal the severe internal logistics problems that Lucid was experiencing, and instead misleadingly pinned the blame again on global supply chain and logistics problems that were impacting the automotive industry as a whole. For example, during the February 28, 2022 call, Defendants repeatedly blamed "ongoing, industrywide challenges in logistics and supply chains," "supply chain challenges" felt by "many manufacturers," and "supply chain challenges that you've heard about in numerous companies across industries this earnings season." As a result, investors were left with the false and misleading impression that Lucid was primed and ready to mass produce its vehicles, but was being constrained by industry-wide factors.

29.     Analysts again credited Defendants' explanation, reporting that Lucid's guidance reduction was the result of "supply chain problems," "'extraordinary' supply-chain pressures," and "supply chain constraints," and noting that Lucid "is getting absolutely crushed by short-term challenges such as higher component costs, supply chain issues, and higher shipping costs."

30.     For the remainder of the Class Period, Defendants continued to point to those purported global, industry-wide supply chain issues as the main obstacle to Lucid producing vehicles, while concealing the severe internal logistics issues that were hampering its actual production. On the back of these misrepresentations, Defendants falsely reaffirmed Lucid's production guidance of 12,000 to 14,000 vehicles throughout the spring of 2022. For example, during the Company's May 5, 2022 1Q22 earnings conference call, Defendants again reiterated Lucid's 12,000 to 14,000 guidance and continued to point to global supply chain issues as the main factor impacting and risk to Lucid's production, noting that "we are reiterating our 12,000 to 14,000 guidance for the balance of the year, so long as the supply chain logistics disruptions aren't material and our mitigation plans are effective."

31.     None the wiser, analysts latched onto and repeated Defendants' statements and false assurances, reporting, for example, that "LCID reiterated its 2022 outlook of 12K-14K units production"

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

and that the Company "does see supply chain disruptions from China as the most likely risk." Bloomberg similarly reported that Lucid "reaffirmed its plans to make as many as 14,000 plug-in vehicles this year" and that the Company was "work[ing] to overcome supply-chain challenges that are gripping the automotive industry."

32.     Just a few months later, on August 3, 2022, the relevant truth concealed by Defendants' false and misleading statements and omissions was fully revealed to the market. That day, in reporting Lucid's 2Q22 results, Defendants finally revealed what they had known all along—that the Company would make less than 10,000 units in 2022, slashing Lucid's guidance again, this time to 6,000 to 7,000 units. Moreover, although they claimed to have just discovered them, Defendants finally disclosed that Lucid's inability to ramp production had been caused primarily by severe internal logistics problems unique to Lucid.

33.     For example, departing from Lucid's prior scapegoating of global supply chain issues, Rawlinson explained that recent developments had "exposed the immaturity of our logistics processes," which he conceded were the "primary bottlenecks." In particular, Rawlinson noted that Lucid had struggled with its "ability to speed the correct part to [Lucid's production] line at the correct time and cadence" and had experienced "unplanned production pauses." As a result, the Company had decided it needed to overhaul its entire "logistics and manufacturing operations." On this news, Lucid's common stock price fell approximately 9.7%, from a close of $20.56 per share on August 3, 2022, to a close at $18.56 per share on August 4, 2022.

34.     Analysts and market commentators reacted negatively, calling Lucid's guidance cut "clearly disappointing," "another disappointing turn," and "a big step back for Lucid," and noting that "Lucid Motors will barely make any EVs this year." Moreover, they reported that the news "will lead to questions about [Lucid's] ability to produce at scale" and that "Lucid makes a very cool car, but now it needs to find a way to make money while making it or it won't be around for long." This lawsuit followed.

## II.    <u>JURISDICTION AND VENUE</u>

35.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, promulgated thereunder (17 C.F.R. § 240.10b-5).

36.     This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act (15 U.S.C. § 78aa). In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337.

37.     Venue is proper in this District under Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1391(b), because Lucid's principal executive offices are in Newark, California, and because many of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading information, occurred in this District.

38.     In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Lead Plaintiff

39.     Lead Plaintiff AP7 is a Swedish public pension fund, established under law as a Swedish governmental agency, with approximately $100 billion in assets under management. As set forth in the certification attached hereto as Exhibit A, AP7 purchased or otherwise acquired Lucid's common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B.    Corporate Defendant

40.     Defendant Lucid is a Delaware corporation headquartered at 7373 Gateway Boulevard, Newark, California 94560. Lucid designs, engineers, builds, and sells luxury electric vehicles. Prior to and throughout the Class Period, the Company built its vehicles at Lucid's manufacturing facility in Casa Grande, Arizona, the Advanced Manufacturing Plant or "AMP-1" (hereafter, "AMP-1" or the "Plant"), which was home to Lucid's only vehicle production line. The Company also operated a single warehouse in Tempe, Arizona (the "Warehouse"). During the Class Period, Lucid produced and sold one vehicle— the Lucid Air. The Company's common stock trades on the Nasdaq under the ticker symbol "LCID."

1

## C. **Individual Defendants**

41.    Prior to and during the Class Period, Defendant Rawlinson served as Lucid's Chief Executive Officer ("CEO") and Chief Technology Officer ("CTO"). Rawlinson joined Lucid as CTO in 2013. As CTO, Rawlinson was responsible for the creation and delivery of all Lucid products. On April 23, 2019, Lucid formally announced Rawlinson's appointment as CEO. As CEO, Rawlinson was responsible for all strategic and business aspects of the Company. Rawlinson brought more than 30 years of automotive industry experience to bear in these roles. Prior to joining Lucid in 2013, Rawlinson served as Tesla's Vice President ("VP") of Vehicle Engineering and Chief Engineer of the Tesla Model S from 2009 to 2012. Before Tesla, Rawlinson served in multiple lead engineering roles, including as Head of Vehicle Engineering at Corus Automotive, Chief Engineer at Lotus Cars, and Principal Engineer at Jaguar Cars.

42.    Defendant Sherry House ("House") served as the Company's Chief Financial Officer ("CFO") throughout the Class Period. On May 5, 2021, Lucid formally announced House's appointment as CFO, citing her "more than two decades of experience, with a compelling background of financial and technical expertise." In announcing House as CFO, Rawlinson remarked that her "rare combination of financial and technical experience bolsters our core leadership team in a pivotal year for Lucid as we prepare to transition to a publicly traded company and launch the Lucid Air." Before joining Lucid, House served as the Treasurer & Head of Investor Relations at Waymo LLC, Google's autonomous vehicle technology company, from July 2020 to April 2021, Waymo's Director of Corporate Development from January 2019 to June 2020, and Waymo's Director of Business & Corporate Finance from August 2017 to January 2019. Prior to Waymo, House served as VP of Corporate Development at Visteon Corporation, an automotive electronics supplier, from December 2016 to August 2017, and as Managing Director at Deloitte Corporate Finance LLC, a global professional services firm, from November 2014 to December 2016. House also previously held high-level positions at GTCR, Alta Partners, and General Motors.

43.    Defendants Rawlinson and House are collectively referred to herein as the "Individual Defendants." Lucid and the Individual Defendants are collectively referred to herein as "Defendants."

44. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control, and did in fact control, Lucid's public statements to the market, including in SEC filings, press releases, the Company's website, and presentations to securities analysts, money and portfolio managers, institutional investors, and the media. In their respective roles, each Individual Defendant was directly involved in preparing, reviewing, and approving the Company's public statements and disclosures to the market.

45. Each Individual Defendant was provided with copies of the Company's SEC filings alleged herein to contain materially false or misleading statements or omissions of material fact prior to, and shortly after, their issuance, had final executive authority to control what they said, or had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations that were being made were materially false and/or misleading.

## IV.   RELEVANT NON-PARTIES

### A.   Relevant Non-Party Lucid Management

46. Peter Hochholdinger ("Hochholdinger") served as Lucid's VP of Manufacturing leading up to and during the Class Period until around May 26, 2022. In that role, Hochholdinger led Lucid's global manufacturing operations and engineering. Hochholdinger has nearly 30 years of experience in automotive manufacturing. Prior to joining Lucid, he was VP of Production for Tesla, responsible for factories in Fremont, California, Lathrop, California, and Tilburg, The Netherlands. Prior to Tesla, Hochholdinger spent 24 years at Audi AG, where he rose to Senior Director of Production for Audi A4, A5, and Q5, overseeing the assembly of over 400,000 cars annually. Hochholdinger reported directly to Rawlinson.

47. Peter Hasenkamp ("Hasenkamp") served as Lucid's VP of Supply Chain leading up to and during the Class Period. In that role, he was responsible for sourcing, selecting, and ensuring the quality of Lucid's key suppliers, and managing the global logistics strategy between supply chain and manufacturing. Prior to joining Lucid, Hasenkamp was Director of Vehicle Systems Purchasing at Tesla.

Hasenkamp also spent ten years in production development at Ford Motor Company, working in Engineering and Program Management leadership roles. Hasenkamp reported directly to Rawlinson.

48.     Eric Bach ("Bach") served as Lucid's Senior VP of Product and Chief Engineer leading up to and during the Class Period. Bach began in that role in March 2021. Prior to that time, he served as Lucid's VP, Hardware Engineering from September 2018 to February 2021 and as Senior Director, Body Engineering from April 2015 to August 2018. Prior to joining Lucid, Bach was Director of Engineering at Tesla from January 2012 to March 2015. From 2000 to December 2011, Bach served in a variety of engineering and program leadership roles at Volkswagen AG. Bach reported directly to Rawlinson.

49.     Ralph Jakobs ("Jakobs") served as Lucid's VP of Program Management from November 2021 to July or August 2022, when he reportedly left Lucid and his profile was removed from the Company website. At the time of Jakobs' hiring, Rawlinson stated "[Jakobs] brings decades of global automotive experience and passion that will help further establish core operational foundations, thereby allowing Lucid to scale across product lines critical to our next phase of growth." Prior to joining Lucid, Jakobs was the Managing Director, Industrial at Vaillant Group from November 2019 to October 2021 and was the Director of R&D at FAW-Volkswagen from June 2016 to May 2019. According to FE-1, Jakobs was assigned to be Rawlinson's "eyes and ears" at the Warehouse.

50.     Mike Boike ("Boike") served as Lucid's Head of Arizona Operations – Senior Director of Manufacturing from April 2021 to August of 2022, when he reportedly left the Company. Boike also served as Lucid's Director of Manufacturing from December 2019 to April 2021, and Lucid's Senior Manufacturing & Manufacturing Engineering Manager from February 2016 to December 2019. During his time as Lucid's Head of Arizona Operations – Senior Director of Manufacturing, Boike worked out of the Plant at Casa Grande, and, according to Boike, "[s]teer[ed] the operation to attain production and efficiency initiatives for electric vehicle manufacturing greenfield in North America by overseeing construction, facility maintenance, process engineering, training, planning, security, and [environment, health, and safety]." Prior to joining Lucid, Boike served as General Motors' Engineering Group Manager – Global Vehicle Systems from September 2012 to February 2016. Boike also served in manufacturing and supply chain management roles at Kia and Chrysler.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

51.     Keith Champion ("Champion") served as Lucid's Director, Operational Excellence from December 2021 to August or September of 2022, when he reportedly left the Company. Champion also served as Lucid's Senior Manager of Operational Excellence from August 2019 to November 2021. Before joining Lucid, Champion held various roles at Tesla for over eight years, including Senior Manager of SX Quality & Central Manufacturing Operations. According to FE-8, Champion was based in Newark, California, visited the Warehouse and the Plant frequently, and reported directly to Hochholdinger.

52.     Walter Ludwig ("Ludwig") is Lucid's VP of Global Logistics. Ludwig was appointed to this position in or around May 2022 to, according to Lucid, "provide strategic and operational leadership to actively develop and implement best practices in automotive logistics and parts management, focusing on supplier capacity management, inbound and outbound logistics, launch and change management, material planning, material handling engineering and data management." Prior to joining Lucid, Ludwig worked at Mercedes-Benz from February 2014 to May 2022, in various positions, including as the Head of Central Logistics.

53.     Randy Tosh ("Tosh") has served as Lucid's Senior Operations Manager – Plant Logistics since August 2021. From November 2020 to August 2021, Tosh served as Lucid's Operations Manager of Plant Logistics. Prior to joining Lucid, Tosh worked at Mack Trucks for over a decade, including as a Senior Operations Manager.

54.     Mike McKenzie ("McKenzie") served as Lucid's Senior Manufacturing Operations Logistics Manager starting in September 2020 through March 2022. McKenzie operated out of Lucid's Plant in Casa Grande and, according to McKenzie, had "[o]verall responsibility and accountability for the Logistics teams which includes managing inventory control, warehouse, distribution and replenishment plans." Prior to joining Lucid, McKenzie was a Supply Chain Manager at Nissan Trading Corporation Americas from January 2018 to September 2020.

B.     **Relevant Non-Party Related Entities**

55.     Universal Logistics Holdings, Inc. ("Universal") is a "full-service provider of customized transportation and logistics solutions" headquartered in Warren, Michigan. Leading up to and during the

Class Period, Lucid used Universal to operate all material facets of its Warehouse, such as offloading, logging, locating, and shipping parts to the Plant in Casa Grande.

56.    Schnellecke Logistics Arizona, LLC ("Schnellecke") is a subsidiary of a German-based company that claims to "offer the best logistics solutions" and "optimize complex supply chains" for its customers. In late March 2022, Schnellecke and Lucid entered into a Statement of Work for Schnellecke to provide warehousing, light manufacturing/assembly, and supply management services to Lucid. Thereafter, Schnellecke replaced Universal in handling multiple aspects of Lucid's Warehouse. In July 2022, Lucid gave Schnellecke 30 days' notice that it was being terminated, effective on or about August 20, 2022.

### C.    Former Lucid Employees or Contractors[3]

57.    FE-1 was employed by Lucid in several managerial and supervisory roles relating to logistics from mid-2021 to mid-2022. Initially, FE-1 worked at Lucid's Plant, reporting to Hochholdinger, Boike, and McKenzie. At the Plant in Casa Grande, FE-1 supervised and had responsibilities concerning Lucid's internal logistics. By late summer 2021, FE-1 moved to and was working at Lucid's Warehouse, where he remained for the rest of his tenure at Lucid. While at the Warehouse, FE-1 held supervisory and managerial roles, and was responsible for trying to fix the issues that Lucid was having at the Warehouse, including problems with parts not being shipped to the Plant in a timely manner, parts being scrapped, and issues with re-flashing parts. In these roles in the Warehouse, FE-1 continued to report to Boike and McKenzie.

58.    FE-2 was employed by Lucid in multiple positions in the Company's Logistics Department from the summer of 2020 to the end of 2021. From the end of 2020 to the end of 2021, FE-2 held coordinator and supervisory roles in Lucid's Warehouse. In these roles, FE-2 coordinated parts deliveries, receiving, inventory, purchase orders, shipping, the writing of processes and procedures, and supervised a number of employees and contractors working in Lucid's Logistics Department. Prior to and during the Class Period, FE-2 was also responsible for employee training and development, scheduling truck shipments to the Plant, coordinating hot calls, and working on the implementation of Lucid's

---

[3] All former employees or contract employees are defined using masculine pronouns to protect their anonymity.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

inventory management system (discussed below). FE-2 reported to Hasenkamp, Greg Henninger ("Henninger"), Lucid's Director of Global Logistics, and Jeffrey Braun ("Braun"), Lucid's Inventory Control Manager.

59.    FE-3 was employed by Lucid at the Warehouse from the start of 2022 through the late summer of 2022. In this role, FE-3 led shifts at the Warehouse and was responsible for managing the inbound and outbound shipment of parts to and from the Warehouse. FE-3 also managed employees from Lucid's third-party logistics contractors, including Universal. FE-3 reported to Tosh and Ludwig.

60.    FE-4 was employed by Lucid at the Warehouse from late 2021 through mid-2022. In this role, FE-4 ran shifts at the Warehouse and was responsible for ensuring that parts requested by the Plant were picked and shipped there in a timely manner. FE-4 also regularly interacted with personnel from Lucid's third-party logistics contractors, Universal and Schnellecke, as part of the process of getting parts orders from the Plant fulfilled. FE-4 reported to Tosh.

61.    FE-5 was employed by Lucid as a manager in the Inventory Control department at the Plant from early 2020 to late spring of 2022. In this role, FE-5 supervised a group of 30 employees who were responsible for inventory control and counting inventory at the Plant. FE-5 was in charge of making sure his team counted the inventory there every other hour, reported what parts were there, and provided notification if the inventory of items was low so that additional parts could be brought in.

62.    FE-6 was employed by Lucid within the Company's Manufacturing Learning and Development Department from late 2019 to the fall of 2021. In this role, FE-6's team was responsible for on-boarding new hires at the Plant and training them on the manufacturing process. FE-6's team reported to the Director of Operational Excellence, Champion, who reported to Hochholdinger.

63.    FE-7 was employed by Lucid on the quality inspection team at Lucid's Plant from mid-2021 to the fall of 2021. In this role, FE-7 inspected cars produced in the Plant to ensure that they met quality standards. Specifically, FE-7 worked from the Body in White station (discussed below), where they checked gaps between the frame and the doors. FE-7 also spent time working at Lucid's Warehouse to help package parts to send to the Plant.

64.    FE-8 was employed by Lucid as a training manager in the Company's Logistics Department from mid-2021 to early 2022. In this role, FE-8 oversaw and coordinated training initiatives

for logistics employees at the Plant and Warehouse. FE-8 spent most of his time at the Warehouse, but also spent time in the Plant because there were also logistics employees at the manufacturing facility. FE-8 reported to Champion, who reported to Hochholdinger.

65.     FE-9 started working at Lucid as a contract employee a few months prior to the Class Period and remained in that position until April of 2022. FE-9 was contracted to work at the Warehouse in the Reflashing Department, which was responsible for updating the software on certain Lucid Air vehicle parts. Among other responsibilities, FE-9 tracked both the shipment of parts into Lucid's Warehouse and the transfer of parts from the Warehouse to the Plant.

66.     FE-10 was employed by Lucid as a lead engineer from mid-2020 to early 2022. In this role, FE-10 was responsible for the dimensional engineering and configuration of the Lucid Air, which meant ensuring that each component of the Lucid Air fit together properly. Part of FE-10's responsibilities also included checking whether new shipments of parts met quality standards. FE-10 worked remotely, but was occasionally physically present at Lucid's Plant to help resolve issues.

## V.     OVERVIEW OF DEFENDANTS' FRAUD

### A.     Lucid's Background And Corporate History

67.     Lucid grew from the startup called Atieva, which was formed in 2007 by Bernard Tse ("Tse"), a former Tesla VP, and Sam Weng ("Weng"), a former Oracle executive. For the first six years, Atieva's business model centered on providing EV batteries and electric powertrains to EV makers. However, in 2013, Atieva decided to design and produce its own EV to capitalize on the growing demand for these vehicles following Tesla's release of the Model S.

68.     Tse and Weng elected to bring in an industry veteran to develop its initial EV and, in 2013, offered Rawlinson a position as Atieva's CTO. At the time, Rawlinson was well known in the EV industry because he had been in charge of the development of Tesla's Model S from 2009 to 2012. Rawlinson also brought with him decades of experience on the more traditional side of the automotive industry, including time spent as chief engineer for British sports-car maker Lotus Cars and as principal engineer for British luxury car-maker Jaguar.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

69.     Rawlinson accepted Tse and Weng's offer, on the condition that Atieva change its name. Tse and Weng agreed, and Lucid was born. In late 2016, the Company changed its name to Lucid Motors, and announced that it would begin producing a luxury EV by the end of 2018.

**B.     The Lucid Air**

70.     During the Class Period, Lucid only produced and sold one vehicle—the luxury electric sedan, the Lucid Air. Lucid first unveiled a prototype of the Lucid Air in 2016.

71.     The production version of the Lucid Air was unveiled in September 2020. At that time, Lucid announced that the Air would be available in four different "trims" priced between $69,900 and $161,500 (after tax credits). The most expensive model—the Lucid Air Dream Edition—is a limited edition model. The Grand Touring and Touring trims have fewer features than the Dream Edition, but also came at a lower price. Lastly, the Pure Air is the least expensive of the Air models:



72.     According to Rawlinson, the Air is designed to compete directly with other high-end luxury automakers like BMW and Mercedes-Benz. The first vehicle trim particularly—the Lucid Air Dream Edition—is an ultra-luxury vehicle designed to compete with the likes of the "S-Class Mercedes." Lucid announced that it would begin with deliveries of the limited edition Dream model. From there, the Company stated that it planned to proceed through the reservations for the remaining three models, going from most expensive to least expensive.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

73.     Lucid hailed the Air as "the most advanced electric vehicle[] in the world." According to the Company, one of the Air's major competitive advantages is that it offers the longest ever range for an EV—520 miles on a single charge. In comparison, Tesla's longest range car travels approximately 405 miles on a single charge.

74.     From its unveiling, industry publications and analysts alike have lauded the Air. For example, analyst Guggenheim Partners ("Guggenheim") wrote:

> We believe Lucid's product is among the most compelling automotive launches in recent years. . . . The product is a technological breakthrough, with industry-leading 500 mile+ range and 1,000+ horsepower. We expect the Lucid Air to become the standard for what a luxury EV must deliver in terms of range, speed/horsepower and interior space.

75.     Analyst BofA Securities, Inc. ("BofA") also zeroed in on Lucid's competitive advantages, including its "innovative/competitive technology" and "an interesting/attractive product with the Air sedan."

76.     From its introduction, the Air also garnered praise for its innovative interior and exterior design, including its signature panoramic glass roof. As Forbes wrote, "[m]oments after seeing photos or walking around the car, one experiences an epiphany, a revelation: there is no conventional windshield header connecting the A-pillars over the dashtop. Instead, the front seats are open to the sky, almost like in a glider aircraft."

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS



77.    In November 2021, MotorTrend named the Lucid Air its 2022 "Car of the Year," marking the first time an automaker had won the award—considered one of the most prestigious awards in the automotive industry—with its first vehicle model. In bestowing this honor on Lucid, MotorTrend stated:

> With the longest driving range of any electric vehicle on the market, an EPA estimated 520 miles, and over 1,100 horsepower available, the Lucid Air is a technological tour de force. . . . The sleek futuristic Lucid Air sedan looks like nothing else on the road, while its gorgeous, smartly-packaged interior sets the standard for the next generation of luxury cars.

78.    As a result of the praise and attention the Air garnered, Lucid was been widely heralded as a formidable potential competitor to Tesla, with analysts like Guggenheim concluding that "[o]verall, as an EV-only OEM and with a strong/differentiated product offering, we believe Lucid is one of the best positioned companies to take share in the rapidly growing EV market." Media outlets reported similarly, including NBC News, who, in an article entitled, *Don't Call it a 'Tesla Killer' – But the Lucid Electric Car Might Be Exactly That*, deemed Lucid the "most serious challenge[r]" to Tesla.

## C.    It Was Well-Known That Lucid's Success Hinged On Its Ability To Quickly Mass Produce The Lucid Air

79.    Although the Air's design elicited praise, Lucid's ability to make money and take market share in the competitive EV market hinged on its ability to ramp up production of the vehicle. This was no secret, as the emerging technologies publication Wired wrote in December 2017, "a prototype, no

matter how lovely, does not make a[n] automaker" and "there's quite a gulf between designing a great car and producing and selling that car." The Motley Fool similarly noted in July 2021 that "[t]here's little doubt that Lucid has accomplished an impressive feat when it comes to technology. However, the growth company remains entirely unproven in its ability to successfully scale its vehicles, as well as show meaningful progress in a path toward profitability."

80.    Defendants, too, were acutely aware of the importance of proving that Lucid could and would mass produce the Air. For example, in February 2021, Rawlinson acknowledged to the market that "until [Lucid] ma[kes] a production car and [] start[s] selling to customers, . . . [it hasn't] achieved a damn thing." Defendants reiterated this reality numerous times, including leading into the Class Period in September 2021, when Rawlinson stated "[t]here's no point in having a 520 mile car out there if no one's driving it. . . . Until we get this thing into production, we haven't achieved a damn thing."

81.    When production and deliveries finally did start in late October 2021, Rawlinson continued to emphasize their significance to the Company. For instance, when Lucid completed its pre-production run and began building its quality validation run, Rawlinson highlighted that the Company had hit an important landmark. In addition, in the earnings report following Lucid's first delivery of vehicles to customers, Lucid and Rawlinson repeatedly highlighted the achievement's significance.

82.    The reason these milestones warranted such attention was simple. While Lucid regularly and repeatedly pointed investors to "anticipate[d]" revenues stemming from its customer reservations, the Company could not recognize this revenue until it actually delivered cars. Thus, Lucid's ability to earn revenue from the Air was entirely contingent on whether it could actually mass produce cars and get them into customers' hands. As Rawlinson acknowledged in November 2021, to make money "Lucid has to produce the cars its customers ha[ve] reserved." So, Rawlinson explained, "[w]hat we've got to do is up the number of cars we're making [in Arizona]" and "[t]hat's my laser focus right now."

83.    Rawlinson's statements throughout the Class Period followed a similar refrain, including in May 2022, when he stated, "we need to get Lucid Airs into the hands of more customers and ramping production of quality vehicles is my top priority." He further stated, "[w]e are intently focused on ramping production this year to get more of our award-winning vehicles into customers' hands. And this

is a top priority[.]" House echoed Rawlinson's statements, confirming that "[r]amping production is a high priority to fulfill growing demand as we're selling every vehicle we can make."

84.    The speed at which Lucid was able to mass produce the Air was also critical. For one, Lucid had to get cars into customer hands before those potential buyers got tired of waiting and decided to look elsewhere for an EV. To be sure, Lucid repeatedly touted its customer reservation count during the Class Period, but there was nothing preventing customers from canceling those reservations if Lucid took too long to deliver. As analyst Guggenheim wrote in August 2022, "LCID's slower production ramp elongates the wait times for reservations and could cause customers to eschew the Lucid Air in favor of other luxury EV alternatives that come to market faster (which we admit are limited)."

85.    The importance of quickly mass producing the Air was underscored by the fact that during the Class Period the Lucid Air was the Company's only EV product and, therefore, its only potential significant revenue source. Lucid expressly acknowledged this fact from day one, stating in the Company's Form S-1 issued to investors ahead of going public in mid-2021 that Lucid would "initially depend on revenue generated from a single vehicle model, the Lucid Air," to cover its costs. As such, the Company stated in no uncertain terms that, "[t]o the extent that production of the Lucid Air is delayed or reduced, or if the Lucid Air is not well-received by the market for any reason, Lucid's revenue and cash flow would be adversely affected" and "it may need to seek additional financing earlier than it expects."

86.    Lucid's dependence on revenues from the sale of the Lucid Air did not change at any point during the Class Period. For example, in the Company's 10-Q filed with the SEC on November 15, 2021, Lucid represented that its revenues, at least until it introduced Project Gravity at "the end of 2023," would be "depend[ent] on" the commercial success of the Lucid Air. And they were. During the fourth quarter of 2021, Lucid's first quarter of production, Lucid reported in a press release that 80% of its revenue ($21.3 million of $26.4 million) came from sales of the Lucid Air. Notably, Lucid did not specifically disclose how much revenue the Company booked from Lucid Air sales during the first quarter of 2022, but did clearly state that "[Lucid's] Q1 revenue was $57.7 million, primarily driven by higher customer deliveries of Lucid Air vehicles." By the second quarter of 2022, sales of the Lucid Air accounted for a staggering 98% ($96.1 million of $97.3 million) of Lucid's revenue.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

87.     Further, the longer the Company took to start earning revenues from the Air (much less generating a profit), the higher the chances that Lucid would run out of funds before it ever got off the ground. This was particularly true given that Lucid made the strategic decision to design, develop, and manufacture vehicles completely in-house, without outsourcing production to third parties.

88.     Rawlinson identified Lucid's vertical integration as a key competitive advantage that differentiated Lucid from other entrants into the EV-market who outsource some parts of the vehicle manufacturing process. But the decision to produce the Lucid Air in-house was incredibly cash-intensive. Building a manufacturing facility large and tooled enough to produce the Lucid Air in volume, and hiring workers to operate the production line at that facility, costs substantially more up front than it would to simply outsource production to third parties.

89.     Lucid's decision thus accelerated its burn rate and exacerbated the Company's cash crunch both in the run up to production and once it actually began production. As Bloomberg wrote:

> [S]ome of the latest crop [of EV entrants], such as Fisker Inc., have sought to cut their need for capital by outsourcing manufacturing and engineering.
>
> Lucid is going the traditional route. It's built a small plant in Arizona, and faces a mounting bill to add factory capacity, develop technology and build a network of sales and service outlets. This may pay off in the long term, as it has for Tesla, but Lucid's near-term projected cash flows look like this:
>
> Right now its finances aren't in tip-top condition.

90.     By way of example, the mere process of designing the Lucid Air and constructing a manufacturing facility to produce it led Lucid to accumulate a more than $1 billion dollar deficit by March 2021 before it ever sold its first car. One month earlier, in February 2021, Lucid disclosed that it expected to burn through almost $10 billion in cash over the next four years. By the end of 2021 alone, the Company reported that it had lost $4.8 billion. And in its first four quarters of production—4Q21, 1Q22, 2Q22, 3Q22—Lucid incurred over $2.7 billion in costs and expenses.

91.     Thus, Lucid's ability to quickly bring in revenues through significant volumes of cars sales would determine whether the Company successfully navigated through the cost-intensive part of the growth process or whether it ran out of money. And, as discussed above, Lucid could only sell cars in significant volumes if it could produce them in significant volumes.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

92.     Lucid's ability to establish and gain market share in the EV market was also dependent upon the Company's ability to quickly ramp production. During the period that Lucid was developing the Air, the EV market had relatively few players, which presented a golden opportunity for Lucid to grab market share in a rapidly-growing space. As analyst BofA wrote, Lucid's "[t]imeline to start [] production/deliveries [] is sooner than many EV OEM peers, potentially allowing for a competitive moat to be established."

93.     At the same time, it was widely recognized that competition in the EV market was likely to quickly increase. As analyst Guggenheim wrote, "[w]hile EV adoption is still in the very early stages, which presents a significant growth opportunity for pure play EV OEMs like Lucid, there is significant competition coming from legacy players and new entrants, particularly in the luxury market." Other predictions were more dire. USA Today quoted another analyst as saying that the Company's "[l]ong-term chances for success are likely to be small because just as Lucid intends to start production, the U.S. and German manufacturers will open the floodgates on all of their electric vehicles[.] . . . And they are the ones who already have a service and distribution network." Thus, it was crucial for Lucid to quickly mass produce and sell the Air to gain critical market share before the market became saturated with competitive offerings.

94.     For all of these reasons, leading up to and during the Class Period, analysts and commentators were hyper-focused on Lucid's ability to mass produce the Air, and made clear that it was the biggest factor driving Lucid's stock price. For instance, as Barron's noted, when Citigroup analyst Itay Michaeli started covering Lucid in September of 2021, he stated that the Company's production "ramp w[ould] be a key sentiment driver for the next six to 12 months."

95.     BofA mirrored this sentiment when it initiated coverage of Lucid in that same month, as it wrote that, in the near-term, investors should judge "LCID's success" based on "customer reservation trends" and "progress on start and ramp of production," noting that "[p]ositive developments on both fronts will be necessary for the stock to work, which we generally anticipate." In December 2021, during the Class Period, a Guggenheim analyst wrote that "[w]hile we were encouraged that Lucid started deliveries of the Air on schedule, we believe the key debate now is can it scale production and hit volume targets."

96.    Rawlinson similarly highlighted how important successful and efficient mass production of the Lucid Air was to the Company's share price. In a CNBC interview with David Faber and Jim Cramer, Rawlinson stated that successful production of the Lucid Air would be Lucid's "great litmus" test and that progress in this endeavor "will truly drive the value" for the Company. At the start of the Class Period, Rawlinson once more indicated that the "sky's the limit [for Lucid] in terms of valuation," but that "[i]t's all about execution, it's all about scaling volume."

