**KESSLER TOPAZ MELTZER
   & CHECK, LLP**
Stacey M. Kaplan (Bar No. 241989)
(skaplan@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:    (415) 400-3000
Fax:    (415) 400-3001

-and-

Gregory M. Castaldo (admitted *pro hac vice*)
(gcastaldo@ktmc.com)
Johnston de F. Whitman, Jr. (admitted *pro hac vice*)
(jwhitman@ktmc.com)
Joshua A. Materese (admitted *pro hac vice*)
(jmaterese@ktmc.com)
280 King of Prussia Road
Radnor, PA 19087
Tel:    (610) 667-7706
Fax:    (610) 667-7056

*Counsel for Lead Plaintiff Sjunde AP-Fonden and
Lead Counsel for the Putative Class*

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re Lucid Group, Inc. Securities Litigation | Case No. 3:22-cv-02094-JD |
| This Document Relates to: All Actions | **LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT**<br><br>Date:          June 15, 2023<br>Time:          10:00 a.m.<br>Courtroom:   11, 19th Floor<br>Judge:        Hon. James Donato |

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................................. ii

TABLE OF DEFINITIONS................................................................................................................ vi

NOTE ON CITATION FORMATS .................................................................................................. viii

I.    INTRODUCTION ...................................................................................................................1

II.   STATEMENT OF FACTS ......................................................................................................2

    A.    Lucid Touts Aggressive Production Targets and Goes Public ...........................................2

    B.    Defendants Mislead Investors About Lucid's Ability to Mass Produce the Air .................2

    C.    Defendants Slash Lucid's 2022 Production Target, but Keep Misleading Investors ..........5

    D.    The Relevant Truth Is Finally Revealed .............................................................................6

III.  ARGUMENT ...........................................................................................................................6

    A.    Plaintiff Adequately Pleads Actionable Misrepresentations and Omissions.......................6

    B.    Plaintiff Adequately Pleads a Strong Inference of Defendants' Scienter ..........................15

    C.    Plaintiff Adequately Pleads Section 20(a) Claims..............................................................20

IV.   CONCLUSION......................................................................................................................20

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021) ..............................................................................................17, 19

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ...................................................................................8, 9, 10, 17

*Bodri v. GoPro, Inc.*,
    252 F. Supp. 3d 912 (N.D. Cal. 2017) ...............................................................................13

*In re Calpine Corp. Sec. Litig.*,
    288 F. Supp. 2d 1054 (N.D. Cal. 2003) ..............................................................................17

*Carr v. Zosano Pharma Corp.*,
    2021 WL 3913509 (N.D. Cal. Sept. 1, 2021) .....................................................................19

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ........................................................................................10, 14

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
    880 F. Supp. 2d 1045 (N.D. Cal. 2012) ..............................................................................11

*Collier v. ModusLink Glob. Sols., Inc.*,
    9 F. Supp. 3d 61 (D. Mass. 2014) .......................................................................................19

*Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*,
    660 F.3d 1170 (9th Cir. 2011), *aff'd*, 568 U.S. 455 (2013) ................................................9

*In re Countrywide Fin. Corp. Derivative Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) ..............................................................................20

*Crews v. Rivian Auto., Inc.*,
    2023 U.S. Dist. LEXIS 27602 (C.D. Cal. Feb. 16, 2023).................................................10

*In re Cutera Sec. Litig.*,
    610 F.3d 1103 (9th Cir. 2010) ............................................................................................13

*Cutler v. Kirchner*,
    696 F. App'x 809 (9th Cir. 2017) .......................................................................................11

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005) ............................................................................................18

*In re Fusion-io, Inc. Sec. Litig.*,
    2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ......................................................................15

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ..............................................................................................6

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) .........................................................................................*passim*

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

*Glazer Cap. Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) ...............................................................................................17

*In re Illumina, Inc. Sec. Litig.*,
    2018 WL 500990 (S.D. Cal. Jan. 22, 2018).............................................................................7

*Jaeger v. Zillow Grp., Inc.*,
    2022 WL 17486297 (W.D. Wash. Dec. 7, 2022) ...............................................................9, 13

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ....................................................................................1, 7, 8, 9

*Kipling v. Flex Ltd.*,
    2020 WL 2793463 (N.D. Cal. May 29, 2020).......................................................................15

*Lamartina v. VMware, Inc.*,
    2023 WL 2763541 (N.D. Cal. Mar. 31, 2023)......................................................................13

*In re LeapFrog Enters., Inc. Sec. Litig.*,
    527 F. Supp. 2d 1033 (N.D. Cal. 2007) ...............................................................................15

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
    416 F.3d 940, 946 (9th Cir. 2005)  ......................................................................................20

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) .............................................................................................11

*Maverick Fund, L.D.C. v. First Solar, Inc.*,
    2018 WL 6181241 (D. Ariz. Nov. 27, 2018).........................................................................18

*McCormick v. Fund Am. Cos., Inc.*,
    26 F.3d 869 (9th Cir. 1994) .................................................................................................11

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) ...............................................................................................11

*Mulderrig v. Amyris, Inc.*,
    492 F. Supp. 3d 999 (N.D. Cal. 2020) ..................................................................................17

*Mulligan v. Impax Labs, Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ........................................................................ 14-15, 16

*In re Nektar Therapeutics Sec. Litig.*,
    34 F.4th 828 (9th Cir. 2022) ................................................................................................11

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ...............................................................................................17

*In re Nuvelo, Inc. Sec. Litig.*,
    668 F. Supp. 2d 1217 (N.D. Cal. 2009) ................................................................................12

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) .............................................................................................19

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
    780 F. App'x 480 (9th Cir. 2019) ...................................................................................*passim*

iii                    Case No. 3:22-cv-02094-JD

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
    575 U.S. 175 (2015) ................................................................................................................14

*In re Plantronics, Inc. Sec. Litig.,*
    2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) .......................................................................9

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.,*
    759 F.3d 1051 (9th Cir. 2014) ........................................................................................12, 13

*Police Ret. Sys. v. Intuitive Surgical, Inc.,*
    2012 WL 1868874 (N.D. Cal. May 22, 2012) .......................................................................12

*Provenz v. Miller,*
    102 F.3d 1478 (9th Cir. 1996) ........................................................................................... 7-8

*In re Quality Sys., Inc. Sec. Litig.,*
    865 F.3d 1130 (9th Cir. 2017) .......................................................... 12, 13, 15-16, 18

*In re QuantumScape Sec. Class Action Litig.,*
    580 F. Supp. 3d 714 (N.D. Cal. 2022) .............................................................12, 13, 17

*Reese v. Malone,*
    747 F.3d 557 (9th Cir. 2014) ........................................................................10, 16, 17

*In re Rigel Pharm., Inc. Sec. Litig.,*
    697 F.3d 869 (9th Cir. 2012) ..........................................................................................10, 17

*Robb v. Fitbit Inc.,*
    2017 WL 219673 (N.D. Cal. Jan. 19, 2017) .......................................................................16

*Robb v. Fitbit Inc.,*
    216 F. Supp. 3d 1017 (N.D. Cal. 2016) ...............................................................................19

*Roberts v. Zuora, Inc.,*
    2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ................................................................14, 18

*Ronconi v. Larkin,*
    253 F.3d 423 (9th Cir. 2001) ................................................................................................7

*S. Ferry LP # 2 v. Killinger,*
    399 F. Supp. 2d 1121 (W.D. Wash. 2005) ...........................................................................14

*S. Ferry LP # 2 v. Killinger,*
    687 F. Supp. 2d 1248 (W.D. Wash. 2009) ...........................................................................17

*Santa Fe Indus., Inc. v. Green,*
    430 U.S. 462 (1977) ..............................................................................................................14

*Siracusano v. Matrixx Initiatives, Inc.,*
    585 F.3d 1167 (9th Cir. 2009) ........................................................................................11, 17

*In re Snap Inc. Sec. Litig.,*
    2018 WL 2972528 (C.D. Cal. June 7, 2018) .......................................................................20

*In re SolarCity Corp. Sec. Litig.,*
    274 F. Supp. 3d 972 (N.D. Cal. 2017) .................................................................................15

iv          Case No. 3:22-cv-02094-JD

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

*In re Splunk Inc. Sec. Litig.*,
592 F. Supp. 3d 919 (N.D. Cal. 2022) ..........................................................................................9

*In re Talis Biomedical Corp. Sec. Litig.*,
2022 WL 17551984 (N.D. Cal. Dec. 9, 2022) .............................................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ..........................................................................................................6, 15, 19

