**Pages 1 - 46**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martinez-Olguin, Judge

| | | |
|---|---|---|
| IN RE LUCID GROUP, INC. SECURITIES LITIGATION | ) ) ) | **NO. 22-cv-02094 AMO** |
| _____ | ) ) | |
| ANANT GOEL, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| VS. | ) ) | **NO. 22-cv-3176 AMO** |
| LUCID GROUP, INC., PETER RAWLINSON, and SHERRY HOUSE, | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

San Francisco, California
Friday, September 8, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Lead Plaintiff:
                    KESSLER TOPAZ MELTZER CHECK LLP
                    One Sansome Street, Suite 1850
                    San Francisco, California 94104
                **BY:  STACEY M. KAPLAN, ATTORNEY AT LAW**


                    KESSLER TOPAZ MELTZER CHECK LLP
                    280 King of Prussia Road
                    Radnor, Pennsylvania 19087
                **BY:  JOSHUA A. MATERESE, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Defendants Lucid Group, Inc., Peter Rawlinson, and Sherry House:

                     DAVIS POLK & WARDWELL LLP
                     450 Lexington Avenue
                     New York, New York 10017
       **BY:   DANIEL J. SCHWARTZ, ATTORNEY AT LAW**

**Friday - September 8, 2023**                          **11:01 a.m.**

                        **P R O C E E D I N G S**

                            ---o0o---

        **THE CLERK:**  Calling Case Number 22-cv-2094 and 22-cv-3176, In Re Lucid Group Incorporated Securities Litigation.

        Counsel, please come up to the podium and state your appearances for the record, starting with the plaintiff.

        **MS. KAPLAN:**  Good morning, Your Honor.  Stacey Kaplan from Kessler Topaz on behalf of the lead Plaintiff AP7, and I also have with me here today my partner Joshua Materese.

        **THE COURT:**  Good morning.

        **MR. MATERESE:**  Good morning.

        **MR. SCHWARTZ:**  Good morning, Your Honor.  Daniel Schwartz from Davis Polk & Wardwell for the defendants.

        **THE COURT:**  All right, Counsel.  Before we get started, just before we dive into the motion, I just wanted to check in with you, Ms. Kaplan, about where you are in terms of the ongoing investigation referenced in your consolidated complaint.  I'm not asking for specifics, but I'm interested to know whether lead plaintiff has uncovered anything that it would seek to amend the complaint with.

        **MS. KAPLAN:**  Your Honor, we have had an ongoing investigation.  And to the extent that the Court believes that any of the allegations are insufficient, which we think that we

have sufficiently alleged both falsity and scienter, but to the extent the Court disagrees, we would ask for leave to amend.

**THE COURT:** So I'll tell you that it is probably where I'm headed. I definitely want to hear you all both today. But it feels, in your papers, that you all are talking a little past each other in some crucial areas. So what I've done in many of my motions hearings is I give you all an opportunity to have a few minutes to present and I throw in there some questions where I've got them.

So on that note, with that, if that sounds good to you all, I'm inclined to let you all sort of have at your side of it for about three to five minutes. And I'll try to give you all of that time before I jump in, unless you say something really intriguing which is where my question is, and then I'm going to jump in there because you will have piqued my interest.

So unless you all have anything else you want to say, either of you, before we jump in, I look to you, Mr. Schwartz, to kick us off, since it's your motion.

**MR. SCHWARTZ:** Thank you, Your Honor.

Plaintiffs' consolidated complaint challenges 30 statements made by defendants over a six-month period between November 15, 2021, and May 26th, 2022, as allegedly false and misleading.

These statements are largely forward-looking

projections by Lucid Group regarding its electric vehicle production targets for 2022 and statements about management's confidence in Lucid's ability to achieve those targets. Many of the statements also provide reasons for production delays that Lucid was experiencing.

Under the Private Securities Litigation Reform Act, plaintiffs have to plead the elements of securities fraud as to each and every one of those statements to proceed on them, and they failed to do so for two principal reasons.

First, they don't allege any actionable false or misleading statement; and, second, they don't allege sufficient facts plausibly supporting a strong inference that defendants acted with scienter.

Our motion to dismiss briefing goes into detail as to why the challenged statements are not actionable; and an appendix, which is attached as Exhibit 15 to the Potischman declaration, goes through each of the 30 statements individually and summarizes the reasons why each one does not support a claim. I'm not going to repeat that analysis today, obviously, but I am happy to answer any questions Your Honor may have about any particular statement.

For today, I'd like to focus on the arguments that there are no allegations that render Lucid's production targets or any of the other challenged statements false or misleading and that the PSLRA's safe harbor for forward-looking statements

protects most of the challenged statements.  And I also plan to address the insufficiency of the scienter allegations.

In the interests of time, though, I plan to stand on the briefing for the other two arguments we made regarding falsity, that many of the statements are non-actionable opinions and some of them are vaguely optimistic non-actionable corporate puffery.  Again, I'm happy to answer any questions Your Honor may have about those arguments.

I'd propose to start with the falsity arguments and the safe harbor and then turn to scienter.

**THE COURT:**  Go ahead.

**MR. SCHWARTZ:**  Okay.  So, some important context here: Lucid lowered its production targets during the putative class period.  At the start, it had reiterated 20,000 electric vehicles as the target for 2022, and that was on November 15, of 2021.  It then reiterate- -- sorry.  It then lowered that target to 12- to 14,000 vehicles in February of 2022; and then at the end of the class period in August of 2022, it lowered it to 6,000 to 7,000 vehicles.

So plaintiffs' theory is that the defendants allegedly knew from the beginning that Lucid couldn't meet its production targets because of purported internal warehouse and inventory management issues and product design issues.  They contend that the statements attributing delays to supply chain and logistics were allegedly misleading because they purportedly concealed

the internal logistics issues that Lucid was experiencing; and they argue that investors believed that if only the transient global supply chain issues cleared up -- which, incidentally, they don't allege ever happened -- then Lucid was ready and able to immediately produce thousands of vehicles.