### D.    Lucid Continually Struggled To Raise Sufficient Capital To Fund Production Of The Air, Causing Production Delays

97.    As discussed above, Lucid originally planned to begin producing the Lucid Air in 2018. To that end, in November 2016, Lucid announced plans to build the $700 million Plant in Casa Grande to begin manufacturing the Air, and said it expected to break ground on the Plant in 2017. In 2017, the Company began looking for funding to build the Plant and start producing vehicles. Lucid, however, struggled to raise the necessary cash, leading it to repeatedly delay its production start date. To raise funds, in 2017 Lucid took loans from a hedge fund (Trinity Capital) and a Chinese bus company, and pledged Lucid's intellectual property as collateral.

98.    Nevertheless, by 2018, Lucid was having difficulty obtaining capital to fund its EV development plans. As one market commentator for The Verge wrote:

> Atieva, the parent company that runs Lucid Motors, has not been able to come up with enough money to put the Lucid Air into production. The company has locked down a site in Arizona where it wants to build a $700 million factory, but it has had trouble securing a new round of funding to help make that happen.

99.    Rawlinson discussed just how hard this period was for Lucid, stating: "Everyone says, 'Oh, the tough thing about a start-up is getting an assembly line going[.]' . . . Let me tell you what's tough: getting finance for the start-up not to go bankrupt."

100.    In 2018, still in need of capital to fund production, Lucid entered into a deal with Saudi Arabia's sovereign wealth fund, the PIF, to raise an additional $1 billion. Market commentators called the sum "eye-popping," and noted that "[t]he deal is a major win for Lucid, which has languished over the last year as it failed to secure the funding necessary to start making its luxury electric cars." This funding was "crucial" to the Company, as it provided cash for Lucid to "construct [a production facility]"

in Arizona" and "get[] its first [EV] model, the [Lucid] Air sedan, into production." Shortly thereafter, in addition to remaining Lucid's CTO, Rawlinson became CEO, replacing the retiring Weng.

101.    Lucid planned to build out its Casa Grande Plant in stages, culminating in production capacity of 400,000 cars per year. In December 2020, Lucid said that it had completed the first phase of the facility, which purportedly gave Lucid a production capacity of 34,000 vehicles per year. By December 2020, Lucid also stated that it had finished a "full beta prototype test fleet" and would next produce "production representative" versions of the Air.

102.    By the beginning of 2021, however, Lucid had still been unable to begin producing the customer versions of the Lucid Air that would allow it to bring in revenues. As a result, the Company was once again running low on cash. This time, rather than seek private financing, Lucid sought to enter the public markets to secure a larger sum of money from a wider pool of investors.

**E.    To Drum Ip Interest In The Merger—And Secure A Much-Needed Capital Infusion—Lucid Released An Aggressive Production Timeline, Including 20,000 Airs In 2022**

103.    To raise additional funds, on February 22, 2021, Lucid announced its plans to merge with Churchill to bring the Company public through a SPAC transaction and provide Lucid an approximately $4.4 billion capital infusion. At the time of the announcement, the Merger was the largest proposed SPAC transaction in history.

104.    Even still, Lucid simultaneously revealed to investors that it was so low on funds that it would need $600 million in bridge financing to continue its operations while awaiting the Merger's completion. Lucid also announced that commercial production of the Air, previously planned for the second quarter of 2021, would be delayed until the second half of 2021, after the Merger's expected close.

105.    Because the cash-infusion that the Merger provided was critical to Lucid's ability to fund its operations, Lucid and Rawlinson took a number of steps to drive interest in the Merger. In particular, they assured investors that Lucid would be able to quickly ramp up production of the Lucid Air, including in Lucid's February 22, 2021 investor presentation announcing the Merger. Therein, Lucid released an investor presentation deck that outlined the Company's "[r]apid growth promise" and,

although Lucid had yet to produce or sell a single Air sedan, the Company "projected [that its] revenue would rocket from around $97 million [in 2021] to more than $2 billion in 2022 and $5.5 billion in 2023."

106.    These projections were based on an aggressive production timeline that had the Company delivering 577 vehicles in 2021, 20,000 vehicles in 2022, and 49,000 vehicles in 2023:



107.    Thus, Lucid and Rawlinson assured investors that despite the delays it had experienced to date, Lucid would soon be able to monetize the Lucid Air and begin bringing in substantial vehicle sales revenues.

**F.    By Taking Lucid Public, Rawlinson Knew He Would Secure A Multimillion Dollar Bonus And Lucrative Compensation Package**

108.    Rawlinson was not only motivated to close the Merger in order to bring in crucial funding for Lucid, but also to line his own pockets. Rawlinson, who was making $500,000.00 in 2021 as a base salary, was entitled to receive a "$2 million cash transaction bonus" if the Company closed the Merger.

109.    Even more importantly, Rawlinson knew that if Lucid successfully went public, he would lock down an incredibly lucrative performance-based compensation package that provided him with the opportunity to rake in hundreds of millions of dollars through massive stock option grants. Indeed, in

January 2021, before the Merger was announced, the Atieva Board had approved the framework for Rawlinson's compensation package. The Board made clear, however, that one of the criteria for the compensation package was a "[s]uccessful merger completion," which was necessary "to receive the grant at all."

110.    The stock options Rawlinson stood to receive if the Merger closed can be split into two categories—time-based restricted stock units ("RSUs") and performance-based RSUs. For the time-based RSUs, if the Merger went through, Rawlinson would be entitled to receive 13.83 million RSUs in 16 quarterly allotments over a period of four years so long as he maintained his position at the Company. At least half of the stock options, however, were performance-based RSUs that would only ultimately be awarded "if [Lucid's] market capitalization meets certain milestones within five years" of going public. In particular, Rawlinson could earn up to 16.02 million additional RSUs if Lucid's average market capitalization over a rolling six-month period met certain thresholds.

111.    This meant that Rawlinson was and would remain highly motivated to keep Lucid's common stock price high over a six-month period in order to ensure that he reached his milestones and secured hundreds of millions of dollars in compensation. In a May 11, 2021 interview with CNBC, Rawlinson admitted just that:

> Well, I'm all in on stock options[,] ***that's what motivates and drives me***. And that's really my [] view of the potential future of this company, so that's what I'm really working for primarily stock options and my [] current stock options in the company.

### G.    In The Run-Up To The Merger And Class Period, Defendants Continued To Assure Investors That Lucid Would Meet Its 2022 Production Target

112.    Leading up to the Merger, Defendants continued to tell investors that Lucid would produce and deliver 20,000 vehicles in 2022, including in the Merger prospectus Churchill issued to investors ahead of the shareholder vote. Therein, investors were told that "Lucid provided Churchill" with vehicle production projections of 600 units in 2021; 20,200 units in 2022; and 48,900 units in 2023.

113.    At the FT Future of the Car Summit in May of 2021, Rawlinson again assured investors that Lucid was "on track" to meet its "20,000 unit[]" production projection for 2022. Similarly, in June of 2021, Rawlinson told CNBC that Lucid was "bang on schedule" to deliver 577 vehicles in 2021 and told CNN that the Company was "on track for this year and next year" in terms of production volume. Then,

when Lucid held its investor call on July 13, 2021, less than two weeks before the Merger was expected to close, Defendants again reiterated that the Company would produce 20,000 EVs in 2022.

114.     Rawlinson also reassured investors multiple times leading up to the Merger that these projections were reasonable and made without over-optimism or unjustified zeal. In May of 2021, for instance, Rawlinson told investors that he felt a "weight of responsibility as the Company goes public" and that "it's better to under promise and over deliver." As to himself specifically, Rawlinson similarly indicated that his own "cautious, conservative nature" made him "feel a weight of responsibility as the company [endeavors to] go[] public . . . to [also ensure he] under promise[d] and over deliver[ed]" as Lucid's CEO.

115.     Despite the fact that Lucid's production projections generated high levels of investor and customer interest as the Merger approached, the Merger almost failed because not enough investors casted votes.

116.     The Merger was scheduled to close on July 22, 2021. That day, however, Churchill's shareholders failed to deliver the required number of votes to approve a proposal that would revise Churchill's charter so that Lucid could receive financing. Faced with the prospect of a failed merger and needing to inject Lucid with cash, Churchill Chairman Michael Klein ("Klein") and Rawlinson pled with investors to vote so that the Merger could be completed.

117.     The Financial Times reported that "[t]he $24bn deal for Lucid Motors to go public struggled to cross the finish line after the blank cheque company merging with the electric vehicle start-up failed to put together enough support from retail investors at a crucial shareholder meeting." It noted that "[i]n a call with shareholders, Klein and Peter Rawlinson, Lucid chief executive, implored investors to vote their shares," with Rawlinson begging investors on a call to "please, please vote." Bloomberg likewise reported that Churchill "made a last-minute appeal for retail shareholders to vote for the deal amid signs that it's struggling to win their approval." The Financial Times further reported that "advisers working with Churchill Capital IV and Lucid [] blitzed online forums such as Reddit and StockTwits to reach shareholders in the Spac in an effort to 'get out the vote.'" Rawlinson similarly "singl[ed] out Robinhood users 'with those diamond hands' in a video posted to social media" that encouraged shareholders to vote.

118.    In reporting on Lucid's initial failure to win approval for the Merger, market commentators also zeroed in on Lucid's ability to actually produce the Air as an area of investor concern. A July 22, 2021 Bloomberg article entitled, *EV Startup Lucid Risks SPAC Deal Collapse on No-Show Holders* noted that following the Merger's announcement, Churchill's "stock surged more than 500% at one point," "[b]ut Lucid delayed the start of production more than once over the course of the pandemic as it faced industry-wide supply-chain issues and quality-control concerns." The article further noted that "Rawlinson has said Lucid is on track to start production for customer deliveries in the second half of 2021" and that in imploring investors to vote for the Merger earlier that day, Rawlinson "said the team was 'energized about going into full production mode' later this year." Rawlinson also told shareholders that the Merger "provides me with that crucial financing that I need to grow and propel this great company," and "I want to be super clear about this, I need you to vote."

119.    A day later, on July 23, 2021, Lucid was able to secure enough votes to ratify the Merger. Lucid's common stock began trading on the Nasdaq under the symbol "LCID" on July 26, 2021. By closing the Merger, Lucid secured $4.4 billion in funding for its near-term endeavors, and Rawlinson secured $2 million in cash bonuses and a staggering $566 million in potential stock option compensation. All told, the compensation package that Rawlinson ensured himself by closing the Merger made him the fourth highest paid executive in the world in 2021.

120.    As discussed below, in the months that followed, Rawlinson continued to assure the market that Lucid was on track to meet its lofty production targets, thereby keeping Lucid's stock price (and market capitalization) elevated for long enough to ensure that he locked down the lion's share of his performance-based stock option award.

### H.    After Beginning Customers Deliveries OF THE Air, Defendants Reiterated Lucid's Production Guidance

121.    With the Merger completed, Defendants continued to repeat their claims regarding the Company's production capabilities. For example, on July 26, 2021, the day Lucid's stock began publicly trading, Defendant Rawlinson told Bloomberg that the Company was on track to hit key milestones, including producing 577 vehicles in 2021 and 20,000 vehicles in 2022. PR Newswire similarly reported that Rawlinson stated: "We are on track to meet our projected deliveries for the next two years." In a

same-day interview with Bloomberg, Rawlinson was asked whether Lucid can start "full production now." Rawlinson responded: "Absolutely. . . . We're on track for this year's production schedule and next year's."

122.    On September 28, 2021, Lucid announced that—after multiple delays and extended deadlines—it had finally begun production of the first trim of the Lucid Air—the Dream Edition. This additional time, Rawlinson stated, had "freed [him]" to "[g]et the product right." To mark the occasion, Lucid hosted a Production Week Preview event where, as Bloomberg reported, viewers could watch the "first battery-electric Air vehicles destined for customers roll[] off the factory line." At the event, Rawlinson stated that he was "delighted" with the achievement.

123.    The importance of the production start was not lost on investors or analysts, with CNBC stating in a same-day article that, with respect to starting production of cars destined for customers, the "milestone is crucial for Lucid."

124.    Thereafter, Defendant Rawlinson continued to repeat assurances about the Company's production capabilities. For example, on September 29, 2021, Rawlinson assured investors that "[w]e are on track to ramp up to 20,000 units next year, with a target of 50,000 in 2023." Lucid made its first deliveries of the Air to customers on October 30, 2021.

**I.    Lucid's Entire Production Process Took Place From The Company's Facilities In Casa Grande And Sole Warehouse In Tempe**

125.    At all relevant times, Lucid had one production facility where it assembled cars. This manufacturing facility was called AMP-1 (short for "Advanced Manufacturing Plant"), and was located in Casa Grande, Arizona." According to the Company, at AMP-1, the production of the Lucid Air vehicle was split into three main steps: (1) body shell manufacture, which was also referred to as "Body in White"; (2) painting of the body shells; and (3) general assembly.

126.    After the first step was complete and the main body of the car was in place, it traveled through the Plant to be attached to the battery pack, with the wheels and doors then attached. From there, the vehicle passed through a number of testing centers where the quality of the final product was checked before the car rolled out of the Plant. FE-7 explained that, at the Plant, completed vehicles had to pass through a separate quality inspection line that had five stations, with two inspectors at each station. FE-7

stated that each of the inspection stations had a computer and when a vehicle failed a quality check, an entry would be made. FE-7 further stated that when a station found a defect, they would send the vehicle back to the appropriate department for corrective action, basically repeating the process.

127.    FE-7 explained that the respective departments could log onto the computer program and specifically see what the defect was, so that it could be fixed. Initially, vehicles were identified using the VIN (Vehicle Identification Number), but Lucid later went to an ID tag, which FE-7 referred to as a "bumper number." FE-7 stated that there was a yellow tag which was attached to the vehicle when there were defects/quality issues that needed to be addressed.

128.    In addition to AMP-1, Lucid also had another manufacturing facility just a short distance away—the "Lucid Powertrain Manufacturing Plant," or "LMP-1." According to the Company, at LMP-1, Lucid manufactured and assembled its complete electric powertrain. Once completed, these electric powertrains were shipped to AMP-1, where the cars were then to be assembled.

129.    Lucid's inventory—or all of the parts it needed to manufacture its vehicles—was kept in the Warehouse. According to FE-3, Lucid's suppliers delivered parts to the Warehouse. FE-3 stated that once the parts arrived, they were supposed to be offloaded onto inbound loading docks by material handlers, reviewed and released pursuant to the applicable purchase order, logged into Lucid's inventory system, and then transported by the material handlers to the correct area of the Warehouse for storage. Later, FE-3 explained, when the parts were needed at the production lines, employees as the Warehouse were responsible for "picking" the parts, loading them onto trailers, and shipping them to the production line in the Plant.

130.    FE-5 explained that when the production line needed parts, Inventory Control would signal the Warehouse to get parts loaded to be transported to the Plant. Once the parts arrived at the Plant, FE-5 said that material handlers would unload the parts from trucks and take the parts to the line (or to buffer areas where excess parts would be placed). FE-5 explained that logistics at the Plant was also responsible for verifying the parts' identity and quantity. FE-5 said that each production area at the Plant (*e.g.*, Body in White, General Assembly) had its own separate logistics manager and logistics team. The logistics managers were in charge of the material handlers.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

131.    Lucid's Warehouse was also responsible for additional critical functions in the manufacturing process. For example, former Lucid employees stated that the Company had a Reflashing Department in its Warehouse that was in charge of reflashing parts that required software updates. According to FE-9, reflashing is the updating of the software component of parts received from a vendor with the most updated software available for the part. FE-9 stated that the Reflashing Department handled 14 parts that went into the Lucid Air, including left and right seats, left and right headlamps, front and rear cabin circuits (i.e., the wire connected control panels), and circuit boards. Each part had a different area in assembly it aligned with.

132.    FE-1 added that Lucid had to reflash certain car parts with new software updates, and that the parts were supposed to be reflashed in the Warehouse before they were sent to the production line at the Plant. According to FE-1, once a part was reflashed, there was supposed to be a green approval sticker attached which indicated that the part had been properly reflashed based on the latest software update.

133.    Lucid's Warehouse was also in charge of "sequencing" parts. FE-1 explained that "sequencing" is the process by which certain parts of vehicles, including bumpers, cameras, and tires, are put together manually. FE-1 further explained that the sequencing was supposed to be done at the Warehouse before the parts were sent to the Plant.

134.    FE-3 added that Lucid's Warehouse was also supposed to perform quality checks on parts before they were sent to the Warehouse.

135.    In 2021, Lucid was using a third-party contractor named Universal to handle the Company's internal logistics operations. Specifically, FE-3 said that, in January 2022, a third-party logistics company called Universal was doing all of the work in the Warehouse, and Lucid employees were managing Universal. Several other former employees, including FE-4, FE-6, and FE-8, similarly stated that at points during their respective tenures, Lucid used Universal to staff and run its warehousing operation at the Warehouse. FE-3 recalled that Universal was fired around May 2022 and replaced by another third-party logistics company, Schnellecke.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2

**J.    Defendants Knew That Lucid Suffered From Severe Internal Logistics Issues And Would Not Meet Its Production Targets**

3    136.    Leading up to and during the Class Period, Defendants and myriad members of Lucid's
4  management team knew that the Company was suffering from pervasive internal logistics problems that
5  were significantly impacting its ability to mass produce the Air. Among such issues were Lucid's
6  inventory systems, which were entirely ineffective, unreliable, and often disregarded, leaving employees
7  with little to no information about how many parts the Company had, where they were, and whether they
8  were usable. At the same time, Lucid's Warehouse was well over-capacity, which led to parts getting lost
9  or destroyed and constant delays in production. Lucid was unable to get parts to its production line in an
10  effective and timely fashion, which resulted in frequent and often elongated production shuts downs.
11  Making matters worse, the Lucid Air had design flaws that were preventing Lucid's chosen suppliers
12  from producing parts in the quantity and quality that Lucid required to build the Air. As a result, even
13  after production of the Air had already started, Lucid was scrambling to redesign parts on the fly and to
14  find temporary workarounds to produce cars with faulty or outdated parts.

15    137.    These issues, as discussed below, had a significant adverse impact on Lucid's ability to
16  produce—and actual production of—the Lucid Air. Indeed, as numerous former Lucid employees
17  confirmed, before the Class Period even began Defendants knew that Lucid would not make 20,000 cars
18  in 2022. In fact, as set forth below in *infra* Section V.J.4, Rawlinson admitted internally that Lucid would
19  make less than 10,000 cars in 2022. This reality stood in stark contrast to Defendants' public statements
20  during the Class Period, set forth below in *infra* Section VI.

21    **1.    Defendants Knew About Lucid's Widespread Internal Logistics Issues**

22    138.    Statements from numerous former Lucid employees establish that prior to and during the
23  Class Period, Lucid suffered from debilitating internal logistics issues across its departments and
24  production processes. For example, FE-6, who worked at Lucid for approximately two years leading up
25  the Class Period, described the issues with Lucid's internal logistics as a "shit show" and stated that there
26  was a lack of organization and communication at the Warehouse. FE-8, who worked at Lucid from mid-
27  2021 to early 2022, described Lucid's Warehouse as "a complete mess—start to finish." FE-1 confirmed
28  that when he began working at the Warehouse in mid-2021, Lucid was experiencing significant issues at

its Warehouse, including a lack of organization and parts getting crushed and smashed, among others. FE-4 said that from the time he got to Lucid in late 2021, the Warehouse was a failing department and the weak link in the production process. FE-4 described the Warehouse as "utter chaos," and said that the same problems existed throughout his entire tenure at Lucid (late 2021 to mid-2022). FE-4 confirmed that when he left in mid-2022, the Warehouse was still disorganized and nothing was accurate.

139.    As set forth herein, these severe and constant internal logistic issues were discussed with Defendants Rawlinson and House and numerous members of Lucid's management team, including by several former Lucid employees whose statements are reflected below.

### a.    Lucid Did Not Have A Functional Inventory System

140.    Inventory was at all times leading up to and during the Class Period critical to Lucid's operations and, in particular, to its production of the Lucid Air. Despite this, the Company never had a functioning inventory control and management computer system.

141.    Effective inventory management enables companies that deal in physical parts or goods, like Lucid, to improve and manage inventory levels, efficiently fill requests for materials, track the movement of materials, and identify which and how much inventory to order at what time. Because manually locating, tracking, and reporting on inventory is time-consuming and error-prone, an effective and functioning inventory control system provides workers with real-time information about exactly where a product is, and how much of that product the company has in its warehouse.

142.    Because Lucid did not have a functional, reliable inventory system, the Company was consistently toggling between different systems—all of which, themselves, were problematic—or relying on *ad hoc* attempts to manually track and manage inventory, leading to inaccuracies, inefficiencies, and ultimately, production delays.

143.    FE-2 stated that Lucid's inventory tracking system led to production delays. Early in FE-2's tenure with the Company, Lucid was told by its third-party logistics contractor, Universal, that its inventory system was inaccurate and not functioning properly and that the Company should stop production until the inventory system was fixed. FE-2 stated that Lucid's inventory control problems were just as bad throughout 2021 and never got better. Although Lucid initially planned to use SAP—a complete wireless inventory management solution—for its inventory control software, FE-2 recalled it

1   was not ready for implementation when Lucid began operations at its Arizona facilities. As a result, FE-2

2   explained that Lucid resorted to using two different systems to try to manually track and manage

3   inventory, leading to inaccuracies.

4          144.    *First*, Lucid used inventory software called Wasp, a cloud-based product that Lucid

5   purchased "off-the-shelf," until it could implement SAP. FE-2 explained that Wasp was very limited in

6   its features and was incapable of adequately managing Lucid's inventory because, among other reasons,

7   it had no scanning or ordering functionality, no overall inventory view, no costing, and no true receiving,

8   and Lucid could not change parts numbers in the system. FE-2 further explained that Wasp was run off of

9   a web browser and if the browser crashed, work would be lost and would have to be redone.

10         145.    *Second*, FE-2 explained that, at the same time, Universal used its own proprietary

11  inventory control system, which FE-2 referred to as "WMS," to concurrently manage Lucid's inventory.

12  FE-2 further explained that, like Wasp, WMS had significant issues. FE-2 said that although WMS had

13  the functionality to scan parts, it also required that every part number be manually entered (i.e., hand-

14  typed) into the system. According to FE-2, the WMS system then prioritized hand-typed parts numbers

15  over computer scanned numbers, so if the number was typed incorrectly it would be entered into the

16  system incorrectly.

17         146.    FE-2 stated that because WMS belonged to Universal, Lucid's ability to use the system or

18  correct errors therein was limited. For instance, FE-2 stated that Lucid employees could not change

19  anything in the WMS system on their own, and would instead have to ask an Universal employee to

20  make the change for them. FE-2 added that the original plan was for Universal to be in charge of the

21  Warehouse because their software could interface with SAP, but Lucid could never get WMS and SAP to

22  talk or interface (once SAP was ultimately implemented). Indeed, FE-8 said that during the first half of

23  his tenure, Lucid relied on Universal's proprietary system for tracking and handling inventory, but that

24  this resulted in Lucid having no idea what parts it had or where things were.

25         147.    In early to mid-2021, Lucid made an attempt to implement SAP, but the attempt quickly

26  failed. To this end, FE-2 stated that in or around March 2021, Lucid attempted to implement SAP, but the

27  system was very "glitchy and unreliable" so Lucid had to revert to Universal's proprietary system. FE-2

28  said that Lucid stopped using Wasp at that point.

148.    FE-8 recalled that in mid-2021, Lucid tried to address its inventory problems by switching software systems from Universal's proprietary system to a SAP platform. FE-8's understanding was that the attempted rollout was such a disaster that Lucid had to unwind it and revert to Universal's system. FE-8 explained that one problem with Lucid's SAP implementation was that the Company did not first conduct a physical inventory, so the new platform had no starting point from which to operate. A physical inventory is a comprehensive, often annual count of the parts or products a company has on-hand. FE-8 further explained that moving from one system to the other without doing a full physical inventory left Lucid blind as to what it had in the Warehouse.

149.    FE-4 said that, in or about November 2021, Lucid was trying to transition from the Universal computer system it had been using to run the Warehouse to a SAP system. FE-4 said the attempted transition to SAP in November 2021 failed and resulted in "utter chaos." FE-9 similarly recalled that an attempt to shift systems occurred around Thanksgiving of 2021, but the attempt was a complete failure and Lucid ultimately backed away from the transition. FE-9 recalled that when the systems were switched from Universal to SAP it was unable to read the JUN number label, which he described as similar to a standard bar code. FE-9 recalled that the JUN number would start with the intake number of 16 digits and then the quantity. FE-9 explained that the SAP system did not recognize the JUN number label so, in SAP, the part would be designated as lost, nonexistent, or moved.

150.    FE-9 recalled that another attempt to implement SAP was made in or around December 2021 or January 2022. FE-9 explained that this time, in connection with an attempt to switch over to SAP, Lucid shut down the entire Plant to conduct inventory reviews for at least eight full days. FE-9 further explained that during this shut down, Lucid hired a team of approximately 50 outside contractors to attempt to do a full physical inventory of parts at the Warehouse. FE-9 stated that the attempt to change over inventory identification numbers to a SAP SKU caused even more confusion and led to more parts getting lost. FE-9 explained that this was because workers would search for parts by the identification number and could not find them, ultimately leading them to re-enter parts into the system under different numbers. FE-9 recalled that, as of early April 2022, there was still a disconnect between old inventory and items in overflow, and inventory specialists were still working to correct the issues at that time.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

151.    FE-3 said that Lucid's inventory systems were never accurate. According to FE-3, SAP had the wrong information and parts were not in the locations they were supposed to be even after Lucid transitioned from Universal's software to SAP. Further, FE-3 explained that workers did not properly input parts into SAP, which contributed to the Warehouse mess. FE-8 too indicated that issues remained even after the switch over to SAP, including inaccurate inventory counts. For example, according to FE-8, for a particular part, SAP might reflect that Lucid had 100 in-house, but when the material handlers went to retrieve them, there were none. FE-8 explained that at other times, SAP would indicate that Lucid had none of a part, but 500 would be found on the shelf.

152.    FE-4 explained that the transition from Universal to SAP still was not working when he left Lucid in mid-2022. FE-3 explained that the SAP problems were prevalent throughout FE-3's entire tenure at Lucid (starting in early 2022 and ending in the late summer of 2022). FE-2 said that, due to a number of software bugs and operational issues, the SAP system had not been fully implemented by the time FE-2 left the Company at the end of 2021. In addition, FE-2 was told by friends who were still working at Lucid that the SAP issues were still present during the summer of 2022 and that the implementation of the software had yet to be completely successful.

153.    Because Lucid's inventory systems were never functional or accurate, former Lucid employees resorted to manually hand counting inventory and keeping track of it on individual live shared Excel spreadsheets. For example, FE-5 stated that the SAP computer system for inventory was not functional so his team had to hand count parts every two hours and manually record the information on the live shared Excel spreadsheets, which was a laborious process.

154.    FE-5 recalled that roughly half of the inventory was counted manually. He further stated that the count was done in all three areas of the manufacturing facility by eight to ten counters approximately every two hours and that the results were entered manually into the live shared spreadsheets. FE-5 said the process was like something from the 1990s. FE-5 stated that everyone at the Plant and at the Warehouse could access the live shared spreadsheets. This included Material Planners, Material Flow, Procurement in the Warehouse, and Logistics Management (including FE-5) at the Plant.

155.    Lucid's senior management was well aware of the many issues with Lucid's inventory tracking systems. FE-2 stated that everyone in senior management knew about the inventory system

issues from the start of his employment with the Company in the summer of 2020, and that these issues were communicated to senior management via emails, reports, and in meetings. In November 2021, FE-2 participated in a meeting with Hasenkamp and others at the Warehouse where the broken inventory system was discussed. According to FE-2, at this meeting Hasenkamp was told that there was no way that Lucid could function properly if the system was not fixed. FE-2 was aware that the contents of that meeting were relayed to Rawlinson.

156.    FE-5 likewise stated that the issues with the SAP system were well-known and well-documented throughout Lucid, including to Rawlinson and upper management. FE-5 stated that Rawlinson was briefed week-after-week that SAP was not working, and that Rawlinson came to the Plant once every couple of weeks. FE-5 further explained that around the fall of 2021, his boss gave Rawlinson a run through about how SAP was not working and explained the separate, but concurrently run spreadsheet inventory system to Rawlinson. FE-5 said that a report was provided during a Town Hall Meeting that occurred once a month or every six weeks, which Rawlinson attended by phone, and that during FE-5's tenure, Rawlinson acknowledged the inventory system was not working.

### b.    Defendants Had No Idea How Much Inventory Lucid Had

157.    Prior to and during the Class Period, Lucid's inventory counts were highly inaccurate. FE-2 said Lucid's inventory count stayed "perpetually messed up" throughout his tenure at the Company. FE-8 said that Lucid management had no idea what parts it had in inventory, where parts were, or what condition parts were in. FE-1 said that Lucid had no clue what parts it did and did not have or how many of each part it had. As a result, FE-1 explained that it was a "guessing game" for Lucid in deciding when to reorder parts and how many parts to order.

158.    The inaccurate and unreliable inventory counts resulted from numerous pervasive, well-known problems with Lucid's inventory management. FE-3 recalled that, at times, inbound parts were brought into the Warehouse without being entered into an inventory system correctly or at all. As a result, FE-3 explained that the parts would not show up in Lucid's inventory count even though they were in the Warehouse, which FE-3 said led to Lucid ordering more of the same part despite the fact that they were already in the Warehouse. FE-8 similarly stated that parts were not properly accounted for when they went into the Warehouse or when they went out to the Plant. FE-2 stated that Lucid suffered

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

from various inventory control issues throughout his tenure, including that Lucid's employees and contractors incorrectly entered both parts numbers and the quantity of parts into the prevailing inventory control systems.

159.    Moreover, Lucid employees failed to accurately indicate when they had used parts in the production process, which resulted in even more inaccuracies in Lucid's inventory count. FE-3 said that some of the inventory count problems resulted from the Plant's failure to properly close out orders on their end. In this regard, FE-3 explained that when the Plant used (or "consumed") parts that it had received, it was supposed to log that into the system to "close out" its parts orders. But, according to FE-3, the Plant consistently failed to do so, which caused Lucid's inventory systems to be inaccurate. As an example, FE-3 said that Lucid might receive 500 parts at the Warehouse and enter them into the inventory system. FE-3 further stated that at some point, those parts would be shipped to the Plant, where they were used on the production line, but never logged as used in the inventory system. As a result, FE-3 said that Lucid's inventory count was inaccurate because the system would still show that Lucid have the 500 parts when it did not.

### c.    Lucid's Inaccurate Inventory Had Significant Negative Impacts On Its Business

160.    Lucid's inaccurate inventory counts resulted in numerous adverse effects on the Company's operations. For instance, FE-3 explained that because Lucid's inventory counts were so inaccurate, Lucid was unable to order parts when it needed them. FE-3 said that because the inventory system might say that Lucid had parts on hand when it did not, the Material Planning Department would think Lucid had the parts and would not order more.

161.    FE-3 explained that many of Lucid's purported "supply chain" challenges were really caused because Lucid did not know it was out of parts, and when it finally ordered them there were three week lead times. For example, FE-3 said that sometimes Lucid thought it had 3,000 of a part on hand when it did not, and then when it realized it was out, the Company had to wait three weeks for the parts to be shipped and arrive.

162.    FE-2 too noted that Lucid's "supply chain" and inventory control issues were often related. For example, FE-2 also said that because Lucid's inventory counts were often incorrect, the

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Company did not know when to order new parts. FE-2 said that Lucid might think that it had a lot of a part when it actually only had a few, which would result in a delay in ordering the part.

163.    FE-3 stated that throughout his tenure at Lucid, the Company prepared a daily parts shortage report, or "PSR," in an Excel spreadsheet that was circulated by email each day. FE-3 said that the PSR was created by Lucid's Material Planning department in an attempt to stay ahead of potential shortages. FE-3 explained that the PSR had rows showing part numbers for each part needed to make a car and columns showing how many production days of each part the Warehouse had on hand, how many of that part Lucid had at the Plant, and how many were ordered and en route. FE-3 said, however, that the PSR was inaccurate because Lucid's inventory counts were inaccurate. According to FE-3, Lucid's Material Planning department ordered parts based on the inaccurate PSR, which precluded Lucid from ordering parts in an efficient and timely manner.

164.    FE-4 said that Lucid's parts ordering calculations always seemed to be off. FE-4 indicated that it seemed like Lucid was always ordering parts it already had and did not need, but not enough of the parts they actually needed.