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) ...........................................................................................7

*In re VeriFone Holdings, Inc., Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) .......................................................................................................15

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ....................................................................................15

*Warshaw v. Xoma Corp.*,
74 F.3d 955 (9th Cir. 1996) ...................................................................................................13, 15

*Waterford Twp. Police & Fire Ret. Sys. v. Mattel, Inc.*,
321 F. Supp. 3d 1133 (C.D. Cal. 2018) .......................................................................................15

*Weston Family P'ship LLLP v. Twitter, Inc.*,
29 F.4th 611 (9th Cir. 2022) ........................................................................................................11

*Weston v. Docusign, Inc.*,
2023 WL 3000583 (N.D. Cal. Apr. 18, 2023) ......................................................................*passim*

*Wochos v. Telsa, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ...............................................................................................13, 20

*Zaghian v. Farrell*,
675 F. App'x 718 (9th Cir. 2017) .........................................................................................13, 16

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) .......................................................................................................19

**Statutes**

15 U.S.C. § 78u-5 ...............................................................................................................11, 12

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

**TABLE OF DEFINITIONS**

| Term | Definition* |
|---|---|
| Air | The Lucid Air (Lucid's sole EV product) |
| Bach | Eric Bach, Lucid's Senior Vice President of Product and Chief Engineer leading up to and during the Class Period |
| Boike | Mike Boike, Lucid's Head of Arizona Operations – Senior Director of Manufacturing from April 2021 to August 2022 |
| CC | Plaintiff's Consolidated Complaint for Violations of the Federal Securities Laws (Dkt. No. 78) |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| Class Period | November 15, 2021 through August 3, 2022, inclusive |
| CTO | Chief Technology Officer |
| CW | Confidential Witness |
| Defendants | Lucid, Rawlinson, and House |
| EV | Electric Vehicle |
| Exchange Act | Securities Exchange Act of 1934 |
| FE | Former Employee |
| Hasenkamp | Peter Hasenkamp, Lucid's Vice President of Supply Chain leading up to and during the Class Period |
| Hochholdinger | Peter Hochholdinger, Lucid's Vice President of Manufacturing leading up to and during the Class Period |
| House | Sherry House, Lucid's CFO leading up to and throughout the Class Period |
| Lead Plaintiff or Plaintiff | Sjunde AP-Fonden ("AP7"), the Court-appointed lead plaintiff in this action |
| Lucid or the Company | Lucid Group, Inc. |
| McKenzie | Mike McKenzie, Lucid's Senior Manufacturing Operations Logistics Manager from September 2020 to March 2022 |
| Merger | The SPAC transaction through which Lucid went public in July 2021 |
| Plant | Lucid's manufacturing facility located in Casa Grande, Arizona |
| Production Ability Statements | Statements ##4, 7 |
| Projection Statements | The portions of statements ##1, 2, 6, 8, 9, 10, 13, 19, 22, 23, 25, 26, 27, 28, 29, 30 where Defendants issued or reiterated vehicle production guidance for 2022 |
| PSLRA | Private Securities Litigation Reform Act |
| Rawlinson | Peter Rawlinson, Lucid's CEO and CTO leading up to and throughout the Class Period |
| Section 10(b) | Section 10(b) of the Exchange Act |

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

| Term | Definition* |
|---|---|
| Section 20(a) | Section 20(a) of the Exchange Act |
| SPAC | Special Purpose Acquisition Company |
| Statements Identifying Reasons for Production Problems | The portions of statements ##1, 2, 3, 5, 6, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 20, 21, 22, 24, 25, 26, 27, 29 where Defendants discussed the reasons for Lucid's production shortfalls, risks associated with production targets, or steps to mitigate such risks |
| Tosh | Randy Tosh, Lucid's Senior Operations Manager – Plant Logistics throughout the Class Period |
| Warehouse | Lucid's warehouse located in Tempe, Arizona |
| Wisdom | Justin Wisdom, Lucid's Material Planning & Logistics Manager |

*Any terms not contained in this chart have the same meaning ascribed to them in the CC.

Case No. 3:22-cv-02094-JD

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

## NOTE ON CITATION FORMATS

Unless otherwise stated, all emphases and ellipses in citations used herein have been added and all quotations, internal quotation marks, citations, and all original emphases and alterations have been omitted.

Commonly used citations in this brief take the following form:

| Citation | Description |
|---|---|
| ¶[•] | Paragraph in the CC |
| §[•] | Section in the CC |
| #[•] | Numbered alleged misstatements set forth in Exhibit B to the CC (Dkt. No. 78-2), which also identifies the "Reasons Why False & Misleading When Made" and the "Facts Giving Rise to Strong Inference of Scienter" |
| MTD [•] | Numbered pages of Defendants' Motion to Dismiss the Consolidated Complaint (Dkt. No. 83) |

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

## I.   INTRODUCTION

During the Class Period, the biggest question facing Lucid was whether it could mass produce its sole EV product—the Air. At every turn, Defendants assured investors that Lucid could and would. In particular, Defendants said the Company would produce 20,000 (and later, 12,000-14,000) vehicles in 2022. The only obstacle Defendants repeatedly highlighted as a true threat to mass producing the Air was a threat facing all automakers—global, *industrywide* supply chain issues. Defendants' statements were materially false and misleading. Undisclosed by Defendants and unbeknownst to investors, Lucid's company-specific production process was riddled with problems that made producing 20,000 vehicles in 2022 a pipe dream. Indeed, the problems were severe enough that just weeks before the Class Period began, Rawlinson admitted internally that Lucid would produce, at most, 10,000 Airs in 2022. As ten FEs uniformly describe, Lucid's internal processes were so broken that it could not get the parts it needed to make cars from its Warehouse to its production line, including because it could not keep track of parts, timely reorder parts, and had not designed parts correctly in the first instance.

By concealing these crippling internal issues and repeatedly issuing false guidance, Defendants created and maintained the false impression that Lucid had the internal ability to mass produce the Air. This enabled Rawlinson to keep Lucid's stock price inflated long enough to lock in hundreds of millions of dollars in stock options. At the end of the Class Period, Defendants finally disclosed what they knew all along—that because of its internal issues, Lucid could not mass produce the Air and would make less than 10,000 cars in 2022. Analysts called the news "a big step back for Lucid," reporting Lucid "will barely make any EVs this year," and that the revelations "will lead to questions about [Lucid's] ability to produce at scale." In response, Lucid's stock price plummeted, and its investors were left holding the bag.

Securities fraud complaints rarely contain the explosive and compelling allegations Plaintiff has developed in the CC. Defendants nevertheless resort to off-the-shelf arguments, claiming the CC does not allege that a single statement was false and there "is not a single well-pled plausible allegation" supporting scienter. Defendants cannot win dismissal by ignoring allegations and substituting their own version of events. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("If defendants are permitted to present their own version of the facts at the pleading stage . . . it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently plausible claim for relief."). Defendants'

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

remaining attacks—attempts to discredit 40 pages of FE allegations, recast knowingly false statements as opinions or puffery, and seek refuge in the PSLRA safe harbor—are meritless. At bottom, "[t]he PSLRA was designed to eliminate frivolous or sham actions, but not actions of substance." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 769 (9th Cir. 2023) ("*Forescout*"). "Requiring more detail than those presently alleged would transform the PSLRA's formidable pleading requirement into an impossible one." *Id*. Plaintiff respectfully requests that the Court deny Defendants' MTD.

## II.    STATEMENT OF FACTS

### A.    Lucid Touts Aggressive Production Targets and Goes Public

Lucid designs, produces, and sells luxury EVs. ¶3. During the Class Period, its sole EV product was the Air. ¶70. After revealing the Air prototype in 2016, Lucid struggled to raise cash, which repeatedly delayed the start of production. ¶¶7, 70, 97-102. By early 2021, the Company still had not commercially produced the Air, and was again running out of capital. ¶¶7, 102. In February 2021, Lucid attempted to raise funds by announcing plans to go public through the Merger. ¶¶8, 103. Rawlinson was highly motivated to close the Merger. Doing so would not only infuse Lucid with $4.4 billion in capital, but also guarantee him a $2 million personal bonus and a lucrative $556 million pay package. ¶¶8-9, 108-11.