Your Honor, that theory just does not square with what Lucid disclosed about its manufacturing process.  It was no secret during the class period that Lucid was still developing that process.  In November of 2021, when the first statements -- the first challenged statements were made, Lucid had been a public company for just one quarter.  It only began producing electric vehicles at the end of September of 2021, and it made its first deliveries to customers at the end of October.

Although it started slow, it expected to be able to ramp up quickly its production.  And indeed, it did scale up. By April, for example, it produced approximately three times the amount of vehicles that it had during 2021.

So on November 15, when the first challenged statements were made, Lucid didn't have some sort of well-established manufacturing process that people believed could churn out thousands of cars immediately.  Rather, it was an early-stage supply chain and manufacturing process that it was still developing but which it anticipated it could scale up over time.

And Lucid disclosed this.  For example, in its 10K for 2021, it explicitly stated (as read):

"We have not yet scaled production in our manufacturing facilities to significant volumes, and accordingly, our ability to scale production and mitigate risks has not been thoroughly tested."

So this wasn't a situation where if global supply chain issues were resolved, everyone would have thought Lucid could immediately produce thousands of vehicles.  Everyone understood -- and Lucid, you know, we disclosed -- we identified many of the disclosures in our briefing -- that there were very significant hurdles that Lucid would have to clear before it could ramp up production to the level that it needed.

**THE COURT:**  Mr. Schwartz, is it your position that there were -- I guess -- I'm just curious.  Which cautionary statements do you think put investors on notice about Lucid's internal logistics?  Because I did see the references in your opening brief to supply chain and logistical challenges and supply chain and logistical issues, but it looks like all of those are in the context of industrywide or global chain challenges due to the pandemic.  So I'm not sure what I -- what am I missing?

**MR. SCHWARTZ:**  Okay.  Sure.  So just to highlight one, there's one in our -- I don't have my brief up here.  But one

example would be...

**THE COURT:** You're welcome to come back to it.

**MR. SCHWARTZ:** Okay. No, I have it here.

**THE COURT:** Okay.

**MR. SCHWARTZ:** I just have to -- right.

(Pause in proceedings.)

**MR. SCHWARTZ:** Right. Okay. So it explicitly stated that if it could not accurately match the timing and quantities of component purchases to its actual needs, or successfully implement automation, inventory management and other systems to accommodate the increased complexity of its supply chain, it could incur production disruption, storage, transportation and write-off costs that could materially negatively -- adversely impact its business.

They also disclosed that they had no experience to date in high volume manufacture; that it was dependent on suppliers timely delivering parts at acceptable quality levels and volumes; and that any inability to effect- -- to efficiently manage these components could have a material adverse effect on Lucid's operations and financial conditions.

Most of these disclosures are in the 10-Q that was filed at around the same time as the first alleged misrepresentations; very similar disclosures during all of the -- all of the reports that Lucid filed during the class period, except that they were augmented over time.

And, Your Honor, just to address the global supply chain and logistics, you know, as we argued in the brief, the complaint itself alleges that global supply -- some of the things that Lucid was characterizing as global supply chain are the same things that plaintiffs are characterizing as internal logistics.

So, for example, you know, there's discussion about -- in the complaint about difficulty finding -- you know, getting glass for the windshield or the cantrail appliques.

Lucid disclosed that as a result of global supply chain issues, its engineering teams could not make it out to coordinate and align with the suppliers to make sure that they were in spec and that, as a result, there could be and had been need to redesign parts and increased costs and the like.  So that was a risk that Lucid specifically -- specifically warned about.

And so it's, you know, in this situation where Lucid has disclosed the very risks that it was going to have to surmount in order to scale up production and get where it needed, and -- you know, and those were the risks that ultimately became more apparent as it did scale up over time.

Just, those risks don't render anything false.  They don't -- you know, they don't render the statements that were made about the production targets false because they don't demonstrate that the production targets were not achievable at

the beginning of the class period.

Plaintiffs allege -- and this is also -- you know, and Lucid also discusses this in the earnings calls and the press releases -- that they took many steps to try and address various issues.  Just from the complaint, they allege that Lucid replaced its warehouse inventory management software, replaced the logistics consultant who was hired to manage its warehouse, hired new people to come in and try and improve the situation, that management was laser focused on it and that the CEO, Mr. Rawlinson, came to the factory to try and really focus people on addressing these issues.

And so the fact that Lucid -- it took them longer and that they weren't able to as expeditiously resolve some of these issues that they might have originally thought that they were going to doesn't, again, make the statements false. It's -- you know, that really gets into the realm of fraud by hindsight where, at the time, Lucid had a plan; they were executing on that plan; and as it turned out, the plan didn't work.  But that, again, doesn't render the projections false and misleading.

**THE COURT:**  Let me ask you -- I've got a few more questions before you get back into --

**MR. SCHWARTZ:**  Sure.

**THE COURT:**  -- your presentation.

So you argue that the alleged statements by

Mr. Rawlinson to FE-2, that they -- that "they" -- that Lucid wouldn't kill themselves to meet targets that -- I'm sorry -- that they would not kill themselves to meet targets that Lucid would miss, is too contradictory to be compelling because it's so contrary to Lucid and his economic interests.  And I have two questions about that.

These are the same economic interests that you argue can't support any inference of scienter; right?

**MR. SCHWARTZ:**  Yes, in the sense that the economic interests of generating -- you know, generating revenue or getting a bonus or having stock options vest, the Ninth Circuit has been very clear, are fairly generic.

But I think it's different in the context of FE-2 because it's not just -- it's not just Mr. Rawlinson -- it's not just his economic interests but the company itself.  As alleged -- again, as alleged in the complaint, you know, it was sort of a make-or-break thing for the company whether or not it was going to be able to scale up its production.

And so as a result, the idea that -- you know, and they allege it was the top priority of the company.  So if that's really the top priority of the company and the goal of management, the idea that management would then tell the people who are supposed to be executing on that goal "Well, don't bother," that's contradictory.