165.    In addition, the inaccuracies in Lucid's inventory system resulted in problems in getting parts to the production line. FE-2 said the issues with Lucid's inventory system impacted Lucid's car production. For instance, FE-2 said that a significant number of parts, approximately 1,500, were not entered into the Company's inventory tracking system at the Warehouse. This, according to FE-2, resulted in inaccuracies and delays when the manufacturing team requested parts. FE-2 further stated that if the manufacturing team requested 200 units of a certain part, which the system said were available, in reality the manufacturing team might only receive 10 units.

### d.    Defendants Knew Lucid Desperately Needed To Conduct A Full Physical Inventory, But Denied Numerous Requests To Do So

166.    When the significant discrepancies between Lucid's actual inventory and the amount recorded in its systems were brought to the attention of Lucid management, they repeatedly failed to take the necessary steps to correct the issues, including repeatedly refusing to sanction a full physical inventory at the Warehouse.

167.     FE-2 recalled that Universal performed a partial physical inventory count at the Warehouse around March 2021. When Universal's inventory count was compared to what Lucid had in its system, FE-2 said a $5.6 million part discrepancy was discovered. FE-2 was told that Lucid just wrote-off the discrepancy as lost product.

168.     The issues were brought to the attention of Defendants and Lucid's management. FE-2 specifically recalled being in an inventory meeting in or around July 2021 with House and other members of Lucid upper-management (including Hasenkamp, Hochholdinger, and Boike) where House said that getting inventory control to be accurate and correct needed to be a primary focus if Lucid was going to be profitable in the next five years.

169.     FE-2 understood that House was aware at this time that Lucid's inventory count was incorrect because of communications that he had with House and other members of Lucid management prior to that July 2021 meeting. Specifically, FE-2 explained that in the weeks leading up to the July 2021 meeting, in an attempt to correct some of the inventory issues at the Warehouse, he requested a full physical inventory recount and relabeling of all parts in the Warehouse. FE-2 said that he got approvals from and had the support of his managers (including Braun) but needed to get approval from the executive level, including House. Nevertheless, during the meeting, House and other Lucid managers denied the request for Lucid to conduct a full physical inventory count. FE-2 was told that the requests for a full physical inventory count and parts relabeling was denied because management did not want to impact Lucid's "books." FE-2 was told never to bring it up again. FE-2 also recalled that during the July 2021 meeting that included House, the running joke amongst the executive management team was how they were going to be "four and done"—meaning that they were going to get Lucid profitable in four years, cash out their stock, and be done working.

170.     FE-2 explained that he had made the request for a full physical inventory count because his team routinely conducted partial "blind" counts of certain pieces of inventory and they were always significantly off from the count in the inventory system. As an example, FE-2 said there were times where the inventory system said there were 200 units of a certain part available, but a physical count only located six such units. FE-2 said it was important to get the inventory count right so that buyers would actually know what parts to order and when to order them.

171.    FE-1 explained that during his tenure at Lucid (mid-2021 to mid-2022) Lucid ***never*** did a full physical inventory of the parts in its Warehouse. FE-1 explained that Lucid's Warehouse would start to do a physical inventory, but then would be told to stop based on Rawlinson's orders. FE-1 recalled that a physical inventory was attempted during Christmas break in 2021 and then again in February 2022.

172.    Other former employees recounted similar experiences. For instance, FE-4 recalled that Lucid attempted to do two physical inventories in the November and December 2021 timeframe in connection with its attempted transition to SAP. FE-4 said that the first took place over Thanksgiving 2021, but was disorganized and consisted of three days of people scanning parts with RF (radio frequency) guns in an unorganized fashion. As a result, FE-4 recalled that nothing improved after the first attempted physical inventory. FE-8 said that during this inventory, Lucid discovered that thousands, or tens of thousands, of parts were either not counted or not counted correctly. FE-8 explained that this necessitated Lucid shutting the Plant and the Warehouse down the week after Christmas for close to a week to attempt to figure out what inventory Lucid really had on hand.

173.    FE-4 explained that there was another physical inventory attempted around Christmas 2021, but that it also failed to improve things. FE-4 further explained that even after both inventories were attempted, there were still thousands of parts in the Warehouse that Lucid had not entered into its computer systems.

174.    FE-1 explained that another physical inventory was attempted in February 2022 but was never finished. In particular, in late January or early February 2022, FE-1 met with Rawlinson during his visit to the Warehouse. During their discussion, FE-1 told Rawlinson of the problems at Lucid's Warehouse, and why it was failing. In the meeting, FE-1 and another Lucid employee emphasized to Rawlinson that Lucid needed to do a physical inventory to fix the disorganization and figure out what parts they actually had, and because Lucid had never done a full physical inventory.

175.    According to FE-1, Rawlinson agreed to do the physical inventory after talking to FE-1 and discussing it with his team, which would have included Hasenkamp, Hochholdinger, Boike, McKenzie, Tosh, and Justin Wisdom ("Wisdom"), Lucid's Material Planning & Logistics Manager. FE-1 said that Rawlinson agreed to shut down production for two weeks to allow for the full physical inventory, but that before even a week had gone by he stopped the inventory because cars were not being

built. FE-1 recalled that the physical inventory started around February 12 or 13, 2022, but was stopped around February 19 or 20, 2022.

176.    After Rawlinson stopped the physical inventory, FE-1 spoke with McKenzie about it and told him that it was a stupid idea to stop it, and that if they did not do the physical inventory they were going to fail. McKenzie replied to FE-1 that he knew that, but that it was out of his hands. FE-1 also complained about the physical inventory stoppages generally to Jakobs, who Rawlinson assigned to work at the Warehouse in or around November 2021, and tried to fight and say that Lucid really needed to do a physical inventory. But Jakobs would tell FE-1 that Rawlinson wanted the given physical inventory stopped because Lucid needed to make cars. Notably, Rawlinson specifically told investors during the February 28, 2022 earnings call that the Company had added Jakobs to "to help spearhead our launch efforts alongside our existing leadership team." Ultimately, FE-1 said Jakobs was fired not long after FE-1 left Lucid.

177.    When Lucid finally conducted a full physical inventory in July of 2022, it showed significant discrepancies with Lucid's inventory system count. FE-3 explained that over two consecutive weekends in early July 2022, Lucid conducted a physical inventory and then compared the results to Lucid's inventory count reflected in the SAP system. FE-3 explained that the project was overseen by Evelyn Chiang, who was hired in June 2022 as Lucid's VP of Process Transformation. According to FE-3, Chiang reported to Rawlinson and House during the Class Period. FE-3 stated that the physical inventory showed that Lucid had way less inventory in its Warehouse than the system showed it did.

**e.    Lucid's Warehouse Was Operating Significantly Above Capacity**

178.    Multiple former Lucid employees explained that, leading up to and during the Class Period, Lucid's Warehouse was operating significantly above capacity, which negatively impacted Lucid's ability to locate parts and transport them to the production line in a timely manner.

179.    For example, FE-3 did not really believe that Lucid had major supply chain issues. Instead, FE-3 said that the real problem was that Lucid's Warehouse was operating way above capacity, explaining that the Company had the parts it needed to make cars, but that a lot of those parts would expire or Lucid would damage them.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

180.    These problems existed prior to and throughout the majority of the Class Period. For example, FE-4 said that in November 2021, the Warehouse was bursting at the seams and was at least 110% or 115% of capacity, and that the Warehouse was operating way over capacity throughout his entire tenure at Lucid, which lasted from late-2021 to mid-2022. FE-3 estimated that when he arrived at Lucid at the start of 2022, the Warehouse was operating at approximately 150% of capacity. FE-4 explained that, based on his experience, warehouses should only operate around 80% capacity so that there is room to replenish parts and store larger bulk items. FE-4 said that once a warehouse gets to 100% or higher, equipment cannot be maneuvered safely, aisles get blocked, boxes get stacked too high and start toppling over, and the warehouse is not safe.

181.    Former employees also described the negative impact this overcrowding had on Lucid's ability to find parts. According to FE-3, boxes of parts were stacked so high in the Warehouse that they were almost touching the ceiling and that towers of pallets would fall over. FE-3 explained that the bulk section of Lucid's Warehouse was supposed to have five rows of parts, but that by February 2022 it had gotten so full that most of the aisles were blocked and it had become just one giant row, so it would take hours to remove a pallet from the middle of the giant aisle to find a part.

182.    FE-1 said that Lucid's Warehouse was so far past capacity that employees could not get down the aisleways and that boxes would tumble over into the aisleways because they were stacked so high. FE-4 likewise stated that parts in the Warehouse were stacked unsafely and that digging into stacks to get parts was like playing Tetris. FE-4 explained that it was unsafe to move through the aisles in Lucid's Warehouse because packages and pallets were all over the place, and stacks of parts were collapsing.

183.    Former employees also described the drastic measures that Lucid took to try to clear parts out of its Warehouse so that it was usable. FE-1 explained that, at one point, Lucid had Universal bring in trailers just to try to clear the aisleways in Lucid's Warehouse. FE-4 said that to try to alleviate the overcrowding in the Warehouse, in January 2022 Lucid started renting 53 foot trailers to store parts in, which were referred to as "Warehouse on Wheels" (discussed below in ¶ 223). FE-4 recalled that Lucid was utilizing fifteen of these trailers in Tempe, but that "it was not enough to make a dent" and the Warehouse was still completely over packed.

184.    FE-3 said that Lucid's Warehouse became so full that it began renting spaces to store materials offsite, recalling specifically that Lucid bought a building about a half a mile away from the Warehouse to store parts and also had another location in downtown Phoenix where it stored extra parts. Moreover, as discussed below, around April or May of 2022, Lucid began trashing parts to clear space in its Warehouse.

### f.    Lucid Could Not Get Parts To The Production Line Because The Warehouse Was A Complete Mess

185.    Further compounding the dire capacity issue at the Warehouse, former Lucid employees explained that the Warehouse was completely disorganized, which led to significant problems finding parts and transporting them to Lucid's production line in a timely fashion.

186.    FE-4 explained, based on his more than 15 years of experience in manufacturing, that an organized Warehouse should have one location (or slot) for each part, and that the system should be able to tell employees exactly which slot contains a particular part. FE-4 also said that having one slot for each part was important because that way, when the slot became low or empty, the company would know to automatically replenish the part.

187.    FE-4 said that at Lucid there was no organization to the way parts were stored at the Warehouse, which made it harder to retrieve parts quickly in response to a request. FE-4 explained that when employees asked the system where to find a part, it would direct them to four or five different places to look for a part, and sometimes the part was not in any of those places. FE-4 said that a picker (i.e., a person who was responsible for going and picking out a needed part) would get to a location and might waste 30 minutes digging through the location only to realize it had 15 other parts but not the one the picker was looking for. FE-4 recalled that pickers would go on a "pick pass" looking for parts, but could not find them. FE-4 said that the disorganization in the Warehouse led to delays in getting parts to the Plant.

188.    FE-3 likewise recalled being blown away during his first week on the job at the start of 2022 by what terrible shape the Warehouse was in and the lack of management in the Warehouse, describing it as a "free for all." FE-3 explained that because parts were not where they were supposed to be, pickers would be sent to find parts but would return empty-handed two hours later because they were

not able to find them. FE-3 said that some workers only picked ten total parts over the course of an entire week. FE-3 explained that as a result, when the Plant ordered parts for production, it was difficult for the Warehouse to locate them. FE-3 added that the Plant would order parts via an outbound delivery order, or "OBD," but the pickers in the Warehouse would be unable to find the parts and so they could not complete the order.

189.    FE-2 stated that parts went missing for multiple reasons, including because they were stored incorrectly in the Warehouse or because of errors during the manual entry of part numbers into the inventory system. FE-2 explained that on a pretty regular basis employees in the Warehouse were just looking for parts that were lost and that the Plant needed. According to FE-2, they would then go and scour through the Warehouse, looking first in the places that had numbers that were close to the correct part number or letters that could be flipped (for example, Es and 3s would often be flipped). FE-6 too explained that the tracking systems did not work so there would be a big pile of parts and no one knew where parts were.

190.    FE-1 said that because the Warehouse was so disorganized and parts were stored so poorly, trying to find parts was a nightmare and Lucid could not find anything. FE-1 said trying to find parts in the Warehouse was like "an Easter egg hunt" or a "scavenger hunt" and explained that, in order to find parts, Lucid had to search the entire Warehouse looking for them. According to FE-1, Lucid had three employees on every shift dedicated just to finding parts in the Warehouse. FE-1 said that these disorganization problems lasted throughout his entire tenure at Lucid (mid-2021 to mid-2022) and never got any better.

191.    FE-10 similarly stated that there were problems with Lucid's Warehouse operation in Tempe. He explained that Lucid used several software systems at the location, but that none of them allowed Lucid to properly track its inventory. As a result, FE-10 stated that the whole supply chain between the Warehouse and the production line was a "mess." FE-10 explained that Lucid's VP of Supply Chain was fired because he could not manage the Warehouse operation. FE-10 also said that a number of different managers were rotated through the Warehouse over the course of eight or nine months.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

192.    FE-7 also stated that the Warehouse was very disorganized, explaining that parts were everywhere, such that he and a co-worker actually created an Excel spreadsheet to help organize what they were doing because they were not provided with training or a system to keep the parts organized. FE-7 added that the parts he was trying to organize were not on shelves, and were just sitting in a pile in the middle of the floor. FE-7 further explained that there were all kinds of random parts in boxes sitting in a ten-by-ten area, and that he would sort through them to try to find what he was looking for. FE-7 estimated that he would only find a part six times out of ten.

193.    FE-9 stated that "things would get lost in the warehouse" and that Lucid's Logistics' team could not find them and Operations would not have them. FE-9 stated that parts were lost in the Warehouse about 20% of the time before the switch to the SAP system, but more frequently after.

194.    FE-9 explained that Lucid's material handlers and dock workers were responsible for locating missing items. Depending on the part and its size, they would first visually scan the area, after which they would go and pull down pallets to search for small-boxed items. FE-9 added that the Warehouse often had many pallets with mixed items all over it. FE-9 further stated that parts were also lost at the Plant, or in transition when being shipped there from the Warehouse. FE-9 explained that if the parts could not be located where the SAP system indicated they should be, the workers would be told to look for them, or FE-9's team would reflash more.

g.    **Lucid's Internal Inventory Logistics Issues Prevented It From Receiving Parts**

195.    The overcrowding in Lucid's Warehouse and its significant internal inventory logistics problems also prevented Lucid from efficiently receiving parts from vendors. FE-4 said that Lucid's Warehouse was so full that it did not have room for any more parts, so trucks delivering parts from suppliers would be lined up outside, waiting to offload into the Warehouse. FE-4 recalled that the wait times for trucks to unload into the Warehouse could be hours or even days. FE-4 said that this hindered Lucid's ability to get parts it needed into the Warehouse.

196.    FE-3 said that Lucid's Warehouse had issues with inbound deliveries from vendors throughout his tenure at Lucid. FE-3 explained that Lucid's Warehouse could only handle about 20 trucks of inbound parts per day because it only had 10 to 15 docks to unload parts on. But, according

to FE-3, the Material Planning department was scheduling 40-50 trucks per day. As a result, FE-3 said that there were always at least 20 trucks sitting outside of the Warehouse waiting to unload, and that Lucid would incur charges for the time that they sat there.

197.    FE-3 further explained that even when the parts were unloaded, they would sit idle on the inbound docks for days waiting because Lucid's system would not let the Warehouse receive parts until the purchase order was "released" by the Material Planning department. FE-3 said that parts would arrive on a Friday but would not be approved until Monday so, even though Lucid had 10-15 docks available for unloading, often only about five were usable because the others were blocked with material that was waiting to be approved before it could be logged into inventory. FE-3 recalled instances when he had to turn trucks delivering parts away.

198.    These issues caused delays in Lucid receiving parts necessary for its production lines. For instance, FE-3 said that sometimes when the production line was down because Lucid did not have a part it needed, Lucid would pay exorbitant amounts of money to charter an aircraft to bring in the parts in a hurry. But even then, according to FE-3, those parts would then just sit on the dock for 24 hours because it would take so long to get the parts released and logged into the system.

199.    FE-3 said that the issues with overcapacity and truck scheduling were discussed every day but that nothing would ever come of the discussion.

### h.    Issues With Reflashing, Sequencing, And Quality Checks At Lucid's Warehouse Resulted In Additional Production Delays

200.    Lucid also experienced significant problems with reflashing, sequencing, and quality checks at its Warehouse.

201.    FE-1 explained that if parts were not reflashed correctly with the latest software, the vehicle would not start and there would be massive issues and chaos. According to FE-1, however, the Warehouse was not reflashing parts correctly before sending them to the Plant—including seats, harnesses, and lights.

202.    FE-1 reported that the Plant was rejecting almost every part that it received from the Warehouse because they were not reflashed correctly. FE-1 explained that parts that had not yet been reflashed or for which there was an issue were sent to "quarantine." According to FE-1, parts that were in

quarantine were not supposed to be sent to the Plant. FE-1 noted, however, that Warehouse employees would ship the quarantined parts to the Plant even though they were not supposed to. Moreover, FE-1 said that parts were also being shipped from the Warehouse to the Plant even when they did not have a green sticker on them indicating that they had been reflashed correctly. In addition, according to FE-1, even when parts did have a green sticker on them, often times the reflashing had not been done correctly. FE-1 stated that the issues with reflashing existed throughout his entire tenure at Lucid (mid-2021 to mid-2022).

203.    FE-1 also said that Lucid's Warehouse had issues with sequencing, which is the process by which certain parts of vehicles, including bumpers, cameras, and tires, are put together manually. FE-1 explained that the sequencing was supposed to be done in the Warehouse before the parts were sent to the Plant. But, according to FE-1, Lucid never had a big enough team working on sequencing to keep up with production needs. FE-1 said that the sequencing problems also persisted throughout his entire tenure at Lucid.

204.    FE-3 explained that Lucid's Warehouse was supposed to perform quality checks on parts before they were sent to the Warehouse. FE-3 stated that because this was not always done, parts with issues would arrive at the Plant but then have to be sent back to the Warehouse. FE-8 similarly stated that defective parts would get out of the Warehouse and get shipped to the Plant where it would be discovered that the parts were deficient. FE-8 explained that this caused lots of repercussions, including line stoppages, and recalled that Champion would scream about this issue during team meetings.

> **i.    As A Result Of The Substantial Issues In Its Warehouse, Lucid Scrapped Millions Of Dollars In Parts**

205.    FE-1 explained that Lucid had to scrap parts that were ruined inside the Warehouse because the parts were not stored properly and, as a result, got crushed or damaged. FE-1 said that parts were being smashed because heavier boxes were being thrown on top of lighter boxes.

206.    FE-4 said that parts come in boxes that can only stand so much weight. FE-4 explained that if the boxes are stacked too high, they crumple and parts get damaged. FE-4 stated that at Lucid's Warehouse, boxes that should have been stacked no more than three high would be stacked five or six high. FE-4 explained that the height and weight caused parts to get damaged or broken, which led to

them being scrapped. FE-3 stated that about 25% of the parts in Lucid's Warehouse ended up damaged because they were stacked so high that the parts on the bottom got crushed.

207.    According to FE-1, Lucid began scrapping parts in the September 2021 or October 2021 timeframe and the issue got worse and worse as time went on. FE-1 explained that there were three dedicated lanes in the Warehouse where they would stack up the parts that needed to be scrapped. FE-1 said that the value of scrapped parts hit $5 million in one month and then kept on growing. By the time FE-1 left in mid-2022, he stated that Lucid was scrapping $20 million to $30 million in parts per month.

208.    FE-1 explained that Lucid had a daily scrap report that he saw on a daily basis which listed the amount of scrapped parts, the cost of the scrapped parts, and the parts numbers. FE-1 further explained that the scrap report was updated daily, and that the scrapping of parts was discussed during the daily 5:30 pm meeting. FE-1 recalled that between August and December 2021, these meetings were held every day Monday through Friday, and sometimes on weekends, and were attended by Hasenkamp, Hochholdinger, Boike, McKenzie, and Tosh, among others. FE-1 participated in the meeting every weekday evening at 5:30 p.m. FE-1 said these daily meetings were initially called the "Special Project for Start Up" meeting, but after a while were just referred to as the "5:30 meeting." FE-1 recalled that the attendees discussed the issues at the Warehouse, what was failing and why, and why parts were not getting to the production line. FE-1 further explained that all of the upper management who attended the meetings had accurate insight into the issues at the Warehouse, because all of the issues at the Warehouse were discussed at the meetings. FE-1 also noted that minutes reflecting the substance of each meeting were circulated to the participants after the meeting concluded.

209.    Lucid was also scrapping perfectly good parts in an effort to bring Warehouse capacity to a manageable level. As discussed above, FE-3 recalled that when Schnellecke was hired around May 2022, the Company began scrapping parts to get the Warehouse to a manageable capacity. FE-3 said that a good portion of the parts Schnellecke scrapped were damaged, but that a lot of parts only had minor damage or scratches and could have been salvaged. In addition, FE-3 indicated that some of the parts Schnellecke trashed looked fine. In other words, FE-3 said that Lucid was scrapping useable parts just to create space in its Warehouse.

210.   FE-3 recalled that Schnellecke spent an entire month scrapping material and moving inventory to get the Warehouse from 150% capacity to 85-90% capacity. Even then, FE-3 explained that parts were still not where they were supposed to be and SAP was still a problem. FE-3 said that Schnellecke also began turning delivery trucks away.

211.   Lucid's upper management was aware of the scrapping of parts. FE-1 told Rawlinson about the scrapping problem during his visits to the Warehouse, and personally discussed the scrapping with McKenzie. FE-3 said that in late April or early May 2022, FE-3 was copied on an email from Hochholdinger to House, where Hochholdinger asked House to approve the scrapping of $22 million in material so that Lucid could start fresh. FE-3 indicated that most of the Warehouse management, including Tosh, was also copied on the email.

212.   In late April or early May 2022, after receiving the email, FE-3 sent an email reply to Hochholdinger individually in which FE-3 discussed the severe issues at the Warehouse, including that it was operating above capacity and scrapping parts, and said that he believed that good parts were being needlessly discarded. FE-3 said that Hochholdinger never responded. FE-3 also stated that he had previously tried to escalate these same issues to Tosh, but Tosh did not respond, which is why FE-3 tried escalating them to Hochholdinger.

213.   FE-3 said he learned in early July 2022 that an additional $77 million in parts were being scrapped (on top of the $22 million scrapped in late April/early May 2022). FE-3 learned about the $77 million because he was copied on an email from Chiang to House that copied Rawlinson, among others. According to FE-3, Chiang's email indicated that Lucid needed to scrap $77 million worth of inventory to get SAP in order. FE-3 explained that the $77 million was partially from Lucid scrapping damaged material and partially to account for the fact that it had less inventory than it thought it had.

### j.   Internal Logistics Inefficiencies At The Plant Resulted In Delays In Getting Parts To The Production Line

214.   Former Lucid employees also described significant issues at Lucid's Plant manufacturing facility that resulted in delays in getting parts to the production line.

215.   For instance, FE-3 said that the process on the Plant's side was poorly managed, explaining that often the parts that the Plant was asking for were already at the Plant just sitting on

trailers. But, FE-3 explained, the team there just did not unload the trailers. FE-3 said that the Plant would just order the parts without bothering to unload the trailers already parked there.

216.    FE-4 explained that, ahead of production shifts, the Plant would give the Warehouse a list of parts that it needed. FE-4 said, however, that once the trailers arrived they would just sit at the Plant and not get unloaded. FE-4 said this was especially a problem on Fridays. FE-4 indicated that the Plant did not have enough people or space to unload parts. FE-4 explained that there might be 15 or 20 trailers sitting there, but the Plant would still order more parts from the Warehouse because they had not unloaded the trailers that were already there and so did not realize they had the parts. FE-4 further explained that when the Plant did not send trailers back, the Warehouse did not have any trailers to ship the additional parts that the Plant was requesting. When empty trailers were not available because they were all at the Plant, FE-4 said that the Warehouse would just stack the parts in a lane and they would sit there until a trailer would finally come back and become available.

217.    FE-3 recalled that at times there were 30 or more trailers full of parts just sitting at the Plant, which meant that the Warehouse would not have enough trailers to deliver parts to the Plant when parts were needed. FE-3 said that this happened once or twice per week. FE-3 recalled that there were times in the summer of 2022 that Lucid would hire Ryder or U-Haul trucks to drive parts from the Warehouse to the Plant because there were no trailers to transport parts since they were all sitting at the Plant.

### k.    Lucid's Internal Logistics Issues Were Known Within The Company

218.    Prior to and throughout the Class Period, Defendants were well aware of Lucid's severe internal logistics issues. In addition to the facts set forth in the preceding sections, numerous former employees stated that they provided direct information to Defendants, as well as many members of Lucid's management, about these dire issues.

219.    During the Class Period, Rawlinson visited, toured, and spoke with other Lucid management and employees at Lucid's Warehouse on a regular basis. FE-1 stated that he personally walked the Warehouse with Rawlinson, among a group of five to ten others, when Rawlinson visited the Warehouse. At these walk and talk meetings, FE-1 and others discussed internal logistics issues at the

Warehouse with Rawlinson. FE-1 personally told Rawlinson about the problems at the Warehouse on multiple occasions, including in September 2021 when Rawlinson came to the Warehouse to visit. During that visit, FE-1 spoke with Rawlinson for 30 minutes and told him about the significant issues at the Warehouse and that things there were not okay. FE-1 recalled specifically telling Rawlinson about the reflashing issues and the multiple issues with parts, including the inability to find parts, parts getting damaged, and parts being scrapped. FE-1 said that Rawlinson definitely understood that there were significant issues at the Warehouse because FE-1 told Rawlinson about them and because, as discussed below, following the conversation, Rawlinson sent executives to the Warehouse to try to address the issues.

220.    At the conclusion of the same September 2021 conversation, Rawlinson said he wanted answers and told FE-1 that he was going to be addressing the issues with all of the Lucid higher ups in a meeting. FE-1 said that, as a result of these discussions, in or around November 2021, Rawlinson assigned Jakobs to work at the Warehouse to try to fix the problems and to be Rawlinson's "eyes and ears" at the Warehouse. FE-1 explained that Rawlinson also sent a team of additional executives to the Warehouse to try to get the problems fixed, including Andrew Rogan, who was sent after Christmas 2021, and HR Director Kristofer Kumfert. Andrew Rogan served as Lucid's Senior Director of Corporate Development.

221.    Other former employees similarly recalled Lucid executives being sent to the Warehouse to try to fix the problems. FE-4 understood that around late October or early November 2021, Lucid moved Steve Inglis ("Inglis") from the Plant's Body in White unit, where he served as the Director of Body Structures Manufacturing, to act as interim manager of the Warehouse. FE-4 believed that Lucid sent Inglis to the Warehouse to try to straighten it out because it was a failing department. FE-8 similarly recalled that Inglis was sent from the Plant to the Warehouse to try to get a handle on the problem at some point in late summer 2021. FE-4 recalled, however, that no real change was implemented, and instead, there was just a lot of screaming and yelling.

222.    FE-1 again told Rawlinson about the problems at Lucid's Warehouse during a subsequent meeting in the first or second week of November 2021, when Rawlinson visited Lucid's Warehouse. FE-1's conversation with Rawlinson lasted a little longer than 30 minutes, during which FE-1 again told

Rawlinson about the same issues at the Warehouse, including that the Warehouse was getting more disorganized, reflashing issues were still a problem, and they were still not able to get parts to the Plant. FE-1 also told Rawlinson that the problems at the Warehouse were getting worse, and that in all of the years FE-1 had worked in logistics, he had never seen as big of a mess as what FE-1 experienced at Lucid's Warehouse.

223.    FE-1 said that Rawlinson's attempts to solve the issues at the Warehouse failed. FE-1 explained that Rawlinson had an idea called "Warehouse on Wheels," which involved the Warehouse putting a certain number of each part on a trailer and then sending it to the Plant so that the Plant employees could pull the parts directly from the trailers rather than having to wait for the Warehouse to find and send parts. FE-1 said that project was so disorganized that it completely failed, explaining that the Warehouse never put the parts into the trailers properly, that Plant employees still could not find the parts they needed for production, and that the Plant would send the trailers back to the Warehouse with the parts still on them. FE-1 recalled that the program started around November 2021 and only lasted about a month and a half before it failed.

224.    FE-4 similarly recalled that as part of the "Warehouse on Wheels" program, Lucid's Warehouse sent trailers packed with parts to the Plant so that they would have the parts they needed there. FE-4 said that this did not help and that the Plant was still calling the Warehouse to say they did not have the parts they needed, despite the fact that the parts were on the trailers.

225.    Other former employees also recalled Rawlinson visiting Lucid's Warehouse in the November 2021 timeframe. For example, FE-8 explained that the Warehouse situation was so bad that Rawlinson made six to ten trips to the Warehouse in a three-month period starting around November 2021. FE-8 recalled that Hochholdinger accompanied Rawlinson on visits. FE-8 said that it was obvious that upper management had visibility into all of the issues at the Warehouse because of all of the visits they made.

226.    FE-4 recalled seeing Rawlinson at the Warehouse during the first or second week of December 2021 and again in mid-to-late January 2022. FE-4 said that the Warehouse was a mess every time that Rawlinson was there. FE-4 said that managers, including Jakobs, Hochholdinger, and Hasenkamp, would accompany Rawlinson when he walked through the Warehouse, and FE-4 could tell

by the frustration on all of their faces they were upset by what was going on. In December 2021, FE-4 also spoke to Hasenkamp about the chaos at the Warehouse and what needed to be improved.

227.    In late January or early February 2022, FE-1 again met with Rawlinson during one of his visits to the Warehouse. During that meeting, FE-1 again discussed with Rawlinson the problems at Lucid's Warehouse and why it was failing. FE-1 also emphasized to Rawlinson that Lucid needed to do a physical inventory to fix the disorganization and figure out what parts they actually had, and because Lucid had never done a full physical inventory. As previously discussed, however, although Rawlinson initially agreed to move forward with the full physical inventory, he cut it off before it could be completed. FE-3 also recalled Rawlinson visiting the Warehouse in February 2022, and said that Rawlinson did not look happy, which was not surprising since the Warehouse was a mess and performance expectations were not being met.

228.    In addition, Rawlinson and other senior Lucid executives were aware of the problems at Lucid's Warehouse as a result of discussions at meetings they attended and reports they received. FE-2 believes that all of Lucid's executives were aware of the inventory control problems because they were discussed at great length at meetings that included upper-management and in the status reports that were sent twice daily to upper management, including Rawlinson, Hasenkamp, Hochholdinger, Bach, Boike, McKenzie, Tosh, and Paul Berton, Lucid's Director, ECU Manufacturing, Testing, and Diagnostics. FE-2 attended two daily meetings, one daily start-of-shift meeting in the morning and one daily end-of-shift meeting in the afternoon. FE-2 said that all of the people who received the daily status reports (listed above) also attended these daily meetings, with the exception of Rawlinson, who attended the daily meetings only once or twice a week. FE-2 said that the two daily status reports were called the "Daily AM" report, which was sent after each start-of-shift meeting, and the "Daily PM" report, which was sent after each end-of-shift meeting. Throughout his tenure, FE-2 saw the status reports on a daily basis. FE-2 explained that these status reports covered all inventory stored at Lucid's Warehouse and included, among other things, information concerning parts that were sent to the Plant, stock outs, the number of daily truck hauls, production sets, problems with assembly kits in the Warehouse, and the number of hot calls in a day. During the last six months of FE-2's tenure, the status reports also made clear why the hot calls were happening (*e.g.*, supply chain shortages v. logistics problems).

229.    FE-2 said that he remembers very clearly that management, including Rawlinson, were at meetings where the inventory issues were discussed. FE-2 recalled that near the end of his employment with Lucid, Rawlinson talked about inventory control issues having caused delays and impacted Lucid's production.