With one product, Lucid's success hinged entirely on its ability to produce the Air at scale. §§V.C, VII.C. Ahead of the Merger, which closed on July 23, 2021, Rawlinson represented that Lucid would quickly increase production and would produce 20,000 Airs in 2022. ¶¶10-12, 104-07, 112-19. Following the Merger, Rawlinson had a compelling personal interest in keeping Lucid's stock price inflated: over half of his stock options vested only if Lucid hit certain market capitalization targets. ¶¶12, 108-11, 444-47. As he admitted, "I'm all in on stock options[,] *that's what motivates and drives me*." ¶111.

### B.    Defendants Mislead Investors About Lucid's Ability to Mass Produce the Air

On November 15, 2021—the first day of the Class Period—Defendants represented that they were "confident in [their] ability to achieve 20,000 units in 2022." ¶¶296, 349; *see also* ¶¶348, 350. As the main impediment to production, Defendants singled out "*ongoing challenges facing the automotive industry, with global disruptions to supply chains and logistics*." ¶296. Their statements thus led investors to believe that Lucid was ready and able to mass produce the Air, absent the purported macro risks facing Lucid and its competitors. ¶¶15-23, 297-99, 352-55. These statements were materially false and misleading.

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

Corroborating accounts of ten FEs confirm that leading into and throughout the Class Period, Lucid suffered from debilitating *internal* problems that prevented mass production. §§V.J.1-3. To start, the Company's ability to manufacture the Air depended on delivering production-ready vehicle parts from its sole Warehouse in Tempe, Arizona, to its Plant in Casa Grande, Arizona. ¶¶20, 40, 125, 129-34, 136-37. At all times though, Lucid had no functional inventory management system, depriving Company employees of even the most basic information necessary to run the Warehouse. §§V.J.1.a-d. As a result, Lucid had no idea how many parts it had (if it had any at all), or where parts were located. §§V.J.1.b-d. Because its inventory system was inoperable, Lucid's employees resorted to a "guessing game" about when to reorder parts, and how many to reorder. ¶¶19, 157-58, 160-64, 170. And because Lucid operated its disorderly Warehouse well above capacity, when the Plant requested parts, Warehouse employees spent hours hunting for them in piles stacked up to the ceiling, often to no avail. ¶¶20, 138; §§V.J.1.e-f. Even when parts were located, the problems continued: FEs reported that the Warehouse regularly failed to reflash (update software), sequence (manually assemble), or quality check the parts before shipping them to the Plant, further delaying production. ¶¶131-34, 200-04. The chaos in the Warehouse prevented Lucid from getting parts to the Plant, severely impacted production, and resulted in tens of millions of dollars in parts being lost or irreparably damaged. §§V.J.1.f-g & i-j, V.J.3.a-b. These issues were present prior to, and persisted throughout, the Class Period. ¶¶20, 138; §§V.J.1.a-j, V.J.3.a-b.

FEs further reported that Lucid's actual part shortages often resulted from internal issues, including that its employees: (i) destroyed parts; (ii) did not know when Lucid was out of parts, so could not timely reorder them; and (iii) could not offload parts into the chronically overcrowded Warehouse. ¶¶19-20, 136, 157, 195-99, 205-06; *see* §§V.J.1.b-c, e, g & i. Further, Lucid's faulty design of the Air prevented suppliers from efficiently producing parts to the correct specifications, or "specs." ¶¶237-43, 246-48, 250, 255-57. This, in turn, resulted in: (i) Lucid trying to manually assemble "out of spec" parts that did not fit together (¶¶21, 242, 257); (ii) many vehicles failing quality inspections and being sent back to the line (¶243); and (iii) Lucid rushing to rework the Air's design after it had gone into production (¶¶239-41, 248, 256).

Defendants knew of these pervasive internal issues and their negative impact on Lucid's ability to produce the Air. §§V.J.1.k, V.J.2-3; ¶¶155-56, 166-71, 174-76, 204, 208, 211-13, 425-32. Rawlinson regularly visited the Warehouse and Plant, walked the floors, and saw and discussed firsthand with key

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

personnel Lucid's internal issues and resulting production delays. ¶¶156, 174, 211, 219-20, 222-27, 273, 285-86. For example, in September 2021, FE-1 told Rawlinson about the Warehouse issues, including the inability to find parts, parts being damaged and scrapped, and multiple other issues with parts. ¶¶219-20. FE-1 then told Rawlinson during the first or second week of November 2021 that the Warehouse problems were getting worse and Lucid could not get parts to the Plant. ¶¶222, 273. In response, Rawlinson devised certain perceived quick fixes, including setting up a "Warehouse on Wheels" (i.e., renting 53-foot trailers to house overflowing parts) and sending senior executives to the Warehouse, but each rapidly failed. ¶¶183, 219-24, 230-31, 234. By early February 2022, FE-1 again met with Rawlinson, reiterated the Warehouse problems, and advised that a physical inventory was necessary. ¶¶174-75. Rawlinson initially agreed, but quickly halted the physical inventory. ¶¶175-76, 227. Defendants' refusal to confront Lucid's inventory troubles was not new; in a July 2021 meeting that House attended, Lucid's inaccurate inventory counts were discussed, but management denied a request for a physical inventory because they did not want it to impact Lucid's "books." ¶¶168-69. Based on these and related FE accounts, the CC plausibly alleges that Defendants and senior management knew about Lucid's internal issues hampering production throughout the Class Period.[1] As pled, they also knew that the Warehouse issues were the main cause of Lucid's deficient production, which FE-1 told Rawlinson at their November 2021 meeting. ¶¶222, 273, 291.[2]

Rawlinson and other senior management also **knew** that, as a result of the internal problems, Lucid could not mass produce the Air and, in turn, could not make its production target. §§V.J.1.k, V.J.3.a-b, V.J.4; ¶¶423. In both September and November 2021, FE-1 told Rawlinson that there was no way Lucid would meet its 2022 production goals because of issues at the Warehouse. ¶291. Rawlinson agreed, admitting during an internal meeting that FE-2 attended in October 2021 or the first week of November

---

[1]    *See, e.g.*, ¶¶228-29 (Rawlinson and other senior managers received Daily AM and Daily PM reports discussing internal issues and attended daily start- or end-of-shift meetings where the same issues were discussed); ¶¶155-56, 233, 235 (internal logistics issues communicated to Defendants and management in emails, reports, and meetings); ¶¶183-84 (describing measures Defendants took to try to combat Warehouse overcapacity); ¶¶208-13 (describing meetings, reports, or emails where scrapping of parts was discussed with Defendants and other management); ¶¶208, 232 (describing a daily "5:30 meeting" where Lucid-specific issues were discussed with senior management); ¶¶237, 241, 249, 257, 259 (describing "CTO" meetings where parts design and other issues were discussed, including with Rawlinson).
[2]    *See, e.g.*, ¶271 (Lucid management blamed line stoppages on the Warehouse); ¶265 (Lucid senior management received emails indicating when and why the line was shut down; FE-8, who received the emails, said that 90% of production issues were caused by Lucid's own logistics problems); ¶270 (Lucid senior management received daily status reports identifying "hot calls" to the Warehouse for missing parts); *see also* ¶284 (Lucid management was aware of line stoppages from meetings and emails).

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

2021 that *Lucid would produce fewer than 10,000 vehicles in 2022*, *but telling attendees to keep the information confidential*. ¶289. Rawlinson's leadership team likewise conceded early on that Lucid would miss its production target. ¶288 (during meetings in October 2021, Rawlinson, Hasenkamp, Hochholdinger, Bach, and Boike admitted Lucid would miss its 2022 production target); ¶292 (senior managers agreed during October 2021 conversations that Lucid would not hit production targets).

Despite their internal admissions and front-row seat to Lucid's severe internal problems, on November 15, 2021, Defendants lied and told investors that Lucid would make 20,000 vehicles in 2022. ¶¶14-23, 296-99, 348-55. The next day, Rawlinson doubled-down during an interview with CNBC's Jim Cramer, agreeing that it was "[a]bsolutely" not a problem for Lucid to mass produce vehicles to fill its 17,000 orders, while highlighting as vulnerabilities only "supply chain shortages that the entire industry is facing." ¶¶302-03, 356-63. These misstatements propped up Lucid's stock price long enough for Rawlinson to cash in. ¶¶25, 108-11, 309, 444-49. By inflating Lucid's stock price for its first six months as a public company (until January 25, 2022), Rawlinson secured 87% of his options, worth *$263 million* as of April 2022. ¶448. Lucid also capitalized on its inflated stock price, conducting an "[o]pportunistic" December 2021 offering of convertible notes that yielded more than *$2 billion* in proceeds. ¶¶306-07, 450. On February 14, 2022, Lucid then falsely affirmed its 20,000 vehicle production target, this time misleadingly touting Lucid's "enviable position" vis-à-vis its peers by claiming competitors "are having a much more difficult time due to [] supply constraints than we ultimately are." ¶¶310-11, 364-72.