**THE COURT:**  So let me ask you my second question here.

I understand -- or that statement isn't contradictory if, as lead plaintiff alleges, Rawlinson knew the company just wasn't going to meet its production goals.  Would you agree?

MR. SCHWARTZ:  I'm sorry.  Could you ask that again?

THE COURT:  Certainly.  Since we're just trying to -- I'm trying to tease out whether if Rawlinson knew the company just wasn't going to meet its goals, it ceases to be contradictory.

MR. SCHWARTZ:  Well, I think it's still contradictory, Your Honor, because -- because the allegations are that he took numerous steps to try and ensure that they would be able to meet their goals, you know, in terms of redesigning components and coming to the factory, you know, daily or weekly to try and make it happen.  So I just don't think it's consistent with -- the idea that he was going to, you know, tell people "Okay, you can slack off some because we're not going to make it" is just not consistent with the actions that he and others are alleged to have taken in the consolidated complaint.

And just with respect to FE-2, Your Honor, I think, you know, that's not the only problem with FE-2's allegations.  Right?  FE-2 is saying, you know, at -- at the most basic level, that Mr. Rawlinson said in either late October or early November of 2021 that Lucid was not going to hit its production goals for the next three years.

There is no way Mr. Rawlinson could have known that.

There's certainly no allegation in the complaint as to how Mr. Rawlinson could have known that because, again, Lucid only began producing vehicles in September.  They had only begun to deliver vehicles to customers in the last week of October.  So, you know, and as Lucid has disclosed in its securities filings, at that point it didn't have a fully developed manufacturing process.  That was still being developed.

So the idea that Mr. Rawlinson had a basis to know at that point what was going to happen 13 months later, let alone 24 or 36 months later, on a process -- based on a process that was still developing is just -- you know, it's not plausible.

And so that's another, I think, very significant problem with the FE-2 allegations and why they can't be credited.

Oh, okay.

**THE COURT:**  However --

**MR. SCHWARTZ:**  Thank you, Your Honor.

**THE COURT:**  -- you'd like.

Thank you.

**MR. SCHWARTZ:**  So I want to address plaintiffs' argument that -- well, before I do that, I just want to note:  So even assuming that these issues had manifested themselves before the start of the class period and that management knew about them doesn't render the production targets unachievable and it doesn't render them false for all

of the reasons that I've been talking about.

I want to address plaintiffs' argument that some of these disclosures were hypothetical and were too hypothetical and concealed the fact that Lucid was having issues currently. I just don't think you can read the disclosures to say that.

I mean, just as an example, they said (as read):

"We have no experience manufacturing at scale and have encountered and expect to encounter risks relating to our ability to refine our commercial manufacturing capabilities.  We have experienced, and may in the future experience, significant delays in design, manufacture, launch, and financing of the Lucid Air.  Volume production will necessitate continued development, maintenance, and improvement of all of our systems."

So, you know, this is very much like the disclosures that the Ninth Circuit confronted in the *Wochos vs. Tesla* case. They rejected a very similar argument from the plaintiffs, and they found that very similarly worded disclosures were not misleading because they contained no explicit or implicit representation that Tesla had not already experienced such issues.

And the same is true here.  They disclose very expressly that Lucid had experienced such issues and that in some instances, that they were continuing to experience such

issues and that the issue -- those same issues, you know, existed in the future as well.

Yes.  Okay.  Just one other point on the global supply chain issue.  Each of those disclosures talks about global supply chain and logistics; and, you know, as I've already discussed and is in our brief, we think the complaint itself links the two of them.  But, you know, if they were the same thing, there wouldn't have been a need to say both of them.

And, in addition, each time, or in many instances when Ms. House and Mr. Rawlinson were discussing that, they would talk about the targets being subject to our own internal plan to improve logistics.  You know, that's something very Lucid specific.  And, again, it's the kinds of things we've talked about:  bringing product manufacture in-house, if necessary and where possible; redesigning products; finding new suppliers; things of that nature -- the exact kinds of things that led to, you know, the kinds of allegations in the complaint about some of these cars sitting on the line, waiting for parts that had to be redesigned.

**THE COURT:**  But by invoking some of the supply chain issues together with what might have been unique to Lucid, isn't that masking the internal problems?

**MR. SCHWARTZ:**  I don't think so, Your Honor.  I think it's a disclosure of both, I mean, especially because of the allegation that the two are -- the two are linked and that you

can't really have -- you can't really have one without the other.

But, you know, whether -- separate and apart from what they said in the calls, you still have all of the disclosures in the securities filings where, you know, they were very specific about needing to overcome internal hurdles, in particular with respect to inventory management and procurement systems -- we quote one of those disclosures in our brief -- and the like.  So we think Lucid was very clear on that.

THE COURT:  Mr. Schwartz, I have one question for you --

MR. SCHWARTZ:  Sure.

THE COURT:  -- about -- it relates just to the request for judicial notice; so I'm happy to hold it if there's something else you want to -- if there's a final point you want to make before.

MR. SCHWARTZ:  No, no.  I would next turn to a different topic.  So, happy to take the question now.

THE COURT:  Okay.  So let me ask you.  You've attached Exhibit 14, which is a web page from the Council of Supply Chain Management Professionals, to one of the declarations; but it's not part of the request for -- I'm sorry -- it's not part of the request for judicial notice.  So I'd like to hear from you how that's something I can consider.

MR. SCHWARTZ:  Yeah.  I mean, I think the first thing

I would say, Your Honor, is that we don't think it's essential that you consider it.

But, I mean, from our perspective, it's more like -- you know, there's no -- there's no allegation in the complaint that the -- that logistics and supply chain, you know, are not related in the way that we've said and that they're not -- you know, and that logistics isn't part of supply chain. There's no, sort of, allegation in the complaint as a kind of term of art, is what I mean.

Obviously, the complaint does allege that they're different, but just in terms of the terms of usage.  So from our perspective, it's sort of -- it's more like citing a dictionary.  Here's a kind of topical dictionary on the issue of supply chain.

But ultimately, you know, whether Your Honor considers that document or not, we don't think any of our arguments turn on it.