230.    FE-2 also believes that Rawlinson was aware of the issues with Lucid's inventory management systems and the issues managing Lucid's inventory because of the organizational structure changes that he was told Rawlinson directed in mid-August 2021. FE-2 explained that in mid-August 2021, Lucid's Logistics organization was changed from a supply chain led organization to a manufacturing led organization, and he was told by various individuals, including McKenzie, Boike, and Hochholdinger, that the organizational changes were directed by Rawlinson. FE-2 was further told that Rawlinson made the changes because he felt that Hasenkamp had failed in managing Lucid's inventory Warehouse, SAP implementation, and overall delivery system, and that Lucid was not producing vehicles fast enough.

231.    FE-2 stated that the organizational changes were announced via email in mid-August 2021. Soon after the changes were announced, FE-2 recalled that Hasenkamp went on hiatus for around several weeks. FE-2 said that these organizational changes resulted in the Warehouse team no longer receiving certain parts (or being allowed to load them into inventory), with the parts instead being shipped directly to the Plant. FE-2 stated that this change caused a lot more inventory discrepancies due to the elimination of certain backend functions. For instance, as a result of parts being shipped directly to the Plant, FE-2 stated that his team was unable to verify part counts and at times would have to hunt for packing lists to even understand what parts Lucid had received.

232.    FE-1 said that during the 5:30 p.m. meetings, which included senior Lucid executives like Boike, McKenzie, Tosh, Hochholdinger, and Hasenkamp, the attendees discussed the issues at the Warehouse, what was failing and why, and why parts were not getting to the production line. FE-1 explained that all of the upper management who attended the meetings had accurate insight into the issues at the Warehouse, because all of the issues at the Warehouse were discussed at the meetings. According to FE-1, the issues at the Warehouse were raised in every single daily meeting by both FE-1 and others. FE-1 said that there was a lot of yelling and finger pointing, which often involved Tosh

discussing his concerns about the inability to find parts. FE-1 said the meetings were uncomfortable because of all of the yelling and cursing that went on. FE-1 explained that the daily 5:30 p.m. meetings came to a halt in December 2021 because they were not making progress, they were wasting time, and the meetings were getting out of control.

233.    FE-4 said that there were manager meetings twice a day—a morning meeting at 7:00 a.m. to start the day and an afternoon meeting at 4:00 p.m. to end the day. FE-4 attended the 4:00 p.m. meeting, which was attended by employees and management from both the Plant and the Warehouse. FE-4 said that during these calls, they discussed the fact that the Warehouse was a mess, and went through the issues at the Warehouse, although it was a quick rundown. FE-4 recalled that Lucid senior managers, including Tosh, Jakobs, and Clayburn Lewis ("Lewis"), Lucid's then-Senior of Logistics Operations, were on these calls and thus would have gotten a fairly good picture of what was happening at the Warehouse.

234.    FE-10 said that he knew Rawlinson was aware of the Warehouse problems by September or October of 2021 for a few reasons. FE-10 recalled Rawlinson referencing the problems at the Warehouse during an All-Hands Meeting in September or October of 2021 and saying that everyone in the Company had to work to try to solve all of the Warehouse issues. FE-10 also knew that Rawlinson was aware of the issues at the Warehouse because, even before the All-Hands Meeting, engineers were being dispatched to the Warehouse to try to fix the issues. For example, a few of FE-10's colleagues were dispatched to the Warehouse for weeks or for months to help try to alleviate the problem.

235.    FE-6 also stated that Lucid leadership knew there was a problem with logistics, in part, due to the Daily Production meetings. FE-6 explained that during the Daily Production Meetings at the Plant—which he attended and were also attended by the VP of Manufacturing, Senior Director of Manufacturing, Senior Director Operations, HR Director, Department Managers, and others—they would discuss production obstacles. FE-6 said that production challenges and shortages, as well as supply chain issues and logistics, would be discussed at the Daily Production Meetings. FE-6 learned about the logistics issues through his team and in these Daily Production Meetings. According to FE-6, the Daily Production Meetings were held via Zoom, generally lasted half an hour to an hour, and occurred beginning in February 2020 and continued throughout his tenure.

## 2. Defendants Knew That Lucid's Ability to Produce Cars Was Adversely Impacted by Parts Design Issues

236.    Leading up to and during the Class Period, shortages of parts and design issues negatively affected Lucid's production of the Lucid Air. As set forth below, these issues were mainly problems of Lucid's own making and were well known to Lucid's management before the Class Period even began.

237.    FE-10 indicated that the design of the Lucid Air was just not where it needed to be before Lucid launched commercial production. FE-10 stated that Rawlinson was aware of this as a result of the discussions at "CTO meetings." FE-10 said that he attended meetings with Rawlinson called CTO meetings, and that Rawlinson attended and conducted all of the CTO meetings, during which problems with design and production of parts were routinely discussed. FE-10 said that prior to launch of production of the Lucid Air, the CTO meetings were held on an as needed basis, whenever an issue arose. FE-10 recalled that during his tenure at Lucid, the meetings would take place on average once or twice a week. FE-10 attended the CTO meetings, provided that the issue being discussed had something to do with FE-10's area of responsibility.

238.    FE-10 had personally worked on the launches of multiple new products prior to the Air, and so FE-10 understood how the process was supposed to work. FE-10 said that Lucid did not follow the correct process with the Lucid Air and that instead everything was a rush.

239.    Indeed, FE-10 said that issues with designs caused Lucid to make design changes even after production of the Air started. For example, FE-10 indicated that changes were made to the designs of the cantrail applique and the door seals (discussed below) after production of the Air began. FE-10 further indicated that there were issues with the hood latch from day one that resulted in the hood not closing properly and that there were also issues with the trunk lid. All of these issues, according to FE-10, resulted in Lucid having to rework the designs of parts after the Air was already in production.

240.    FE-6 said that design engineering changes were instituted at the last minute and that this negatively impacted production. FE-6 explained that when design changes were made, the supplier would have to stop production and re-tool to accommodate the change, which could result in two-week delays. FE-6 heard about the engineering issues through meetings and through his staff. FE-6 recalled hearing in meetings from Lucid leadership that the Company's engineers had "dropped the ball." FE-6

offered a Lego analogy, explaining that if you are building with Legos, and the directions call for a red 2x4 part and you instead have a 2x3 and a 1x2 part, you can't put the Legos together. FE-6 said that the same situation existed at Lucid with incorrect parts because you cannot assemble a vehicle if you do not have the correct parts.

241.    FE-10 stated that, during CTO meetings, Rawlinson acknowledged that the designs were not working and needed to be changed as quickly as possible. FE-10 explained, however, that the design changes were rushed and that Lucid was not giving enough time for cross-functional teams to do analysis before the designs were changed. FE-10 said that the rush to change designs thus precluded Lucid from conducting an analysis of how changing a design in one area might affect other areas. FE-10 indicated that Rawlinson was aware that there was no cross-functional checking for design changes.

242.    FE-10 further indicated that Lucid, from the beginning, was using out of specification (or "spec") parts and trying to move ahead with production anyway. FE-10 recalled that Bach, who reported directly to Rawlinson, approved the use of such parts to build Lucid's cars in the July or August 2021 timeframe, and FE-10 was then instructed to use out of spec parts.

243.    Problems with part designs and shortages caused delays in production. FE-7 indicated that there were a lot of quality issues with the Airs put together on Lucid's production line, including that there would be exceptionally large gaps around doors and where the hood was attached. FE-7 further noted that adjoining pieces that were supposed to be flush were not. FE-7 said that nearly every vehicle failed quality inspection, and the majority did not pass at any of the five quality inspection stations. FE-7 knew about the quality issues at the other stations because the Team Lead would mention it to him, or he saw it on the computer, or physically saw it. FE-7's station was the last one on the line, so he could see everything that happened before it got to him. FE-7 focused on doing gap tests—gaps were one of the hardest things to get right on the vehicle. FE-7 recalled that even when vehicles got through electronics, paint, and power train, they would run into problems with the gaps between doors and frames. FE-7 advised that roughly 80% of inspected vehicles did not pass and had to be sent back to the line to be reworked. FE-7 stated that the quality issues existed throughout his entire tenure.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

244.    The following are additional examples of internal issues Lucid experienced with parts for the Lucid Air prior to and during the Class Period, all of which adversely impacted Lucid's production of the Air:

a.    **Cantrail Applique**

245.    A cantrail is the piece of the body of the car between the side windows and the roof. An applique is a decoration fastened to the body of the car.

246.    FE-10 explained that Lucid had a shortage of a part called the cantrail applique, and that this shortage affected Lucid's production. FE-10 recalled that the issue with the cantrail appliques was that Lucid had not designed the part for manufacturability, so the manufacturer was not able to efficiently produce the cantrail appliques to meet Lucid's specs. FE-10 said that 100% of the cantrail appliques that Lucid received from its supplier did not meet specifications for the part. The cantrail appliques received from the manufacturer, FE-10 stated, were off by two to three millimeters from the design specifications, which caused gaps to appear around the doors and roof glass, negatively impacting how Lucid's cars looked.

247.    FE-10 stated that these problems with the cantrail appliques caused production delays. Because the manufacturer was having trouble making parts to Lucid's specs, FE-10 stated that vehicles that were mostly put together would have to sit in the yard for a couple of months, waiting on the parts. FE-10 estimated that perhaps 500 to 600 cars were sitting at Lucid's Plant waiting for additional parts.

248.    FE-10 said that these issues with the cantrail appliques were apparent by no later than September or October 2021. FE-10 explained that, as a result, Lucid was trying to rework the design on the cantrail appliques, but the design issue still was not fixed when he left Lucid in early 2022. FE-10 heard recently from friends still at the Company that Lucid is still changing the cantrail appliques design.

249.    FE-10 attended CTO meetings with Rawlinson where the issues with the cantrail appliques (and other issues) were discussed. FE-10 said that the problems with the cantrail appliques were definitely discussed in the CTO meetings, starting in September or October 2021. Accordingly, FE-10 stated that Rawlinson was well aware of the problems with the cantrail appliques, and that the issues were slowing down production.

### b. Glass

250. FE-2 explained that Lucid faced shortages of glass throughout his tenure. FE-2 said Lucid would routinely run out of windshields, which caused production to stop. FE-2 said that the glass for Lucid's cars was incredibly hard to manufacture because of the way the windshield curved. If a glass piece had too big of a curve, for instance, FE-2 stated that it would break when removed from its molding. FE-2 explained that Lucid's glass supplier was only able to produce glass panels at a 5% to 10% yield, meaning that for every 100 pieces of glass they attempted to manufacture, only 5 to 10 pieces were useable in Lucid's cars. FE-2 also said that sometimes entire orders of glass windshields would arrive broken. The glass supply shortage lasted throughout FE-2's entire tenure at Lucid.

251. FE-10 stated that Lucid did not have enough roof glass to build the Lucid Air. FE-10 said that the roof glass pieces arriving were not meeting quality targets and did not have the tolerances Lucid wanted. As a result, FE-10 said that Lucid did not have enough roof glass to build its cars. FE-10 said it was apparent by September or October 2021 that the roof glass issue was affecting production.

252. FE-9 was aware of glass shortages in December 2021. Specifically, FE-9 recalled that the glass orders were incomplete when they came in, arriving in pieces at a time. Some of these pieces were broken at the Plant during vehicle assembly and Lucid then had to order replacement pieces, FE-9 stated. He estimated that overall replacement glass could take two to three weeks to arrive.

253. FE-2 stated that as a result of a shortage of glass, Lucid would produce cars without the windshield and store them throughout the Plant or in the parking lot with tarps. FE-2 explained that when the Plant manufacturing ran out of storage space for the cars without windshields, production would stop. According to FE-2, production stoppages due to a shortage of glass windshields happened multiple times throughout his tenure. FE-2 recalled that production was stopped due to a glass shortage around Labor Day, and production did not resume until the end of September 2021. FE-2 said everyone at the Company was aware that production was stopped in September due to the glass supply shortage because it was discussed in emails, team messages, and meetings, but he specifically mentioned that Hasenkamp, Hochholdinger, and Boike knew about the stoppages. FE-2 believes Rawlinson was on emails at that time which discussed the glass supply shortage and the related production shutdown.

254.   FE-10 was certain that Rawlinson was aware of the roof glass issues because Rawlinson was a micromanager who reviewed each and every problem that came up with the Lucid Air.

### c.   Door Seals

255.   FE-10 explained that Lucid experienced issues with the door seals on the Air that resulted in production delays. FE-10 said that, as designed, the doors on the Air would not close properly. According to FE-10, in the September or October 2021 timeframe, Lucid was not able to close the doors properly on any of the cars coming off of the production line. FE-10 said that Lucid did not build enough pre-production cars to understand this issue prior to launching production.

256.   As a result of the issues, FE-10 stated that design changes to all of the door seals were made in October or November of 2021. In particular, according to FE-10, Lucid had to change the design of the door seal to reduce the height of the bulb. FE-10 said that the process of changing the design was rushed, as the design engineer was pressured to release a new design within a day when it typically takes a month to design door seals properly. FE-10 said that Lucid had not fixed the issues with the door seal design fully by the time he left Lucid in February 2022.

257.   FE-10 explained that because the door seals were not designed correctly, every single car that came off of Lucid's production line needed a major rework. FE-10 said that, if two people were working on it at once, the rework took 30-45 minutes for each car. FE-10 explained that after Lucid manually implemented this fix to each car, the doors would then close properly. However, FE-10 indicated that fixing the door seals would create gaps in the body of the vehicle that allowed more air to pass through, increasing cabin noise. FE-10 indicated that the need to rework every car to fix the door seal issue slowed down production and affected volume. FE-10 indicated that the door gap issues were discussed in the CTO meetings in July or August 2021.

### d.   Body in White Panels

258.   FE-10 said that by September or October 2021, there were issues with the Body in White panels for the Lucid Air—i.e., the panels that make up the body of the car before anything is attached to them. FE-10 explained that it is very difficult to make a car when the Body in White panels do not meet specifications. FE-10 stated that approximately 50% of the Body in White panels that arrived from Lucid's supplier did not meet quality standards and were clearly out of spec.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

259.    FE-10 understood that the Technical Project Managers (or "TPMs") had told Rawlinson about the issues with the Body in White panels. FE-10 also recalled hearing a discussion about the hood Body in White panel being out of spec in one of the CTO meetings that FE-10 attended with Rawlinson.

260.    FE-10 further indicated that Lucid had an internal system called "Quals," and that, for every part Lucid received that was not in specification, a "qual" was logged into that system indicating that the part did not meet specifications. FE-10 stated that Rawlinson had access to the Quals system.

### e.    Carpets

261.    As pled below, on February 28, 2022, Defendants identified a shortage of carpets as a cause for the Company's production target miss in 2021. FE-2 stated that the Company blaming carpet suppliers for not meeting its production target was inaccurate because there were tons of carpets in the Warehouse. FE-2 further stated that carpets were one of the commodities that the Company never had an issue with and that suppliers always delivered on time and perfectly color-matched.

### 3.    Defendants Knew Lucid's Internal Problems Significantly Impacted Its Ability To Produce The Air

#### a.    Because Of Internal Logistics Problems, Lucid Could Not Get Parts To The Production Line

262.    The severe internal logistics issues that Lucid experienced at its Warehouse both before and during the Class Period had a significant negative impact on the Company's ability to produce the Air.

263.    FE-1 confirmed that the issues that he described at the Warehouse had a major impact on production. FE-1 stated that the disorganization in Lucid's Warehouse and failure to perform a full physical inventory (discussed above) hurt Lucid tremendously because it could not get parts to the production line in a timely manner. FE-4 explained that the disorganization in the Warehouse was the bigger part of the problem Lucid was facing, and stated that the Warehouse's inability to get parts to the manufacturing line was the big failure in the process and slowed down production. FE-6 also confirmed that logistics issues affected production and caused production line stoppages due to a lack of parts, among other things.

264.    FE-5 stated that parts were mislabeled in the Warehouse and would arrive in the Plant, but the material handlers would not open the boxes to confirm what was provided, and the problem would

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

not be discovered until the parts got to the line, which was too late. The production line would then go down as the situation snowballed and there would then be a need to rush parts from the Warehouse to get the line back up and running. FE-5 explained that these issues caused time lags to obtain the correct parts and that the lags could last from two to three hours to a day in length. FE-10 said that production delays resulted from a combination of issues at the Warehouse, issues at the Plant, and issues with the parts and suppliers.

265.    FE-8 stated that there is no question that logistics issues caused stoppages and slowdowns at the Plant. FE-8 recalled instances where production was affected because requested parts were not on the shelf, were misplaced, or were damaged. FE-8 knew that the logistics issues negatively impacted production because he received email notifications that there were stoppages to straighten out parts problems via email. The emails were sent from either manufacturing or logistics leadership and copied Lucid's senior management. FE-8 said that the emails indicated the time and date of the shutdown, its anticipated duration, and the reason for the shutdown. FE-8 said that 90% of Lucid's production issues were caused by poor logistics, adding that he could say, with a high degree of confidence, that the issue was logistics—"that's where the bottleneck was." FE-8 added that Lucid's failure to hit 2021 production targets were the result of incompetence in the logistics system.

266.    These issues were exacerbated by the significant transit time between the Warehouse and the production line in the Plant.

267.    FE-1 explained that the transit time between the Warehouse and the Plant was 90 minutes, so if the Warehouse sent the wrong parts (or parts that had not properly been reflashed or sequenced) then the Plant would have to wait to get the correct parts and the entire production line was shut down for hours or even days at a time. FE-4 explained that Lucid was trying to operate a "just in time" system where parts would be delivered to the production line from the Warehouse as needed. FE-4 said that this did not work because there was a 90 minute drive between the Warehouse and the Plant. FE-4 stated that part of the reason the Plant attempted to institute the "just in time" concept was because it did not have enough space for actual manufacturing.

268.    Multiple former employees also indicated that when Lucid's production facility ran out of a part, it would result in a "hot call" to the Warehouse to try to deliver the part immediately. FE-8 said

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

that when production could not find a part, it would necessitate a "hot call," which meant we need it right now, go and find it. FE-8 said hot calls occurred at least weekly if not daily. FE-8 indicated that hot calls were reported in a daily report and also discussed in daily data team meetings held every morning at 8:00 a.m. FE-8 stated that the meetings included Champion's group and employees from the industrial engineering team.

269.    FE-4 stated that the Warehouse would ship parts to the Plant every few hours. FE-4 too explained that if the Plant needed parts faster than that, they would make what were called "hot calls"—according to him, the name changed over time and they were also referred to internally as "hot list" or "priority list." Hot calls would cause the Warehouse to try to put the parts in vans and ship them to the Plant faster.

270.    FE-2 was involved in coordinating "hot calls" for missing parts that Lucid's Plant needed urgently. FE-2 recalled that there were at least ten hot calls a day and that the number of hot calls was never in the single digits, not even on weekends. FE-2 noted that every hot call resulted in a slowdown or stoppage of the production line, and that a production stoppage was usually for a minimum of an hour because the Warehouse was an hour away from the manufacturing facility. FE-2 stated that the number of hot calls was included in the daily status reports (i.e., Daily AM and Daily PM reports) sent to Lucid management and also were discussed during daily shift meetings. During FE-2's last six months at Lucid, the status reports also made clear why the hot calls were happening (*e.g.*, supply chain shortages v. logistics problems).

271.    Moreover, internally the blame for the production issues was placed squarely on the logistics issues in the Warehouse. FE-3 indicated that the logistics team typically got the blame when the Plant did not have the parts it needed. FE-4 said that the Plant blamed the Warehouse for production delays and line stoppages because they were not supplying parts fast enough. FE-4 said that during the 4:00 p.m. daily meetings, management at the Plant would pin the blame for line stoppages on the Warehouse, saying that the line was down because the Warehouse had failed to get it the parts in time. FE-4 also recalled emails from Lewis and Tosh that went to everyone in the Warehouse, stating that they needed to get parts quicker.

272.   FE-4 also believed that the Plant was partly at fault because they would not order key parts far enough ahead of time to ensure they were on hand when needed. FE-4 said that the Plant would indicate that the line would go down unless the Warehouse could get them a part in the next thirty minutes, but that was not enough time. FE-4 explained that the Plant never took into account the delays in getting parts from the Warehouse but instead just kept expecting them to magically appear as soon as they were requested. FE-3 similarly indicated that when the production line ran out of a part, the Warehouse would get a call to get the parts to the production line. FE-3 explained that the line would expect to get the parts in 15 minutes but that it took three hours at a minimum, even when the call was a priority.

273.   FE-1 specifically told Rawlinson during early November 2021 that the Warehouse issues were the reason that the production team was not getting the parts it needed. FE-1 likewise stated that Rawlinson understood the impact the issues at the Warehouse were having on production because he sent various executives to try to address the issues.

### b.   Lucid's Production Line Was Consistently Shut Down

274.   Multiple former Lucid employees reported that because the production line did not have the parts it needed, it would go down for hours, days, or even weeks at a time, which significantly and negatively impacted Lucid's production.

275.   For example, FE-1 recalled that the production line would sometimes go down for hours, for the entire shift, or even days at a time. FE-1 further recalled that when it was down, no cars would be produced. FE-1 recalled at least one instance where the production line was down for two weeks because of improperly reflashed seats. FE-1 knew about the stoppages because, during the daily 5:30 p.m. meetings that he attended, they would discuss where the production line was down and for how long.

276.   FE-9 estimated that the line would slow down five out of seven days due to a part/inventory problem. FE-2 recalled times during his tenure where the manufacturing line was shut down for longer periods, from two weeks up to six weeks. FE-2 said that these shutdowns resulted both from inventory control problems and from shortages of materials, but that most stoppages happened because parts were in the wrong inventory location.

277.     FE-3 stated that, as a result of the logistics issues that he described, the production line was shut down every day because it did not have the parts it needed. FE-3 explained that he could see the parts shortage dashboard, which FE-3 could access on an internal website and could also easily see on televisions displayed around the Warehouse. FE-3 explained that every time a station in the production line ran out of parts, that station would turn red on the dashboard and that would mean it was shut down. FE-3 said that production stations were always running out of parts. FE-3 recalled that his entire tenure at Lucid (start of 2022 through the late summer of 2022), the production line would be shut down an average of two or three hours per day.

278.     FE-4 said that line stoppages in the Plant occurred several times a week because of a lack of parts. FE-4 explained that this downtime could be anywhere from a couple of hours to a couple of days. FE-4 could tell when production was stopped because Lucid had an internal website link (called something like APM Diagnostics or APM Analytics) that showed the real-time production in each department and FE-4 was sure that Tosh had access to it. FE-4 said that each line could be looked at separately, so based on the internal website, FE-4 could tell which departments at the Plant were stopped and which were still operating.

279.     FE-7 explained that Lucid's main production line had lots of stoppages and slowdowns as a result of "a really bad logistics problem" and that there was a real problem getting parts to the assembly line from the Warehouse. FE-7 recalled that line shutdowns happened about "75% of the time" he was there. As a result, FE-7 stated that during his tenure, the quality line was very slow and that he spent most of his eight hour shift just sitting and waiting for a vehicle. FE-7 advised that there were times when not a single car would come down the quality control line for his inspection over a seven to ten day period because of problems with parts.

280.     FE-6 confirmed that there were continuous production line stoppages due to lack of parts. He stated that the lack of the necessary components was a constant problem, as Lucid was not getting the components they needed. FE-6 believed the frequency of the production line stoppages to have been 33%. He said the line was stopped between 25% and 50% of the time. FE-6 recalled that there would be a production stoppage "easily" one day per week.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

281.    FE-5 was aware that production lines at the Plant were down all the time because he had "eyes on the line." FE-5 stated that at least one station on the line was down once per day. FE-5 could not recall a single day where there was not one station down, which he recalled created significant delays.

282.    Several former employees explained that Lucid's production line was shut down for an extended period of time right before the Class Period began. For example, FE-2 explained that early in October 2021, Lucid shut down manufacturing for several weeks due to a combination of parts shortages and software issues with the electronic control units and car seat software, which needed to be repeatedly "flashed." FE-2 said members of the executive management were aware of these specific issues because Hasenkamp and Henninger "lived" at the Plant when it was happening. Hasenkamp told FE-2 that Rawlinson was upset at the issues and he would be making changes. FE-2 believed that Rawlinson came to the Plant for a visit during that time.

283.    FE-10 said that Lucid's production line was completely shut down for two weeks prior to the late-September 2021 launch, and also for two weeks after the launch. In other words, according to FE-10, Lucid's production line was entirely shut down for an aggregate four week period between mid-September 2021 and mid-October 2021. He explained that the reason for the shutdowns was that there were not enough parts to build the cars, with the roof glass and cantrail appliques being the major ones.

284.    FE-6 stated that there was an awareness of the production line stoppages and parts shortages at every level of Lucid leadership from the supervisor to the VP level. He further stated that there was regular daily discussion among leadership and on the shop floor about the issues. FE-6 said that, "without a doubt," Lucid upper management knew when the production lines were down. Specifically, he said that Hochholdinger was notified about work stoppages. FE-5 stated that there were emails regarding station stoppages sent to all senior managers at the Plant, as well as to Logistics at the Warehouse during his tenure. FE-8 also received emails regarding station stoppages and noted that the emails would reflect the time and the date of the shutdown, its anticipated duration, and the reason for the shutdown. FE-8 noted that Champion (who reported directly to Hochholdinger) was copied on these emails. When FE-3 first started at Lucid in early 2022, he attended daily 7:00 a.m. meetings that included Ross George, a consultant Lucid brought in to try and fix the Warehouse, managers from the Warehouse, and managers from all of the different departments at the Plant. FE-3 recalled that the production team

screamed during the bulk of the conversation at these meetings because they did not have enough parts to run the line and make cars.

### c. Rawlinson Was Regularly at the Plant, Including During Line Shutdowns

285.    Former Lucid employees also confirmed that Rawlinson was regularly at the Plant when the line shutdowns were occurring.

286.    FE-6 stated that Defendant Rawlinson's presence at the Plant ramped up in mid-2021. FE-6 recalled that during these visits Rawlinson would walk the floor and talk with employees, and further stated that Rawlinson's visits were more frequent between June 2021 and October 2021. FE-5 stated that, in the fall of 2021, Rawlinson came to the Plant once every couple of weeks. FE-7 indicated that Rawlinson walked through the facility at least once or twice a month to tour the Plant and meet with the department heads. FE-7 stated that Rawlinson would walk around the Plant with the various managers and interact with the employees, often accompanied by Hochholdinger. FE-7 stated that Rawlinson visited the inspection line and spoke to his department head, and further stated that Rawlinson would have seen the yellow tags on the cars and cars not moving through the line.

### 4. Defendants Knew That Lucid Would Not Meet Its Production Guidance

287.    Defendants knew before the Class Period began that Lucid would not produce 20,000 cars in 2022. This reality is confirmed by statements from numerous former Lucid employees.

288.    FE-2 stated that during meetings he attended in October 2021, Rawlinson, along with Hasenkamp, Hochholdinger, Bach, and Boike, made statements that Lucid was going to miss its year-end vehicle production targets for 2021, 2022, and 2023. These statements were made at various times beginning in October 2021 during start-of-shift meetings, end-of-shift meetings, and other meetings attended by FE-2. FE-2 stated that during the meetings, the attendees were told that the fact that Lucid would miss its targets was confidential information and not to share it. FE-2 explained that during these meetings, the reasons given by those members of Lucid's management for missing year-end production targets included, among other things, inventory control problems, vehicle redesign, and supply chain problems.

289.    FE-2 specifically recalled that at one meeting he attended in October 2021 or the first week of November 2021, with respect to the 2022 volume target of 20,000 vehicles, Rawlinson stated that Lucid would make less than 10,000 vehicles in 2022. During that meeting, Rawlinson also told FE-2 and other attendees that the fact that Lucid would miss its targets was confidential information that should not be shared with others, saying something to the effect of, this should be kept in your "belt loop." FE-2 stated that Rawlinson only discussed the fact that Lucid would miss its production targets in the smaller group meeting, and that Rawlinson said he was telling them so they would not kill themselves to meet targets that Lucid would miss.

290.    FE-2 stated that presentation slides were routinely shared at the daily end-of-shift meetings, which included a combination of multiple slides prepared by different employees. This deck included a slide with a greyscale graph showing Lucid's production goal on one diagonal line compared to its actual production number. FE-2 specifically recalled that around the October 2021 timeframe, this greyscale graph was shared at multiple end-of-shift meetings and it clearly showed that Lucid was going to miss its vehicle production target. FE-2 specifically recalled that Hasenkamp, Hochholdinger, Tosh, and Braun were in attendance at those end-of shift meetings in October 2021 in which that greyscale graph was shared.

291.    FE-1 first recalled hearing of Lucid's 2022 production goal of 20,000 cars around August or September 2021 during one of the 5:30 p.m. meetings. FE-1 knew immediately that Lucid was not going to hit this goal because of the issues in the Warehouse (discussed below). During FE-1's meetings with Rawlinson in September 2021 and November 2021, FE-1 personally told Rawlinson, in the context of discussing Lucid's internal logistics issues that because of all of those issues, Lucid would never meet its production goals. FE-1 said that Rawlinson reacted by nodding his head. In October 2021, FE-1 also spoke with Hasenkamp and Hochholdinger a few times and told them that there was no way that Lucid would make its 20,000 vehicle target.

292.    FE-1 was also involved in conversations all of the time where Lucid executives discussed that it was impossible for Lucid to hit the goal and that Lucid would never hit it. FE-1 said that these conversations began in the October 2021 timeframe and occurred about every few days. According to

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

FE-1, these conversations involved Tosh, Wisdom, McKenzie, and Boike, among others, and everyone agreed that Lucid would not hit its production targets.

293.    FE-3 said that as a result of all of the problems at the Warehouse, there was no way that enough parts were being shipped every day from the Warehouse to the Plant to meet the goal of producing 20,000 cars in 2022. FE-3 said that early in his tenure, in January 2022, he knew that there was no way Lucid was going to produce 20,000 cars in 2022. FE-3 knew this, in part, because of the issues in the Warehouse, including that it was a mess, and because the production team was always screaming during the 7:00 a.m. meetings that it was not getting sufficient parts to run the line. FE-3 recalled discussing with Tosh, likely in the January or February 2022 timeframe that Lucid was not going to make the 20,000 car figure. FE-3 said Tosh responded that Lucid's senior managers were just there for their four-year options.

294.    FE-4 said that by early December 2021, he concluded that Lucid's production goals could not be met because of the Company's daily struggles getting materials from the Warehouse to the Plant. FE-4 said that everyone at the Warehouse knew that Lucid was not going to make its production goals.

**K.    To Begin The Class Period, Defendants Misled Investors About Lucid's Production And Concealed The Severe Internal Problems That Were Impacting The Company's Ability To Produce Vehicles**

295.    As indicated above, leading into the Class Period, all eyes were on Lucid's ability to reach the Company's production targets and, in particular, to produce 20,000 units in 2022.

296.    Against this backdrop, on the first day of the Class Period, Defendants Rawlinson and House told investors in no uncertain terms that "[h]eading into 2022, *we remain committed to our plan to achieve 20,000 units in the calendar year*" and that Defendants were "*confident in [their] ability to achieve 20,000 units in 2022*." As for potential risks to those targets, Defendants expressly directed market participants only to the "*ongoing* challenges facing the automotive industry, with global disruptions to supply chains and logistics," but assured investors, "*[w]e are taking steps to mitigate these challenges*."

297.    These were lies. Rawlinson knew and expressly acknowledged internally at Lucid in October 2021 or the first week of November 2021 that the Company would produce *less than 10,000 units* in 2022—less than half of the 20,000 target he falsely re-affirmed. Furthermore, Rawlinson was

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

told time and again, including during meetings at the Warehouse with FE-1 in September 2021 and November 2021, that because of all the internal logistics issues plaguing the Company, it would never meet its production goals.