## C. Defendants Slash Lucid's 2022 Production Target, but Keep Misleading Investors

On February 28, 2022, just two weeks after affirming Lucid's guidance and a month after Rawlinson secured his options, Defendants began walking back their statements, cutting 2022 guidance to between 12,000 to 14,000 vehicles. ¶¶26, 312, 373-77, 455-59. In response, Lucid's stock price fell more than 13%, but remained inflated for several reasons. ¶¶26, 313, 460. *First*, Defendants knew Lucid would miss even the reduced guidance—internally, Rawlinson had already conceded that Lucid would make less than 10,000 vehicles in 2022, and the internal issues Lucid was experiencing persisted. ¶¶27, 289, 297, 317-18, 386-87; §§V.J.1-4, VII.A. *Second*, Defendants continued to conceal these Lucid-specific problems, which were still severely hampering production. §§V.J.1-3, VII.B. Instead, they misleadingly attributed sluggish production to "industrywide challenges in logistics and supply chains" and the "supply

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

chain challenges that you've heard about in numerous companies across industries this earnings season." ¶¶28, 319-20, 381; *see also* ¶¶323-25, 375, 377-80, 383, 385, 388-90. These misstatements created the misleading impression that Lucid's struggles were temporary in nature, and shared by all of its competition. *Id.* After their story was credited by market commentators (¶¶29, 325-28), Defendants stuck to it and falsely reaffirmed Lucid's reduced 2022 guidance in March, April, and May 2022 (¶¶30, 329-30, 332, 334-37, 391, 393, 395-96, 399-400, 402, 404-06, 412, 417). When asked about issues impacting production, Defendants repeatedly pointed to the same scapegoat—temporary industrywide issues—concealing entirely Lucid's myriad ongoing internal issues. ¶¶30, 329-32, 391, 393, 397-99, 401-02, 404-05, 412.

### D.    The Relevant Truth Is Finally Revealed

On August 3, 2022, Lucid then cut its guidance again, this time to 6,000 to 7,000 units, finally revealing what Defendants knew all along—that Lucid would make less than 10,000 vehicles in 2022. ¶¶32, 338, 477-79. For the first time, Defendants also revealed that Lucid's production woes largely resulted from internal "logistics challenges," including its inability to "speed the correct part to [the] line at the correct time and cadence." ¶¶32-33, 339-40, 480-85. Defendants claimed, however, to have just discovered the internal logistics issues. ¶¶32, 339, 481. In response, Lucid's stock price declined by nearly 10% (¶341), with analyst Guggenheim reporting that the news raised "questions about LCID's ability to produce at scale[.]" ¶¶343, 489; *see also* ¶¶342, 344-47, 486-88, 490-505.

### III.    <u>ARGUMENT</u>

In resolving this motion to dismiss, the Court must consider the CC in its entirety, accept all allegations as true, and draw all reasonable inferences in Plaintiff's favor. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings[.]" *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

### A.    Plaintiff Adequately Pleads Actionable Misrepresentations and Omissions

"A statement is false or misleading if it directly contradicts what the defendant knew at that time or omits material information." *Forescout*, 63 F.4th at 764. When defendants "tout positive information to the market," they must "do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Id*. Whether a statement is materially misleading

cannot be resolved on the pleadings unless "the adequacy of the disclosure . . . is so obvious that reasonable minds could not differ." *Khoja*, 899 F.3d at 1014.

***Defendants' Projection Statements were materially false***. A projection is "false" if: "(1) the statement is not actually believed, (2) there is no reasonable basis for the belief, ***or*** (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *Provenz v. Miller*, 102 F.3d 1478, 1487 (9th Cir. 1996). Here, Rawlinson internally admitted by early November 2021 that Lucid would make less than 10,000 cars in 2022, and thus did not believe Lucid's projections exceeding that amount. ¶¶288-89. Lucid's other top executives also admitted pre-Class Period that it would miss its 2022 guidance. ¶¶288, 292. Moreover, Rawlinson, who regularly visited the Warehouse and Plant (¶¶219-20, 222-23, 225-27, 285-86), saw and was repeatedly told of Lucid's internal issues and their adverse impact on production, as were other Lucid executives (§§V.J.1.k, V.J.2-3; ¶¶155-56, 166, 168-69, 171, 174-76, 204, 208, 211-13). Indeed, in September and early November 2021, FE-1 told Rawlinson that because of these problems, Lucid would miss 2022 guidance. ¶291. These allegations plead falsity under each prong. *See Khoja*, 899 F.3d at 1008 ("Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time.").[3] They also lay bare Defendants' shopworn "fraud by hindsight" argument and their claim that the CC's allegations are "consistent with" their statements. MTD 8.

Defendants' argument that their false statements are inactionable because they disclosed that Lucid was subject to risks is meritless. *Id.* at 8-9. They cannot rely on language "describing hypothetical risks to avoid liability for the failure to disclose that the company already had information suggesting" it would miss projections. *Forescout*, 63 F.4th at 779. Lucid's "disclosures did not counterbalance [the] misleading impression created by" Defendants' statements. *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 (9th Cir. 2019).[4] Their attempts to redraft the CC likewise fail. Plaintiff does not plead that

---

[3]    *See, e.g.*, *Provenz*, 102 F.3d at 1487-88 (reversing summary judgment where projections contradicted internal forecasts); *In re Illumina, Inc. Sec. Litig.*, 2018 WL 500990, at *5 (S.D. Cal. Jan. 22, 2018) (projections of sales rise actionable where allegations "plausibly suggest[ed]" defendants knew sales were declining); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 972-73 & 972 n.12 (N.D. Cal. 2009) (projections actionable where plaintiffs "alleged that [defendants] were aware of undisclosed facts tending seriously to undermine [their] accuracy"). Conversely, in *Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001) (MTD 8), the complaint did not "explain what the serious operational problems were," or how the unnamed "difficult problems' decreased revenues," and alleged "no facts . . . that would support an inference that the company's [statements] were known to be false or misleading." *Id.* at 430, 434.

[4]    *See also Provenz*, 102 F.3d at 1387 ("There is a difference between knowing that any product-in-development may run into a few snags, and knowing that a particular product has already developed

7                                    Case No. 3:22-cv-02094-JD

**LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT**

"it took Lucid longer than anticipated to successfully mitigate the issues" (MTD 8), but rather that when Defendants spoke, they *already* knew that Lucid would miss guidance. Thus, Plaintiff has met its "burden under the PSLRA by stating with particularity the facts supporting each of [its] beliefs as to why the challenged statements were false or misleading." *Forescout*, 63 F.4th at 769.

***Defendants' Statements Identifying Reasons for Production Problems were materially false or misleading***. Throughout the Class Period, Defendants repeatedly blamed Lucid's production woes on ***global, industrywide*** supply chain and logistics issues.[5] At the same time, they concealed then-existing, Lucid-specific issues that were severely hampering the Company's production. These statements left investors with an "impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]," *Berson*, 527 F.3d at 985—namely, that Lucid's production problems resulted from transient, external issues, rather than from fundamental and persistent internal issues preventing mass production. While concealing these internal issues, Defendants also touted their purported positive efforts to mitigate the global challenges, leaving investors with the misleading impression that Lucid was ready and able to mass produce the Air as soon as the referenced global issues subsided. *E.g.*, ##1, 5, 13-14, 18, 21-22, 25-27; *see Khoja*, 899 F.3d at 1009 ("[O]nce defendants choose to tout positive information," they must "disclos[e] adverse information that cuts against the positive information.").

Defendants' challenges are easily refuted. *First*, despite repeated references (MTD 1, 3-4, 9-10), they do not identify a single disclosure where Lucid stated it was currently experiencing severe internal issues hampering mass production (*id.*). Instead, they contend that by discussing ***global*** supply chain challenges, they somehow disclosed the ***internal*** issues. *Id.* at 9. Even a cursory reading of Defendants' statements, which discussed "challenges facing the ***automotive industry*** with ***global disruptions*** to supply chains and logistics" (¶349), belies these claims. That Lucid's internal issues—including its destruction of parts, failure to timely reorder parts, and significant design flaws—caused ***parts shortages*** does not transform them into global supply chain issues impacting other companies. MTD 9. Surely recognizing

---

problems[.]"); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (saying something "might" occur is "quite different" from saying it "in fact" occurred; "[o]ne indicates a risk, the other a certainty," and investors "treat the two differently").