**THE COURT:**  While we're on the topic of judicial notice or of the request for judicial notice, I'm going to turn to you for just a moment, Ms. Kaplan.

Other than Exhibit 14, you don't address any other document listed in the request for judicial notice.  So do you agree that I should take judicial notice of Exhibits 1 through 13?

**MS. KAPLAN:**  Defendants appear to be using the

documents, we believe, for a proper purpose, Your Honor, which is simply to make clear that statements were made to the market, that certain risk disclosures were made to the market. So we don't oppose defendants' motion for the limited purpose of determining what statements were made to investors during the class period.

But the law is also very clear that the Court can't take the facts in those documents as true.  We didn't read defendants' motion to be asking the Court to do that, which is why we didn't oppose it, but we would oppose any effort or attempt to do that.

**THE COURT:**  I appreciate you both letting me stick that in the middle here.

Mr. Schwartz, is there a last point you want to make before we give Ms. Kaplan the floor?

**MR. SCHWARTZ:**  No.  I think Ms. Kaplan -- I'm happy to cede the floor to Ms. Kaplan.

**MS. KAPLAN:**  Thank you, Your Honor.

So as set forth in our briefing, we think that falsity and scienter are adequately alleged here.  This is a case where the CEO admitted, just weeks before making public projections, that the company was going to miss those same projections.  And it's a case where defendants knew about severe internal problems that were preventing Lucid from mass producing cars and concealed those problems from investors for the entire

class period.

Now, defendants have two main arguments. First, they say that FE-2's allegations about Rawlinson's admission should be disregarded entirely because we don't explain how Rawlinson could know that Lucid would miss guidance.

And as an initial matter, Your Honor, that's simply not the standard. The complaint's allegations must be accepted as true. We only have to plead enough to show that an FE was in a position to know the information that he provided.

And here, defendants don't even challenge that any of the FEs, let alone FE-2, was in a position to know. And they really couldn't challenge that for FE-2, Your Honor. FE-2 was in the meetings where these statements were made, clearly in a position to know.

But regardless, the complaint also explains exactly how Rawlinson knew. Lucid's warehouse was in complete disarray. It had no functional inventory system. It could not get parts to the production line, and as a result, it could not mass produce cars. This is confirmed by ten different former employees across the company in 40 pages of detailed, particularized allegations. And defendants don't dispute that Rawlinson knew all of that when he spoke. They do not dispute scienter.

The complaint also pleads that another FE, FE-1, specifically told Rawlinson, in both September and early

November, that because of the internal issues, Lucid could not make guidance. And FE-1 also confirms that Rawlinson's direct reports, including Hochholdinger, Hasenkamp, and Boike, knew by October 2021 that Lucid would not make guidance.

FE-2 then corroborates that Rawlinson and his direct reports knew in this time frame that Lucid was not going to make 2022 guidance. FE-2 was in meetings in October 2021 or early November 2021 where Rawlinson, Hochholdinger, Hasenkamp, Boike, Wisdom -- all of Lucid's top brass -- admitted that Lucid was not going to make guidance.

So how did Rawlinson know? He knew because he knew that Lucid was nowhere near ready to mass produce, because he was directly told that Lucid would miss guidance, and because all of his direct reports knew and discussed it.

Defendants don't challenge any of these allegations. They only challenge the one allegation from FE-2 in the meeting. So it's extremely plausible that Rawlinson knew that Lucid would [sic] make guidance. And I think it's also plausible that he would tell a small group of his top executives that they weren't -- that Lucid wasn't going to make guidance, particularly given the context that all of them already knew.

He admitted this in a group setting with a small group of his top lieutenants. And I think the fact that he did that does not show that he wasn't motivated to make cars. I think

the more plausible inference is he knew for certain that Lucid was not going to make these numbers and he wasn't going to push his top executives.

But he also told them to keep it confidential.  He didn't want it spread around the whole company.  He wanted the folks who were on the line still pushing to get cars out the door.  And so I think it's plausible he would admit that in that small group setting.

But I think also, given all of the other facts we've pled, we very clearly pled scienter here, even without that admission.

THE COURT:  Could you talk me through the core facts of your theory of scienter?  You've started to already, but I think I'm -- is there anything -- let me phrase that differently.  Is there anything differently about -- is there anything you would add?

I'm sort of asking -- as you can see, this is actually a question I intended to ask you before you started.  Just walk me through your core theory of it, because the smaller pieces that I'm having trouble with -- and this is -- this goes a little to something that I think I heard Mr. Schwartz raise in his initial presentation -- is how statements from Rawlinson made to former employees in 2021 could establish scienter for statements made in 2022.

MS. KAPLAN:  Sure, Your Honor.

So Rawlinson was specifically told in September and November that Lucid was not going to make its guidance because of the internal issues, and he knew about all of the internal issues. Again, defendants don't dispute that. They don't dispute that Rawlinson was aware of all of the problems at the warehouse, that he was aware that it was in complete disarray, that he was aware that production had been stopped repeatedly because of it. And we allege facts showing that, in fact, that was the case from ten different FEs.

Rawlinson knew that the factory was in disarray, that Lucid could not mass produce cars. And that's a reason that he knew, in addition to these FEs telling him, that Lucid couldn't make guidance because he was aware of all these problems. He was aware that Lucid was nowhere ready to mass produce cars.

But on top of that, we have multiple people specifically telling him that, specifically telling him in that September and November time frame that Lucid could not make its projections. We have Rawlinson himself admitting it and admitting that Lucid was going to make less than 10,000 cars that next year.

And then we also allege that the problems continued, that they weren't able to fix them. We allege multiple FEs who were there through the summer of 2022 or longer that say all of those same problems that were impacting production before were still impacting production that entire time.

And so that's why I think that Rawlinson, first of all, knew from the get-go that Lucid was going to make less than 10,000 cars, which he admitted and still knew, I'm sure, in February; and also, the problems hadn't gotten better.