298.    Moreover, by pinning the Company's ability to meet its 2022 production target on the potential impact of external, global "***supply chain and logistic[] challenges that the automotive industry has been facing***" and telling investors that the Company was already "***taking steps to mitigate***" the industry-wide challenges, Defendants concealed from the market the panoply of internal logistics and design issues unique to Lucid that had already impacted—and continued to impact—the Company's production of the Lucid Air. This included that Lucid: (i) did not have a functional inventory system and instead relied on unreliable programs and *ad hoc* manual data entry and inventory tracking, *e.g.*, Section V.J.1.a; (ii) had no clue how much inventory it held or needed to order, but was refusing to conduct a full physical inventory review, *e.g.*, Sections V.J.1.b-d; (iii) was operating its Warehouse well-over capacity, and that its Warehouse and inventory tracking were in such disarray that the Company could not get the parts it needed to make cars to the production line, *e.g.*, Section V.J.1.e-g; (iv) was experiencing significant issues with reflashing, sequencing, and quality checks at the Warehouse, which resulted in delays in delivering parts to the line, as well as deficient parts being delivered to the line, *e.g.*, Section V.J.1.h; (v) was destroying and scrapping millions of dollars in parts, *e.g.*, Section V.J.1.i; (vi) had not designed its parts correctly, which meant suppliers could not produce them to specs, resulting in parts shortages and last minute rushed design changes, *e.g.*, Section V.J.2; (vii) was using deficient, out of spec parts to build cars, which resulted in time-consuming work-arounds on the production line, *id.*; and (viii) could not get parts into its Warehouse in a timely, efficient, or reliable manner, nor to the production line, which resulted in persistent and prolonged production shutdowns, *e.g.*, Sections V.J.1.j, V.J.3.

299.    Thus, by blaming external, industry-wide factors, and telling investors that they were already working to mitigate those external factors, while concealing Lucid's pervasive and ongoing internal problems, Defendants gave investors the false or misleading impression that the Company was internally ready and had the ability to ramp up production of the Lucid Air when it was not and did not.

300.    In the dark about Lucid's actual production abilities and the host of **internal** problems currently standing in its way, analysts quickly latched on to Defendants' statements reaffirming the 2022 targets. BofA reported that Lucid was "confident in its ability to achieve 20k units of production/deliveries in 2022 . . . which is consistent with the target provided by the company in its Investor Presentation earlier this year."

301.    Media outlets similarly trumpeted Defendants' statements. For example, on November 15, 2021, Bloomberg wrote, "[Lucid] used its debut earnings statement to affirm its guidance to produce 20,000 vehicles next year." And on November 16, 2021, CNBC published an article entitled, *Lucid Motors CEO says the EV start-up is targeting expansion in China, Middle East by mid-decade*, which stated: "[Lucid's] market capitalization surpassed that of Ford Motor on Tuesday as investors reacted to management confirming production plans for 2022[.]" The same day, Bloomberg, in an article entitled, *Lucid's Market Cap Is Now Bigger Than Ford and GM*, wrote that Lucid shares "closed up 24% in New York, bringing its value to over $91 billion. . . . The surge in the shares came after Lucid said Monday it remained confident in its ability to produce 20,000 vehicles in 2022." The article further explained that "Lucid Group Inc.'s rally on Tuesday added over $17 billion to the electric vehicle startup's valuation, pushing its market cap above that of Ford Motor Co. and General Motors Co. in one fell swoop."

302.    On the heels of these positive reports and just weeks ahead of Lucid's multi-billion dollar offering, Rawlinson doubled-down. This time, during a November 16, 2021 interview with CNBC's Jim Cramer, Rawlinson again assured investors that Lucid had "mitigation plans for" the "**supply chain shortages that the entire industry is facin**g." Rawlinson then left no doubt that Lucid was ready and able to ramp up production of the Lucid Air, telling Cramer that "**[a]s soon as we can get this quality parts to the line, we can spool that up. The factory is there and ready for 34,000 units per annum**."

303.    This was, at best, materially misleading because, as Rawlinson well knew and had already admitted internally, Lucid was in no position to "spool [] up" production. Rather, Rawlinson knew that Lucid was experiencing myriad internal problems with production, and that the Company would make less than 10,000 vehicles in 2022.

304.    Less than three weeks later, on December 3, 2021, Lucid received a subpoena from the SEC. According to the Company, the subpoena "request[ed] the production of certain documents related

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

to an investigation" that "appears to concern ***the business combination between [Churchill and Lucid] and certain projections and statements***." Upon receiving the subpoena, however, Defendants did not issue any corrections to the production projections that they had laid out in the Company's November 15, 2021 earnings announcement and earnings call.

## L. Defendants Capitalized On Lucid's Inflated Stock Price And Market Capitalization

305.     Despite knowing that Lucid would produce less than 10,000 vehicles in 2022—less than half of Defendants' publicly disclosed and repeatedly re-affirmed production target of 20,000—and that the SEC was investigating the projections and statements associated with the Merger, Defendants took advantage of Lucid's artificially inflated stock price in two ways.

306.     *First*, on December 8, 2021, Lucid announced its intention to offer $1.75 billion of convertible senior notes in a private offering, with an expectation to grant the initial purchasers of the notes a time-restricted option to purchase up to an additional $262,500,000 principal amount of notes. Noteholders were given rights to, among other things, convert the notes to Lucid common stock. All told, the Company estimated that the net proceeds from the offering would be approximately $1.727 billion to $1.987 billion. Lucid further stated that it intended "to use the net proceeds of the offering for business expansion and general corporate purposes, which may include investing in our manufacturing capabilities." Ultimately, Lucid secured total gross proceeds from the offering of ***$2,012,500,000***.

307.     By conducting an offering while Lucid's stock was artificially inflated—and pegging the value of the convertible notes sold through the offering to Lucid's common stock price—Defendants were able to raise billions in proceeds. Remarking on the "***[o]pportunistic timing***" of Lucid's offering, on December 9, 2021, Morgan Stanley commented that this was an "important development" and that Lucid made a "strategic" move. More specifically, it wrote that Lucid was "[t]aking advantage of a strong stock price to transform an investor vote of confidence into real/hard dollars." It further highlighted the importance of the raise given the cash-intensive nature of Lucid's business, writing that:

> While LCID already enjoys a $4 to $5 [billion] cash position pre-convert, the company's cash needs must be seen through the context of the enormous amount of capital required to launch an EV business, the raises by competitors (i.e. Rivian had raised approx $25 [billion] so far including its IPO) and risks outside of the company's control (supply chain and execution risks which could exhaust cash resources).

308.    Analysts also credited Defendants' representations that the funds would help facilitate Lucid's ability to mass produce the Lucid Air, with Morgan Stanley noting that Lucid "expressed [that] the use of proceeds [would] be related to expansion of the vehicle portfolio and manufacturing capability." Analysts at BofA similarly noted that Lucid's offering appeared to be motivated by "an acceleration of growth plans outlined by LCID upon going public," including expansion of its AMP-1 facility, and the "further *de-risking of a capital-intensive business with more liquidity, and accessing a more diversified investor base*."

309.    *Second*, by inflating or maintaining the artificial inflation in Lucid's stock price (and, thus, market capitalization) with his false and misleading statements up to this point, Rawlinson triggered a windfall compensation package. Specifically, Rawlinson secured over nearly 14 million performance-based RSUs that, as Bloomberg reported on April 28, 2022, were then worth *$263 million*. Rawlinson's performance-based RSUs vested based upon Lucid's market capitalization during the period from July 26, 2021 (the first day of trading for the combined Company) through January 25, 2022 (the first possible measurement for the potential vesting of his RSUs—six calendar months following the close of the Merger). Put in perspective, this compensation amounts to over $80 million more than Lucid's total revenues of approximately $181.4 million during the Class Period.

**M.      Fresh Off The Multi-Billion Dollar Offering, Defendants Falsely Re-Affirmed Lucid's 2022 Production Guidance, Only To Slash It Weeks Later**

310.    On February 14, 2022, Daniel Witt, Lucid's Head of State & Local Public Policy, presented before the Arizona State Legislature's Transportation and Technology Committee. During his live-streamed presentation, Witt not only re-affirmed that Lucid had the capacity to, and would, complete 20,000 units, but went so far as to hail Lucid's smaller size as a competitive advantage in a challenging global supply chain environment, stating:

> We're in a little bit of an enviable position in that we are so small this year, we're looking to produce about 20,000 units . . . much larger companies that produce millions of units annually are having a much more difficult time due to due to supply constraints than we ultimately are.

311.    Witt then claimed that Lucid had the ability to satisfy all of its pending orders: "We have the capacity to fill all the orders received to date and more."

312.   Then, just two weeks after affirming Lucid's 2022 production guidance to the market, Defendants did an abrupt about-face. After the close of trading on February 28, 2022, Defendants revealed that Lucid would miss its 20,000 vehicle target by up to 40%, slashing the Company's 2022 production guidance to between 12,000 to 14,000 vehicles.

313.   The market reacted swiftly, driving Lucid's common stock down more than 13%, from a close of $28.98 per share on February 28, 2022, to a close at $24.99 per share on March 1, 2022.

314.   Analysts and market commentators were also quick to condemn Lucid's announcement and pin the blame for the Company's significant stock price decline squarely on the production guidance cut. For example, in cutting its price target for Lucid stock, analyst CFRA called the guidance cut "particularly disappointing" given that Lucid's guidance was "considered manageable in light of industry challenges." It explained that "the massive cut to volume guidance is likely to weigh heavily on the shares[.]" Guggenheim wrote that "FY22 delivery targets were lowered significantly" and that "slower near-term ramp and the 'hockey stick' cadence likely means there isn't much cushion."

315.   The New York Times reported that the "significant[]" reduction "will most likely disappoint investors who had seen the company as a serious challenger to Tesla." Seeking Alpha reported that "[p]erhaps the biggest news for investors in the short term was that Lucid management significantly reduced its guidance for 2022." Seeking Alpha further explained that "Wall Street analysts were a bit skeptical going into Monday's report, and yet the company still disappointed to a meaningful degree" before concluding that "[i]n the end, Monday afternoon's report was a clear disappointment for Lucid investors."

316.   The Motley Fool explained that "[t]he most jarring kernel of news was that Lucid reduced its 2022 production and delivery estimate from 20,000 units down to a range of 12,000 to 14,000 Lucid Air electric sedans." It reported that "[u]ntil now, Lucid had given investors every reason to trust in the company's ability to execute on its goals," noting that "[d]uring its third-quarter 2021 earnings call in mid-November, Lucid confirmed its full-year 2022 goal to produce and deliver 20,000 vehicles . . . even in the face of mounting supply chain concerns." But it reported that the production cut amounted to a "[f]all from grace," explaining that "[t]he comments made during Lucid's Feb. 28 earnings call and the content presented in its investor presentation derailed its trajectory and plunged Lucid into an uphill

1  battle to regain investor trust." It further explained that "[t]he biggest threat to Lucid is that it misses on
2  its already lower guidance and further slashes guidance in the coming quarters."

3  **N.      Despite The Drastic, Unexpected Guidance Cut, Lucid's Stock Remained Artificially
4  Inflated Because Defendants Continued To Mislead Investors**

5  317.    Unbeknownst to the market, at the time Defendants lowered Lucid's targets to 12,000 to
6  14,000 vehicles in 2022, they knew that the Company would miss even those reduced figures because of
7  the severe issues Lucid was facing. Indeed, internally, Rawlinson had already conceded that Lucid would
8  make less than 10,000 vehicles in 2022, and its internal logistics issues were continuing unabated.

9  318.    As discussed above, Defendants also knew that the Company was experiencing such
10  severe and unaddressed internal logistics challenges—including an inability to get parts to the production
11  line so that it could actually produce cars—that they had no reasonable basis to tell investors that Lucid
12  would produce 12,000 to 14,000 cars by year-end. As a result, Defendants' statements on February 28,
13  2022, that Lucid would make 12,000 to 14,000 cars in 2022 were materially false and misleading when
14  made.

15  319.    Further misleading investors, after announcing the guidance cut on February 28,
16  Defendants again pinned the blame for the Company's slow production ramp on short-term, external,
17  industry-wide challenges, which they once again told investors the Company was mitigating. Indeed,
18  during the earnings call, Rawlinson claimed that "[i]n the more immediate term, *like many*
19  *manufacturers, our production has been and indeed continue[d] to be impacted by supply chain*
20  *challenges*." House followed, telling investors that "*we are managing through supply chain*
21  *challenges that you've heard about in numerous companies across industries this earning*
22  *season*." At the same time, Defendants' concealed the severe internal Lucid-specific problems that the
23  Company had not rectified which were severely hampering its ability to ramp production.

24  320.    Notably, in the Company's Form 10-K issued the same day, Defendants made mention of
25  logistics issues only with respect to the ongoing COVID-19 pandemic and, again "ongoing, industrywide
26  challenges in logistics and supply chains," and noted they "expect[ed] that these industry-wide trends
27  will continue for the foreseeable future." Never did Defendants disclose the true, adverse state of Lucid's
28  internal logistics challenges.

321.     On the February 28 earnings call, John Joseph Murphy, an analyst with BofA, pressed Rawlinson for more details about the "causal factors for the reduction in your planned production this year," and whether he could "rank those in order of . . . impact":

> [A]s you think about the causal factors for the reduction in your planned production this year, I mean, you're citing supply chain. It appears that maybe some of the capacity expansion and reorganization has put forth or been prioritized over ramping volume in the near term for the benefit in the long term, and there might be some other micro issues that we can't see.
>
> I'm just wondering if you could kind of bucket those or maybe rank those in order of sort of impact.

322.     In response, Rawlinson once again attributed the guidance reduction to the impact of transient, external supply chain factors on Lucid, and even downplayed those purported issues, telling the market that "this has been really a phenomenon of just a small handful of our 250 suppliers," that Lucid was focused on "quality over volume," "prioritize[d] quality over numbers," and "d[id]n't want to get sucked into myopic view of short-term numbers."

323.     Rawlinson then assured investors that Lucid was in midst of alleviating the purported "supply chain" woes, and that "[a]s travel has opened back up, our supplier quality teams have been able to address many of these issues." He then boasted that "[w]e accomplished deep deliveries against the backdrop of an extraordinary supply chain and supply quality challenges. Indeed, we could have chosen to build faster, but we elected not to sacrifice quality, given our unwavering commitment to the highest standards."

324.     When he was asked by a Citigroup analyst to discuss visibility into Lucid's production throughout the year, Rawlinson once more falsely assured investors that the supply-chain issues were the main hurdle holding Lucid back and that, if those issues were resolved, it would see a "significant uptake" in production: "So we're very optimistic that we will resolve [the supply chain challenges], but it's going to take a few months, and the second half of the year, we'll see a significant uptake. ***And our guidance is based upon that premise***."

325.     Because Defendants' misrepresented and concealed the full relevant truth, Lucid's stock price remained artificially inflated. Indeed, despite their disappointment about the guidance reduction, analysts credited Defendants' story that Lucid's failure to get production off the ground had resulted

from short-term external supply chain problems that were out of the Company's control. For example, analyst CFRA wrote that "LCID cut 2022 production guidance for the Lucid Air to 12K-14K units, down from 20K units previously, *citing supply chain constraints* and a focus on quality."

326.   The New York Times, in an article entitled, *Lucid Motors Will Produce Fewer Cars Than Expected: The electric car start-up cited supply chain problems*, reported that Lucid "significantly scaled back its production goals for the year, *citing supply chain problems*." It noted that the Company "said the supply problems were related to relatively low-tech products like exterior trim rather than the semiconductor shortages that have plagued other carmakers." Bloomberg reported that "the company lowered its 2022 EV production target to 12,000-14,000 units from prior view of 20,000, due to *'extraordinary' supply-chain pressures*."

327.   CNBC wrote that "[t]he company *cited supply chain constraints* for slashing production expectations to between 12,000 and 14,000 vehicles, down from 20,000 units," and that "Lucid's CEO said the problems are more to do with commodity parts such as glass and carpet rather than an ongoing global shortage of semiconductor chips." Electrek, in an article entitled, *Lucid Motors' Q4 earnings: 125 Air deliveries in 2021, 2022 production estimates slashed as much as 40% due to 'supply chain constraints,'*" reported that "global supply chain issues have put a damper on the automaker's production goals for 2022." Electrek further noted, however, that Lucid "projects supply chain improvements to arrive in the second half of the year."

328.   The Silicon Valley Business Journal reported that "[t]he company *blamed supply chain constraints* and parts quality issues for the reduced expectations." The Motley Fool blamed the guidance cut squarely on short-term external factors, reporting that Lucid "is *getting absolutely crushed by short-term challenges such as higher component costs, supply chain issues, and higher shipping costs*." It noted, however, that it was "encourag[ed]" by management's commentary on the call: "Lucid said that it expects the bulk of supply chain constraints to come in the next few months and heavily subside in the second half of the year" and "[i]t was also encouraging to hear Lucid say that it isn't encountering any fundamental supply chain constraints (chips and batteries), but rather is facing supply chain challenges from only a handful of its 250 suppliers for largely cosmetic components like glass, carpets, etc."

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Autoweek wrote that "Lucid reduce[d] 2022 production outlook from 20,000 Air sedans to between 12,000 and 14,000, *citing supply-chain issues*."

329.    Defendants then continued to falsely reaffirm Lucid's reduced production volume for 2022 throughout March, April, and May 2022. At each turn, when they were asked by analysts and market commentators about the issues impacting production, Defendants continued to point to global, industry-wide supply chain issues purportedly impacting the industry as a whole, concealing entirely Lucid's rampant internal logistics and part design issues.

330.    In a March 1, 2022 segment on the news program "Squawk Box," for instance, CNBC's Phil LeBeau noted that he had personally spoken to Rawlinson the previous day and that Rawlinson had again pinned the blame for the guidance cut on supply chain problems. Specifically, LeBeau noted that Lucid had cut its guidance to 12,000 to 14,000 vehicles because:

> [T]he company is dealing with supply chain challenges. And we're not talking about the chip issue. In fact, when I talked to Peter Rawlinson after the numbers came out yesterday, he said this has to do with the commodities that go into the trim, the fit and the finish of the Lucid Air things like the quality of the glass. He said, look, it wasn't up to snuff and therefore we're considering alternative sourcing. . . . So they are going to be slowing down production to focus on quality.

331.    A couple weeks later, on March 17, 2022, Rawlinson participated in an interview with Reuters, during which he again misleadingly stated that "***the bottlenecks were caused by a handful of suppliers for windshield glass, carpeting and some exterior trim parts***," while concealing entirely the significant, internal, Lucid-specific issues that were preventing the Company from getting mass production of the Air off the ground.

332.    Then, on May 5, 2022, in Lucid's press release and during the earnings call concerning first quarter 2022 results—despite having known for nearly six months that Lucid would make less than 10,000 units and was suffering from still-undisclosed, pervasive internal logistics and part design problems—Rawlinson once more touted Lucid's then-existing production efforts, claiming that the Company "***continued to make progress in the first quarter of 2022 despite on-going global supply chain challenges***" and that "***[w]e are working closely with our suppliers to mitigate the impact of disruptions***." From there, Rawlinson assured investors about Lucid's production, stating, "***[w]e're***

*reiterating our 12,000 to 14,000 vehicle production forecast for '22. And that's based on the information we have at this point, combined with our current mitigation plans*."

333. Following the call, analysts and market commentators glommed onto Defendants' statements. For example, on May 5, 2022, analyst BofA wrote that:

> The company reiterated its 2022 production outlook for 12k-14k vehicles, which was encouraging in light of ongoing supply chain constraints and production disruptions globally for the automotive value chain (LCID, in particularly cited COVID-related factory shutdowns in China and other supply chain and logistics challenges that it is facing and working to mitigate).

On May 9, 2022, BNP Paribas wrote that "*LCID's production guide remains intact*," explaining that "LCID reiterated its 2022 outlook of 12K-14K units production." (Emphasis in original.) It further noted that Lucid "does see supply chain disruptions from China as the most likely risk, and did confirm in April a few days of downtime and 1-2 weeks of 'slowed' production."

334. Also on May 5, 2022, Bloomberg wrote that Lucid "reaffirmed its plans to make as many as 14,000 plug-in vehicles this year after delivering 360 in the period." It also reported that Lucid was "work[ing] to overcome supply-chain challenges that are gripping the automotive industry" and quoted Rawlinson as saying "[w]e continued to make progress in the first quarter of 2022 despite ongoing global supply-chain challenges." In a same-day article, The Wall Street Journal reported that Lucid "stuck with its production outlook of 12,000 to 14,000 vehicles in 2022, a forecast it reduced earlier this year citing supply-chain disruptions and trouble getting parts such as glass and carpet. Lucid said it continues to face logistics challenges, citing factory shutdowns in China related to Covid-19."

335. The New York Times, in a May 5, 2022 article, wrote that "Lucid Motors, a maker of electric cars seen as a potential challenger to Tesla, said Thursday that it had delivered only a few hundred vehicles during the first three months of the year but maintained that it was still on track to sell at least 12,000 by the end of 2022." It noted that "Lucid said it was struggling to acquire the components needed to fulfill reservations it has received for 30,000 vehicles" and quoted House as saying, "[s]imilar to many companies in our industry, we continue to face global-supply-chain and logistics challenges, including Covid-related factory shutdowns in China." It also reported that both Rawlinson and House "said that supply chain problems are easing," and further noted that it had interviewed both House and

Rawlinson that day, and quoted Rawlinson as saying: "***We actually see a light at the end of the tunnel now***."

336.   Two weeks later, on May 20, 2022, during an interview with Lara Habib Chamat of Al Arabiya News Channel, in response to a question regarding the lowering of Lucid's production targets, Rawlinson only identified supply chain challenges as potentially impacting production and reiterated Lucid's production goals, stating:

> Our challenge now is to ramp up the volume of this incredible machine. ***We're facing global supply chain challenges, as is all the auto industry and other industries***. And we're working assiduously to overcome our near-term challenges with commodity goods are being resolved and ***we're looking forward to hitting our 12 to 14,000 Units that we're targeting for production this year***.

337.   Thereafter, on May 26, 2022, Nat Lingo, a Lucid spokesperson, told Business Insider that Lucid was "committed to maintaining a consistent, high level of quality as we ramp production towards our ***year-end goal of 12,000 to 14,000***."

### O.   The Relevant Truth Concealed By Defendants' Misrepresentations and Omissions Was Finally Revealed to Investors on August 3, 2022

338.   Just a few months later, on August 3, 2022, Lucid once again slashed its 2022 vehicle production guidance, revealing that the Company would only make 6,000 to 7,000 vehicles in 2022. It further disclosed that in the entire first six months of 2022, it had only produced 1,405 vehicles total. Moreover, in the second quarter of 2022, it had only delivered 679 vehicles to customers and, as a result, had only brought in $96.1 million in revenue from car sales (and $97.3 million total), compared to total costs and expenses of over $656 million.

339.   Moreover, for the first time, Defendants revealed that Lucid's production woes and guidance cuts had been largely caused by its previously undisclosed severe internal logistics problems: "Our revised outlook guidance for the year reflects the logistic challenges I described as we begin scaling, which exposed the immaturity of our logistics processes." Rawlinson claimed to have purportedly just discovered the logistics challenges, stating that as supposed "supply chain and logistics challenges" began to abate and "we attempted to push forward the rate, we found that our logistics constraints prevented us from scaling meaningfully."

340.   In particular, in describing Lucid's internal logistics challenges, Rawlinson noted that Lucid had struggled with its "ability to speed the correct part to [Lucid's production] line at the correct time and cadence." As a result of the Company's efforts "to improve our logistics processes," it had experienced "unplanned production pauses." Rawlinson noted that the Company was already taking steps to fix the internal logistics problems that he referred to as the "primary bottlenecks," including bringing "logistics operations in-house" and "restructur[ing] our logistics and manufacturing operations." Rawlinson noted that this should "help mitigate and begin to eliminate the logistics bottlenecks." Defendant House stated, however, that "it's unlikely we'll be able to make up the anticipated loss volume in 2022. Consequently, we are adjusting our 2022 production guidance to 6,000 to 7,000 units."

341.   On this news, the price of Lucid's common stock fell $2.00 per share, or approximately 9.7%, from a close of $20.56 per share on August 3, 2022, to a close at $18.56 per share on August 4, 2022.

342.   Analysts and market commentators expressed surprise and disappointment. Analyst BNP Paribas wrote that Lucid's "***significant 50% cut***" to its vehicle production guidance was "*clearly disappointing*." (Emphasis in original.) It further reported that "[e]arly-stage improvement in the availability of LCID's most constrained supply components have now exposed weaknesses in its logistics processes." BNP Paribas also explained that "LCID revised its full-year production outlook to 6K-7K units (from 12K-14K) amid newfound weaknesses in its logistics processes that have resulted in various bottlenecks and quality issues (*e.g.*, May 25th recall affecting ~1,100 units), which the Co. is now aggressively addressing."

343.   Analyst Guggenheim wrote that "the magnitude [of the guidance cut] was larger than we expected and will lead to questions about LCID's ability to produce at scale[.]"  It concluded that "[o]verall, we believe the significant reduction in production targets this year amid quality/manufacturing/logistics issues supports investors' concerns about LCID's ability to ramp production, which likely makes the stock a 'show me' story until the company is able to prove it can produce vehicles at scale."

344.   The New York Times reported that Lucid "cut its production target for the year by almost half on Wednesday after delivering just 679 vehicles in the second quarter." It further noted that:

Mr. Rawlinson conceded that much of Lucid's production shortfall was caused by the company's inexperience — for example, difficulties setting up a system that delivers the right parts to the assembly line at the right time. Several unplanned shutdowns at Lucid's factory in Arizona "exposed the immaturity of our logistics processes," he said.

345.    CNBC wrote in an article entitled, *EV maker Lucid again cuts production targets as logistics challenges cripple output* that "Electric vehicle maker Lucid Group again cut its production targets," and reported that "Lucid's shares fell about 12% in after-hours trading following the news." CNBC also wrote that:

> Rawlinson told CNBC in an interview that the process of working through the supply-chain issues forced the company to confront another set of bottlenecks. "It really unveiled the next level of challenges, the immaturity of our logistics systems," Rawlinson said, explaining that Lucid is in the process of bringing shipping and other services in-house.

346.    Electrek reported that "Lucid Group's stock (LCID) is crashing this morning after the company slashed its 2022 production guidance and confirmed that it burned through another $800 million during the last quarter." In further noted that "[t]his is a big step back for Lucid. We are already more than halfway through the year, and they are now reducing their production guidance by half." Electrek concluded that "Lucid makes a very cool car, but now it needs to find a way to make money while making it or it won't be around for long."

347.    Business Insider reported that Lucid "cut its production goal for the second time this year, from between 12,000 and 14,000 cars to between 6,000 and 7,000." It further explained that "[i]n Lucid's second-quarter report call, CEO Peter Rawlinson blamed logistics issues for the company's production shortcomings. 'We found that our logistics constraints prevented us from scaling meaningfully this past quarter,' Rawlinson said." Business Insider further reported that Rawlinson "mentioned trouble in getting the right parts to the line at the right time and cadence, while also maintaining Lucid's particularly high quality standards." The article also noted that "Lucid delivered 679 cars in the quarter (around half of them in April), a dismal number considering it entered 2022 targeting 20,000 for the year. In the first six months, it built 1,405 cars and delivered just 1,039 to customers." It quoted Ali Faghri, managing director of automotive research at Guggenheim, as stating, "[a]t a $30 billion market cap, you really need to have more confidence that they can produce vehicles at much higher levels of volumes than they are currently to justify that valuation."

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT[4]

### A.   November 15, 2021

348.   On November 15, 2021, Lucid issued a press release on Form 8-K entitled, *Lucid Announces Third Quarter 2021 Financial Results and Lucid Air Wins MotorTrend Car of the Year*. The Form 8-K was signed by House.

349.   In the press release, Rawlinson stated:

We see significant demand for the award-winning Lucid Air, with accelerating reservations as we ramp production at our factory in Arizona. ***We remain confident in our ability to achieve 20,000 units in 2022. This target is not without risk, given ongoing challenges facing the automotive industry with global disruptions to supply chains and logistics***. ***We are taking steps to mitigate these challenges***, however, and look forward to the launch of the Grand Touring, Touring, and Pure versions of Lucid Air through 2022.

350.   On the same day, Lucid hosted an earnings call to discuss the Company's third quarter 2021 financial results. During the earnings call, House stated: "***Heading into 2022, we remain committed to our plan to achieve 20,000 units in the calendar year. However, this plan is not without risk, given the extraordinary supply chain and logistics challenges that the automotive industry has been facing***."

351.   During the same call, Rawlinson stated: "***Even in a challenging environment as COVID-19 continues to present numerous obstacles for the auto industry and supply chain. Lucid is no stranger to this, but we have continued to deliver against our time line and with the highest standard of quality***."

352.   Defendants' statements set forth in ¶¶ 349-50 affirming Defendants' 2022 production guidance of 20,000 units were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact, because at the time they made the statements Defendants knew that Lucid would produce less than 10,000 vehicles in 2022. *See* Section V.J.4.

---

[4]      In this Section, Lead Plaintiff has highlighted in ***bold and italics*** the portion of each statement that it alleges was materially false or misleading. Additional text is provided often for context, but that context can also contribute to the false and misleading nature of Defendants' statements.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

353.    Defendants' statements set forth in ¶¶ 349-50 affirming Lucid's 2022 production guidance of 20,000 units were also materially false and misleading when made, or omitted material facts necessary to render such statements not misleading, because the Company was experiencing severe and pervasive internal issues, including internal logistics issues and design flaws, that were already having a significant negative impact on Lucid's ability to mass produce the Air and which were nowhere near being remedied. *See* Sections V.J.1-3, VII.B. Accordingly Defendants had no reasonable basis to represent to investors that Lucid would make 20,000 vehicles in 2022, and were aware of undisclosed facts that tended to seriously undermine those statements' accuracy.

354.    Defendants' statements set forth in ¶¶ 349-50 pinning the Company's ability to meet the 2022 production target on external industry-wide supply problems—including stating that the target was "***not without risk, given ongoing challenges facing the automotive industry with global disruptions to supply chains and logistics***"—and telling investors that Lucid was already "***taking steps to mitigate***" the industry-wide challenges were also materially false or misleading when made, or omitted material facts necessary to render such statements not misleading for several reasons. *First*, Defendants already knew at the time they made these statements that Lucid would make less than 10,000 units in 2022, including because of the severe internal logistics, parts shortages, and design issues at Lucid. *Second*, by choosing to speak about external, global "***supply chain and logistic challenges that the automotive industry has been facing***," Defendants had a duty to speak completely and accurately about the factors underlying and impacting Lucid's production ability and actual production, and violated that duty. In particular, Defendants concealed from the market the panoply of internal issues unique to Lucid that had already severely impacted—and continued to impact—the Company's production of the Lucid Air, including that Lucid: (i) did not have a functional inventory system and instead relied on unreliable programs and *ad hoc* manual data entry and inventory tracking, *e.g.*, Section V.J.1.a; (ii) had no clue how much inventory it held or needed to order, but was refusing to conduct a full physical inventory review, *e.g.*, Sections V.J.1.b-d; (iii) was operating its Warehouse well-over capacity, and that its Warehouse and inventory tracking were in such disarray that the Company could not get the parts it needed to make cars to the production line, *e.g.*, Sections V.J.1.e-g; (iv) was experiencing significant issues with reflashing, sequencing, and quality checks at the Warehouse, which resulted in delays in delivering parts to the line,

as well as deficient parts being delivered to the line, *e.g.*, Section V.J.1.h; (v) was destroying and scrapping millions of dollars in parts, *e.g.*, Section V.J.1.i; (vi) had not designed its parts correctly, which meant suppliers could not produce them to specs, resulting in parts shortages and last minute rushed design changes, *e.g.*, Section V.J.2; (vii) was using deficient, out of spec parts to build cars, which resulted in time-consuming work-arounds on the production line, *id.*; and (viii) could not get parts into its Warehouse in a timely, efficient, or reliable manner, nor to the production line, which resulted in persistent and prolonged production shutdowns, *e.g.*, Sections V.J.1.j, V.J.3. Thus, by concealing these pervasive and ongoing internal problems, and instead blaming external, industry-wide factors and telling investors that they were already working to mitigate those external factors, Defendants gave investors the false or misleading impression that the potential risk to the 2022 production guidance was short-term, transient, and felt by the entire auto-making industry when in fact, Lucid's internal struggles were structural in nature, widespread, and ongoing. These statements also gave investors the false or misleading impression that the Company was internally ready and had the ability to ramp up production of the Lucid Air when it was not and did not.