[5]    *See, e.g.*, #29 ("We're facing ***global supply chain challenges***, ***as is all the auto industry*** and other industries."); #20 (touting progress "despite on-going ***global*** supply chain challenges"); ##3-6, 9-18, 24-26.

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

this, Defendants improperly cite extrinsic internet material—which is not referenced or relied on in the CC, or identified in Defendants' request for judicial notice—to suggest that the words "supply chain" are somehow synonymous with every internal Lucid logistics issue. *Id*. At best, this argument raises a premature factual dispute. Indeed, whether a statement is misleading cannot be resolved as a matter of law unless "the adequacy of the disclosure . . . is so obvious that reasonable minds could not differ." *Khoja*, 899 F.3d at 1014; *see also In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *15 (N.D. Cal. Aug. 17, 2022) (rejecting argument that alleged misstatement disclosed the truth because "reasonable minds could differ as to whether" it "disclosed . . . the information that plaintiffs allege was omitted").

*Second*, Defendants' use of the word "logistics" (MTD 9-10) did not disclose Lucid's internal issues. The very statements to which Defendants point refer to "***global*** disruptions to . . . logistics" that were "***facing the automotive industry***," and "***logistics challenges*** that the ***automotive industry has been facing***." ¶¶349-50. Nor did Defendants' lone reference to "internal plans to improve logistics" (MTD 9-10) disclose ***Lucid-specific*** logistics problems, much less "reveal[] the extent and duration of the [issues] or [their] [] impact on the company's [production]," *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 940 (N.D. Cal. 2022). Thus, "it's far from clear that a reasonable investor could have decoded this meaning at the time," and "[a]bsent undisputed evidence" a court cannot find, "as a matter of law, that defendants disclosed" it. *Berson*, 527 F.3d at 987 (reversing holding that defendants disclosed concealed information). Further, "[t]he perceptions of analysts are an acceptable measure of what reasonable investors would have understood," *Jaeger v. Zillow Grp., Inc.*, 2022 WL 17486297, at *7 (W.D. Wash. Dec. 7, 2022), and following Defendants' statements, market commentators blamed Lucid's production woes on external factors: Lucid "is getting absolutely crushed by short-term challenges such as higher component costs, supply chain issues, and higher shipping costs," ¶328; *see also* ¶¶325-27. Defendants' claim that they disclosed Lucid-specific issues in February 2022 is also impossible to square with their statement six months later that they had just discovered those issues. ¶¶339, 481, 483, 497. Indeed, an analyst described these belated admissions as disclosing "***newfound*** weaknesses in [Lucid's] logistics processes." ¶488. In any event, Defendants' truth-on-the-market defense raises "a merits issue to be reached at trial." *Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1177 (9th Cir. 2011), *aff'd*, 568 U.S. 455 (2013).

*Third*, Defendants are wrong that they had no duty to disclose Lucid's pervasive internal issues.

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

MTD 10. Having chosen to speak about the purported risks to Lucid's production and causes of production shortfalls, Defendants were "bound to do so in a manner that wouldn't mislead investors." *Berson*, 527 F.3d at 987. They did not, repeatedly failing to disclose the internal issues that were driving Lucid's production problems, and thereby giving "reasonable investor[s] the impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Id*. at 985. In *Forescout*, the Ninth Circuit recently found falsity adequately pled because, "if a significant cause of the missed revenue guidance was the misclassification of illusory deals, it was misleading to blame the revenue miss entirely on EMEA conditions (***even if*** EMEA conditions were also a factor in the financial performance)." 63 F.4th at 770. It was misleading here for Defendants to blame production problems on publicized industrywide issues when undisclosed internal issues were, at least, a "significant cause." *Id*.[6]

*Fourth*, the information Defendants concealed was material. Defendants, analysts, and investors alike were hyper-focused on Lucid' ability to mass produce its only real revenue source. *See, e.g.*, §V.C. Guggenheim wrote that "the key debate now is can [Lucid] scale production and hit volume targets." ¶95; *see also Reese v. Malone*, 747 F.3d 557, 570 (9th Cir. 2014) ("Facts demonstrating public interest in the withheld information support its materiality."), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017). Defendants' statements misleadingly concealed that Lucid did not have that ability, regardless of any external impediments. When Defendants finally revealed these facts in August 2022, Lucid's stock price fell nearly 10%. ¶¶339-47, 480-86. Contrary to Defendants' argument (MTD 10-11), the CC plausibly alleges that Lucid's internal issues had a distinct, negative impact on production beyond any delays caused by global challenges (§§V.J.1-3, VII.B). FEs confirm that the majority—***up to 90%***—of production delays resulted from internal problems, blame was pinned internally on Lucid-specific problems, and Rawlinson was ***explicitly told*** Lucid would never meet guidance due to internal problems. *E.g.*, ¶¶262-84, 291-94, 423. At the end of the Class Period, Defendants conceded that internal issues had been the "primary bottlenecks" impeding

---

[6]    In *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 880 & 880 n.8 (9th Cir. 2012) (MTD 10), by contrast, the plaintiffs did not adequately allege that the omissions "made the alleged statements misleading." In *Crews v. Rivian Auto., Inc.*, 2023 U.S. Dist. LEXIS 27602, at *36-37 (C.D. Cal. Feb. 16, 2023), the court held that the concealed information was "consistent" with the alleged statements. Regardless, *Rivian* was decided prior to the Ninth Circuit's decision in *Forescout*.

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

production. ¶¶339-40, 490.[7] In any event, materiality is a fact-specific inquiry best reserved for a jury. *See Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1178 (9th Cir. 2009).

***Defendants' Production Ability Statements were materially misleading***. In a November 16, 2021 interview, Jim Cramer noted that Lucid had 17,000 vehicle orders and said "[a]nd that's not a problem for you to make." Rawlinson responded: "Absolutely. We already have a factory scale for 34,000 units a year. As soon as we can get this quality parts to the line, we can spool that up." #4.[8] Defendants argue that these statements were technically true because Lucid's factory had been built for a production capacity of 34,000 vehicles (MTD 8-9), but "statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). As pled, Defendants' statements gave the misleading impression that Lucid was ready and able to fill its 17,000 orders once supply chain issues cleared, when, as a result of its severe internal issues, Lucid was nowhere near ready to "spool [] up" production and could not make enough Airs to fill its orders. #4; *see Cutler v. Kirchner*, 696 F. App'x 809, 814 (9th Cir. 2017) (statements that product was "working" and "ready to scale" gave misleading impression); *see also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (statement "plainly misleading" even though "[t]echnically, this may have been true").

***The PSLRA safe harbor does not protect Defendants' statements***. Defendants argue all but three statements (##17, 20, 24) are protected by the PSLRA safe harbor. MTD 11-13. Protection under the safe harbor's first prong requires that forward-looking statements be ***both*** "identified as a forward-looking statement" ***and*** "accompanied by ***meaningful*** cautionary statements." 15 U.S.C. § 78u-5(c)(1)(A)(i). Oral forward-looking statements are also protected if they are identified as forward-looking, accompanied by a statement that "actual results might differ materially," "***and***" (not "or," as Defendants argue (MTD 12)) identify a written document that contains ***meaningful*** cautionary statements. 15 U.S.C. § 78u-5(c)(2). Under the second prong, a statement is not actionable unless it is made with actual knowledge that it is

---

[7] By contrast, in *Weston Family P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 621-22 (9th Cir. 2022) (MTD 10), no facts were pled indicating that software bugs had caused delays. In *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 836 (9th Cir. 2022) (MTD 10), the plaintiff failed to "allege with specificity . . . why investors would have felt misled" by the omissions. In *McCormick v. Fund Am. Cos., Inc.*, 26 F.3d 869, 884 (9th Cir. 1994) (MTD 11), the omitted facts "would not have added useful information." In *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064-65 (N.D. Cal. 2012) (MTD 11), plaintiffs failed to allege that concealed problems precluded the company from making projections.

[8] Similarly, in response to the question, "so the orders that you do have, [can be] filled at this time," Lucid stated, "***[w]e have the capacity to fill all the orders received to date and more***." #7.

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

false or misleading. *Id.* § (c)(1)(B)(i). Neither prong shelters any of Defendants' statements.