And we allege that very clearly through a variety of FEs. And, in fact, FE-1 told Rawlinson again in January or February that the problems were worse, that they had not gotten better, and Lucid really needed to do a physical inventory in order to try to fix them.

Rawlinson brought in -- got together with his top executives, decided to do the physical inventory, but then quickly called it off. They didn't do it until the summer of 2022, at which point it was far too late, Your Honor. And so those are some of the reasons that Rawlinson knew.

But I think, also, it's important to look at what defendants disclosed at the end of the class period, Your Honor. At the end of the class period -- and this goes to a point Mr. Schwartz made earlier. He said that we never alleged that the supply chain problems cleared. In fact, Mr. Rawlinson said at the end of the class period, in August, that the supply chain problems had gotten better and that's how he had suddenly discovered that Lucid had all of these internal problems; but, in fact, Lucid's internal processes were so immature at that point that it could not produce cars. That's what he admitted at that point.

So we know that those processes did not get better throughout the entire class period, all the way through August, because at that point Lucid admitted that it could not mass produce cars because of the internal problems, that that was the primary bottleneck, and that Lucid was going to have to overhaul its entire logistics processes to fix it.

**THE COURT:**  Let me take a step back from Rawlinson for a moment.

Some of the statements that you claim were false or misleading by Sherry House, by Daniel Witt, by Nat Lingo, just as an example, do not seem to be -- these folks are not as heavily involved in operations as Rawlinson.  And so how does -- how do you establish -- how does your core theory of scienter for these folks, how does it extend to those other -- the other individuals who made these statements?

**MS. KAPLAN:**  Sure, Your Honor.

So for Ms. House, I think that we do allege in several instances that she was made aware of some of the logistics problems.

So, for instance, in a meeting in July 2021, she was told that Lucid did not have a working inventory management -- I'm sorry -- she was told that Lucid needed to do a full inventory count because its inventory was off; their numbers were off; they did not know how much inventory they had, and she rejected that.  She was also copied on an e-mail in late

April or early May 2022 discussing the need to scrap $20 million worth of parts, which was significant, given that at that point the company was making very little money.

And so she -- those were red flags that we believe directly made Ms. House aware of some of these internal logistics problems.

But past that, I think this is a case where the misrepresented facts go to the core of the company's operations. This is a company that made no money unless it produced this one product that it had, and we allege that the internal problems were so severe and so bad that it could not mass produce them.

Mr. Schwartz said earlier how Lucid actually got better over time; it had tripled its production by April. What that actually meant, Your Honor, it had produced 100 cars by the end of 2021 and, by April 2022, it produced 300, while it was telling the market that it was going to make 20,000 cars that year. So that's the tripling he's talking about, from 100 to 300 cars.

Now, Ms. House, in addition -- I'm sorry. Back to the core operations. Defendants don't actually address our core operations allegations, which we think are dispositive here.

The Ninth Circuit, in several opinions, including *Reese* and *Berson*, has said that where misrepresented facts go to the core of a company's operations, courts will infer

knowledge, even in the absence of specific allegations.

And we think that this case is a perfect example of that, Your Honor.  These allegations clearly go to the core of Lucid's operations.  It was 98 percent of revenue.  And these were very obvious problems.  It could not produce its only product.

And I think the inference is particularly powerful here, where we have allegations that pretty much everyone else at the top of the company was aware that Lucid wouldn't make guidance.  We have allegations that Hochholdinger, Hasenkamp, Bach, Boike, Tosh, Wisdom, McKinsey, all admitted -- all admitted -- that Lucid was not going to make its guidance; all admitted in meetings before it made its guidance that it was not going to make its guidance.

And courts have also found that where the executives at the top of a company know this information, there's a strong inference that that information was also shared with other executives at the top of the company.

So we think the core operations inference, plus the red flags that we've talked about, plus the fact that everyone around Ms. House knew, leads to a compelling inference that she also knew.  It's at least as compelling as the opposite inference, that she had no idea when everyone else at the top of Lucid did.

And then with respect to the other two speakers,

Your Honor, we don't -- this is, I believe you're referring to Statements 6 and 7 made by Mr. Witt and Number 30 by Mr. Lingo. We don't allege that they are liable for those statements.  We allege that Lucid is.  So Lucid is the defendant there.

And so the question becomes:  Whose scienter can be imputed to Lucid for purposes of those statements?  And we believe that Mr. Rawlinson's scienter can be imputed and that Ms. House's scienter can be imputed.  These were basically corporate spokespeople.  And we believe that the CEO and CFO's scienter can be imputed.

We've cited the *Alphabet* case for that proposition; and there, the Ninth Circuit held that the CEO's scienter could be imputed to the company, despite the fact that the CEO was not alleged to have been the actual maker of the statement.

And defendants also in their brief cited the *Volkswagen* case, and I think that that case strongly supports our argument here.  And there, the Court explained that the scienter of corporate officials who either make a statement or have responsibility or authority at the company for making statements or correcting statements, the scienter of all of those people can be imputed to the company for purposes of determining liability for the company.

So we've pled that Lucid is a maker of those statements, and we believe that Mr. Rawlinson's scienter and Ms. House's scienter can both be imputed.

**THE COURT:** Your position -- you think that the *Alphabet* case gets around the fact that Witt and Lingo don't have CEO-like roles?

**MS. KAPLAN:** I'm sorry?

**THE COURT:** It's your position -- I'm just making sure I'm following you. You think that the *Alphabet* case gets you around the fact that Witt and Lingo didn't have CEO-like roles?

**MS. KAPLAN:** I think the *Alphabet* case stands for the proposition that the scienter of a CEO or corporate executive can be imputed to a company even where that person is not alleged to be the actual maker of the statement. I think there's a footnote in *Alphabet* that makes clear that the plaintiffs there were not arguing that the CEO was the maker of a statement but that his scienter was still imputed to the corporation. The statement was pled as a statement by the corporation, and we're pleading these statements here as statements by Lucid.

And I think it's a particularly strong inference here also, Your Honor, that Mr. Rawlinson and Ms. House had authority and approved these statements, given that the statements that were made were very similar to other statements Mr. Rawlinson and Ms. House were making.