355.     Defendants' statements set forth in ¶ 351 that despite "***a challenging environment as COVID-19 continues to present numerous obstacles for the auto industry and supply chain***," Lucid had "***continued to deliver against our time line and with the highest standard of quality***," were materially false and misleading when made, or omitted material facts necessary to render such statements not misleading, for the same reasons set forth in ¶ 354. Moreover, Defendants' statement that "***we have continued to deliver against our time line and with the highest standard of quality***" was materially false and misleading because Lucid had not delivered against it timeline but, rather, was not ready to and still did not have the ability to mass produce its vehicles because of the severe and pervasive internal issues that were impacting the Company's production. *E.g.*, Sections V.J.1-3. This statement was also materially false and misleading because of the host of problems with Lucid's design for the Air when Defendants started production, which resulted in part shortages because suppliers were unable to manufacture parts to meet Lucid's specs, Lucid rushing to make design changes even after production began and without proper cross-checks, Lucid building cars with deficient parts, and ultimately production delays. *E.g.*, Section V.J.2.

**B.** **November 16, 2021**

356. On November 16, 2021, Rawlinson participated in an interview with CNBC's Jim Cramer on behalf of the Company.

357. During the interview, Cramer asked, "[b]ut you have said, let's be clear about this, you have a lot of demand, 17,000. And that's not a problem for you to make. But you have dreams. Let's hopefully realities [sic] of 500,000 production and more."

358. Rawlinson responded: "*Absolutely. We already have a factory scale for 34,000 units a year. As soon as we can get this quality parts to the line, we can spool that up. The factory is there and ready for 34,000 units per annum*."

359. During the same interview, Cramer asked Rawlinson:

So if I go under the hood, which fortunately could be in a size of a suitcase, will I find the same Semiconductor shortage problem? Will I find the labor problem? I find all the things that are plaguing every other company in the automotive business. Or would they be looking at, say, an Apple phone and saying, you know what? Look, we've got the technology, the customers love it, and let's stop worrying about things that don't really mean anything to us.

360. Rawlinson responded:

We've been able to mitigate the semiconductor risk because as a tech company, we design all our printed circuit boards, our PCBAs, in house, and that means that we can design for alternative sourcing and different types of chip and that will reduce the risk. *So we've been able to mitigate that risk. That isn't to say we aren't vulnerable to today's supply chain shortages that the entire industry is facing, in fact, many industries are facing, that is something that we are a challenge with and we have mitigation plans for*.

361. Rawlinson's statements on behalf of Lucid set forth in ¶ 358 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading because they gave investors the false or misleading impression that Lucid was ready to ramp up production of the Lucid Air "*as soon as we can get [] quality parts to the line*," when, in truth, Lucid was nowhere near ready to "*spool [] up*" and produce up to 17,000 (or 34,000) vehicles. Rather, the Company was not ready to and still did not have the ability to "spool [] up" mass production of its vehicles because of the severe and pervasive internal issues that were impacting the Company's production. *E.g.*, Sections V.J.1-3. Moreover, Rawlinson had already admitted, internally, in October 2021 that Lucid would produce less than 10,000 units in 2022. *E.g.*, Sections V.J.4, VII.A.

362. Rawlinson's statements on behalf of Lucid set forth in ¶ 360 about "**supply chain shortages that the entire industry is facing**" which he told investors that "**we have mitigation plans for**" were also materially false or misleading when made, or omitted material facts necessary to render such statements not misleading for several reasons. By choosing to speak about external, global "**supply chain and logistic challenges that the automotive industry has been facing**," Defendants had a duty to speak completely and accurately about the factors underlying and impacting Lucid's production ability and actual production, and violated that duty. In particular, Defendants concealed from the market the panoply of internal issues unique to Lucid that had already severely impacted—and continued to impact—the Company's production of the Lucid Air, including that Lucid: (i) did not have a functional inventory system and instead relied on unreliable programs and *ad hoc* manual data entry and inventory tracking, *e.g.*, Section V.J.1.a; (ii) had no clue how much inventory it held or needed to order, but was refusing to conduct a full physical inventory review, *e.g.*, Sections V.J.1.b-d; (iii) was operating its Warehouse well-over capacity, and that its Warehouse and inventory tracking were in such disarray that the Company could not get the parts it needed to make cars to the production line, *e.g.*, Sections V.J.1.e-g; (iv) was experiencing significant issues with reflashing, sequencing, and quality checks at the Warehouse, which resulted in delays in delivering parts to the line, as well as deficient parts being delivered to the line, *e.g.*, Section V.J.1.h; (v) was destroying and scrapping millions of dollars in parts, *e.g.*, Section V.J.1.i; (vi) had not designed its parts correctly, which meant suppliers could not produce them to specs, resulting in parts shortages and last minute rushed design changes, *e.g.*, Section V.J.2; (vii) was using deficient, out of spec parts to build cars, which resulted in time-consuming work-arounds on the production line, *id.*; and (viii) could not get parts into its Warehouse in a timely, efficient, or reliable manner, nor to the production line, which resulted in persistent and prolonged production shutdowns, *e.g.*, Sections V.J.1.j, V.J.3. Thus, by concealing these pervasive and ongoing internal problems, and instead blaming external, industry-wide factors and telling investors that they were already working to mitigate those external factors, Defendants gave investors the false or misleading impression that the main factor impacting Lucid's production was short-term, transient, and felt by the entire auto-making industry when, in fact, Lucid's internal struggles were structural in nature, widespread, and ongoing. These statements also gave investors the false or misleading impression that

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the Company was internally ready and had the ability to ramp up production of the Lucid Air when it was not and did not.

363.    Moreover, none of Defendants' statements set forth in ¶ 358 and ¶ 360 were accompanied by cautionary language.

**C.    February 14, 2022**

364.    On February 14, 2022, Daniel Witt, Lucid's Head of State & Local Public Policy presented before the Arizona State Legislature's Transportation and Technology Committee on behalf of Lucid. Witt appeared in person and the presentation was livestreamed.

365.    During the hearing, Arizona State Senator, Rosanna Gabaldón, one of the committee members, asked Witt:

> [I]n regards to supplies, you know, you drive by any car dealership today and there's very few cars on their lot. I'm wondering how Lucid is addressing this? I guess I heard you say that there's orders and that people are going to be coming, et cetera. So I was wondering if you could address that.

366.    Witt responded: "***Yes, we're in a little bit of an enviable position in that we are so small this year, we're looking to produce about 20,000 units***." Witt further stated: "Much larger auto companies excuse me . . . ***much larger companies that produce millions of units annually are having a much more difficult time due to due to supply constraints than we ultimately are***."

367.    Arizona State Senator Gabaldón then asked Witt: "[Y]ou indicated all these employees, and, so the orders that you have, maybe I am misunderstanding, so the orders that you do have, [can be] filled at this time with individuals that have, the consumer who has purchased these vehicles."

368.    Witt responded, in part: "***We have the capacity to fill all the orders received to date and more.***"

369.    Defendants' statements set forth in ¶ 366 affirming Defendants' 2022 production guidance of 20,000 units were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact, because at the time they made the statements Defendants knew that Lucid would produce less than 10,000 vehicles in 2022. *E.g.*, Sections V.J.4, VII.A.

370.    Defendants' statements set forth in ¶ 366 affirming Lucid's 2022 production guidance of 20,000 units were also materially false and misleading when made, or omitted material facts necessary to render such statements not misleading, because the Company was experiencing severe and pervasive internal issues, including internal logistics issues and design flaws, that were already having a significant negative impact on Lucid's ability to mass produce the Air and which were nowhere near being remedied. *E.g.*, Sections V.J.1-3, VII.B. Accordingly Defendants had no reasonable basis to represent to investors that Lucid would make 20,000 vehicles in 2022, and were aware of undisclosed facts that tended to seriously undermine those statements' accuracy.

371.    Defendants' statements set forth in ¶ 366 and ¶ 368 concerning the purported "supply constraints" faced by "much larger companies," Lucid's "enviable position" vis-à-vis these companies because "***much larger companies . . . are having a much more difficult time due to due to supply constraints than we ultimately are***," and then-existing "***capacity to fill all the orders received to date and more***" were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading for the reasons set forth in ¶ 362. These statements were also false and misleading and because they gave investors the false or misleading impression that Lucid was currently in an "enviable position" compared to its peers and had the internal ability to mass produce vehicles to "fill all the orders received to date and more," when, in truth, because of severe and pervasive internal logistics and design problems, Lucid's production was already being severely impacted and the Company had no ability at that time to mass produce EVs. Here, by choosing to speak about Lucid's purported competitive advantages and the actual and then-existing state of the Company's production, Defendants had a duty to speak completely and accurately, and violated that duty.

372.    Moreover, none of Defendants' statements set forth in ¶ 366 and ¶ 368 were accompanied by cautionary language.

### D.    February 28, 2022

373.    On February 28, 2022, Lucid issued a press release on Form 8-K titled *Lucid Announces Fourth Quarter and Full Year 2021 Financial Results, Updates 2022 Outlook*. The Form 8-K was signed by House.

374.   In the press release, Defendants stated the following: "***Updating 2022 production outlook for Lucid Air to a range of 12,000 to 14,000 vehicles***."

375.   In the same press release, Rawlinson stated:

>     ***Looking ahead, we're updating our outlook for 2022 production to a range of 12,000 to 14,000 vehicles. This reflects the extraordinary supply chain and logistics challenges we've encountered and our unrelenting focus on delivering the highest-quality products***. We remain confident in our ability to capture the tremendous opportunities ahead given our technology leadership and strong demand for our cars[.]

376.   On February 28, 2022, Lucid hosted an earnings call to discuss its fourth quarter and full year 2021 financial results.

377.   During the earnings call, Rawlinson stated: "In the more immediate term, ***like many manufacturers, our production has been and indeed continued to be impacted by supply chain challenges***. As you saw from our press release today, ***we have updated our 2022 production outlook for Lucid Air to a range of 12,000 to 14,000 vehicles***."

378.   Rawlinson then stated:

>     ***The supply chain issues that we are experiencing from factors including components shortages, our insistence on the highest quality parts and logistics issues***. In some cases, the pandemic meant that our teams could not visit our suppliers in person to ensure alignment on engineering specifications and tooling. As travel has opened back up, our supplier quality teams have been able to address many of these issues. ***I will note that these issues are impacting only a handful of our approximately 250 suppliers and are not affecting critical single source or dual source components like semiconductors or batteries. Instead, it's been commodity items like glass and carpets, and we've adapted by changing our specifications or indeed switching vendors if needed***.

379.   Rawlinson also stated: "***We accomplished deep deliveries against the backdrop of an extraordinary supply chain and supply quality challenges. Indeed, we could have chosen to build faster, but we elected not to sacrifice quality, given our unwavering commitment to the highest standards***."

380.   During the same call, House stated:

>     ***All in, with everything we've accomplished recently, we have the elements in place to execute successfully on our plans, the core pillars for future scalability and growth***. Now turning to guidance. ***We're updating our outlook for 2022 production to a range of 12,000 to 14,000 vehicles. This projection represents our best estimate as we analyze our relationship with our suppliers and where the bottlenecks still exist in the supply chain, as well as our own internal plans to improve logistics. We expect to remain supply chain constrained in select parts of the business in the coming months, and project improvement in the second half of the year***.

381.    House further stated:

As mentioned by Peter [Rawlinson], *we are managing through supply chain challenges that you've heard about in numerous companies across industries this earning season*. At Lucid, we have the right experience and resources to help mitigate these issues. In some cases, we're buying ahead to reduce the risk of parts shortages.

382.    During the earnings call, Itay Michaeli – Citigroup Inc., Research Division – Director & Global Head of Autos Sector, asked:

A couple of questions. Just first, going back to the supply chain pressures. I was hoping you can maybe articulate it sounds like you expect most of the recovery to happen in the second half of the year. Maybe talk about how much visibility you have over the next few months with some of the suppliers you mentioned and just the degree of confidence of how to think about the cadence of improvement in production throughout the year.

383.    Rawlinson responded to Michaeli and stated:

Yes. Well, we have an earning focus on addressing some of the supply chain challenges. We see them to continue for the next few months. *But we see an uptake in the second half of the year. So we're really optimistic that we're going to be able to resolve these. And again, this is a small handful of suppliers. We're not talking about fundamental technologies here. We're talking largely paradoxically commodity suppliers, finishes, carpet, glass and things like that. And unfortunately, you can't sell a single quality car unless those -- particularly those visible parts are absolutely perfect.*

*So we're very optimistic that we will resolve, but it's going to take a few months, and the second half of the year, we'll see a significant uptake. And our guidance is based upon that premise*.

384.    Also during the call, John Joseph Murphy – BofA Securities, Research Division – MD and Lead United States Auto Analyst, asked:

[A]s you think about the causal factors for the reduction in your planned production this year, I mean, you're citing supply chain. It appears that maybe some of the capacity expansion and reorganization has put forth or been prioritized over ramping volume in the near term for the benefit in the long term, and there might be some other micro issues that we can't see.

I'm just wondering if you could kind of bucket those or maybe rank those in order of sort of impact. And then also as we think about this, does this change your outlook for 2023 volumes?  Or is this sort of short-term pain for long-term gain?

385.    In response, Rawlinson stated:

Those are interesting points. *I mean, first of all, I would say that we have been primarily constrained. We've got about 250 suppliers worldwide, notionally about 3,000 parts. And this has been really a phenomenon of just a small handful of our 250 suppliers. Paradoxically, we've been mainly impacted in a commodity supply parts. For example, finished parts, trim parts for the exterior, even glass and carpet. So it's not the core technologies of the vehicle that have been largely impacting us here. And we*

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*have – you're right, we've chosen quality over volume.* We don't want to get sucked into myopic view of short-term numbers. We're building a brand with a 10-year plan. And our customers have been really grateful and appreciative of the quality that we've built into our car, the build quality.

> *So we prioritize quality over numbers*.

386.    Defendants' statements set forth in ¶¶ 374-75, ¶ 377, and ¶ 380 issuing Defendants' 2022 production guidance of 12,000 to 14,000 units were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact, because at the time they made the statements Defendants knew that Lucid would produce less than 10,000 vehicles in 2022. *E.g.*, Sections V.J.4, VII.A.

387.    Defendants' statements set forth in ¶¶ 374-75, ¶ 377, and ¶ 380 issuing Defendants' 2022 production guidance of 12,000 to 14,000 units were also materially false and misleading when made, or omitted material facts necessary to render such statements not misleading, because the Company was experiencing severe and pervasive internal issues; including internal logistics issues and design flaws, that were already having a significant negative impact on Lucid's ability to mass produce the Air and which were nowhere near being remedied. *E.g.*, Sections V.J.1-3, VII.B. Accordingly Defendants had no reasonable basis to represent to investors that Lucid would make 12,000 to 14,000 units in 2022, and were aware of undisclosed facts that tended to seriously undermine those statements' accuracy. Moreover, these severe internal logistics issues were continuing to have a significant negative impact on production. *Id.*

388.    Defendants' statements set forth in ¶ 375, ¶¶ 377-81, ¶ 383, and ¶ 385 indicating that Lucid's slow production to date had been the result of global supply chain challenges impacting the entire industry, including statements that "like many manufacturers, our production has been and indeed continued to be impacted by supply chain challenges," were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading because Defendants' concealed one of the main reasons for the production slowdown and guidance cut. By choosing to speak about the reasons for Lucid's production slowdown, Defendants had a duty to speak completely and accurately about the factors underlying and impacting Lucid's production slowdown and actual production, and violated that duty. In particular, Defendants concealed from the market the panoply of

internal issues unique to Lucid that had already severely impacted—and continued to impact—the Company's production of the Lucid Air, including that Lucid: (i) did not have a functional inventory system and instead relied on unreliable programs and *ad hoc* manual data entry and inventory tracking, *e.g.*, Section V.J.1.a; (ii) had no clue how much inventory it held or needed to order, but was refusing to conduct a full physical inventory review, *e.g.*, Sections V.J.1.b-d; (iii) was operating its Warehouse well-over capacity, and that its Warehouse and inventory tracking were in such disarray that the Company could not get the parts it needed to make cars to the production line, *e.g.*, Sections V.J.1.e-g; (iv) was experiencing significant issues with reflashing, sequencing, and quality checks at the Warehouse, which resulted in delays in delivering parts to the line, as well as deficient parts being delivered to the line, *e.g.*, Section V.J.1.h; (v) was destroying and scrapping millions of dollars in parts, *e.g.*, Section V.J.1.i; (vi) had not designed its parts correctly, which meant suppliers could not produce them to specs, resulting in parts shortages and last minute rushed design changes, *e.g.*, Section V.J.2; (vii) was using deficient, out of spec parts to build cars, which resulted in time-consuming work-arounds on the production line, *id.*; and (viii) could not get parts into its Warehouse in a timely, efficient, or reliable manner, nor to the production line, which resulted in persistent and prolonged production shutdowns, *e.g.*, Sections V.J.1.j, V.J.3. Thus, by concealing these pervasive and ongoing internal problems, and instead blaming external, industry-wide factors and telling investors that they were already working to mitigate those external factors, Defendants gave investors the false or misleading impression that the main factor impacting Lucid's production was short-term, transient, and felt by the entire auto-making industry when, in fact, Lucid's internal struggles were structural in nature, widespread, and ongoing. These statements also gave investors the false or misleading impression that the Company was internally ready and had the ability to ramp up production of the Lucid Air when it was not and did not.

389.    Defendants' statements set forth in ¶ 380 and ¶ 383 pinning Lucid's ability to meet the 2022 production target of 12,000 to 14,000 to global supply chain challenges impacting the entire industry, including statements that "*[w]e expect to remain supply chain constrained in select parts of the business in the coming months, and project improvement in the second half of the year*" and "*we're very optimistic that we will resolve, but it's going to take a few months, and the second half of the year, we'll see a significant uptake. And our guidance is based upon that premise,*"

were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading for several reasons. *First*, these statements were materially false and misleading for the same reasons set forth in ¶¶ 386-88. Indeed, by blaming external, industry-wide factors, while concealing Lucid's pervasive and ongoing internal problems, Defendants gave investors the false and misleading impression that Lucid's was ability to mass produce vehicles and meet its production guidance hinged on the resolution of short-term, transient issues felt by the entire auto-making industry when, in fact, Defendants knew that, regardless of whether those issues resolved, the Company was experiencing severe and pervasive internal issues, including internal logistics issues and design flaws, that were already having a significant negative impact on Lucid's ability to mass produce the Air and which were nowhere near being remedied, and which would prevent it from meeting its production guidance. Indeed, by choosing to expressly identify the purported basis for Lucid's reduced production guidance and the Company's ability to meet it, Defendants had a duty to speak completely and accurately about the host of then-existing, adverse production impacts that had already resulted and were continuing to result from Lucid's many internal issues, and violated that duty. These statements also gave investors the false or misleading impression that the Company was internally ready and had the ability to ramp up production of the Lucid Air when it was not. *Second*, Defendants already knew at the time they made these statements that Lucid would make less than 10,000 units in 2022, including because of the severe internal logistics and parts shortages and design issues at Lucid. *E.g.*, Sections V.J.4, VII.A.

390.   Defendants' statements set forth in ¶ 379 and ¶ 385 indicating that Lucid was choosing to build slowly to focus on quality, including statements that "***we could have chosen to build faster, but we elected not to sacrifice quality, given our unwavering commitment to the highest standards***," "***we've chosen quality over volume***" were materially false and misleading when made, or omitted material facts necessary to render such statements not misleading, for the same reasons set forth in ¶ 388. Moreover, these statements were materially false and misleading because Defendants were not choosing to build slowly to focus on quality but, instead, were hampered by severe internal issues that rendered it impossible for them quickly ramp up production volumes. Indeed, Lucid was in such a rush to try to build cars that it decided to do so with parts there were out of spec, and was rushing to make last-minute

design changes as a quick fix to the part design problems, with no cross-functional checks. These statements were also materially false and misleading because they gave investors the misleading impression that Lucid was ready and able to ramp up production of the Air, but was slowing down to focus on quality, when in reality Lucid's internal logistics and parts designs were deficient and problematic and had already prevented the Company from mass producing the Air.

## E.    March 17, 2022

391.    On March 17, 2022, Reuters reported the following in an article entitled, *Rising Costs Have Lucid CEO Eyeing Price Hike for Future Electric Cars*:

> Lucid in February cut its production forecast for this year to a range of 12,000 to 14,000, from its original target of 20,000 vehicles, citing "extraordinary supply chain and logistics challenges." Its shares slid after that announcement.
>
> ***Rawlinson on Thursday said the bottlenecks were caused by a handful of suppliers for windshield glass, carpeting and some exterior trim parts. "I'm super frustrated because we're not gated by silicon chips, we're not gated by our ability to make electric motors," Rawlinson said***.

392.    Defendants' statements set forth in ¶ 391 blaming Lucid's production slowdown and lowered guidance on global "supply chain" issues that impacted the industry as a whole were materially false and misleading when made, or omitted material facts necessary to render such statements not misleading, because Defendants' concealed one of the main reasons for the production slowdown and guidance cut. In particular, Defendants concealed from the market the panoply of internal issues unique to Lucid that had already severely impacted—and continued to impact—the Company's production of the Lucid Air, including that Lucid: (i) did not have a functional inventory system and instead relied on unreliable programs and *ad hoc* manual data entry and inventory tracking, *e.g.*, Section V.J.1.a; (ii) had no clue how much inventory it held or needed to order, but was refusing to conduct a full physical inventory review, *e.g.*, Sections V.J.1.b-d; (iii) was operating its Warehouse well-over capacity, and that its Warehouse and inventory tracking were in such disarray that the Company could not get the parts it needed to make cars to the production line, *e.g.*, Sections V.J.1.e-g; (iv) was experiencing significant issues with reflashing, sequencing, and quality checks at the Warehouse, which resulted in delays in delivering parts to the line, as well as deficient parts being delivered to the line, *e.g.*, Section V.J.1.h; (v) was destroying and scrapping millions of dollars in parts, *e.g.*, Section V.J.1.i; (vi) had not designed

its parts correctly, which meant suppliers could not produce them to specs, resulting in parts shortages and last minute rushed design changes, *e.g.*, Section V.J.2; (vii) was using deficient, out of spec parts to build cars, which resulted in time-consuming work-arounds on the production line, *id.*; and (viii) could not get parts into its Warehouse in a timely, efficient, or reliable manner, nor to the production line, which resulted in persistent and prolonged production shutdowns, *e.g.*, Sections V.J.1.j, V.J.3. Thus, by concealing these pervasive and ongoing internal problems, and instead blaming external, industry-wide factors and telling investors that they were already working to mitigate those external factors, Defendants gave investors the false or misleading impression that the main factor impacting Lucid's production was short-term, transient, and felt by the entire auto-making industry when, in fact, Lucid's internal struggles were structural in nature, widespread, and ongoing. These statements also gave investors the false or misleading impression that the Company was internally ready and had the ability to ramp up production of the Lucid Air when it was not and did not.

### F.    April 28, 2022

393.    On April 28, 2022, the Company filed a Proxy Statement on Schedule 14A that contained a Letter to Stockholders from Rawlinson. Therein, Rawlinson stated: "***We are not immune to the challenging global environment that has impacted parts of our supply chain and logistics, but our team continues to work hard to mitigate these risks***."

394.    Defendants' statements set forth in ¶ 393 that "***the challenging global environment***" "***has impacted parts of our supply chain and logistics, but our team continues to work hard to mitigate these risks***" were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading because Defendants' concealed one of the main reasons for the production slowdown and guidance cut. By choosing to speak about these purported headwinds, Defendants had a duty to speak completely and accurately about the factors underlying and impacting Lucid's production slowdown and actual production, and violated that duty. In particular, Defendants concealed from the market the panoply of internal issues unique to Lucid that had already severely impacted—and continued to impact—the Company's production of the Lucid Air, including that Lucid: (i) did not have a functional inventory system and instead relied on unreliable programs and *ad hoc* manual data entry and inventory tracking, *e.g.*, Section V.J.1.a; (ii) had no clue how much inventory it held or needed to order,

but was refusing to conduct a full physical inventory review, *e.g.*, Sections V.J.1.b-d; (iii) was operating its Warehouse well-over capacity, and that its Warehouse and inventory tracking were in such disarray that the Company could not get the parts it needed to make cars to the production line, *e.g.*, Sections V.J.1.; (iv) was experiencing significant issues with reflashing, sequencing, and quality checks at the Warehouse, which resulted in delays in delivering parts to the line, as well as deficient parts being delivered to the line, *e.g.*, Section V.J.1.h; (v) was destroying and scrapping millions of dollars in parts, *e.g.*, Section V.J.1.i; (vi) had not designed its parts correctly, which meant suppliers could not produce them to specs, resulting in parts shortages and last minute rushed design changes, *e.g.*, Section V.J.2; (vii) was using deficient, out of spec parts to build cars, which resulted in time-consuming work-arounds on the production line, *id.*; and (viii) could not get parts into its Warehouse in a timely, efficient, or reliable manner, nor to the production line, which resulted in persistent and prolonged production shutdowns, *e.g.*, Sections V.J.1.j, V.J.3. Thus, by concealing these pervasive and ongoing internal problems, and instead blaming external, industry-wide factors and telling investors that they were already working to mitigate those external factors, Defendants gave investors the false or misleading impression that the main factor impacting Lucid's production was short-term, transient, and felt by the entire auto-making industry when, in fact, Lucid's internal struggles were structural in nature, widespread, and ongoing. These statements also gave investors the false or misleading impression that the Company was internally ready and had the ability to ramp up production of the Lucid Air when it was not and did not.

### G.    May 5, 2022

395.    On May 5, 2022, Lucid issued press release on Form 8-K titled *Lucid Reports First Quarter 2022 Financial Results*. The Form 8-K was signed by House.

396.    In the press release, Defendants stated that "***Lucid reiterated its 2022 production volume outlook of 12,000 to 14,000 vehicles***" and that Lucid's "***[p]roduction volume outlook for 2022 remains on track at 12,000 to 14,000 vehicles***."

397.    In the same press release, Rawlinson stated: "***We continued to make progress in the first quarter of 2022 despite on-going global supply chain challenges***."

398.    In the press release, House stated: "***Similar to many companies in our industry, we continue to face global supply chain and logistics challenges, including Covid-related factory shutdowns in China. We are working closely with our suppliers to mitigate the impact of disruptions***."

399.    House further stated: "***While any extended disruptions could result in an impact to our production forecast, today we are reiterating our 12,000-14,000 vehicle production forecast for 2022 based on the information we have at this point combined with our mitigation plans***."

400.    The same day, May 5, 2022, Lucid hosted an earnings call to discuss its first quarter 2022 financial results. During the earnings call, Rawlinson stated that "in April alone, we delivered well over 300 vehicles, demonstrating our accelerated production ramp. ***And this growth progression keeps us nicely on track for our 12,000 to 14,000 production targets***."

401.    Rawlinson further stated: "***I do want to highlight that supply chain dynamics are very fluid, and the COVID lockdowns in China that's impacting others in the industry are also resulting in some bottlenecks for us***."

402.    During the earnings call, House also stated:

Moving to our production outlook. ***Similar to many companies in our industry, we continue to face global supply chain and logistics challenges, including COVID-related factory shutdowns in China. We are working closely with our suppliers to mitigate the impact of disruption. While any extended disruptions could result in an impact to our production forecast, today we are reiterating our 12,000 to 14,000 vehicle production guidance for 2022 based on the information we have at this point, combined with our mitigation plan***.

403.    During the call, Itay Michaeli – Citigroup Inc., Research Division – Director & Global Head of Autos Sector, asked if Lucid could provide "[a]ny kind of early update on Q2, maybe an April number?"

404.    House responded to Michaeli and stated:

So Itay, as we said in our prepared remarks, ***we are reiterating our 12,000 to 14,000 guidance for the balance of the year, so long as the supply chain logistics disruptions aren't material and our mitigation plans are effectiv***e. And we've been watching the China lockdown situation really closely. We have had a little bit of impact there. We had a couple of days that we did shut down, and we did have a little bit of slowing for about 1.5 weeks in April. But we have mitigation plans in place. We were able to get access to some warehouses. We're able to move production to another area of China in one case.

405.   In response to the same question, Rawlinson stated that "*[w]e're reiterating our 12,000 to 14,000 vehicle production forecast for '22. And that's based on the information we have at this point, combined with our current mitigation plans*."

406.   In conjunction with the May 5, 2022 earnings call, Defendants published a slide which stated: "*Production Volume • 12,000-14,000 vehicles*."

407.   Defendants' statements set forth in ¶ 396, ¶ 399, ¶ 400, ¶ 402, and ¶¶ 404-06 affirming Defendants' 2022 production guidance of 12,000 to 14,000 units were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact, because at the time they made the statements Defendants knew that Lucid would produce less than 10,000 vehicles in 2022. *E.g.*, Sections V.J.4, VII.A.

408.   Defendants' statements set forth in ¶ 396, ¶ 399, ¶ 400, ¶ 402, and ¶¶ 404-06 affirming Defendants' 2022 production guidance of 12,000 to 14,000 units were also materially false and misleading when made, or omitted material facts necessary to render such statements not misleading, because the Company was experiencing severe and pervasive internal issues, including internal logistics issues and design flaws, that were already having a significant negative impact on Lucid's ability to mass produce the Air and which were nowhere near being remedied. *E.g.*, Sections V.J.1-3, VII.B. Accordingly Defendants had no reasonable basis to represent to investors that Lucid would make 12,000 to 14,000 units in 2022, and were aware of undisclosed facts that tended to seriously undermine those statements' accuracy. Moreover, these severe internal logistics issues were continuing to have a significant negative impact on production. *Id*.

409.   Defendants' statements set forth in ¶¶ 397-98, ¶¶ 401-02, and ¶ 405 indicating that Lucid's slow production to date had been the result of global supply chain challenges impacting the entire industry, including representing that "*[s]imilar to many companies in our industry, we continue to face global supply chain and logistics challenges, including Covid-related factory shutdowns in China. We are working closely with our suppliers to mitigate the impact of disruption*," "*[w]e continued to make progress in the first quarter of 2022 despite on-going global supply chain challenges*," and "*the COVID lockdowns in China that's impacting others in the industry are also resulting in some bottlenecks for us*," were materially false or misleading when made, or omitted

material facts necessary to render such statements not misleading for several reasons because Defendants' concealed one of the main reasons for the production slowdown plaguing the Company. By choosing to speak about the reasons for Lucid's production slowdown, Defendants had a duty to speak completely and accurately about the factors underlying and impacting Lucid's production slowdown and actual production, and violated that duty. In particular, Defendants concealed from the market the panoply of internal issues unique to Lucid that had already severely impacted—and continued to impact—the Company's production of the Lucid Air, including that Lucid: (i) did not have a functional inventory system and instead relied on unreliable programs and *ad hoc* manual data entry and inventory tracking, *e.g.*, Section V.J.1.a; (ii) had no clue how much inventory it held or needed to order, but was refusing to conduct a full physical inventory review, *e.g.*, Sections V.J.1.b-d; (iii) was operating its Warehouse well-over capacity, and that its Warehouse and inventory tracking were in such disarray that the Company could not get the parts it needed to make cars to the production line, *e.g.*, Sections V.J.1.e-g; (iv) was experiencing significant issues with reflashing, sequencing, and quality checks at the Warehouse, which resulted in delays in delivering parts to the line, as well as deficient parts being delivered to the line, *e.g.*, Section V.J.1.h; (v) was destroying and scrapping millions of dollars in parts, *e.g.*, Section V.J.1.i; (vi) had not designed its parts correctly, which meant suppliers could not produce them to specs, resulting in parts shortages and last minute rushed design changes, *e.g.*, Section V.J.2; (vii) was using deficient, out of spec parts to build cars, which resulted in time-consuming work-arounds on the production line, *id.*; and (viii) could not get parts into its Warehouse in a timely, efficient, or reliable manner, nor to the production line, which resulted in persistent and prolonged production shutdowns, *e.g.*, Sections V.J.1.j, V.J.3. Thus, by concealing these pervasive and ongoing internal problems, and instead blaming external, industry-wide factors and telling investors that they were already working to mitigate those external factors, Defendants gave investors the false or misleading impression that the main factor impacting Lucid's production was short-term, transient, and felt by the entire auto-making industry when, in fact, Lucid's internal struggles were structural in nature, widespread, and ongoing. These statements also gave investors the false or misleading impression that the Company was internally ready and had the ability to ramp up production of the Lucid Air when it was not and did not.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

410.    Defendants' statements set forth in ¶ 399, ¶ 402, and ¶¶ 404-05 pinning Lucid's ability to meet the 2022 production target of 12,000 to 14,000 to global supply chain challenges impacting the entire industry, including statements that "*we are reiterating our 12,000 to 14,000 guidance for the balance of the year, so long as the supply chain logistics disruptions aren't material and our mitigation plans are effective*," were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading for several reasons. *First*, these statements were materially false and misleading for the same reasons set forth in ¶¶ 407-09. Indeed, by blaming external, industry-wide factors, while concealing Lucid's pervasive and ongoing internal problems, Defendants gave investors the false and misleading impression that Lucid's ability to mass produce vehicles and meet its production guidance hinged on the resolution of short-term, transient issues felt by the entire auto-making industry when, in fact, Defendants knew that, regardless of whether those issues resolved, the Company was experiencing severe and pervasive internal issues, including internal logistics issues and design flaws, that were already having a significant negative impact on Lucid's ability to mass produce the Air and which were nowhere near being remedied, and which would prevent it from meeting its production guidance. Indeed, by choosing to speak about factors impacting the Company's ability to meet its guidance, Defendants had a duty to speak completely and accurately about the host of then-existing, adverse production impacts that had already resulted and were continuing to result from Lucid's many internal issues, and violated that duty. These statements also gave investors the false or misleading impression that the Company was internally ready and had the ability to ramp up production of the Lucid Air when it was not. *Second*, Defendants already knew at the time they made these statements that Lucid would make less than 10,000 units in 2022, including because of the severe internal logistics and parts shortages and design issues at Lucid. Sections V.J.4, VII.A.