*First*, "the safe harbor is not designed to protect [defendants] . . . when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017). Many of Defendants' statements fall in this category, or are present tense statements about current production ability or industrywide problems that purportedly ***had been*** or were ***currently*** impacting Lucid.[9] In all events, these statements are not "misleading because they failed to predict the future, but because they concealed or downplayed" current facts about Lucid's internal problems. *In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1231 (N.D. Cal. 2009); *see also QuantumScape*, 580 F. Supp. 3d at 737 (statement that "may seem to be forward-looking because it responds to a question about [] future sustainability advantage . . . [b]ut, in reality, . . . contains an express or implied concrete assertion concerning a specific current or past fact").

*Second*, there is no protection for statements Defendants did not specifically identify as forward-looking. *See* ##4-7, 29-30. Defendants claim they are protected "even without such identification" because they are "forward-looking on their face." MTD 11-12. But their own authority holds that the first prong applies ***only if*** a statement is "***identified as a forward-looking statement***." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014). There, the statements were not only "forward-looking on their face" but ***also*** "***appropriately identified as such***." *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 2012 WL 1868874, at *10 (N.D. Cal. May 22, 2012). Defendants here point to no such identification for ##4-7, 29-30. *See Weston v. Docusign, Inc.*, 2023 WL 3000583, at *15 (N.D. Cal. Apr. 18, 2023) (statements outside safe harbor where none "were identified as forward-looking when they were made").

*Third*, Defendants' forward-looking statements were not accompanied by "meaningful cautionary language." *Id.* (cautionary language must "discredit the [misleading statement] so obviously that the risk of real deception drops to nil"). Cautionary language is not "meaningful" where, as here, defendants were "aware of a significant likelihood that the risk would materialize and did not sufficiently apprise its

---

[9]    *E.g.*, #5 ("[W]e've been able to mitigate that risk."); #10 ("[O]ur production has been and indeed continued to be impacted by supply chain challenges."); #12 ("[W]e could have chosen to build faster, but we elected not to sacrifice quality[.]"); #13 ("[W]e have the elements in place to execute successfully on our plans[.]"); #29 ("We're facing global supply chain challenges[.]"); ##3-4, 6-7, 9, 11, 14-16, 18, 21, 25, 27. Statement #4 was about ***current*** production capabilities. *See In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 737 (N.D. Cal. 2022) (statement that company was "ready for commercial deployment as soon as we can scale up production" was "a statement about the present").

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

investors of this development." *Forescout*, 63 F.4th at 781. Statements ##4-7 and 29-30 failed to point to any written document containing cautionary language and themselves were accompanied by virtually no cautionary language, let alone meaningful cautionary language.[10] For the remainder, the language Defendants point to presented risks either as yet-to-occur contingencies or hurdles Lucid had previously faced. MTD 3-5, 12-13. None disclosed that Lucid was ***currently experiencing*** severe internal problems that were ***currently*** impeding production such that it could not make the projections. Warnings that issues have previously impacted or may in the future impact a company's business are inadequate when, as here, there are severe and undisclosed issues currently impacting the Company. *See Zaghian v. Farrell*, 675 F. App'x 718, 720 (9th Cir. 2017) (cautionary language inadequate where it failed to warn of known issues currently impacting company); *Jaeger*, 2022 WL 17486297, at *4 n.7 (same); *Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *12 (N.D. Cal. Mar. 31, 2023) ("The safe harbor cannot protect cautionary statements made with superior knowledge that some of the potential perils identified have in fact been realized."); *Docusign*, 2023 WL 3000583, at *17 (cautionary language courts previously approved was "inadequate" because it did not disclose that risks "had already come to fruition"); *QuantumScape*, 580 F. Supp. 3d at 738 (warning of "substantial delays" insufficient because defendants did not disclose company "in fact did not (allegedly) have a battery that would function as promised").[11] At best, it is premature to decide if the safe harbor applies. *See Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) ("Only if a disclosure was so obvious that reasonable minds could not differ can the issue of whether shareholders have been adequately cautioned about the risks be settled as a matter of law.").

*Finally*, "Defendants cannot invoke safe-harbor protection on the basis that they lacked actual

---

[10]    For mixed statements (a forward-looking statement accompanied by a materially misleading non-forward-looking statement), "it is likely that no cautionary language – short of an outright admission of the false or misleading nature of the non-forward-looking statement – would be sufficiently meaningful to qualify the statement for the safe harbor." *Quality Sys.*, 865 F.3d at 1146-47.

[11]    Defendants' authorities are not to the contrary. In *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 932 (N.D. Cal. 2017), the court agreed that cautionary language could be inadequate "[i]f a company were to warn of the potential deterioration of [a business line], when in fact it was established that that line of business had already deteriorated," but found that, unlike here, the plaintiffs failed to allege the business had already deteriorated such that "GoPro could not meet its Q4 guidance." In *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112-13 (9th Cir. 2010) and *Intuitive Surgical*, 759 F.3d at 1058-59, plaintiffs did not allege that the risks had already arisen. MTD 12. In *Wochos v. Telsa, Inc.*, 985 F.3d 1180, 1193 (9th Cir. 2021), the plaintiffs "did not directly challenge the adequacy of Tesla's cautionary statements." While the panel explained, in dicta within a footnote, that Tesla's cautionary language was "detailed and specific," it did not have before it an argument that the language was inadequate because the risks it warned of, or said Tesla had previously experienced, were currently impacting the company. *Id*. at 1193 n.3.

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

knowledge of falsity" for the reasons set forth above in Section II.B, including their actual knowledge that Lucid would miss its projections. *Forescout*, 63 F.4th at 781. In addition, given their knowledge of the rampant internal issues preventing mass production, Defendants lacked a reasonable basis for the projections. *Id*.; *see also Docusign*, 2023 WL 3000583, at *18 (plaintiffs "plausibly alleged" actual knowledge where defendants had access to and tracked data showing waning demand); *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *10 (N.D. Cal. Apr. 28, 2020) (actual knowledge pled where "defendants did not have a reasonable basis to believe [statements were true]").[12]

*Defendants' statements are not inactionable opinions*. Defendants wrongly argue that all but two alleged statements (##17, 20) are inactionable opinions. MTD 13. Many are representations of current facts and, thus, are not opinions.[13] *See, e.g.*, *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184 (2015) ("a determinate, verifiable statement" is a fact representation). Even if construed as opinions, the CC pleads these statements were subjectively and objectively false. *See supra* Section II.B. In *Align*, 856 F.3d at 615-17 (MTD 14), by contrast, there were "no allegations" that the defendants did not believe their statements. Equally fatal, "[e]ven if [Defendants] sincerely believed" them, the CC pleads that Defendants' "concrete assurances did not fairly align with the information in [their] possession at the time," *Forescout*, 63 F.4th at 771, 779—i.e., that Lucid's production was severely hampered by undisclosed internal issues, and it would not produce more than 10,000 Airs in 2022—hardly some isolated "fact cutting the other way" (MTD 13-14), *see Docusign*, 2023 WL 3000583, at *18 (even if opinions, statements about demand actionable because defendants omitted facts about demand problems that rendered them misleading).

*Defendants' statements are not puffery*. Defendants claim that half their misstatements, including reaffirmations of production guidance, are immaterial puffery. MTD 14 (citing ##1-3, 6, 9, 12-13, 15-16, 18-20, 23). But "the exception for puffery is narrowly drawn," *S. Ferry LP # 2 v. Killinger*, 399 F. Supp. 2d 1121, 1129 (W.D. Wash. 2005), and courts must "examine the entire statement and its circumstances

---

[12]    Citing *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977), Defendants argue that the CC alleges only inactionable "mismanagement." MTD 13 n.10. While they are wrong, "*Santa Fe* does not protect defendants who mismanage their company *and lie to investors about that mismanagement*." *Lifelock*, 780 F. App'x at 484 n.4.
[13]    *See, e.g.*, #5 ("*[W]e've been able to mitigate that risk*."); #10 ("[O]ur production *has been and indeed continued to be* impacted by supply chain challenges."); #11 (discussing "supply chain issues that *we are experiencing*"); #14 ("[W]e *are managing* through supply chain challenges[.]").