**THE COURT:** Defendants highlight that you don't have any allegations of scienter for either Witt or Lingo; and if I'm following you, *Alphabet* says that I'm supposed to impute

those statements to the corporation.

Do I need scienter for those folks?  Because they're pointing out that you don't have any allegation of scienter for them.

**MS. KAPLAN:**  We don't believe you need scienter for those folks, Your Honor.  We believe that Mr. Rawlinson's scienter can be imputed to corporate statements, and we believe that Ms. House's scienter can be imputed to corporate statements.

**THE COURT:**  I've got just one more question for you, Ms. Kaplan, or -- yes, because we already did the judicial notice one.

Could you speak a little to defendants' argument that a forward-looking statement can be identified as such based on its plain language and the context of the statement?  I have that at page 14.

**MS. KAPLAN:**  So I think that the statute, the PSLRA, is very clear that a statement must be not only forward looking but also specifically identified as such.  That's directly from the language of the PSLRA.  It must be identified as a forward-looking statement.

And the Ninth Circuit has said the same thing in *Intuitive Surgical*.  And in *Intuitive Surgical*, defendants are arguing that the Court found that the statement was forward looking on its face, and that's it.  But that's not true.

The Court there specifically said that the statement was not only forward looking but also appropriately identified as such.

And I went and looked at the conference calls there, Your Honor, because the Court said that it was based on the statement itself but also context. And there, at the beginning of each of the conference calls that they were citing that these statements were made in, the defendants explicitly said, "Comments mentioned on today's call may be deemed to contain forward-looking statements."

So the defendants in that case did identify those statements as forward looking properly. That distinction is critical, Your Honor, because the defendants here, for a number of their statements, 4 through 7 and 29 through 30, didn't make any such identification -- identifying statement at the beginning of those conversations.

And Judge Orrick recently found in *Westin v. DocuSign* -- that's 2023 Westlaw 3000583 at 15 -- that where the defendants failed to explicitly identify certain statements as forward looking in the transcripts at issue, the first prong of the safe harbor did not apply.

And in contrast, for other statements in that case, the transcript showed at the beginning of the call the defendants said the call might contain forward-looking statements, which was sufficient, Judge Orrick found, to identify them as forward looking.

So here, we have a situation where defendants made no such identification.  They've not pointed to a single case where a court has found that just on the face of the statement, it's sufficient -- it's sufficient for a statement to be forward looking without identifying it as such.

And, in fact, they also cite, I think it's some sort of handbook for corporations in their reply brief; and that document also says, Your Honor, specifically that it's not enough for a statement to be forward looking on its face; that careful companies should also make sure to identify them as forward looking.

So all of the authority they cite also supports what the plain language of the PSLRA says here.

**THE COURT:**  Ms. Kaplan, those are all the questions I had for you.

Are there any other points you want to make before we hand the floor back to Mr. Schwartz?

**MS. KAPLAN:**  I would, Your Honor.

I want to address, defendants also say it just doesn't make sense why Rawlinson would have done this here, but I think we know exactly why he did it.  He did it to earn his stock options.  And in order to do that, he had to keep Lucid's stock price high over a six-month period on average.

So in November, he was four months into that; and by making the false projection targets, he kept Lucid's stock

price inflated for two more months and he locked down $263 million worth of stock options.

I also want to address defendants' argument that by discussing global issues impacting all companies or making disclosures about potential risks that they may experience in the future, they somehow disclosed Lucid's internal issues.

So I think defendants' argument has a gaping hole. They can't point to a single disclosure where they told investors that Lucid was currently experiencing internal issues that were preventing production.  And when you asked Mr. Schwartz a few moments ago to identify a disclosure where they did so, all he identified were statements where they said if problems arise, then they could be impacted.

But they already knew that they were being impacted. They already knew that those problems had arisen.  They already knew that their severe internal issues were preventing them from mass producing cars.

And the law is very clear that it's misleading to warn of risks that have already come to fruition.  So we believe that those risk disclosures themselves were misleading and can't be meaningful cautionary language.

To illustrate just how deficient defendants' class period statements were, I think it's helpful to look at what defendants finally disclosed at the end of the class period in August 2022.  And there, for the very first time, they admitted

what they'd known all along:  that Lucid's internal issues were preventing it from mass producing cars.  They said they couldn't get parts from the warehouse to the line which had caused line stoppages.  They said the internal issues were the primary bottlenecks and that, to fix them, they had to overhaul Lucid's entire logistics function.

And if you compare that to what defendants said during the class period, it's very clear how misleading their class period statements were.  Nowhere did they disclose that internal issues were preventing mass production.  Instead, over and over again, they pointed to global supply chain issues affecting the entire industry.  And when they asked -- when asked for more detail, they said it was just a handful of external suppliers that were causing the bottlenecks.  When asked to rank the thing that was impacting production most, again, they pointed to those handful of external suppliers.  And, in fact, they told investors they were better positioned than other companies and that they could have chosen to build faster.  None of that disclosed to investors that the company did not have the internal ability to mass produce cars.

And analysts took them at their word, Your Honor.  They said Lucid had been impacted by global supply chain issues and repeated defendants' statements that Lucid was facing supply chain challenges from only a handful of it's 250 suppliers.

One last point on this, and I think it's important. When defendants finally disclosed the internal logistics problems in August 2022, they told the market they had just discovered the problems that quarter.  Now, why would they tell the market they had just discovered those internal logistics problems if they had already disclosed those same issues back in February?  They wouldn't, Your Honor.  It just doesn't make sense.  And their claim now that they disclosed this back in February is not plausible.

And I think the market also understood the August disclosure of those internal logistics issues to be brand-new information, writing that the company had disclosed, quote, newfound weaknesses in its internal logistics processes.  And the stock also fell nearly 10 percent, which shows that this wasn't information that was already out in the market.

To win dismissal on the ground that they've disclosed the truth defendants here have to meet a very high standard. They have to show that the adequacy of their disclosures was so obvious that reasonable minds could not differ, and they can't come anywhere close here.