**H.    May 20, 2022**

411.    On May 20, 2022, Rawlinson participated in an interview with Lara Habib Chamat of Al Arabiya News Channel on behalf of the Company in which he was asked:

> Let's discuss now your global operations. We know that the company is facing some issues in delivering the cars due to supply chain disruptions. We know that Lucid lowered the annual production target to 12,000 cars versus original prediction of 20,000 cars for this year. When do you expect, when do you expect things to look better?

412.    In response, Rawlinson stated:

Our challenge now is to ramp up the volume of this incredible machine. ***We're facing global supply chain challenges, as is all the auto industry and other industries. And we're working assiduously to overcome our near-term challenges with commodity goods are being resolved and we're looking forward to hitting our 12 to 14,000 units that we're targeting for production this year***.

413.    Defendants' statements set forth in ¶ 412 affirming Defendants' 2022 production guidance of 12,000 to 14,000 units were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact, because at the time they made the statements Defendants knew that Lucid would produce less than 10,000 vehicles in 2022. *E.g.*, Sections V.J.4, VII.A.

414.    Defendants' statements set forth in ¶ 412 affirming Defendants' 2022 production guidance of 12,000 to 14,000 units were also materially false and misleading when made, or omitted material facts necessary to render such statements not misleading, because the Company was experiencing severe and pervasive internal issues, including internal logistics issues and design flaws, that were already having a significant negative impact on Lucid's ability to mass produce the Air and which were nowhere near being remedied. *E.g.*, Sections V.J.1-3, VII.B. Accordingly Defendants had no reasonable basis to represent to investors that Lucid would make 12,000 to 14,000 units in 2022, and were aware of undisclosed facts that tended to seriously undermine those statements' accuracy. Moreover, these severe internal logistics issues were continuing to have a significant negative impact on production. *Id*.

415.    Defendants' statements set forth in ¶ 412 concerning purported "supply chain challenges" and representing that Lucid was "***facing global supply chain challenges, as is all the auto industry and other industries***" and was "***working assiduously to overcome our near-term challenges with commodity goods***" were materially false and misleading when made, or omitted material facts necessary to render such statements not misleading, because Defendants' concealed one of the main reasons for the production slowdown. By choosing to speak about the reasons for Lucid's production slowdown and risks to meeting guidance, Defendants had a duty to speak completely and accurately about the factors underlying and impacting Lucid's production slowdown and actual production, and violated that duty. In particular, Defendants concealed from the market the panoply of internal issues unique to Lucid that had already severely impacted—and continued to impact—the Company's production of the Lucid Air,

including that Lucid: (i) did not have a functional inventory system and instead relied on unreliable programs and *ad hoc* manual data entry and inventory tracking, *e.g.*, Section V.J.1.a; (ii) had no clue how much inventory it held or needed to order, but was refusing to conduct a full physical inventory review, *e.g.*, Sections V.J.1.b-d; (iii) was operating its Warehouse well-over capacity, and that its Warehouse and inventory tracking were in such disarray that the Company could not get the parts it needed to make cars to the production line, *e.g.*, Sections V.J.1.e-g; (iv) was experiencing significant issues with reflashing, sequencing, and quality checks at the Warehouse, which resulted in delays in delivering parts to the line, as well as deficient parts being delivered to the line, *e.g.*, Section V.J.1.h; (v) was destroying and scrapping millions of dollars in parts, *e.g.*, Section V.J.1.i; (vi) had not designed its parts correctly, which meant suppliers could not produce them to specs, resulting in parts shortages and last minute rushed design changes, *e.g.*, Section V.J.2; (vii) was using deficient, out of spec parts to build cars, which resulted in time-consuming work-arounds on the production line, *id.*; and (viii) could not get parts into its Warehouse in a timely, efficient, or reliable manner, nor to the production line, which resulted in persistent and prolonged production shutdowns, *e.g.*, Sections V.J.1.j, V.J.3. Thus, by concealing these pervasive and ongoing internal problems, and instead blaming external, industry-wide factors and telling investors that they were already working to mitigate those external factors, Defendants gave investors the false or misleading impression that the main factor impacting Lucid's production was short-term, transient, and felt by the entire auto-making industry when, in fact, Lucid's internal struggles were structural in nature, widespread, and ongoing. Indeed, by choosing to speak about the actual and then-existing state of the Company's production and the factors impacting its ability to "ramp up the volume," Defendants had a duty to speak completely and accurately about the host of then-existing, adverse production impacts that had already resulted and were continuing to result from Lucid's many internal issues, and violated that duty. These statements also gave investors the misleading impression that the Company was internally ready and had the ability to ramp up production of the Lucid Air when it was not and did not.

416.    Moreover, Defendants' statements set forth in ¶ 412 were not accompanied by cautionary language.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**I.    May 26, 2022**

417.    In an article published by the Business Insider on May 26, 2022, Nat Lingo, a Lucid spokesperson, stated on behalf of the Company that Lucid was "***committed to maintaining a consistent, high level of quality as we ramp production towards our year-end goal of 12,000 to 14,000 vehicles***."

418.    Defendants' statements set forth in ¶ 417 affirming Defendants' 2022 production guidance of 12,000 to 14,000 units were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact, because at the time they made the statements Defendants knew that Lucid would produce less than 10,000 vehicles in 2022. *E.g.*, Sections V.J.4, VII.A.

419.    Defendants' statements set forth in ¶ 417 affirming Defendants' 2022 production guidance of 12,000 to 14,000 units were also materially false and misleading when made, or omitted material facts necessary to render such statements not misleading, because the Company was experiencing severe and pervasive internal issues, including internal logistics issues and design flaws, that were already having a significant negative impact on Lucid's ability to mass produce the Air and which were nowhere near being remedied. *E.g.*, Sections V.J.1-3, VII.B. Accordingly Defendants had no reasonable basis to represent to investors that Lucid would make 12,000 to 14,000 units in 2022, and were aware of undisclosed facts that tended to seriously undermine those statements' accuracy. Moreover, these severe internal logistics issues were continuing to have a significant negative impact on production.

420.    Moreover, Defendants' statements set forth in ¶ 417 were not accompanied by cautionary language.

**VII.    ADDITIONAL ALLEGATIONS OF SCIENTER**

421.    The facts detailed above, when viewed holistically and together with the other allegations in this Complaint, establish a strong inference that each of the Defendants knew or was severely reckless in not knowing that each of the misrepresentations and omissions alleged herein would be, and was, misleading to investors at the time it was made.

422.    In addition to the facts set forth above, the following facts also support a strong inference of scienter.

**A.    Defendants Knew Lucid Would Not Achieve Its Production Guidance**

423.    Defendants had actual knowledge prior to each announcement and re-affirmation of Lucid's production targets for 2022 that the Company could not and would not achieve those targets. As set forth above, in October and/or November 2021, Defendant Rawlinson, along with Hasenkamp, Hochholdinger, Bach, and Boike, admitted, internally, that Lucid was going to miss its year-end vehicle production targets for 2021, 2022, and 2023. These statements were made during start-of-shift meetings, end-of-shift meetings, and other meetings attended by FE-2, and the attendees, including FE-2, were told that Lucid's miss was confidential information and not to share it. ¶ 288 Moreover, at a meeting in October 2021 or the first week of November 2021, Rawlinson stated internally that Lucid would produce less than 10,000 vehicles in 2022. ¶ 289. In addition, Rawlinson was specifically told by FE-1 in September 2021 and November 2021, during discussions they had at the Warehouse, that Lucid would never meet its production goals because of the ongoing internal logistics problems. ¶¶ 291-92. Defendants also knew that Lucid's severe internal issues were significantly impacting its ability to produce the Lucid Air and that, as a result, the Company's guidance projections lacked any reasonable basis. *See infra* Section VII.B.

**B.    Defendants Knew Of The Widespread, Internal Problems At Lucid And Their Adverse Impact on Lucid's Production**

424.    As set forth fully in Section V.J, statements from numerous former Lucid employees establish that prior to and throughout the Class Period, Defendants knew but failed to disclose that Lucid was experiencing widespread ***internal*** logistics and part design problems.

425.    *First*, Rawlinson frequently visited the Warehouse and the Plant, and was repeatedly told about the pervasive, widespread issues with Lucid's internal logistics. In September 2021, for example, FE-1 told Rawlinson about the problems at the Warehouse, including the reflashing issues and the multiple issues with parts, such as the inability to find parts, parts getting damaged, and parts being scrapped. In November 2021, FE-1 had another over 30 minute in-person conversation with Rawlinson at the Warehouse, during which he again told Rawlinson about the same issues. During that conversation, FE-1 also told Rawlinson that the problems at the Warehouse were getting worse, and that, in all of the years FE-1 had worked in logistics, he had never seen as big of a mess as what FE-1 experienced at

Lucid's Warehouse. Then, in late January or early February 2022, FE-1 again discussed with Rawlinson the problems at the Warehouse during one of Rawlinson's visits, and why it was failing, this time emphasizing to Rawlinson that Lucid needed to do a physical inventory to fix the disorganization, figure out what parts it actually had, and because Lucid had never done a full physical inventory.

426.    Rawlinson's regular, in-person presence at the Warehouse and the Plant and first-hand observation of the many problems at those facilities is confirmed by numerous former employees, all of whom personally interacted with or saw Rawlinson during such visits. In addition to FE-1, who met with and discussed Lucid's many internal logistic issues with Rawlinson on several occasions during his visits (discussed above) in September 2021, November 2021, and late January or early February 2022, FE-6 confirmed that Rawlinson ramped up his presence at the Plant in mid-2021, visiting up to once per week, and that his visits were more frequent between June 2021 and October 2021. FE-5 stated that Rawlinson came to the Plant once every couple of weeks starting in the fall of 2021. FE-8 recalled that Rawlinson made six to ten trips to the Warehouse in a three-month period around November 2021. FE-4 recalled seeing Rawlinson at the Warehouse during the first or second week of December 2021, and again in mid-to-late January 2022, and stated that the Warehouse was a mess every time that Rawlinson was there. FE-3 recalled Rawlinson visiting the Warehouse in February 2022. FE-7 indicated that Rawlinson was at the Plant at least once or twice a month and met with the department heads. Thus, Rawlinson had first-hand knowledge of and viewed, in real-time, the many internal issues that had and continued to delay Lucid's production of the Air. Indeed, Rawlinson was provided with the Daily AM and Daily PM reports, which covered all inventory stored at Lucid's warehouse and included, among other things, information concerning parts that were sent to the manufacturing facility, stock outs, the number of daily truck hauls, production sets, problems with assembly kits in the warehouse, and the number of hot calls in a day.

427.    *Second*, Rawlinson and House were present at and/or participated in meetings and conversations prior to and throughout the Class Period in which Lucid's internal logistic issues were discussed. FE-10 recalled Rawlinson referencing the problems at the Warehouse during an all-hands meeting in September or October of 2021, and saying that everyone in the Company had to work to try to solve all of the Warehouse issues. FE-5 said that a report was provided during a Town Hall Meeting that occurred once a month or every six weeks, which Rawlinson attended by phone, and that during FE-5's

tenure, Rawlinson acknowledged the inventory system was not working. FE-2 said that he remembers very clearly that upper management, including Rawlinson, were at meetings where the inventory issues were discussed. FE-2 recalled that near the end of his employment with Lucid, Rawlinson talked about inventory control issues having caused delays and impacted Lucid's production. FE-2 said that during a November 2021 meeting he attended with Hasenkamp at the Warehouse, the broken inventory system was discussed and Hasenkamp was told that there was no way that Lucid could function properly if it was not fixed, and FE-2 was further aware that the contents of this meeting were relayed to Rawlinson. Indeed, Rawlinson was briefed week-after-week that SAP was not working, according to FE-5, including around the fall of 2021, when FE-5's boss gave Rawlinson a run through about how SAP was not working and explained the separate, but concurrently run spreadsheet inventory system to Rawlinson. House likewise knew of these issues, including because specific requests were made to her for full inventories to remedy inventory issues, and requests were made by Hochholdinger to House to approve the scrapping of $22 million in material so that Lucid could start fresh.

428.    Rawlinson was also present at and/or participated in meetings and discussions in which Lucid's part design and shortage issues were discussed. For example, according to FE-10, at CTO meetings that Rawlinson conducted and FE-10 attended, door gap issues were discussed in July or August 2021, and issues with the cantrail appliques were discussed starting in September or October 2021. FE-10 indicated that Rawlinson was aware that there was no cross-functional checking for design changes, and was told about the issues with the Body in White panels, which were discussed during at least one CTO meeting. FE-7 advised that every Friday there was an hour long zoom call—a meeting for everyone in the Plant—reviewing everything that needed to be fixed. FE-7 explained that the department heads gave presentations for their group and that Rawlinson would be on these calls once or twice a month. FE-7 further explained that the department heads would raise all pertinent issues.

429.    *Third*, Rawlinson and House were likewise both specifically informed about the Company's need to conduct full physical inventories in light of the debilitating inventory issues the Lucid was experiencing. In response to all such requests to conduct a physical inventory, Rawlinson or House either denied the request, or the resulting inventory was abruptly terminated before completion. For example, in or around July 2021, FE-2 attended an inventory meeting with House and other members

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

of Lucid upper-management (including Hasenkamp, Hochholdinger, and Boike), during which FE-2 was told that his request for a full physical inventory count and parts relabeling was denied because management did not want to impact Lucid's "books." FE-2 was told never to bring it up again. In or around February 2022, after agreeing to shut down production for two weeks to facilitate a full physical inventory, Rawlinson backtracked.

430.    *Fourth*, Rawlinson was also aware of numerous production shutdowns, including, according to FE-2, shutdowns in September and October of 2021. FE-2 stated that the October shutdown in manufacturing lasted for approximately several weeks due to a combination of parts shortages and software issues with the electronic control units ("ECUs") and car seat software, which needed to be repeatedly "flashed." FE-2 was told that Rawlinson was upset at the issues and confirmed that Rawlinson came to the Plant for a visit during that time.

431.    *Fifth*, Rawlinson took affirmative measures to address or Band-Aid the problems at the Warehouse, which is further indicia of his actual knowledge of the problems within the Warehouse. FE-2 was told by, among others, Hochholdinger, that Rawlinson made significant organizational changes to Lucid's Logistics group in-mid-August 2021 because he felt that Hasenkamp had failed in managing Lucid's inventory Warehouse, SAP implementation, and overall delivery, and because Lucid was not producing vehicles fast enough. Around November 2021, Rawlinson assigned Jakobs to the Warehouse to try to fix the problems and to be Rawlinson's "eyes and ears" at the Warehouse, and also sent a team of additional executives to the Warehouse to try to get the problems fixed. Lucid likewise moved Inglis to serve as interim manager of the Warehouse at some point between late summer 2021 and early November 2021, according to FE-4 and FE-8. Rawlinson also introduced the failed "Warehouse on Wheels" initiative.

432.    *Sixth*, the actual knowledge of multiple executives, senior managers, and employees at Lucid, who were aware of the material, adverse facts set forth in, *e.g.*, Section V.J, including through their participation in meetings and discussions, receipt of periodic (often daily) reports, and personal observations at the Warehouse and the Plant, is imputed to Lucid.

### C.    The Production And Sale Of The Lucid Air Was Critical To Lucid's Operations

433.    Defendants' fraud concerned Lucid's core operation—the production and sale of the Lucid Air—which was the Company's most important revenue driver. Moreover, at all relevant times, Lucid built its full vehicles at just one Plant and had just one Warehouse.

434.    There is no genuine question that Lucid's financial success and growth were entirely dependent on Lucid Air sales. From the start, Lucid told the market in no uncertain terms that the Company would "initially depend on revenue generated from a single model," the Lucid Air. And it did. Approximately 80% of Lucid's total reported revenue for 4Q 2021 resulted from its initial deliveries of the Lucid Air, according to the Company. For 1Q 2022, Lucid did not specifically break out the total revenues derived from sales of the Lucid Air, but House did announce that, "[Lucid's] Q1 revenue was $57.7 million, primarily driven by higher customer deliveries of Lucid Air vehicles." By 2Q 2022, Defendants announced that "automotive revenue from the delivery of 679 [Lucid Airs]" delivered a staggering 98% of Lucid's total revenues.

435.    Moreover, Defendants made clear to the market that the Company's ability to generate revenue and grow the Company was almost entirely reliant on its ability to mass produce the Air. While Lucid repeatedly highlighted "anticipated" revenues stemming from its customer reservations, the Company could not recognize this revenue until it actually made and delivered cars. Thus, Rawlinson acknowledged that "[t]here's no point in having a 520 mile car out there if no one's driving it," and that "[u]ntil we get this thing into production, we haven't achieved a damn thing." For this reason, he likewise assured investors that "[w]hat we've got to do is up the number of cars we're making [in Arizona]," and "[t]hat's my laser focus right now." Put simply, Rawlinson stated, "until [Lucid] ma[kes] a production car and [] start[s] selling to customers, . . . [it hasn't] achieved a damn thing."

### D.    Defendants Repeatedly Spoke About The Issues At The Center Of The Fraud

436.    Defendants' statements during the Class Period strongly and plausibly suggest each had access to negative material undisclosed information. Throughout the Class Period, they regularly and repeatedly spoke about and reaffirmed Lucid's production volume guidance for 2022. *E.g.*, Section VI. When Lucid experienced production delays, Defendants pointed investors to temporary, global, industry-wide supply chain issues as the primary impediment to Lucid achieving its production targets. *Id*. Indeed,

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

throughout the Class Period, analysts specifically asked each Defendant numerous times to discuss Lucid's production problems and the basis for Defendants' guidance. *Id*. In response, Defendants never once identified Lucid's rampant internal logistics issues that were contemporaneously preventing the Company from reaching its publicly-stated production goals. *Id*. These repeated statements about the amount of vehicles Lucid would produce and the reasons for its production delays demonstrate that Defendants had knowledge of and access to information about those topics, or, at the very least, that they were reckless in failing to investigate the very issues on which they spoke publicly.

E.   **Defendants Controlled The Contents of Lucid's Public Statements and Had Unfettered Access To Information Contrary To Their Statements**

437.   The Individual Defendants' control over the entire Company and access to non-public information also support a strong inference of scienter. As Lucid's top executives during the Class Period, Defendants Rawlinson and House (CEO and CFO, respectively) controlled the Company's day-to-day operations and were informed of and unquestionably intimately involved with Lucid's production guidance and information about the factors underlying Lucid's performance, as indicated above.

438.   The Individual Defendants' high-level positions, and their involvement with Lucid's core operation, allowed them to control the contents of the material misstatements alleged in Section VI. Each of the Individual Defendants controlled the contents of the oral statements they made during various earnings calls and investor conferences during the Class Period. In addition, because of their high-level positions, each Individual Defendant was provided with, or had access to, copies of the press releases, SEC filings, and presentations alleged herein to be false and misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

439.   Moreover, throughout the Class Period, former employees at Lucid identified numerous internal reports and systems that contained the material, adverse facts set forth in Section V.J. concerning Lucid's internal issues at the Warehouse and Plant. Additionally, because of their high-level positions and access to material non-public information concerning the Company, the Individual Defendants knew, or were deliberately reckless in not knowing, that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made to investors were materially false, misleading, and incomplete, and/or lacked any reasonable basis.

440.    The Individual Defendants were responsible for the accuracy of Lucid's corporate statements, and each is therefore responsible and liable for the false and misleading representations contained therein or material information omitted therefrom. Lucid knowingly and/or recklessly made the materially false and misleading statements and omissions of material fact alleged herein based on the fact that the Individual Defendants and other individuals at Lucid whose knowledge can be imputed to the Company knew and/or recklessly disregarded that the Company's statements were materially false and misleading and/or omitted material facts at the times that such statements were made. Each of the Individual Defendants was among the most senior executives of the Company throughout the Class Period and a member of the Company's management, and their knowledge may be imputed to the Company.

**F.    The Temporal Proximity Between Defendants' Material Misrepresentations And Partial Revelations Of The Relevant Truth Supports A Strong Inference Of Scienter**

441.    The temporal proximity between Defendants' statements reiterating their production targets and subsequent drastic reductions to those same targets bolsters the strong inference that Defendants knew, or were deliberately reckless in not knowing, the false and/or misleading nature of their statements about Lucid's production capabilities set forth above.

442.    For example, from the start of the Class Period through February 28, 2022, Defendants repeatedly re-affirmed that Lucid would complete 20,000 units in 2022. Indeed, as late as February 14, 2022, Lucid publicly re-affirmed that the Company not only had the capacity to, but would in fact complete 20,000 units. Just two weeks later though, on February 28, 2022, Defendants drastically slashed that 20,000 to a range of 12,000 to 14,000 vehicles for 2022. It is implausible that the same, undisclosed internal logistics issues which, unbeknownst to investors, led Lucid to cut its production target on February 28, 2022, were not present and known (or recklessly disregarded) on February 14, 2022. In fact, as set forth herein, statements from numerous former employees confirm that such issues were ever-present and well-known by Lucid's management, including Defendants.

443.    Defendants also issued statements on May 5, 2022, May 20, 2022, and May 26, 2022, re-iterating each time a range of 12,000 to 14,000 vehicles for 2022. At each turn, Defendants failed to disclose, among other things, the adverse impact of Lucid's internal logistics issues on the Company's

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

production. Then, on August 3, 2022, less than three months later, Defendants again slashed Lucid's production target—this time in half, from 12,000 to 14,000 vehicles to 6,000 to 7,000 vehicles for 2022. Only then did Defendants finally disclose that Lucid's own internal logistics problems had caused the massive production issues and subsequent slashing of the Company's production guidance. Overall, Lucid decreased its 2022 production targets by two-thirds in a Class Period of less than eight months. Again, it is implausible that the same issues which led Lucid to cut its production target again on August 3, 2022, were not present and known (or recklessly disregarded) in May 2022, particularly in light of the host of material facts that were known by Defendants throughout the Class Period.

### G.    Defendants Had Motive And Opportunity To Mislead Investors

#### 1.    By Inflating Lucid's Stock Price And/Or Maintaining That Artificial Inflation, Defendant Rawlinson Increased His Compensation By Hundreds Of Millions Of Dollars

444.    Leading up to and throughout the Class Period, Rawlinson had motive to inflate and maintain the inflation in Lucid's stock price in order to cash in on his lucrative performance-based RSUs. Rawlinson himself stated in an interview with CNBC that the rights to his unvested "***stock options [are] what motivates and drives***" him.

445.    More specifically, as noted above, as part of Rawlinson's compensation package, Lucid awarded him performance-based RSUs that would vest if Lucid's market capitalization remained at certain levels over defined time periods—on average, over a rolling six-month period. Tranches of securities would vest to Rawlinson when Lucid maintained market capitalizations at or above the following targets:

| Tranche | # of CEO Performance RSUs | 6-Month Market Capitalization | Multiple of Initial Valuation[5] | Cumulative Growth Rate |
|---------|---------------------------|-------------------------------|----------------------------------|------------------------|
| 1 | 3,483,568 | $23.50 billion | 2X | 100% |
| 2 | 3,483,568 | $35.25 billion | 3X | 200% |
| 3 | 3,483,568 | $47.00 billion | 4X | 300% |
| 4 | 3,483,568 | $58.75 billion | 5X | 400% |
| 5 | 2,090,140 | $70.50 billion | 6X | 500% |

---

[5] Measured from the equity valuation of $11.75 billion at the time of the Merger.

446.     Thus, this incentive package provided Rawlinson with the opportunity to vest 16,024,411 performance-based stock units if all market capitalization milestones were hit. All told, in its 2021 Annual Report/2022 Proxy Statement, filed April 28, 2022, the Company indicated it valued Rawlinson's total compensation package for 2021 at $556 million, which Bloomberg reported that same day was "one of the largest compensation packages paid to any executive last year [2021]." In 2020, Rawlinson's total compensation was valued at approximately $678,007.00, according to Lucid's 2021 Annual Report/2022 Proxy Statement.

447.     Given the foregoing, Rawlinson was incentivized to drive Lucid's stock price up and/or maintain artificial inflation in the Company's stock price with the alleged misrepresentations and omissions throughout the Class Period in order to trigger his windfall compensation package.

448.     And he did just that. Rawlinson vested performance-based RSUs based upon Lucid's market capitalization during the period of July 26, 2021 (the first day of trading for the combined Company) through January 25, 2022 (the first possible measurement for the potential vesting of his RSUs) equating to **$263 million** as of April 28, 2022, as reported by Bloomberg. All told, Lucid's artificially inflated market capitalization during this period allowed him to achieve four of the five market capitalization targets, resulting in Rawlinson being awarded 13,934,272 (or 87%) of the 16,024,411 potential performance-based RSUs.

449.     Indeed, after the award, media outlets noted that it was "one of the largest compensation packages paid to any executive" and "[Rawlinson's] pay is surprising given the size of the company." All told, Rawlinson was the fourth highest paid CEO in 2021/2022, behind Tesla's Elon Musk, Rivian Automotive's Robert Scaringe, and Apple's Tim Cook. As Yahoo! Finance wrote in a post-Class Period October 2022 article entitled, "*The Most Outrageous CEO Salaries and Perks*," "Rawlinson's wily management of his pay package epitomizes the dilemma that corporations face when they issue gargantuan stock awards based on company performance and share price. ***Executives like Rawlinson can cash in on fleeting success, take the money and run just before the going gets tough***."

### 2. Lucid Capitalized On Its Fraud By Releasing Convertible Notes in a Private Offering, Reaping $2 Billion In Proceeds

450. Defendants were also motivated to inflate the value of Lucid stock in order to secure much-needed funding. In December 2021, while Lucid's common stock price was artificially inflated by Defendants' alleged misrepresentations and omissions, the Company raked in *$2,012,500,000* in total gross proceeds from a private offering of convertible senior notes. Noteholders were given rights to, among other things, convert the notes to Lucid common stock. By pegging the value of the convertible notes sold through the offering to Lucid's common stock price, while Lucid's common stock was artificially inflated, Defendants were able to raise billions in proceeds. Notably, an analyst remarked on the "*[o]pportunistic timing*" of Lucid's offering. On December 9, 2021, Morgan Stanley commented that Lucid made a "strategic" move to take "advantage of a strong stock price to transform an investor vote of confidence into real/hard dollars." Analysts at BofA similarly noted that Lucid's offering appeared to be motivated by "an acceleration of growth plans outlined by LCID upon going public," including expansion on its AMP-1 facility, and the "further de-risking of a capital-intensive business with more liquidity, and accessing a more diversified investor base."

## VIII. <u>LOSS CAUSATION</u>

451. As a result of Defendants' materially false and misleading statements, omissions of material facts, and fraudulent course of conduct, Lucid's publicly traded common stock traded at artificially inflated prices during the Class Period. Relying on the integrity of the market price for Lucid common stock and public information related to Lucid, Lead Plaintiff and other Class members purchased or otherwise acquired Lucid common stock at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact alleged herein. As a result of their purchases of Lucid common stock during the Class Period at artificially inflated prices and the removal of that inflation upon the disclosures set forth below, Lead Plaintiff and the Class suffered economic losses (i.e., damages) under the federal securities laws.

452. Defendants' false and misleading statements, material omissions, and deceptive course of conduct had their intended effect, directly and proximately causing Lucid common stock to trade at artificially inflated prices during the Class Period, closing as high as $55.52 per share on November 16,

2021. Those misrepresentations and omissions of material fact that were not immediately followed by an upward movement in the price of Lucid common stock served to maintain the price of Lucid common stock at an artificially inflated level.

453.    Absent Defendants' misrepresentations and omissions of material fact, Lead Plaintiff and other Class members would not have purchased or otherwise acquired their Lucid common stock at the artificially inflated prices at which they traded. It was entirely foreseeable to Defendants that misrepresenting and concealing material facts from the public would artificially inflate the price of Lucid common stock and/or maintain artificial inflation in Lucid's stock price. The economic losses (i.e., damages suffered by Lead Plaintiff and other members of the Class) were a direct, proximate, and foreseeable result of Defendants' materially false and misleading statements and omissions of material fact, which artificially inflated the price of the Company's common stock and/or maintained artificial inflation in Lucid's stock price, and the subsequent significant decline in the value of the Company's common stock when the relevant truth was revealed and/or the risks previously concealed by Defendants' material misrepresentations and omissions materialized.

454.    Lead Plaintiff and other Class members suffered actual economic loss and were damaged when the material facts and/or the foreseeable risks concealed or obscured by Defendants' misrepresentations and omissions were revealed and/or materialized through the disclosure of new information concerning Lucid on February 28, 2022 and August 3, 2022. As alleged in this Section, the disclosure of the relevant truth and/or materialization of the foreseeable risks concealed by Defendants' fraud directly and proximately caused foreseeable declines in the price of Lucid common stock by removing the artificial inflation in the price of Lucid common stock that resulted from Defendants' fraud. The timing and magnitude of the declines in the price of Lucid common stock, as detailed herein, negate any inference that the loss suffered by Lead Plaintiff and the Class was caused by changed market conditions or other macroeconomic factors unrelated to Defendants' fraudulent conduct.

A.    **February 28, 2022**

455.    Investors began to learn the relevant truth concealed by Defendants' misrepresentations and omissions on February 28, 2022. On that day, Lucid admitted that it had fallen short of its 577 vehicle target for 2021, disclosing that the Company had only delivered approximately 125 vehicles in

2021, and still had only produced approximately 400 EVs by February 28, 2022. Lucid then shocked the market by disclosing that it would miss its 20,000 vehicle production target for 2022, and instead would only produce between 12,000 and 14,000 vehicles in 2022.

456.    Specifically, in a February 28, 2022 press release filed with the SEC on Form 8-K entitled, *Lucid Announces Fourth Quarter and Full Year 2021 Financial Results, Updates 2022 Outlook*, the Company disclosed that it had missed its 577 vehicle production target for 2021, revealing that "[p]roduction exceeds 400 vehicles as of February 28, 2022, with 125 customer deliveries as of year-end 2021 and over 300 deliveries to date." From there, Defendants stated that "[t]he Company's Q4 revenue was $26.4 million, including $21.3 million from initial deliveries of its innovative Lucid Air Dream Edition, which began in October."

457.    Defendants also disclosed through the February 28, 2022 press release that Lucid would miss its 20,000 car guidance for 2022, stating that Lucid was "[u]pdating 2022 production outlook for Lucid Air to a range of 12,000 to 14,000 vehicles." In addition, the press release stated that "Lucid cited supply chain constraints and a continued focus on quality alongside an updated outlook for its 2022 production of Lucid Air to a range of 12,000 to 14,000 vehicles." It further quoted Rawlinson as saying: "Looking ahead, we're updating our outlook for 2022 production to a range of 12,000 to 14,000 vehicles. This reflects the extraordinary supply chain and logistics challenges we've encountered and our unrelenting focus on delivering the highest-quality products."