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

to determine if it is actionable," *Mulligan v. Impax Labs, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014). These statements all concern production of the Air—the "core aspect of [Lucid's] business," and the most important issue facing the Company—and thus were not immaterial. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 WL 66281, at *17 (N.D. Cal. Jan. 4, 2017) (rejecting puffery arguments). After Defendants reaffirmed guidance, analysts attributed Lucid's share price increase to Defendants' statements, confirming the importance investors placed on them. ¶¶300-01 ("The [24%] surge in the shares came after Lucid said Monday it remained confident in its ability to produce 20,000 vehicles in 2022."). Other statements are not puffery because they provided "a concrete description of the past and present" factors purportedly impacting production. *Forescout*, 63 F.4th at 770. Moreover, responses to analyst questions and statements made to address market concerns about production delays "cannot be discounted as mere puffery." *Id.* at 771; *see Warshaw*, 74 F.3d at 959 (statement that "everything [was] going fine" actionable when made in response to market fears about FDA approval for major product). In any event, even "general statements of optimism, when taken in context," are actionable where, as here, they "address specific aspects of a company's operation that the speaker knows to be performing poorly." *Quality Sys.*, 865 F.3d at 1143; *Docusign*, 2023 WL 3000583, at *18.[14] In short, this "fact-intensive assessment[]" is "more properly left to the jury." *Mulligan*, 36 F. Supp. at 966.

**B.    Plaintiff Adequately Pleads a Strong Inference of Defendants' Scienter**

"Scienter can be established by intent, knowledge, or certain levels of recklessness." *In re VeriFone Holdings, Inc., Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012). The scienter inference "need not be" of "the smoking-gun genre, or even the most plausible" inference. *Tellabs*, 551 U.S. at 324. Rather, a district court should ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Quality Sys.*, 865 F.3d at 1144.

---

[14]    Defendants' cases involved vague statements about aspirations or undefined goals. *See Kipling v. Flex Ltd.*, 2020 WL 2793463, at *13-14 (N.D. Cal. May 29, 2020) (statements about "amorphous" strategy being "on track"); *In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *15 (N.D. Cal. Feb. 12, 2015) ("excellent progress" on undefined "product road map"); *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1049-50 (N.D. Cal. 2007) ("loose predictions"). Unlike here, in *In re SolarCity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 996 (N.D. Cal. 2017), the statement did not issue or reaffirm the goal, instead providing a vague assessment of progress toward it. Regardless, Defendants' own authority (MTD 15) confirms that statements of optimism are actionable when, as here, they are alleged to "address specific aspects of a company's operation that the speaker knows to be performing poorly." *Waterford Twp. Police & Fire Ret. Sys. v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1049 (C.D. Cal. 2018).

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

Here, the inference of Defendants' scienter is overwhelming.

To start, Defendants do not dispute Rawlinson's or Lucid's knowledge of the debilitating internal issues, including inoperable internal logistics, product design problems, and the resulting production impact, including Plant shutdowns—they instead falsely claim to have disclosed these facts. MTD 1, 3-4, 9-10. Regardless, the CC contains numerous well-pled allegations that Rawlinson and Lucid's executives were repeatedly informed of these problems. ¶¶423-32. These facts plead scienter for all of the alleged misstatements. *See Mulligan*, 36 F. Supp. 3d at 953, 970 (scienter pled where plaintiffs alleged knowledge or reckless disregard for "pervasive manufacturing and QC deficiencies"); *Docusign*, 2023 WL 3000583, at *22 ("statements from multiple confidential witnesses about the internal information available to the defendants" raised strong scienter inference); *Zaghian*, 675 F. App'x at 720 (actual knowledge pled where defendants "knew of reliable information indicating that the [product] was unlikely to succeed").

Scienter is also pled through allegations that Rawlinson and other senior executives were explicitly informed, internally admitted, and discussed at meetings that Lucid would miss the very guidance that they nevertheless reaffirmed. ¶¶15-16, 137, 287-94, 352, 423. FEs confirm that right before the Class Period, Rawlinson admitted Lucid would make less than 10,000 Airs in 2022 (FE-2), and was told (multiple times) Lucid would miss guidance because of its internal issues (FE-1). ¶¶288-89, 291.

As for House, the CC pleads her access to facts contrary to her statements and direct knowledge of Lucid's internal problems, including its failing inventory controls and its scrapping of tens of millions of dollars of parts. ¶¶168-69, 177, 211, 213, 427, 429. And Rawlinson and House "worked together to promote" the guidance and discussed it "extensively in [] public statements," raising a strong inference that once Rawlinson realized Lucid would miss guidance, he "shared that fact" with House. *Lifelock*, 780 F. App'x at 485. This is especially true here, where many senior executives—including Hasenkamp, Hochholdinger, Bach, Boike, Tosh, Wisdom, and McKenzie—also knew Lucid would miss guidance. ¶¶288-93; *see Robb v. Fitbit Inc.*, 2017 WL 219673, at *6-7 (N.D. Cal. Jan. 19, 2017) (where senior executive knew important information, most plausible inference was that CEO, CTO, and CFO also knew).

While these facts alone raise a strong inference of scienter, "the totality of the circumstances under the *Tellabs* analysis makes the inference irresistible." *Reese*, 747 F.3d at 577. *First*, Rawlinson was uniquely motivated to make false projections and conceal Lucid's internal problems to keep its stock price

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

artificially inflated long enough to vest stock options then worth ***$263 million***. ¶¶444-49; *see also Siracusano*, 585 F.3d at 1182 ("[P]ersonal financial gain may weigh heavily in favor of a scienter inference[.]"). Rawlinson's misconduct squares directly with his admission that he was "all in on stock options" and they were "***what motivates and drives me***." ¶111. That Rawlinson has not yet cashed in the options he now owns does not change this calculus (MTD 20); under controlling law, a lack of stock sales does not negate scienter. *See No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003). Lucid's "[o]pportunistic" convertible notes offering, which generated ***over $2 billion***, only bolsters the CC's motive allegations, which are not "generic and implausible" as Defendants claim (MTD 20), but routinely credited.[15]

*Second*, Defendants repeatedly spoke about Lucid's production of the Air and represented that they "had all of the information necessary to make accurate predictions," which, "[i]f [they] did not in fact have such knowledge, [] would be at least actionably reckless." *S. Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009). *Third*, the CC pleads (¶¶441-43) that the short gaps between misstatements and corrective disclosures ***bolster***, not establish (MTD 20), scienter. *See Reese*, 747 F.3d at 574 (temporal proximity supports scienter). *Fourth*, the Air constituted 80-98% of Lucid's revenues, and was the "epitome of core" to its operations. *Id.* at 576; ¶433-35. Moreover, the pervasive problems at Lucid's Warehouse, which repeatedly halted production of its sole product, "were prominent enough that it would be absurd to suggest that top management was unaware of them." *Berson*, 527 F.3d at 989.[16]

---

[15]    *See Am. W. Holding*, 320 F.3d at 944 (crediting allegation executives were "motivated to inflate [] financial results and stock prices because their eligibility for stock options and bonuses were based mostly on company's financial performance"); *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1029 (N.D. Cal. 2020) (crediting allegations that "bonus structure incentivized defendants" to make misstatements and company conducted offering to raise "desperately needed cash"); *QuantumScape*, 580 F. Supp. 3d at 741-42 (motive bolstered scienter where company "spent a decade developing" product, "went public just before" class period, and "raised hundreds of millions of dollars" during class period). Defendants' cases (MTD 20) stand for the unremarkable proposition that motive allegations on their own cannot establish scienter. *See Rigel*, 697 F.3d 869; *In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054 (N.D. Cal. 2003).
[16]    Defendants claim the CC does not allege scienter for individuals who "made" statements ##6-7 and 30. MTD 16 n.13. But the CC alleges Lucid was a "maker" of those statements. Rawlinson and House's scienter, among others, is imputed to Lucid because the "scienter of the senior controlling officers of a corporation may be attributed to the corporation." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 705-06 & 705 n.8 (9th Cir. 2021) (imputing CEO's scienter to Alphabet despite the fact that CEO did not make the statement). In *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 744-45 (9th Cir. 2008), by contrast, scienter was not adequately alleged for ***any*** individual defendant. The court also confined its holding to "limited nature and unique context" of the statements there, and recognized that collective scienter might be appropriate where, as here, the statements were critically "important" and "dramatically false." *Id.*