And I think you asked Mr. Schwartz earlier about Exhibit 14, and I think it's very telling that they tried to put that in because I think it shows that they know that their statements, on their face, which discuss global supply chain issues, issues impacting other companies -- and to be clear,

logistics issues -- when discussing the logistics issues, they also said that those were global and that they were logistics issues affecting all companies.  They never said internal logistics issues were affecting Lucid.  The fact that they had to put that extrinsic evidence in to try to show what their statements meant makes very clear that they cannot meet this standard that the adequacy of their disclosures was so obvious that reasonable minds could not differ.

**THE COURT:**  Thank you.

**MR. SCHWARTZ:**  Thank you, Your Honor.

I'd like to address several of the points that Ms. Kaplan made.

So first, taking -- starting with the last piece about internal supply and disclosure and global issues, so Ms. Kaplan stated that Lucid disclosed in August that global supply issues had cleared up.  That's simply not correct, Your Honor. Exhibit 11 to the Potischman declaration is the transcript of the earnings call from August 3rd, 2022, which is the -- the quarter that was -- that was being disclosed in the end of the class period.  And in Mr. Rawlinson's statements, he says (as read):

"Whilst we have experienced supply chain and logistics challenges along with the entire industry, the limitations of our logistics system have compounded the challenge; and although we continue to

face supply chain constraints, the resolution of some
earlier gating component supply issues allows us to
push towards increasing the production rate."

So he didn't disclose that the global supply chain issues had cleared up.  He's saying:  We are continuing to experience those issues.  It's just that there are now other issues as well.

I think the idea that defendant somehow knew that we needed to put in extraneous evidence on the supply chain point is completely off base.  As I mentioned, we don't even think that's an essential point of our argument.  We view it really more like a dictionary, as a supporting point.  But we stand by all of our arguments I made previously and that are stated in our brief.

In terms of the disclosures, Your Honor, I cited to you at this very podium disclosures that Lucid has encountered and expects to continue to encounter risks relating to our ability to refine our commercial manufacturing capabilities. We have experienced and may in the future experience significant delays in the design, manufacture, launch, and financing of Lucid Air.  Those are all internal issues.

It sounds like plaintiffs want to micromanage what Lucid -- how -- the words that Lucid used in disclosing, and that's not the standard.  In terms of those disclosures, Ms. Kaplan said that has to meet a standard that no reasonable

minds can differ.  That, with respect, Your Honor, is the standard for determining materiality and it may be the standard for a truth-on-the-market defense, but that's not the argument we've made.

We've made the argument that the allegations in the complaint don't allege, plausibly, facts that support an inference of fraud or misleading omissions.  And that's plaintiffs' burden.  It's plaintiffs' burden to plead those plausible facts.  It's not our burden to demonstrate that no reasonable minds can differ because we're not making a truth-on-the-market defense.

I want to turn to some of the scienter points. I think plaintiffs' argument all comes back to FE-2; and, you know, we've indicated what we -- what we see as the deficiencies in the FE-2 allegations.  Ms. Kaplan stated that the complaint's allegations have to be accepted as true. That's true if the allegations are plausible.  But as we've argued, the allegations relating to FE-2 are not plausible for all of the reasons that I articulated earlier and that are set forth in the brief.

Ms. Kaplan stated that defendants do not dispute scienter.  That's clearly not correct.  We have -- you know, we spent a lot of space arguing about scienter.  I think it is correct that we are not disputing the facts that the various FEs -- with the exception of FE-2's statement, which we just

think is so implausible and contradictory with other allegations -- that the FEs, you know, saw what they claimed to have seen.

But the point that we're making is, at the start of the class period and throughout the class period, as Lucid is building out its manufacturing process, as it is taking steps to improve -- to try and improve the issues that these FEs are identifying, Lucid was entitled to, you know, based on that information, conclude that it could make its production targets.

Not one of the FEs was responsible for projecting production targets, for monitoring progress towards production targets. So while they've identified some issues, we don't think that those issues plausibly support the idea that -- that the targets were impossible to achieve, either at the beginning of the class period or throughout.

I want to address FE-1 because I think it's very apropos of that. So FE-1's allegation, as Ms. Kaplan stated, was that he told Mr. Rawlinson that he -- that he didn't believe that Lucid was going to meet its production targets.

The Ninth Circuit dealt with almost the exact same allegation in the *Wochos vs. Tesla* case. There, I think it was two employees and a supplier told Elon Musk of Tesla that there was no way they were going to meet the weekly production target. And the Ninth Circuit said there was no allegation

that he endorsed the gloomy and pessimistic view.  The fact that a party -- the fact that a pessimistic argument could be made, that wasn't enough in *Wochos*.

And it wasn't enough in the *Ronconi* case that we cite as well, where, you know, the issue was a merger, and the company believed that integration was going to go well, and it turned out that it didn't because of certain steps that the company had taken.  And, again, the company was entitled to hold its optimistic view about how well that was going to go; and we think that, you know, the Ninth Circuit law on that is very clear.

I want to talk about the physical inventory and the scrapping of parts.  We just don't see why -- we don't think the complaint -- we don't see where the complaint explains why performing a physical inventory would or would not indicate that the targets were achievable or any of the other statements were false or misleading, and similarly with scrapping parts, that somebody knowing about a request to scrap parts would demonstrate that the targets were unachievable.  We just -- we think there's an analytical gap there, Your Honor, and it just doesn't hold up.

With respect to Ms. House -- so I want to note that plaintiffs don't include any motive allegations with respect to Ms. House.  And although motive allegations are neither necessary nor sufficient under Ninth Circuit law for alleging

scienter, the Ninth Circuit has made clear that in the absence of a plausible motive, it's very difficult to plead scienter.

And so plaintiffs are left with the three allegations:

That way before the start of the class period in July of '21, even before Lucid started producing any vehicles, Ms. House allegedly learned that FE-1 wanted to do a physical inventory. And, again, there's no explanation as to why that knowledge at that time demonstrated that the production targets would be unachievable.

And then they allege that she was copied on an e-mail in May, requesting permission to scrap some parts; and, again, we just don't see it.

And then the third one, that in July of 2022, which is after the last alleged misstatement had been made, there was a physical inventory done by somebody who reported to her and it showed discrepancies with the inventory management system.

You know, whether that's true or not and whether -- you know, whatever its implication is, it can't affect the circumstances under which the alleged misstatements were made; and so it's irrelevant to the actionability of any of those statements, which were all made before then.

Corporate scienter, again, we've cited the *Nvidia* case from 2014. We think it's quite -- and some other cases as well. We think it's quite clear that you can't take one person's statement and another person's scienter and mush them

together to get a corporate scienter that supports a Section 10(b) claim.  The Ninth Circuit, again, has been clear that in most cases you really do need to allege that the speaker had scienter, and plaintiffs are not contesting that there are no allegations as to those individuals.

I'd also note that, you know, there are other reasons why those statements are not actionable either.  They concern production capacity.  And there's no dispute that Lucid's factory was, in fact, built out and scaled for 34,000 units at the time.  And so the idea -- you know, I'm not planning on addressing that argument at length, but it's in the briefs. And we just -- we don't think there's any falsity with respect to those statements.

In terms of core operations, we did not read plaintiffs to be making a core operations argument.  If they are, you know, we would say that it's a very narrow exception. And, you know, even the new *Nvidia* case that plaintiffs put in as supplemental authority, the CFO was found not to have scienter -- not to have been alleged to have acted with scienter there, even though it was a very significant portion of the company's revenues, these graphics cards that were being used for crypto mining, and even though his prominence as the CFO -- none of that put it over the line.

And we think with respect to Ms. House, that's absolutely the same here.  I mean, we also think that the

allegations are totally different from that case; and so it's not -- you know, it's not directly on all fours.  But with the types of allegations that can support scienter, we think the complaint here falls well below what's necessary and is more akin to the allegations relating to the CFO in that case, which were just held not to be sufficient.

THE COURT:  Ms. Kaplan, I'll give you an extra minute or two if there's any last point you want to make.

MS. KAPLAN:  Sure, Your Honor.

I think the falsity standard absolutely is the correct one.  I'd point the Court to the decision in *Splunk*, Judge Tigar's recent decision in *Splunk*, 592 F.Supp. 3d 941, and also Judge Orrick's recent opinion in *QuantumScape*, which is 580 F.Supp. 3d at 733.

As to the plausibility point, Your Honor, defendants -- the only cases they've cited for the fact that a confidential witness's allegations can be entirely disregarded as implausible are *Zucco* and *Nvidia*.

And in *Zucco*, we had a situation where plaintiffs pled in one place that the CEO told an FE in a meeting not to write down inventory, but the complaint actually pled that the company wrote down a ton of inventory that year, and so the Court found it was implausible because the actual allegations were completely irreconcilable.

It would be as if, here, we said Rawlinson said in a

meeting that they were going to make projections and then they actually are not going to make projections, and then they actually made the projections.

In *Nvidia*, it was similar.  They said that in a meeting, the -- or, I'm sorry.  They said that the company knew by 2007 that they weren't going to make certain things and then had another -- cited a declaration where it said they knew in 2008.  And so those allegations were irreconcilable, the actual allegations in the complaint themselves -- in the complaint itself, and that's why the Court disregarded them as implausible.  There's nothing like that here, Your Honor.

As to *Tesla*, *Tesla* didn't reach scienter.  It actually wasn't briefed in front of the Ninth Circuit -- I'm sorry.  It wasn't a decision that the district court made, and so the Ninth Circuit didn't consider it.  It explicitly said in its decision that it wasn't addressing scienter.

The impossibility discussion, Your Honor, was only in the context of the sole argument that the plaintiffs made there as to the cautionary language.  And in *Tesla*, the plaintiffs did not challenge the cautionary language, either at the district court or in front of the Ninth Circuit.  The only argument they made, the sole argument is that if defendants knew it was absolutely impossible to make projections, then the cautionary language wasn't adequate.

That was the argument that the Court was addressing

when it spoke about impossibility.  It didn't say that impossibility is necessary to plead scienter, and it didn't say that impossibility is necessary for cautionary language.  Simply not the standard.

And also, *Tesla* had very different facts.  There, two different FEs told Elon Musk a year before he made his statements that the company wasn't going to make certain projections.  He immediately fired them and brought in a new team, and then a year later, he made these statements.

Here, we have folks telling Rawlinson right before he made his projections that Lucid was not going to make them.  His entire senior leadership team, all of his direct reports are pretty much telling him this, and then Rawlinson himself admitting in a meeting that Lucid wasn't going to make it.  So the facts here are just very different.

In *Nvidia*, as to the corporate scienter argument, Your Honor, no defendant there had scienter.  The plaintiffs didn't adequately plead it for any individual defendant.  And so the Court looked at something called the collective scienter document -- doctrine, which is different than what we're talking about here.

And under collective scienter, the Court looks at whether someone at the company must have known; whether the facts were so obvious that someone must have known.  And the reason they were looking at that is because they had not pled

that the executives at the top of the company knew.  Here, we think that we have absolutely pled that, and so we think that the scienter of Mr. Rawlinson and Ms. House can be imputed to Lucid.

And the last thing I'll say, Your Honor, on the core operations point is that we very clearly plead in Section VII(C) of the complaint that this was Lucid's core operation, and that's one of the things we're using to support scienter.  And defendants did not address it in their papers.

**THE COURT:**  Counsel, I thank you both for your time.

Mr. Kaplan [sic], I see you, but I want to wrap it up.

I'm going to take it under submission.  We've got your papers.  Thank you for coming today.  You'll hear from us, or from me.

**MS. KAPLAN:**  Thank you, Your Honor.

**MR. SCHWARTZ:**  Thank you, Your Honor.

(Proceedings adjourned at 12:05 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Monday, September 18, 2023

*Ana Dub*

_____

Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official United States Reporter