458.    During Lucid's 4Q21 and fiscal year 2021 earnings conference call that same day, Rawlinson confirmed that Lucid had missed its 2021 vehicle production target of 577 vehicles, stating "[w]e commenced customer deliveries of the world's most advanced EV sedan" and disclosed that "[a]s of year-end 2021, this included 125 cars in customers' hands, while we produced over 400 vehicles in total as of today."

459.    During the call, Rawlinson also reiterated that Lucid was slashing its vehicle production target from 20,000 vehicles to 12,000 to 14,000 vehicles. In particular, Rawlinson stated: "In the more immediate term, like many manufacturers, our production has been and indeed continues to be impacted by supply chain challenges. As you saw from our press release today, we have updated our 2022 production outlook for Lucid Air to a range of 12,000 to 14,000 vehicles." During the same call, House

similarly stated: "We're updating our outlook for 2022 production to a range of 12,000 to 14,000 vehicles."

460.    On this news, the price of Lucid common stock fell $3.99 per share, or more than 13%, from a close of $28.98 per share on February 28, 2022, to a close at $24.99 per share on March 1, 2022.

461.    Lucid's stock price, however, remained artificially inflated because Defendants misrepresented and concealed the full relevant truth—that because of the severe issues it was facing, Lucid would produce less than 10,000 cars in 2022. Moreover, rather than disclose that the production misses were largely the result of severe internal problems that the Company had not rectified— Defendants instead pinned most of the blamed on short-term external factors like global supply chain challenges that they said would abate by the second half of 2022, as well as a focus on quality. As a result, investors were left with the misleading impression that: (1) Lucid was ready and able to mass produce cars and was only being constrained by short-term external factors like supply chain; (2) Lucid was well-positioned to withstand those external pressures; and (3) Lucid would produce 12,000 to 14,000 cars in 2022.

462.    Analysts and market commentators expressed dismay and surprise at Lucid's production guidance cut, and attributed the stock price declines that day to the production guidance misses and cuts. For example, in a same-day report entitled *Good 4Q:21, but production lagging accelerating reservations—first take*, analyst BofA wrote that "LCID did update its outlook for production in 2022, specifically lowering it from 20k units to 12k-14k, which was not entirely unexpected directionally, but somewhat surprising in magnitude." That same day, analyst CFRA reported that "LCID cut 2022 production guidance for the Lucid Air to 12K-14K units, down from 20K units previously, citing supply chain constraints and a focus on quality." CFRA explained that "[t]he guidance was particularly disappointing given the fact the company was expected to produce at a quantity which was considered manageable in light of industry challenges." CFRA concluded that:

> While there is a lot to like about the LCID story, such as the quality and specs of the Air, its balance sheet ($6.3B of cash at year-end), and its state-of-the-art new factory in Arizona, the massive cut to volume guidance is likely to weigh heavily on the shares and further the stock's ongoing re-rating after highflying performance in 2021.

463.    As a result, CFRA cut its price target for Lucid's stock by $10 to $25.

464.    The following day, analyst Guggenheim wrote that several "[k]ey takeaways" from Lucid's announcement were that "4Q vehicle deliveries of 125 fell short of guidance of 500+, and improved to only ~300 as of 2/28" and "FY22 production guidance was reduced ~35% at the mid-point to 12-14k, which is expected to be back-half weighted as supplier headwinds persist near-term." Guggenheim further noted that "FY22 delivery targets were lowered significantly" and that "slower near-term ramp and the 'hockey stick' cadence likely means there isn't much cushion."

465.    On February 28, 2022, in an article entitled *Lucid Motors Will Produce Fewer Cars Than Expected: The electric car start-up cited supply chain problems*, The New York Times reported that "Lucid Motors, a fledgling maker of electric cars, on Monday significantly scaled back its production goals for the year, citing supply chain problems." The New York Times reported that the "significant[]" reduction "will most likely disappoint investors who had seen the company as a serious challenger to Tesla." The New York Times further noted that "Lucid shares fell in after-hours trading" after "Lucid said it expected to produce 12,000 to 14,000 vehicles this year at its factory in Arizona, down from the 20,000 that its chief executive, Peter Rawlinson, a former Tesla engineer, set as a goal last November."

466.    Bloomberg, in a same-day article entitled *Lucid Shares Sink as EV Startup Cuts 2022 Production Target*, reported that "[e]lectric vehicle startup Lucid shares drop 10% in postmarket trading, after the company lowered its 2022 EV production target to 12,000-14,000 units from prior view of 20,000, due to 'extraordinary' supply-chain pressures."

467.    Electrek, a news site dedicated to the electric vehicle market, published a February 28, 2022 article entitled, *Lucid Motors' Q4 earnings: 125 Air deliveries in 2021, 2022 production estimates slashed as much as 40% due to 'supply chain constraints'*, Electrek reported that "overall output is expected to be quite a bit lower than originally anticipated. Lucid now expects to produce 12,000–14,000 EVs this year, down quite a bit from previous estimates of 20,000." Electrek wrote that "[p]reviously, Lucid was expecting to produce 20,000 EVs this year, so that's a 30–40% cut in output. This is sure to affect Lucid Motors' earnings for 2022 as well."

468.    In a February 28, 2022 article entitled, *Lucid Drops As 2022 Guidance Slashed*, Seeking Alpha reported that "[t]he company delivered 125 cars to customers in the fourth quarter, with total

production exceeding 400 vehicles to date and over 300 deliveries to customers at this point. These numbers represent a much slower ramp up than investors and analysts were expecting." But it noted that:

> Perhaps the biggest news for investors in the short term was that Lucid management significantly reduced its guidance for 2022, primarily as a result of extraordinary supply chain and logistics challenges. The new forecast calls for Air production of 12,000 to 14,000 vehicles, which is well below previous guidance for deliveries of 20,000 units.

469.    Seeking Alpha further explained that:

> Wall Street analysts were a bit skeptical going into Monday's report, and yet the company still disappointed to a meaningful degree. The average analyst revenue forecast for this year prior to today's news was just over $2 billion, or about $200 million below the above company projection. However, using a 13,000 vehicle midpoint for deliveries and extrapolating that based on the above original revenue projection gets us to about $1.44 billion for this year. This major disappointment was the main reason why shares were down more than 10% in Monday's after-hours session . . . .

> . . . .

> In the end, Monday afternoon's report was a clear disappointment for Lucid investors.

470.    In a February 28, 2022 article entitled, *EV start-up Lucid slashes 2022 vehicle production forecast, causing shares to plummet*, CNBC wrote that "Lucid Group is cutting its car production forecast for this year by as much as 40%, sending shares of the electric vehicle start-up tumbling 14% during after hours trading." CNBC further noted that "[t]he company cited supply chain constraints for slashing production expectations to between 12,000 and 14,000 vehicles, down from 20,000 units."

471.    On March 1, 2022, in an article entitled, *Lucid Air production cut deflates company's valuation by billions*, the Silicon Valley Business Journal reported that "Lucid Group Inc.'s shares plunged by as much as 19% Tuesday morning after the Tesla electric vehicle rival slashed by up to 40% projections for the number of cars it expects to deliver this year." The Silicon Valley Business Journal further wrote that Lucid had "originally projected to deliver 20,000 of its Lucid Air sedans this year. It now says the number will be between 12,000 and 14,000."

472.    That same day, in a segment on the news program "Squawk Box" called "Lucid shares fall after slashing 2022 electric vehicle production guidance," CNBC's Phil LeBeau gave a "report on shares of Lucid, which have fallen sharply after the electric-vehicle maker slashed its 2022 production guidance." In particular, LeBeau stated that, "any time you cut your Production 30 to 40 percent, your

Production guidance, I should say, by 30 to 40 percent, your stock is going to get whacked. And that's what we saw yesterday after Lucid reported its Q4 results, its new guidance for Production for 2022, it was 20,000 vehicles. Now it's in the range of 12,000 to 14,000 vehicles."

473.    In a March 1, 2022 article entitled, *Here's Why Lucid Just Cut Its 2022 Production Plans*, Autoweek wrote that "Lucid reduce[d] 2022 production outlook from 20,000 Air sedans to between 12,000 and 14,000, citing supply-chain issues." Autoweek further reported that:

> News of the dramatic cut to its 2022 production outlook has already dinged Lucid stock today.
>
> Even though Lucid currently offers a model that competes with the Tesla Model S, among others, it is a long way from matching Tesla's annual volume, which in 2021 amounted to over 930,000 delivered cars.

474.    In a March 5, 2022 article entitled, *Lucid Cuts 2022 Production Guidance. Time to Sell?*, The Motley Fool reported that "[i]n a flash, Lucid went from delivering on its promises to disappointing investors," noting that "[s]hare prices of electric vehicle manufacturer Lucid Group . . . tumbled 13.8% on March 1 after the company reported worse-than-expected fourth-quarter and full-year 2021 results, and slashed its 2022 guidance." The Motley Fool explained that "[t]he most jarring kernel of news was that Lucid reduced its 2022 production and delivery estimate from 20,000 units down to a range of 12,000 to 14,000 Lucid Air electric sedans."

475.    The Motley Fool then reported that [u]ntil now, Lucid had given investors every reason to trust in the company's ability to execute on its goals," noting that "[d]uring its third-quarter 2021 earnings call in mid-November, Lucid confirmed its full-year 2022 goal to produce and deliver 20,000 vehicles . . . even in the face of mounting supply chain concerns."

476.    The Motley Fool then reported that the production cut amounted to a "[f]all from grace," explaining that:

> The comments made during Lucid's Feb. 28 earnings call and the content presented in its investor presentation derailed its trajectory and plunged Lucid into an uphill battle to regain investor trust. Not only was Lucid's production guidance poor, but it also said that it had pro[du]ced only 400 vehicles and delivered 300 vehicles as of the end of February." [The Motley Fool further explained that:] "The biggest threat to Lucid is that it misses on its already lower guidance and further slashes guidance in the coming quarters.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**B.**     **August 3, 2022**

477.     The relevant truth concealed by Defendants' false and misleading statements and omissions was revealed to the market on August 3, 2022, when Lucid once again slashed its 2022 vehicle production guidance.

478.     This time, in an August 3, 2022 press release filed with the SEC on Form 8-K entitled, *Lucid Announces Second Quarter 2022 Financial Results, Reports Strong Demand While Lowering Production Guidance for the Year*, the Company revealed that "Lucid revised its 2022 production volume outlook to a range of 6,000 to 7,000 vehicles." It further disclosed that in the first six months of 2022, it had only produced 1,405 vehicles total: "Lucid reported first half production of 1,405 vehicles." Moreover, "Lucid reported Q2 revenue of $97.3 million on deliveries of 679 vehicles."

479.     During Lucid's same-day 2Q21 earnings conference call, Rawlinson similarly reported that "[i]n the first half of 2022, we produced 1,405 vehicles." He also reiterated that Lucid was once again slashing its guidance for 2022: "[W]e are reducing our 2022 production guidance to a range of 6,000 to 7,000 vehicles." Also on the earnings call, House repeated that "we are adjusting our 2022 production guidance to 6,000 to 7,000 units from 12,000 to 14,000 units." House further reported that Lucid's "second quarter revenue was $97.3 million, which represented a quarter-over-quarter increase of 69%. This included $96.1 million in automotive revenue from the delivery of 679 vehicles."

480.     Moreover, for the first time, Defendants disclosed the Company's internal logistics challenges and revealed that they were responsible for Lucid's production misses and guidance cuts. For example, during the 2Q21 earnings call, Rawlinson stated, "whilst we have experienced supply chain and logistics challenges along with the entire industry, *the limitations of our logistics system have compounded the challenge*."

481.     Rawlinson told investors that the Company had only become aware of the logistics challenges in the second quarter of 2022:

> Although we continue to face supply chain constraints, the resolution of some earlier gating component supply issues allowed us to push towards increasing the production rate. And as we attempted to push forward the rate, we found that our logistics constraints prevented us from scaling meaningfully this past quarter.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

482.    In particular, in describing Lucid's internal logistics challenges, Rawlinson noted that Lucid had struggled with its "ability to speed the correct part to a line at the correct time and cadence." Rawlinson further noted that the Company's production had been impacted by production line stoppages: "From a production standpoint, we have both planned and unplanned pauses in the quarter that resulted in approximately 2.5 weeks where we have no daily production at the factory." He disclosed that at least some of the stoppages resulted directly from internal logistics problems: "we did also experience some unplanned production pauses, primarily in order to improve our logistics processes, which, as I stated earlier, became more apparent as we started to scale." Rawlinson concluded that "[s]o as a result, we are reducing our 2022 production guidance to a range of 6,000 to 7,000 vehicles."

483.    To be sure, Rawlinson placed the blame for the guidance reduction squarely on the previously undisclosed internal logistics issues: "Our revised outlook guidance for the year reflects the logistic challenges I described as we begin scaling, which exposed the immaturity of our logistics processes." He noted that the Company was already taking steps to fix the internal logistics problems that he referred to as the "primary bottlenecks":

> I do believe that we've identified the primary bottlenecks and have already taken steps to begin to remedy the situation. We have made a significant decision to bring our logistics operations in-house. We've made key hires to the executive team, and we've restructured our logistics and manufacturing organizations accordingly. We accelerated access to our logistics center as part of our Phase 2 expansion in Arizona. And within a couple of months, we expect to have our logistics center on site at AMP-1, which should help mitigate and begin to eliminate the logistics bottlenecks as well as reduce costs of the shipping and handling of parts. Furthermore, we're overhauling our logistics processes and introducing a series of improvements to simplify the system and yet make it more efficient and robust.

484.    Rawlinson further noted that "I want to be clear that right now, my relentless focus is with this great team right here in Arizona in helping resolving our logistics challenges and in ramping up production." Likewise, during the call, House discussed "the actions we're taking to address the near-term production bottlenecks we're experiencing," noting that "[b]ringing our logistics operations entirely in-house in accelerating access to our logistics center on site at our Arizona factory will help reduce complexity, cut down lead times and reduce various costs." She further stated that "[w]e believe these decisive actions as well as the addition of leadership across logistics, process transformation and supplier quality will help us unlock these bottlenecks." She noted, however, that "it's unlikely we'll be able to

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

make up the anticipated loss volume in 2022. Consequently, we are adjusting our 2022 production guidance to 6,000 to 7,000 units from 12,000 to 14,000 units."

485.    Similarly, in the August 3, 2022 press release, Rawlinson stated: "Our revised production guidance reflects the extraordinary supply chain and logistics challenges we encountered . . . . We've identified the primary bottlenecks, and we are taking appropriate measures – bringing our logistics operations in-house, adding key hires to the executive team, and restructuring our logistics and manufacturing organization." House likewise stated in the press release: "Despite our immediate challenges, we believe that bringing our logistics center on-site at our Arizona factory will help reduce complexity, cut down lead times, and reduce various costs."

486.    On this news, the price of Lucid common stock fell $2.00 per share, or approximately 9.7%, from a close of $20.56 per share on August 3, 2022, to a close at $18.56 per share on August 4, 2022.

487.    Analysts and market commentators again expressed surprise at the magnitude of the production guidance cut, reporting that it had caused Lucid's stock price to decline. For example, that same day, analyst CFRA reported that "LCID cut 2022 production guidance by 50% to 6K-7K units from 12K-14K units." CFRA further reported that "[t]he EV manufacturer appears to be in the 'production hell' stage of its development[.]" In a same-day report, analyst BofA wrote that "the company lowered its 2022 production outlook to 6-7k vehicles from its prior guidance for 12k-14k vehicles, which it attributed to supply chain and logistics challenges."

488.    The following day, analyst BNP Paribas, in a report entitled, *Learning Curve in Logistics*, wrote that Lucid's "*significant 50% cut*" to its vehicle production guidance was "*clearly disappointing*." (Emphasis in original). BNP Paribas further reported that "*Early-stage improvement in the availability of LCID's most constrained supply components have now exposed weaknesses in its logistics processes*." (Emphasis in original). In a section entitled, *Significant cut to production*, BNP Paribas explained that "LCID revised its full-year production outlook to 6K-7K units (from 12K-14K) amid newfound weaknesses in its logistics processes that have resulted in various bottlenecks and quality issues (*e.g.*, May 25th recall affecting ~1,100 units), which the Co. is now aggressively addressing."

489.    In an August 11, 2022 report, analyst Guggenheim wrote that "FY22 production guidance was cut to 6-7k from 12-14k (originally 20k), and while the cut was not a surprise (we were below the prior guide), the magnitude was larger than we expected and will lead to questions about LCID's ability to produce at scale[.]"  Guggenheim reiterated that Lucid's **slow ramp and quality issues lead to concerns about ability to produce at scale.** (Emphasis in original). In conclusion, Guggenheim explained that "[o]verall, we believe the significant reduction in production targets this year amid quality/manufacturing/logistics issues supports investors' concerns about LCID's ability to ramp production, which likely makes the stock a 'show me' story until the company is able to prove it can produce vehicles at scale."

490.    On August 3, 2022, the New York Times reported that "Lucid Motors, a maker of widely praised electric cars that the company has struggled to mass-produce, cut its production target for the year by almost half on Wednesday after delivering just 679 vehicles in the second quarter." The New York Times further noted that:

> The California company . . . had told investors this year that it would deliver 12,000 vehicles in 2022. The new target is 6,000 to 7,000. Even that more modest goal requires Lucid to deliver at least five times as many cars in the second half of the year as it did in the first half.
>
> . . . .
>
> Mr. Rawlinson conceded that much of Lucid's production shortfall was caused by the company's inexperience — for example, difficulties setting up a system that delivers the right parts to the assembly line at the right time. Several unplanned shutdowns at Lucid's factory in Arizona "exposed the immaturity of our logistics processes," he said.

491.    The article noted that "[t]he company's stock was down about 11 percent in extended trading on Wednesday after it announced that it was cutting its production forecast."

492.    In a same-day article entitled, *Lucid Motors will barely make any EVs this year* as it *slashes production goals again / The company now expects to make 7,000 vehicles at most this year*, The Verge noted that "[i]t was another disappointing turn for the EV maker," reporting that:

> Luxury electric vehicle maker Lucid Motors is slashing its production forecast for 2022 for the second time this year. The Newark, California-based company announced it was revising its production expectations to between 6,000 and 7,000 vehicles.
>
> Lucid originally said it would make 20,000 vehicles in 2022, but that number was revised in February to 12,000–14,000 vehicles.

493.    That same day, technology news site Engadget published an article entitled, *Lucid Motors has drastically reduced its production target, again. The company says it only will deliver a fraction of the 20,000 cars it originally promised for 2022*. Therein, Engadget reported that "[l]uxury EV startup Lucid Motors changed its yearly production target again, lowering it to an expected output of between 6,000 and 7,000 vehicles, the company announced today. That's only a fraction of the 20,000 cars that Lucid initially promised to deliver in 2022."

494.    Also on August 3, 2022, the Financial Times reported that "Tesla rival Lucid Motors halved its 2022 production target on Wednesday." The Financial Times further explained that "[t]he California-based group, backed by Saudi Arabia's sovereign wealth fund, said 2022 production is now estimated between 6,000 and 7,000 cars, down from an earlier projection of 12,000 to 14,000 — which itself was a cut from a start-of-year forecast of 20,000 vehicles." The Financial Times quoted Rawlinson as saying that "[w]e've identified the primary bottlenecks, and we are taking appropriate measures — bringing our logistics operations in-house, adding key hires to the executive team, and restructuring our logistics and manufacturing organisation." The article noted that "[s]hares of the electric carmaker were already down 50 per cent this year, reflecting numerous challenges in scaling up production of its Lucid Air . . . . Shares fell an additional 12 per cent after-hours on Wednesday."

495.    In an article entitled, *Lucid stock plunges after electric-vehicle maker cuts production guidance for the year*, MarketWatch reported on August 3, 2022, that:

> Shares of Lucid Group Inc. . . . fell more than 10% in after-hours trading Wednesday after the electric-vehicle maker announced a reduction in its production forecast. Lucid said it now expects its 2022 production volume to hit 6,000 to 7,000 vehicles, after stating 12,000 to 14,000 vehicles in May.

496.    In an August 3, 2022 article entitled, *EV maker Lucid again cuts production targets as logistics challenges cripple output*, CNBC wrote that "[e]lectric vehicle maker Lucid Group again cut its production targets Wednesday" as "[s]upply chain and logistics challenges mean demand for the company's EVs far outpaces its output." CNBC further reported that:

> In February, it said that it expected to build between 12,000 and 14,000 vehicles in 2022, down from an original forecast of 20,000.
>
> It cut its full-year deliveries guidance for a second time, saying that it now expects to deliver just 6,000 to 7,000 vehicles in 2022, and announced a new senior executive to lead operations.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lucid's shares fell about 12% in after-hours trading following the news.

497.    CNBC also reported that:

Rawlinson told CNBC in an interview that the process of working through the supply-chain issues forced the company to confront another set of bottlenecks.

"It really unveiled the next level of challenges, the immaturity of our logistics systems," Rawlinson said, explaining that Lucid is in the process of bringing shipping and other services in-house.

498.    The following day, Electrek, in an article entitled, *Lucid (LCID) crashes as it slashes 2022 production guidance and burns through $800M*, similarly reported that:

Electric automaker Lucid Group's stock (LCID) is crashing this morning after the company slashed its 2022 production guidance and confirmed that it burned through another $800 million during the last quarter.

Yesterday, Lucid reported its Q2 2022 earnings and confirmed small progress in delivering its Air electric sedan.

499.    The article further explained that:

In Q2, the automaker delivered 679 vehicles for $97.3 million in revenue – up from the previous quarter, but with 1,405 vehicles produced in the first half of 2022, it is still far behind its goal to produce between 12,000 and 14,000 vehicles in 2022.

Therefore, the company announced that it is slashing that goal to just 6,000 to 7,000 vehicles.

500.    Electrek further noted that "[t]his is a big step back for Lucid. We are already more than halfway through the year, and they are now reducing their production guidance by half." The article concluded that:

Unfortunately, with plans to produce only about 5,000 units during the second half, I doubt that they can turn a positive margin on the Air this year, and it most likely means even greater losses during the second half of the year.

. . . Lucid makes a very cool car, but now it needs to find a way to make money while making it or it won't be around for long.

501.    Also on August 4, 2022, CNN Business, in an article entitled, *Lucid shares plunge as it cuts production target in half*, wrote that "[s]hares of luxury electric car maker Lucid plunged more than 10% Thursday after the company disclosed it will make roughly half the cars this year it had planned to build."

502.    On August 10, 2022, in an article entitled, *Lucid Motors' Abysmal Q2 Raises Even More Questions*, Seeking Alpha wrote that "Lucid's long-term outlook is clouded by the massive ~67%

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

production cut from 20,000, as production from 2025 may fall significantly short of original targets." Seeking Alpha explained that:

> Lucid Motors (NASDAQ:LCID) reported quite a dismal quarter, missing heavily on revenues while slashing a previous production guidance of 12,000 to 14,000 units this year in half. Questions about Lucid's ability to reach an original 20,000 unit target for 2022 have lingered since May 2021, over a year ago, with Lucid nailing the coffin shut with Q2, with production guidance nearly 70% lower.

503.    Seeking Alpha further reported that "[l]ogistics issues are unlikely to clear quickly, and the scope of the production cut signifies that major parts/components are in disarray."

504.    On August 12, 2022, Business Insider reported that Lucid "cut its production goal for the second time this year, from between 12,000 and 14,000 cars to between 6,000 and 7,000." Business Insider further explained that:

> In Lucid's second-quarter report call, CEO Peter Rawlinson blamed logistics issues for the company's production shortcomings.
>
> "We found that our logistics constraints prevented us from scaling meaningfully this past quarter," Rawlinson said. He mentioned trouble in getting the right parts to the line at the right time and cadence, while also maintaining Lucid's particularly high quality standards.

505.    The article also noted that "Lucid delivered 679 cars in the quarter (around half of them in April), a dismal number considering it entered 2022 targeting 20,000 for the year. In the first six months, it built 1,405 cars and delivered just 1,039 to customers." The Business Insider quoted Ali Faghri, managing director of automotive research at Guggenheim, as stating that "[a]t a $30 billion market cap, you really need to have more confidence that they can produce vehicles at much higher levels of volumes than they are currently to justify that valuation" and, "[w]hile it's encouraging that they reduced their guidance to a more achievable level, producing 6,000 cars, frankly, won't be able to prove that Lucid can actually scale at higher volume."

## IX.    CLASS ACTION ALLEGATIONS

506.    Lead Plaintiff brings this action on its own behalf and as a class action, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities who, during the Class Period, purchased or otherwise acquired Lucid common stock and were damaged thereby. Excluded from the Class are Defendants, the officers and directors of Lucid, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or

assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

507. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Throughout the Class Period, Lucid's common stock was actively traded on the Nasdaq (an open and efficient market) under the symbol "LCID." As of February 22, 2022, Lucid had approximately 1.65 billion shares of common stock outstanding. Record owners and the other Class members may be identified from records maintained by Lucid and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

508. Lead Plaintiff's claims are typical of the claims of the other Class members, as all Class members were similarly affected by Defendants' wrongful conduct in violation of federal laws that is complained of herein.

509. Lead Plaintiff will fairly and adequately protect the interests of the other Class members and has retained counsel competent and experienced in prosecuting class actions and securities litigation.

510. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are: (i) whether Defendants violated the federal securities laws by their acts and omissions as alleged herein; (ii) whether Defendants' statements to the investing public during the Class Period contained material misrepresentations and/or omitted to disclose material facts; (iii) whether and to what extent the market price of Lucid's common stock was artificially inflated during the Class Period due to the material misrepresentations and omissions alleged herein; (iv) whether Lucid and the Individual Defendants acted with the requisite level of scienter; (v) whether the Individual Defendants were controlling persons of the Company; and (vi) whether members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

511. A class action is also superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by each individual member of the Class

may be relatively small, the expense and burden of individual litigation make it impracticable for Class members to seek redress for the wrongful conduct alleged herein. Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## X.   A PRESUMPION OF RELIANCE APPLIES

512.   At all relevant times, the market for Lucid's common stock was efficient for the following reasons, among others:

a.   Lucid's stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

b.   As a regulated issuer, Lucid filed periodic reports with the SEC;

c.   Lucid regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.   Lucid was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

513.   As a result of the foregoing, the market for Lucid common stock reasonably promptly digested current information regarding Lucid from all publicly available sources and reflected such information in the price of Lucid common stock. Purchasers and acquirers of Lucid common stock during the Class Period suffered similar injury through their purchases and acquisitions of Lucid common stock at artificially inflated prices, and a presumption of reliance applies.

514.   Further, at all relevant times, Lead Plaintiff and other Class members relied on Defendants to timely disclose material information as required by law. Lead Plaintiff and other Class members would not have purchased or otherwise acquired Lucid common stock at artificially inflated prices if Defendants had timely disclosed all material information as required by law. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning the Company and its business, Lead Plaintiff and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XI.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY

515.    The Private Securities Litigation Reform Act's statutory safe harbor and/or the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein. Most, if not all, of the statements complained of herein were not forward-looking statements. Rather, they were either: (i) historical statements or statements of purportedly current facts and conditions at the time the statements were made; (ii) mixed statements of present and/or historical facts and future intent; and/or (iii) omitted to state material current or historical facts necessary to make the statements not misleading.

516.    To the extent that any of the materially false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

517.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, or portion thereof, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, Defendants knew the statement was false and/or misleading, did not actually believe the statements, had no reasonable basis for the statements, and/or were aware of undisclosed facts tending to seriously undermine the statements' accuracy

1

## XII. **CAUSES OF ACTION**

2

### COUNT I

3

### Violation of Section 10(b) of the Exchange Act and
### SEC Rule 10b-5 Promulgated Thereunder
### Against All Defendants

4

5

518.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth

6

above as if fully set forth herein.

7

519.    This Count is asserted pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b),

8

and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiff and all

9

other members of the Class, against all Defendants.

10

520.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct

11

which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including

12

Lead Plaintiff and other Class members, as alleged herein; and (ii) cause economic harm to Lead Plaintiff

13

and other members of the Class.

14

521.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue

15

statements of material fact and/or omitted to state material facts necessary to make the statements not

16

misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and

17

deceit upon the purchasers and acquirers of the Company's common stock in violation of Section 10(b)

18

of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

19

522.    Defendants, individually and in concert, directly and indirectly, by the use, means, or

20

instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous

21

course of conduct to conceal adverse material information about the Company's financial well-being,

22

operations, and prospects.

23

523.    During the Class Period, Defendants made the false and misleading statements specified

24

above, which they knew or recklessly disregarded to be false and misleading in that they contained

25

misrepresentations and failed to disclose material facts necessary in order to make the statements made,

26

in light of the circumstances under which they were made, not misleading. Defendants had actual

27

knowledge of the misrepresentations and omissions of material facts set forth herein or recklessly

28

disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal

Lucid's true condition from the investing public and to support the artificially inflated prices of the Company's stock.

524.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased or acquired Lucid common stock and were harmed when the truth about Lucid negatively impacted the price of those securities. Lead Plaintiff and the Class would not have purchased or acquired Lucid common stock at the prices they paid or at which they acquired them, or at all, had they been aware of the truth about Lucid.

525.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered harm in connection with their respective purchases or acquisitions of the Company's common stock during the Class Period.

526.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

527.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

528.    This Count is asserted pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiff and all other members of the Class, against the Individual Defendants.

529.    As alleged above, the Company and the Individual Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by making materially false and misleading statements and/or omissions of material fact in connection with the purchase or sale of Lucid's common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter, and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of the Company's and/or the other Individual Defendants' statements alleged herein to have been materially false and misleading when made and/or omitted material facts necessary to make the statements not misleading in light of the circumstances under which

they were made, and the fraudulent nature of the Company's and the Individual Defendants' scheme during the Class Period.

530.    As set forth above, the Individual Defendants were controlling persons of the Company and one another during the Class Period due to, among other things, their senior positions with the Company and their direct involvement in the Company's day-to-day operations, including their power to control or influence the policies and practices giving rise to the securities violations alleged herein, and exercised the same. As such, the Individual Defendants had regular access to nonpublic information about Lucid's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings or meetings of the Company's Board of Directors and committees thereof, as well as reports and other information provided to them in connection therewith.

531.    By virtue of the foregoing, each of the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company and the other Individual Defendants, including the content of their public statements with respect to Lucid's operations.

532.    The Individual Defendants were culpable participants in the Company's and the Individual Defendants' fraud alleged herein, by acting knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Lead Plaintiff and the other members of the Class who purchased or otherwise acquired the Company's common stock during the Class Period.

533.    By reason of the foregoing, each Individual Defendants is liable to Lead Plaintiff and the members of the Class as controlling persons of the Company and the other Individual Defendants in violation of Section 20(a) of the Exchange Act

## XIII.    PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff respectfully prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Kessler Topaz Meltzer & Check, LLP as class counsel pursuant to Rule 23(g);

B.    Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C.    Awarding compensatory damages and equitable relief in favor of Lead Plaintiff and other members of the Class against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

D.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

E.    Granting such other and further relief as the Court may deem just and proper.

## XIV.    DEMAND FOR JURY TRIAL

Lead Plaintiff hereby demands a trial by jury.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Dated: December 13, 2022

Respectfully submitted,

**KESSLER TOPAZ MELTZER**
**& CHECK, LLP**

/s/ Stacey M. Kaplan
Stacey M. Kaplan (Bar No. 241989)
(skaplan@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:    (415) 400-3000
Fax:    (415) 400-3001

-and-

Gregory M. Castaldo (admitted *pro hac vice*)
(gcastaldo@ktmc.com)
Johnston de F. Whitman
(jwhitman@ktmc.com)
Joshua A. Materese (admitted *pro hac vice*)
(jmaterese@ktmc.com)
Daniel B. Rotko (admitted *pro hac vice*)
(drotko@ktmc.com)
280 King of Prussia Road
Radnor, PA 19087
Tel:    (610) 667-7706
Fax:    (610) 667-7056

*Counsel for Lead Plaintiff Sjunde AP-Fonden and*
*Lead Counsel for the Putative Class*