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

Faced with these scienter facts, Defendants resort to meritless and isolated attacks on the well-pled FE allegations. Courts credit FE accounts that are identified with "sufficient particularity" to support "the probability that a person in the position occupied by the source would possess the information alleged." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005). Here, the CC pleads each FE's tenure, "job description and responsibilities, and, in some instances, the [FE's] exact title and to which [] executive the witness reported," as well as the basis for their knowledge. *Quality Sys.*, 865 F.3d at 1145. ¶¶57-66; *see generally* §V.J. Tellingly, Defendants do *not* argue that *any* FE lacked a basis to know the information attributed to him. Instead, they argue that certain FEs had "narrow warehouse or factory roles." MTD 2, 16. But "[t]he adequacy of the [CC] does not depend on each [FE] possessing inside knowledge about corporate-level trends; Plaintiff[] need only provide a basis for each [FE's] knowledge about the specific statements he made." *Forescout*, 63 F.4th at 771. Nor must FEs have direct contact with Defendants or provide insight into their state of mind. *See LifeLock*, 780 F. App'x at 484 n.5 (refusing to discount allegations from CW who lacked direct contact with defendant because CW was in "position to be personally knowledgeable" about facts reported); *Roberts*, 2020 WL 2042244, at *10-11 (rejecting argument that FE allegations did not support scienter because FE lacked "direct contact" with defendants"); *Maverick Fund, L.D.C. v. First Solar, Inc.*, 2018 WL 6181241, at *10-12 (D. Ariz. Nov. 27, 2018) (rejecting argument that FE allegations do not demonstrate scienter because FEs lacked personal knowledge of defendants' states of mind). Nevertheless, the CC pleads ***the very facts Defendants falsely claim are required and missing***, including Rawlinson discussing his own conclusion that Lucid could not produce more than 10,000 cars in 2022, and direct discussions, meetings, and communications with Rawlinson, House, and Lucid senior management.

Defendants' argument that FE-2's allegations "lack the necessary detail" (MTD 18) rings equally hollow. FE-2 specified the meetings he attended (e.g., ¶¶228, 288-90, describing daily start-of-shift-meetings and end-of-shift meetings), the Lucid management who attended (*id*., including Hasenkamp, Hochholdinger, Bach, Tosh, and Boike), that Rawlinson attended once or twice a week (¶228), and when the meetings occurred (October 2021 or the first week of November 2021) (¶¶288-90). FE-2 also detailed what was said and by whom. ¶289 ("Rawlinson stated that Lucid would make less than 10,000 vehicles in 2022" and "also told FE-2 and other attendees that the fact that Lucid would miss its targets was

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

confidential information[.]"); ¶288 ("Rawlinson, along with Hasenkamp, Hochholdinger, Bach, and Boike, made statements that Lucid was going to miss its year-end vehicle production targets for 2021, 2022, and 2023."). The CC thus pleads that FE-2 attended the meetings and was in a position to know the information attributed to him. *See Forescout*, 63 F.4th at 771 (complaint "sufficiently explains how each CW possessed knowledge about the statements he made" because they "described conversations that they themselves heard"). This level of detail is more than sufficient. *See Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1032 (N.D. Cal. 2016) (crediting FE allegations about reports from "June or July 2015"); *Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 73 (D. Mass. 2014) ("Court cannot construe the PSLRA's pleading requirement to mean that confidential witnesses, who are former employees of the Company, must recall all possible details from their former positions.").[17]

Defendants cannot raise a more compelling inference by disputing well-pled FE allegations as "implausible" or arguing that FE-2's discussions with Rawlinson never occurred. MTD 18-19. *See Tellabs*, 551 U.S. at 326-27 (court must undertake a "comparative assessment of plausible inferences, while constantly assuming the plaintiff's allegations to be true"); *Alphabet*, 1 F.4th at 698 ("When there are well-pleaded factual allegations, a court should assume their veracity[.]"). Moreover, Rawlinson's conclusion that Lucid would produce less than 10,000 Airs is entirely plausible not only because he ***expressly stated it***, but because he knew Lucid could not mass produce as a result of its severe internal problems, as confirmed by numerous FEs. *See Forescout*, 63 F.4th at 772 ("Having considered the level of detail of the CW statements, the number of CWs, and the consistency between the CW's statements of subjective opinion and those of verifiable fact, we find that the CWs tell a reasonably plausible story about Forescout's state of affairs."). Because Defendants do not identify any allegation that is irreconcilable with FE-2's account, their cases do not apply.[18] None of the facts Defendants point to—that increasing production was

---

[17]    The CC's allegations are nothing like those in *In re Talis Biomedical Corp. Sec. Litig.*, 2022 WL 17551984, at *26 n.16 (N.D. Cal. Dec. 9, 2022) (MTD 18), which the court found "conclusory, often stated in the form of an opinion without explaining the basis for the opinion, vague or silent as to time period, and often based on vague hearsay or rumors." The pleading in *Carr v. Zosano Pharma Corp.*, 2021 WL 3913509, at *10 (N.D. Cal. Sept. 1, 2021) (MTD 18), did not contain FE allegations.

[18]    MTD 18-19 (citing *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1057-58 (9th Cir. 2014) (CW allegation that company learned of problem in 2007 conflicted with declaration incorporated into complaint stating company learned of problem in mid-2008)); MTD 19 n.14 (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 999 (9th Cir. 2009) (CW account that defendant said not to write down inventory in 2004 directly contradicted by allegation of "significant" inventory write-downs in 2004)).

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

critical to Lucid, that Rawlinson continued to push for increased production, or that Defendants slowly leaked the relevant truth to the market (MTD 18-19)—is inconsistent with (let alone directly contradictory to) Rawlinson's earlier admission to a small group of senior executives that Lucid would miss its guidance.

As for FE-1, Defendants acknowledge he told Rawlinson in September 2021 that Lucid would never meet its production goal because of internal issues, but debate the meaning of Rawlinson "nodding his head" in response. MTD 17. Whether Rawlinson "shared" FE-1's view (*id.*) is for a jury to decide, and, regardless, ***Rawlinson internally admitted***—just a month later—that Lucid would not meet its production goals. *See In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *7 (C.D. Cal. June 7, 2018). Rawlinson's admission distinguishes this case from *Wochos*, where the "[p]laintiffs failed to plead any facts showing that [defendants] ever accepted" that Tesla would miss targets. 985 F.3d at 1194. More to the point, *Wochos* "d[id] not reach the issue[] of scienter" and thus has no bearing on the inquiry here. *Id.* at 1188.[19]

In sum, the FEs tell "essentially the same story," "span different levels of [Lucid's] hierarchy," and "remain consistent across different time periods." *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058-59 (C.D. Cal. 2008). Moreover, the CC's collective allegations—about a CEO who knowingly lied to the market to line his own pockets—are compelling and plausible. Defendants' competing inference that they "believed Lucid would achieve certain results but were later proven wrong" (MTD 20) cannot be squared with Plaintiff's well-pled allegations.

## C.    Plaintiff Adequately Pleads Section 20(a) Claims

Defendants do not dispute "control," and, as set forth above, the CC sufficiently pleads a primary violation of Section 10(b). Accordingly, Plaintiff's Section 20(a) claims are adequately alleged.

## IV.    **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' MTD. Should the Court deem any portion of the CC insufficient, Plaintiff respectfully requests leave to amend. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

---

[19]    The court's discussion of "impossibility" in *Wochos* had nothing to do with scienter. Rather, the plaintiffs there did not challenge the adequacy of the cautionary language itself, and instead only argued that if defendants knew it was impossible to make guidance, any cautionary language that did not disclose that impossibility would be inadequate. *Id.* at 1193-94. It was in that specific context that the court examined whether plaintiffs had pled defendants' knowledge of impossibility. *Id. Wochos* did not suggest that knowledge of impossibility is required for scienter (or to render cautionary language inadequate).

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

Dated: April 24, 2023

Respectfully submitted,

**KESSLER TOPAZ MELTZER
  & CHECK, LLP**

*/s/ Stacey M. Kaplan*
Stacey M. Kaplan (Bar No. 241989)
(skaplan@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:    (415) 400-3000
Fax:    (415) 400-3001

        -and-

Gregory M. Castaldo (admitted *pro hac vice*)
(gcastaldo@ktmc.com)
Johnston de F. Whitman, Jr. (admitted *pro hac vice*)
(jwhitman@ktmc.com)
Joshua A. Materese (admitted *pro hac vice*)
(jmaterese@ktmc.com)
280 King of Prussia Road
Radnor, PA 19087
Tel:    (610) 667-7706
Fax:    (610) 667-7056

*Counsel for Lead Plaintiff Sjunde AP-Fonden and
Lead Counsel for the Putative Class*

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT