1
2
3
4                       UNITED STATES DISTRICT COURT

5                     NORTHERN DISTRICT OF CALIFORNIA

6

7    In re Lucid Group, Inc. Securities Litigation    Case No.  22-cv-02094-AMO

8                                                      **ORDER GRANTING IN PART AND
                                                       DENYING IN PART MOTION TO**
9                                                      **DISMISS WITH LEAVE TO AMEND;**
                                                       **GRANTING REQUEST FOR JUDICIAL**
10                                                     **NOTICE**

11                                                     Re: Dkt. Nos. 83, 84

12           This is a securities fraud case about electric car production.  Defendants Lucid Group, Inc.,

13   Chief Executive Officer Peter Rawlinson, and Chief Financial Officer Sherry House move to

14   dismiss Lead Plaintiff Sjunde AP-Fonden's consolidated class action complaint.  The Court held a

15   hearing on the motion on September 8, 2023.  Having carefully considered the parties' papers, the

16   relevant legal authority, the arguments advanced by counsel during the hearing on the motion, and

17   good cause appearing, the Court **DENIES** the motion **IN PART** and **GRANTS** the motion **IN**

18   **PART WITH LEAVE TO AMEND** and **GRANTS** Defendants' accompanying request for

19   judicial notice.

20   I.      **BACKGROUND**

21           A.      **Factual Background**[1]

22           In 2016, Lucid unveiled a prototype of its electric vehicle, the Lucid Air.  ECF 78 ¶¶ 4, 70.

23   Production was to start in 2018.  *Id.* ¶¶ 4, 70.  Needing funding, in 2018, Lucid secured $1 billion

24   from Saudi Arabia's sovereign wealth fund – the Public Investment Fund – in exchange for a

25   _____

26   [1] This factual background is based on the well-pleaded allegations in the consolidated complaint,
     which are taken as true for the purpose of deciding the instant motion.  *See Wochos v. Tesla, Inc.*,
27   985 F.3d 1180, 1185 (9th Cir. 2021).  The Court addresses additional facts below where relevant
     to its analysis.
28

United States District Court
Northern District of California

majority interest in the company.  *Id.* ¶¶ 7, 100.  In September 2020, Lucid revealed the production version of the Air.  *Id.* ¶ 71.  By early 2021, commercial production of the vehicle had still not commenced, and Lucid again needed funding.  *Id.* ¶¶ 7, 102.

On February 22, 2021, Lucid announced its plan to merge with Churchill Capital Corp IV.  *Id.* ¶¶ 8, 103.  The merger would allow Lucid to go public through a special purpose acquisition company and provide Lucid with $4.4 billion in cash.[2]  *Id.* ¶¶ 8, 103.  Lucid's CEO – Peter Rawlinson[3] – would earn a $2 million bonus and $556 million in potential stock option compensation.  *Id.* ¶¶ 9, 12, 108, 110.  Half of the stock options would vest only if Lucid met certain capitalization targets within five years of going public.  *Id.* ¶¶ 12, 110.  The merger was set to close on July 22, 2021, but Defendants had not secured the necessary votes from Churchill shareholders.  *Id.* ¶¶ 11, 116.  The merger closed a day later, after "Rawlinson implored investors to 'please, please vote,' and again reiterated that Lucid was 'energized about going into full production mode' later this year. "  *Id.* ¶¶ 11, 117, 119.  Public trading of Lucid stock began on July 26, 2021.  *Id.* ¶ 121.

On September 28, 2021, Lucid announced that it began production of the Air.  *Id.* ¶¶ 13, 122.  Deliveries to customers started on October 30, 2021.  *Id.* ¶¶ 13, 81, 124.  Lucid announced its first quarterly results as a public company on November 15, 2021, telling investors that it was "confident in [its] ability to achieve 20,000 units in 2022."  *Id.* ¶ 14.  With this news causing a "surge in the shares," on December 8, 2021, Lucid announced a public offering of convertible senior notes, raising over $2 billion.  *Id.* ¶¶ 24, 25, 306.  By January 25, 2022, Rawlinson had met the capitalization benchmarks triggering the vesting of nearly 14 million stock options from his promised compensation package.[4]  *Id.* ¶¶ 25, 309.

---

[2] In the interim, Lucid would require $600 million in bridge financing to continue operations until the merger closed.  ECF 78 ¶ 104.

[3] Rawlinson joined Lucid as Chief Technology Officer in 2013.  *Id.* ¶ 41.  Lucid announced Rawlinson's appointment as CEO on April 23, 2019.  *Id.*

[4] On April 28, 2022, Bloomberg reported that the stock options were worth $263 million.  *Id.* ¶ 309.

During a February 28, 2022 earnings call, Lucid announced it would miss the 20,000 unit target and reduced its vehicle production forecast to a range of 12,000 to 14,000 vehicles. *Id.* ¶¶ 27, 312. Lucid's stock price fell "from a close of $28.98 per share on February 28, 2022, to a close at $24.99 per share on March 1, 2022." *Id.* ¶¶ 27, 313. On May 5, 2022, Lucid reiterated its vehicle production target of 12,000 to 14,000 vehicles. *Id.* ¶¶ 30, 332.

On August 3, 2022, Lucid reduced its vehicle production target to between 6,000 and 7,000 vehicles. *Id.* ¶¶ 32, 338. Lucid also disclosed that it had only produced 1,405 vehicles in the first six months of 2022, and only delivered 679 to customers. *Id.* ¶¶ 33, 338. Rawlinson stated: "Our revised outlook guidance for the year reflects the logistic challenges I described as we begin scaling, which exposed the immaturity of our logistics processes." *Id.* ¶ 339. He explained that once " 'supply chain and logistics challenges' began to abate and 'we attempted to push forward the rate, we found that our logistics constraints prevented us from scaling meaningfully.' " *Id.* Specifically, Rawlinson "noted that Lucid had struggled with its 'ability to speed the correct part to [Lucid's production] line at the correct time and cadence,' " and had "experienced 'unplanned production pauses' " resulting from efforts " 'to improve . . . logistics processes.' " *Id.* ¶ 340 (modifications in original). Rawlinson also disclosed that Lucid "was already taking steps to fix the internal logistics problems that he referred to as the 'primary bottlenecks,' including bringing 'logistics operations in-house' and 'restructur[ing] . . . logistics and manufacturing operations," which Rawlinson said should "help mitigate and begin to eliminate the logistics bottlenecks." *Id.* (modifications in original). On this news, Lucid's stock price fell "from a close of $20.56 per share on August 3, 2022, to a close at $18.56 per share on August 4, 2022." *Id.* ¶¶ 33, 341.

### A.     Procedural Background

On April 1, 2022, an individual investor filed a putative securities class action against Lucid, Rawlinson, and House. ECF 1. A second proposed class action – *Goel v. Lucid Group, Inc.*, No. 22-cv-03176 (N.D. Cal.) – followed on May 31, 2022. On September 30, 2022, the Court related and consolidated the two cases, appointed Sjunde AP-Fonden Lead Plaintiff, and approved its selection of Kessler Topaz Meltzer & Check, LLP as Lead Counsel. ECF 60.

On December 13, 2022, Lead Plaintiff filed a consolidated class action complaint on behalf of all persons and entities who bought or acquired Lucid common stock between November 15, 2021 and August 3, 2022.  ECF 78 at 6, ¶ 506.  Lead Plaintiff alleges violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C § 78j(b), and Rule 10b-5 promulgated thereunder, 17 U.S.C. § 240.10b-5, and brings a claim against Rawlinson and House for control person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  *Id.* ¶¶ 518-526, 527-533.

Defendants filed a motion to dismiss the consolidated complaint on February 23, 2023, with a request for judicial notice.  ECF 83, 84.  Lead Plaintiff filed an opposition to the motion on April 24, 2023, without a response to the request for judicial notice.  ECF 88.  Defendants' reply followed on June 8, 2023.  ECF 94.  The Court held a hearing on September 8, 2023.  ECF 99.

## II.    LEGAL STANDARDS

### A.    Motion to Dismiss

Federal Rule of Civil Procedure 8 requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

To overcome a Rule 12(b)(6) motion to dismiss, the factual allegations in the plaintiff's complaint " 'must . . . suggest that the claim has at least a plausible chance of success.' "  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013) (alterations in original)).  In ruling on a Rule 12(b)(6) motion, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citation omitted).

"[A]llegations in a complaint . . . may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."  *Levitt*, 765 F.3d at 1135 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).  The court may dismiss a claim "where there is either a lack of a

United States District Court
Northern District of California

1   cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal claim."

2   *Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 850 (9th Cir. 2011) (citing *Johnson v. Riverside*

3   *Healthcare Sys., LP,* 534 F.3d 1116, 1121 (9th Cir. 2008)).  "[T]he non-conclusory 'factual

4   content' and reasonable inferences from that content must be plausibly suggestive of a claim

5   entitling the plaintiff to relief."  *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009).

6       For claims sounding in fraud or mistake, a plaintiff must "state with particularity the

7   circumstances regarding the fraud or mistake."  Fed. R. Civ. P. 9(b).  A plaintiff must set forth

8   " 'the who, what, when, where, and how' of the misconduct charged."  *Vess v. Ciba-Geigy Corp.*

9   *USA*, 317 F.3d 1097, 1107 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir.

10   1997)).

11       A claim for violations of Section 10(b) and Rule 10b-5 "must meet both the heightened

12   pleading requirements for fraud claims under Fed. R. Civ. P. 9(b) . . . and the exacting pleading

13   requirements . . . of the Private Securities Litigation Reform Act ('PSLRA') . . . ."  *In re Quality*

14   *Systems, Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) (citing *Tellabs, Inc. v. Makor Issues*

15   *& Rights, Ltd.*, 551 U.S. 308, 313 (2007)).  In assessing whether a securities fraud claim meets this

16   heightened pleading standard, "courts must consider the complaint in its entirety, as well as other

17   sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular,

18   documents incorporated into the complaint by reference, and matters of which a court may take

19   judicial notice."  *Tellabs*, 551 U.S. at 322-23 (citations omitted).

20   **III.   DISCUSSION**

21       **A.   Request for Judicial Notice**

22   Defendants ask that the Court take judicial notice of the following 13 documents:

23   - Exhibit 1: Lucid's Form 10-Q, filed with the SEC on November 15, 2021.

24   - Exhibit 2: Excerpts of Lucid's Form 10-K, filed with the SEC on February 28, 2022.

25   - Exhibit 3: Excerpts of Lucid's Form 10-Q, filed with the SEC on May 5, 2022.

26   - Exhibit 4: Lucid's Form 10-Q, filed with the SEC on August 3, 2022.

27   - Exhibit 5: Lucid's Q3 2021 Earnings Call Transcript, dated November 15, 2021.

28   - Exhibit 6: Lucid's Form 8-K, filed with the SEC on November 15, 2021, together with

*United States District Court*
*Northern District of California*

excerpts of Lucid's press release entitled *Lucid Announces Third Quarter 2021 Financial Results and Lucid Air Wins 2022 MotorTrend Car of the Year*, which is appended thereto as Ex. 99.1.

- Exhibit 7: Lucid's Q4 2021 Earnings Call Transcript, dated February 28, 2022.
- Exhibit 8: Lucid's Form 8-K, filed with the SEC on February 28, 2022, together with excerpts of a Lucid press release entitled, *Lucid Announces Fourth Quarter and Full Year 2021 Financial Results, Updates 2022 Outlook*, which is appended thereto as Ex. 99.1.
- Exhibit 9: Lucid's Q1 2022 Earnings Call Transcript, dated May 5, 2022.
- Exhibit 10: Lucid's Form 8-K, filed with the SEC on May 5, 2022, together with excerpts of Lucid's press release entitled, *Lucid Reports First Quarter 2022 Financial Results*, which was appended thereto as Ex. 99.1.
- Exhibit 11: Lucid's Q2 2022 Earnings Call Transcript, dated August 3, 2022.
- Exhibit 12: The unpublished opinion, *Crews v. Rivian Auto., Inc.*, No. 2:22-cv-01524-JLS-E (C.D. Cal. Feb. 16, 2023).
- Exhibit 13: Excerpts from Lucid's Proxy Statement, filed with the SEC on April 28, 2022.

ECF 84 at 2-3. [5]

### 1.   Federal Rule of Evidence 201(b)

A district court may take judicial notice of facts that are "not subject to reasonable dispute" because they are (1) "generally known within the trial court's territorial jurisdiction," or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir.

---

[5] The documents are attached to the declaration of Neal Potischman filed in support of Defendants' motion to dismiss. ECF 83-1. An additional exhibit, which is an excerpt from a webpage of the Council of Supply Chain Management Professionals, is attached to the Potischman declaration but is not listed in Defendants' request for judicial notice. *See* ECF 83-1 ¶ 15; ECF 84. At oral argument, Defendants indicated that the document is not essential to their arguments for dismissal. Accordingly, the Court has not considered Exhibit 14 in ruling on the instant motion.

1993).  "Accordingly, '[a] court may take judicial notice of matters of public record.' "  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001)).  A court cannot, however, "take judicial notice of disputed facts contained in such public records."  *Id.*

Lead Plaintiff did not file a response to Defendants' request for judicial notice.  During oral argument, Lead Plaintiff indicated that it does not oppose Defendants' request for judicial notice to the extent Defendants seek to rely on documents for the limited purpose of establishing that certain representations were made to the market.  With that statement from Lead Plaintiff in mind, the Court **GRANTS** the request for judicial notice as follows:

The Court takes judicial notice of Exhibit 12, which is an unpublished district court decision.  *See Selane Prod., Inc. v. Cont'l Cas. Co.*, No. 21-55123, 2021 WL 4496471, at *2 n.4 (9th Cir. Oct. 1, 2021) (granting motion to take judicial notice of unpublished case).  The Court also takes judicial notice of Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11 and 13, which consist of SEC filings, earnings calls transcripts, and press releases, for the limited purpose of noting the representations Defendants made to the market and only to the extent Defendants have specifically identified any such representations within those documents.  *See Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 872 (N.D. Cal. 2023).  The Court does not take judicial notice of the contents of those documents for their truth.  *See Khoja*, 899 F.3d at 1000 ("To the extent that the district court judicially noticed the . . . investors' call transcript for the purpose for which was offered, *i.e.*, to determine what the investors knew . . . at that time, the district court abused its discretion.").

### 2.   Incorporation by Reference

As to Exhibits 5, 6, 7, 8, 9, 10, and 13, Defendants also assert that the documents are properly before the Court because they are incorporated into the consolidated complaint by reference.  ECF 84 at 3.

"Unlike rule-established judicial notice, incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself.  The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken – or doom – their claims."  *Khoja*, 899

United States District Court
Northern District of California

United States District Court
Northern District of California

F.3d at 1002.  "Although the incorporation-by-reference doctrine is designed to prevent artful pleading by plaintiffs, the doctrine is not a tool for defendants to short-circuit the resolution of a well-pleaded claim."  *Id.* at 1003.

Exhibits 5, 6, 7, 8, 9, 10, and 13 are the source of several statements Lead Plaintiff alleges were false and misleading.  *See, e.g.*, ECF 78-2 (Statements 1, 2, 10, 13, 18, 19, 23).  As such, the documents form the basis of Lead Plaintiff's claims.  For this reason, the Court finds that Exhibits 5, 6, 7, 8, 9, 10, and 13 are incorporated by reference.  *See Khoja*, 899 F.3d at 1006 (district court did not abuse its discretion by incorporating Form S-8 registration statement where complaint alleged the registration statement "incorporated by reference the Company's materially misleading . . . Form 8-K").  The Court, however, does not assume the truth of any facts stated in Exhibits 5, 6, 7, 8, 9, 10, or 13 to the extent they serve to dispute well-pleaded facts in the consolidated complaint.  *See id.* at 1003 ("[I]t is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint.").

**B.    Motion to Dismiss**

Defendants move to dismiss Lead Plaintiff's Section 10(b) claim and the derivative Section 20(a) claim.  ECF 83 at 15, 28.  Because the Section 20(a) claim is derivative, the Court addresses the Section 10(b) claim first.

**1.    <u>Section 10(b) and Rule 10b-5 Claim</u>**

To state a claim under Section 10(b) and Rule 10b-5,[6] a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.' "  *Quality Systems*, 865 F.3d at 1140-41 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

---

[6] "SEC Rule 10b-5 implements [Section] 10(b) by declaring it unlawful: '(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.' "  *Tellabs*, 551 U.S. at 318 (quoting 17 C.F.R. § 240.10b-5).

United States District Court
Northern District of California

Defendants argue that Lead Plaintiff's Section 10(b) claim fails for two reasons.  ECF 83 at 15-23, 23-29.  First, they argue that Lead Plaintiff fails to plead any actionable misstatement or omission, because the allegations of falsity are insufficient and because the statements at issue fall within the PSLRA's safe harbor, are non-actionable opinion, and/or constitute corporate puffery. *Id.* at 15-23.  Second, Defendants argue that Lead Plaintiff does not plead particularized facts sufficient to support a strong inference of scienter.  *Id.* at 23-28.  The Court first addresses whether Lead Plaintiff has sufficiently alleged an actionable misstatement or omission, then analyzes whether Lead Plaintiff has adequately alleged facts supporting a strong inference of scienter.

### a.   Alleged material misstatements or omissions

"Where the alleged fraud is a material misstatement or omission, 'the complaint shall specify (1) each statement alleged to have been misleading, (2) the reason or reasons why the statement is misleading, and, (3) if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.' "  *Khoja*, 899 F.3d at 1008 (quoting 15 U.S.C. § 78u-4(b)(1)).

"In the securities fraud context, statements and omissions are actionably false or misleading if they directly contradict what the defendant knew at that time, or create an impression of a state of affairs that differs in a material way from the one that actually exists[.]"  *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948 (9th Cir. 2023) (internal quotations and citations omitted).

Lead Plaintiff alleges that the following statements were false or materially misleading:

- In a November 15, 2021 press release titled *Lucid Announces Third Quarter 2021 Financial Results and Lucid Air Wins MotorTrend Car of the Year*, issued on Form 8-K and signed by House:

  1. Rawlinson stated: "We see significant demand for the award-winning Lucid Air, with accelerating reservations as we ramp production at our factory in Arizona.  ***We remain confident in our ability to achieve 20,000 units in 2022.  This target is not without risk, given ongoing challenges facing the automotive industry with global disruptions to supply chains and logistics.  We are taking steps to mitigate these challenges,***[7] however, and look forward to the launch of the Grand Touring,

---

[7] In the consolidated complaint, Lead Plaintiff uses **bold and italics** to identify the portions of

Touring, and Pure versions of Lucid Air through 2022."  ECF 78 ¶ 349; ECF 78-2 at 1.

- During a 3Q21 Earnings Call held November 15, 2021:

    2. House stated: "***Heading into 2022, we remain committed to our plan to achieve 20,000 units in the calendar year.  However, this plan is not without risk, given the extraordinary supply chain and logistics challenges that the automotive industry has been facing***."  ECF 78 ¶ 350; ECF 78-2 at 1-2.

    3. Rawlinson stated: "***Even in a challenging environment as COVID-19 continues to present numerous obstacles for the auto industry and supply chain.  Lucid is no stranger to this, but we have continued to deliver against our time line and with the highest standard of quality***."  ECF 78 ¶ 351; ECF 78-2 at 4.

- During an interview with CNBC's Jim Cramer on November 16, 2021:

    4. Cramer asked: "But you have said, let's be clear about this, you have a lot of demand, 17,000.  And that's not a problem for you to make.  But you have dreams.  Let's hopefully realities [*sic*] of 500,000 production and more."  ECF 78 ¶ 357; ECF 78-2 at 5-6.

    Rawlinson responded: "***Absolutely.  We already have a factory scale for 34,000 units a year.  As soon as we can get this quality parts to the line, we can spool that up.  The factory is there and ready for 34,000 units per annum***."  ECF 78 ¶ 358; ECF 78-2 at 5-6.

    5. Cramer also asked: "So if I go under the hood, which fortunately could be in a size of a suitcase, will I find the same Semiconductor shortage problem?  Will I find the labor problem?  I find all the things that are plaguing every other company in the automotive business.  Or would they be looking at, say, an Apple phone and saying, you know what?  Look, we've got the technology, the customers love it, and let's stop worrying about things that don't really mean anything to us."  ECF 78 ¶ 359; ECF 78-2 at 6-7.

    Rawlinson responded: "We've been able to mitigate the semiconductor risk because as a tech company, we design all our printed circuit boards, our PCBAs, in house, and that means that we can design for alternative sourcing and different types of chip and that will reduce the risk.  ***So we've been able to mitigate that risk.  That isn't to say we aren't vulnerable to today's supply chain shortages that the entire industry is facing, in fact, many industries are facing, that is something that we are a challenge with and we have mitigation plans for***."  ECF 78 ¶ 360; ECF 78-2 at 6-7.

---

statements that it alleges are actionable and provides additional text for context.  ECF 78 at 91 n.4; ECF 78-2 at 1 n.2.

- During a February 14, 2022 hearing before the Arizona State Legislature's Transportation and Technology Committee:

  6. Arizona State Senator, Rosanna Gabaldón, Member of the Arizona State Legislature's Transportation and Technology Committee asked: "[I]n regards to supplies, you know, you drive by any car dealership today and there's very few cars on their lot.  I'm wondering how Lucid is addressing this?  I guess I heard you say that there's orders and that people are going to be coming, et cetera.  So I was wondering if you could address that." ECF 78 ¶ 365; ECF 78-2 at 8-9.

     Daniel Witt, Lucid's Head of State and Local Public Policy, responded: "***Yes, we're in a little bit of an enviable position and that we are so small this year, we're looking to produce about 20,000 units.***" ECF 78 ¶¶ 364, 366; ECF 78-2 at 9.

     Witt added: "Much larger auto companies excuse me . . . ***much larger companies that produce millions of units annually are having a much more difficult time due to supply constraints than we ultimately are.***" ECF 78 ¶ 366; ECF 78-2 at 9.

  7. Senator Gabaldón also asked: "[Y]ou indicated all these employees, and, so the orders that you have, maybe I am misunderstanding, so the orders that you do have, [can be] filled at this time with individuals that have, the consumer who has purchased these vehicles." ECF 78 ¶ 367; ECF 78-2 at 9-10.

     Witt responded, in part: "***We have the capacity to fill all the orders received to date and more***." ECF 78 ¶ 368; ECF 78-2 at 10.

- In a press release titled *Lucid Announces Fourth Quarter and Full Year 2021 Financial Results, Updates 2022 Outlook*, issued on Form 8-K and signed by House:

  8. Defendants stated: "***Updating 2022 production outlook for Lucid Air to a range of 12,000 to 14,000 vehicles***." ECF 78 ¶ 374; ECF 78-2 at 10-11.

  9. Rawlinson stated: "***Looking ahead, we're updating our outlook for 2022 production to a range of 12,000 to 14,000 vehicles.  This reflects the extraordinary supply chain and logistics challenges we've encountered and our unrelenting focus on delivering the highest quality products.***  We remain confident in our ability to capture the tremendous opportunities ahead given our technology leadership and strong demand for our cars[.]" ECF 78 ¶ 375; ECF 78-2 at 11.

- During a 4Q21 & FY2021 Earnings Call held February 28, 2022:

  10. Rawlinson stated: "In the more immediate term, ***like many manufacturers, our production has been and indeed continued to be impacted by supply chain challenges***.  As you saw from our press release today, ***we have updated our 2022 production outlook for Lucid Air to a range of 12,000 to 14,000 vehicles***." ECF 78 ¶ 377; ECF 78-2 at 14.

11. Rawlinson then stated: "***The supply chain issues that we are experiencing from factors including components shortages, our insistence on the highest quality parts and logistics issues***.  In some cases, the pandemic meant that our teams could not visit our suppliers in person to ensure alignment on engineering specifications and tooling.  As travel has opened back up, our supplier quality teams have been able to address many of these issues.  ***I will note that these issues are impacting only a handful of our approximately 250 suppliers and are not affecting critical single source or dual source components like semiconductors or batteries.  Instead, it's been commodity items like glass and carpets, and we've adapted by changing our specifications or indeed switching vendors if needed***."  ECF 78 ¶ 378; ECF 78-2 at 17-18.

12. Rawlinson also stated: "***We accomplished deep deliveries against the backdrop of an extraordinary supply chain and supply quality challenges.  Indeed, we could have chosen to build faster, but we elected not to sacrifice quality, given our unwavering commitment to the highest standards***."  ECF 78 ¶ 379; ECF 78-2 at 19.

13. House stated: "***All in, with everything we've accomplished recently, we have the elements in place to execute successfully on our plans, the core pillars for future scalability and growth***.  Now turning to guidance.  ***We're updating our outlook for 2022 production to a range of 12,000 to 14,000 vehicles.  This projection represents our best estimate as we analyze our relationship with our suppliers and where the bottlenecks still exist in the supply chain, as well as our own internal plans to improve logistics.  We expect to remain supply chain constrained in select parts of the business in the coming months, and project improvement in the second half of the year***."  ECF 78 ¶ 380; ECF 78-2 at 22-23.

14. House also stated: "As mentioned by Peter [Rawlinson], ***we are managing through supply chain challenges that you've heard about in numerous companies across industries this earning season***.  At Lucid, we have the right experience and resources to help mitigate these issues.  In some cases, we're buying ahead to reduce the risk of parts shortages."  ECF 78 ¶ 381; ECF 78-2 at 27.

15. Analyst Itay Michaeli ("Michaeli"), Citigroup Inc., Research Division, Director & Global Head of Autos Sector, asked Rawlinson: "A couple of questions.  Just first, going back to the supply chain pressures.  I was hoping you can maybe articulate it sounds like you expect most of the recovery to happen in the second half of the year.  Maybe talk about how much visibility you have over the next few months with some of the suppliers you mentioned and just the degree of confidence of how to think about the cadence of improvement in production throughout the year."  ECF 78 ¶ 382; ECF 78-2 at 29-31.

Rawlinson responded: "Yes.  Well, we have an earning focus on addressing some of the supply chain challenges.  We see them to continue for the next few months.  ***But we see an uptake in the second half of the year.  So we're really optimistic that we're going to be able to resolve these.  And again, this is a small handful of suppliers.  We're not talking about fundamental technologies here.  We're talking largely paradoxically commodity suppliers, finishes, carpet, glass and***

*things like that.  And unfortunately, you can't sell a single quality car unless those -- particularly those visible parts are absolutely perfect.  So we're very optimistic that we will resolve, but it's going to take a few months, and the second half of the year, we'll see a significant uptake.  And our guidance is based upon that premise*."  ECF 78 ¶ 383; ECF 78-2 at 29-31.

16. John Joseph Murphy, BofA Securities, Research Division, MD and Lead United States Auto Analyst, asked: "[A]s you think about the causal factors for the reduction in your planned production this year, I mean, you're citing supply chain. It appears that maybe some of the capacity expansion and reorganization has put forth or been prioritized over ramping volume in the near term for the benefit in the long term, and there might be some other micro issues that we can't see.  I'm just wondering if you could kind of bucket those or maybe rank those in order of sort of impact.  And then also as we think about this, does this change your outlook for 2023 volumes?  Or is this sort of short-term pain for long-term gain?"  ECF 78 ¶ 384; ECF 78-2 at 33-34.

Rawlinson responded: "Those are interesting points.  *I mean, first of all, I would say that we have been primarily constrained.  We've got about 250 suppliers worldwide, notionally about 3,000 parts.  And this has been really a phenomenon of just a small handful of our 250 suppliers.  Paradoxically, we've been mainly impacted in a commodity supply parts.  For example, finished parts, trim parts for the exterior, even glass and carpet.  So it's not the core technologies of the vehicle that have been largely impacting us here.  And we have – you're right, we've chosen quality over volume.*  We don't want to get sucked into myopic view of short-term numbers.  We're building a brand with a 10-year plan.  And our customers have been really grateful and appreciative of the quality that we've built into our car, the build quality[.]  *So we prioritize quality over numbers*."  ECF 78 ¶ 385; ECF 78-2 at 33-34.

- A March 17, 2022 article entitled *Rising Costs Have Lucid CEO Eyeing Price Hike for Future Electric Cars* stated:

17. Lucid in February cut its production forecast for this year to a range of 12,000 to 14,000, from its original target of 20,000 vehicles, citing "extraordinary supply chain and logistics challenges."  Its shares slid after that announcement.

*Rawlinson on Thursday said the bottlenecks were caused by a handful of suppliers for windshield glass, carpeting and some exterior trim parts.  "I'm super frustrated because we're not gated by silicon chips, we're not gated by our ability to make electric motors," Rawlinson said.*  ECF 78 ¶ 391; ECF 78-2 at 37.

- In Lucid's 2022 Proxy Statement filed in connection with Lucid's Schedule 14A, dated April 28, 2022:

18. Rawlinson stated: "*We are not immune to the challenging global environment that has impacted parts of our supply chain and logistics, but our team continues to work hard to mitigate these risks*."  ECF 78 ¶ 393; ECF 78-2 at 39.

United States District Court
Northern District of California

- In a press release titled *Lucid Reports First Quarter 2022 Financial Results*, issued on Form 8-K and signed by House:

  19. Defendants stated: "***Lucid reiterated its 2022 production volume outlook of 12,000 to 14,000 vehicles***" and Lucid's "***[p]roduction volume outlook for 2022 remains on track at 12,000 to 14,000 vehicles***."  ECF 78 ¶ 396; ECF 78-2 at 41.

  20. Rawlinson stated: "***We continued to make progress in the first quarter of 2022 despite on-going global supply chain challenges***."  ECF 78 ¶ 397; ECF 78-2 at 42.

  21. House stated: "***Similar to many companies in our industry, we continue to face global supply chain and logistics challenges, including Covid-related factory shutdowns in China.  We are working closely with our suppliers to mitigate the impact of disruptions***."  ECF 78 ¶ 398; ECF 78-2 at 44.

  22. House stated: "***While any extended disruptions could result in an impact to our production forecast, today we are reiterating our 12,000-14,000 vehicle production forecast for 2022 based on the information we have at this point combined with our mitigation plans***."  ECF 78 ¶ 399; ECF 78-2 at 47-48.

- During a 1Q22 Earnings Call held May 5, 2022:

  23. Rawlinson stated: "[I]n April alone, we delivered well over 300 vehicles, demonstrating our accelerated production ramp.  ***And this growth progression keeps us nicely on track for our 12,000 to 14,000 production targets***." ECF 78 ¶ 400; ECF 78-2 at 49.

  24. Rawlinson also stated: "***I do want to highlight that supply chain dynamics are very fluid, and the COVID lockdowns in China that's impacting others in the industry are also resulting in some bottlenecks for us***."  ECF 78 ¶ 401; ECF 78-2 at 49.

  25. House stated: "Moving to our production outlook.  ***Similar to many companies in our industry, we continue to face global supply chain and logistics challenges, including COVID-related factory shutdowns in China.  We are working closely with our suppliers to mitigate the impact of disruption.  While any extended disruptions could result in an impact to our production forecast, today, we are reiterating our 12,000 to 14,000 vehicle production guidance for 2022 based on the information we have at this point, combined with our mitigation plan***."  ECF 78 ¶ 402; ECF 78-2 at 52.

  26. Itay Michaeli asked: "Any kind of early update on Q2, maybe an April number?" ECF 78 ¶ 403; ECF 78-2 at 56-57.

  House responded: "So Itay, as we said in our prepared remarks, ***we are reiterating our 12,000 to 14,000 guidance for the balance of the year, so long as the supply chain logistics disruptions aren't material and our mitigation plans are effective.***  And

we've been watching the China lockdown situation really closely.  We have had a little bit of impact there.  We had a couple of days that we did shut down, and we did have a little bit of slowing for about 1.5 weeks in April.  But we have mitigation plans in place.  We were able to get access to some warehouses.  We're able to move production to another area of China in one case." ECF ¶ 404; ECF 78-2 at 56-57.

27. Rawlinson also responded: "***We're reiterating our 12,000 to 14,000 vehicle production forecast for '22.  And that's based on the information we have at this point, combined with our current mitigation plans***." ECF 78 ¶ 405; ECF 78-2 at 59.

- A slide from a May 5, 2022 1Q22 Earnings Call Presentation stated:

28. "***Production Volume • 12,000-14,000 vehicles***." ECF 78 ¶ 406; ECF 78-2 at 64.

- During a May 20, 2022 Interview with Lara Habib Chamat of Al Arabiya News Channel:

29. Lara asked: "Let's discuss now your global operations.  We know that the company is facing some issues in delivering the cars due to supply chain disruptions.  We know that Lucid lowered the annual production target to 12,000 cars versus original prediction of 20,000 cars for this year.  When do you expect when do you expect things to look better?" ECF 78 ¶ 411; ECF 78-2 at 64-65.

Rawlinson responded: "Our challenge now is to ramp up the volume of this incredible machine.  ***We're facing global supply chain challenges, as is all the auto industry and other industries.  And we're working assiduously to overcome our near-term challenges with commodity goods are being resolved and we're looking forward to hitting our 12 to 14,000 units that we're targeting for production this year***." ECF 78 ¶ 412; ECF 78-2 at 64-65.

- In a May 26, 2022 article published by Business Insider:

30. Nat Lingo, a Lucid spokesperson stated Lucid was "***committed to maintaining a consistent, high level of quality as we ramp production towards our year-end goal of 12,000 to 14,000 vehicles***." ECF 78 ¶ 417; ECF 78-2 at 67-68.

### i.      Adequacy of Allegations

Defendants argue that Lead Plaintiff does not allege particularized facts to plausibly allege that Statements 1-30 were false or misleading.  ECF 83 at 15.  Specifically, Defendants attack the sufficiency of Lead Plaintiff's allegations with respect to statements about Lucid's production targets (Statements 1-4, 6, 8-10, 12-16, 18-23, 25-30), Lucid's manufacturing capacity (Statements 4 and 7), and the reasons for Lucid's production delays (Statements 1-3, 5, 9-18, 20-21, 24-26, 29).  ECF 15 at 15-19.

United States District Court
Northern District of California

Before turning to each category, the Court notes that Defendants have lumped the following statements into the first category, though portions of them do not concern production targets:  Statements 3 (portion indicating that Lucid was making deliveries "with the highest standard of quality"), 4 (discussing factory capacity), 12 (indicating Lucid's "unwavering commitment to the highest standards"), 14 (discussing supply chain challenges), 15 (referencing supplier issues), 16 (stating that Lucid prioritizes quality over numbers), 18 (referring to global supply chain challenges), 20 (same), 21 (same), 30 (portion expressing commitment "to maintaining a consistent, high level of quality as [Lucid] ramp[s] production").

As to portions of Statements 3, 12, 16, and 30 that merely concern Lucid's commitment to quality, without relying on quality as an excuse for production delays, Lead Plaintiff's consolidated complaint does not contain particularized facts as to why those portions were false or misleading.  *See Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1039 (N.D. Cal. 2020) ("In order to adequately allege that [defendant] made misleading statements regarding product quality, plaintiffs must allege with specificity how each alleged statement was false or misleading at the time it was made, and ho[w] it was not mere puffery.").  The Court discusses Statements 12 (in part), 14, 15, 16, 18, 20, and 21 with the other statements about the reasons for Lucid's production delays and Statement 4 with the other statement about Lucid's manufacturing capacity.

Moreover, the Court notes that Lead Plaintiff has failed to adequately allege falsity as to the following statements, which do not cleanly fit into any of the three categories Defendants outline: Statement 1 (portion that reads "[w]e are taking steps to mitigate these challenges"), 5 (portions discussing mitigation plans and mitigating risk), 12 (portion discussing "deep deliveries" that Lucid accomplished), 18 (portion indicating that Lucid team "continues to work hard to mitigate these risks"), 20 (portion indicating that Lucid "continued to make progress in the first quarter of 2022"), 21 (portion indicating Lucid was working closely with suppliers to mitigate impact of disruption), 25 (same), 28 (portion indicating Lucid was working to overcome near-term challenges), 29 (portion that states Lucid was "working assiduously to overcome [its] near-term challenges with commodity goods").  *See Wochos*, 985 F.3d at 1196 ("Tesla's remark . . . that 'great progress' was being made on battery production would potentially be an actionable false

statement only if, as the district court put it, Tesla had been 'making no progress at all.' Plaintiffs pleaded no facts that would establish falsity in that sense."). The Court offers this guidance to aid Lead Plaintiff in the preparation of a more focused amended complaint. The Court now turns to the remaining statements Defendants identify as falling in the first category.

### a) *Production targets*

Defendants challenge the following statements on the ground that Lead Plaintiff has not sufficiently alleged falsity: Statement 1 ("We remain confident in our ability to achieve 20,000 units in 2022."), 2 ("Heading into 2022, we remain committed to our plan to achieve 20,000 units in the calendar year."), 6 ("[W]e're looking to produce about 20,000 units."); 8 ("Updating 2022 production outlook for Lucid Air to a range of 12,000 to 14,000 vehicles."), 9 ("Looking ahead, we're updating our outlook for production to a range of 12,000 to 14,000 vehicles."), 10 ("[W]e have updated our 2022 production outlook for Lucid Air to a range of 12,000 to 14,000 vehicles."), 13 ("We're updating our outlook for 2022 production to a range of 12,000 to 14,000 vehicles."), 19 (" 'Lucid reiterated its 2022 production volume outlook of 12,000 to 14,000 vehicles' and that 'Lucid's [p]roduction volume outlook for 2022 remains on track at 12,000 to 14,000 vehicles.' ") (modification in original), 22 ("[T]oday we are reiterating our 12,000-14,000 vehicle production forecast for 2022[.]"), 23 ("And this growth progression keeps us nicely on track for our 12,000 to 14,000 production targets."), 25 ("[T]oday we are reiterating our 12,000 to 14,000 vehicle production guidance for 2022[.]"), 26 ("[W]e are reiterating our 12,000 to 14,000 guidance for the balance of the year."), 27 ("We're reiterating our 12,000 to 14,000 vehicle production forecast for '22."), 28 ("Production Volume • 12,000-14,000 vehicles."), 29 ("[W]e're looking forward to hitting our 12 to 14,000 units that we're targeting for production this year."), 30 (discussing ramping up "production towards our year-end goal of 12,000-14,000 vehicles"). ECF 88 at 16.

"The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement." *Nursing Home Pension Fund Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004).

To demonstrate that here, Lead Plaintiff offers statements from former employees.[8] Former employee 2 "("FE-2") worked for "Lucid in multiple positions in the Company's Logistics Department from the summer of 2020 to the end of 2021.  From the end of 2020 to the end of 2021, FE-2 held coordinator and supervisory roles in Lucid's Warehouse."  ECF 78 ¶ 58.  FE-2 stated that during meetings held during October 2021, Rawlinson and others "made statements that Lucid was going to miss its year-end vehicle production targets for 2021, 2022, and 2023," and directed employees to keep the information "confidential and not to share it."  *Id.* ¶ 288.  FE-2 also stated that at one meeting, held in October 2021 or the first week of November 2021, "Rawlinson stated Lucid would make less than 10,000 vehicles in 2022."  *Id.* ¶ 289.  FE-2 recalls Rawlinson instructing that this information "should be kept in your 'belt loop.' "  *Id.*  FE-2 also indicated that Rawlinson "only discussed the fact that Lucid would miss its production targets in the smaller group setting, and that Rawlinson was telling them so they would not kill themselves to meet targets that Lucid would miss."  *Id.*

This account is consistent with that of former employee 1 ("FE-1"), who worked for "Lucid in several managerial and supervisory roles relating to logistics from mid-2021 to mid-2022. . . .  At the Plant in Casa Grande, FE-1 supervised and had responsibilities concerning Lucid's internal logistics.  By late summer 2021, FE-1 moved to and was working at Lucid's Warehouse, where he remained for the rest of his tenure at Lucid."  *Id.* ¶ 57.  During his "meetings with Rawlinson in September 2021 and November 2021, FE-1 personally told Rawlinson, in the context of discussing Lucid's internal logistics issues[,] that because of all of those issues, Lucid would never meet its production goals," to which "Rawlinson reacted by nodding his head."  *Id.* ¶ 291.

---

[8] For the reasons set forth in the section discussing scienter, the Court takes the allegations based on the observations of the former employees discussed in this order as true, as Lead Plaintiff plausibly alleges that these former employees observed the circumstances they describe first-hand, and Defendants do not dispute that the former employees "saw what they claim to have seen," with the exception of FE-2.  *See In re BoflHolding, Inc. Sec. Litig.*, 977 F.3d 781, 793 (9th Cir. 2020) (finding that facts alleged by midlevel auditor revealed that a number of alleged misstatements were false).

United States District Court
Northern District of California

In the context of the first category of statements Defendants attack, FE-1's and FE-2's statements can only be tied to Statements 1 and 2, made on November 15, 2021. *See Crews v. Rivian Auto., Inc.*, No. 2:22-CV-01524-JLS-E, 2023 WL 4361098, at *8 (C.D. Cal. July 3, 2023) ("A plaintiff may rely on *contemporaneous* statements or conditions to demonstrate why statements were false when made[.]"). Rawlinson, however, did not make Statement 2. House did. Other than the assertion that Rawlinson and House "worked together to promote" the production guidance, ECF 88 at 25, Lead Plaintiff does not connect any of the statements from FE-1 or FE-2 to House or establish that House held or adopted the negative views those former employees expressed about Lucid's ability to meet its production targets. *Cf. Robb v. Fitbit Inc.*, No. 16-CV-00151-SI, 2017 WL 219673, at *6 (N.D. Cal. Jan. 19, 2017) (failing to allege that executive did not share information with other defendants was not fatal where a holistic evaluation of the allegations presented a cogent and compelling argument that information known to the executive would have been known to the other defendants).

As a result, Lead Plaintiff's existing allegations are insufficient to show that House made Statement 2 while possessing knowledge of contradictory information. *See Khoja*, 899 F.3d at 1008 ("Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time.") (citations omitted); *Quality Systems*, 865 F.3d at 1142-44 (finding actionable a statement about new customer sales where speaker allegedly knew sales opportunities were decreasing).

As to Statement 1, the accounts from FE-1 and FE-2 plausibly suggest that when Rawlinson said "[w]e remain confident in our ability to achieve 20,000 units in 2022," he possessed contrary facts and had subscribed to the former employees' views that meeting Lucid's projection goals was not possible at that time. This is sufficient. *Cf. Wochos*, 985 F.3d at 1194 ("Plaintiffs rely on allegations that two employees told Musk in 2016 that the goal of producing 5,000 cars per week by the end of 2017 was impossible to achieve, but the district court correctly held that Plaintiffs failed to plead any facts showing that Musk ever accepted those employees' views that the goal was impossible."); *In re Talis Biomedical Corp. Sec. Litig.*, No. 22-CV-00105-SI, 2022 WL 17551984, at *15 (N.D. Cal. Dec. 9, 2022) (concluding that

1    allegations that CEO was " 'notorious' for not having a scheduling buffer support[ed] an inference

2    that [he] was aggressive in setting timelines, rather than an inference that statements about

3    projected timelines were false when made.").

4        For these reasons, the Court finds that the portion of Statement 1 discussed above is

5    adequately pleaded, but the portions of Statements 2, 6, 8, 9, 10, 13, 19, 22, 23, 25, 26, 27, 28, 29,

6    30 discussing projection targets are not adequately pleaded because the complaint lacks allegations

7    indicating that the speaker possessed contemporaneous knowledge that the statements were false

8    when made.[9]

9                          *b)*   *Manufacturing Capacity*

10       Defendants argue that Statements 4 and 7, which concern Lucid's manufacturing capacity,

11   are also insufficiently pleaded.  ECF 83 at 16-17.  On November 16, 2021, Rawlinson told

12   CNBC's Jim Cramer: "We already have a factory scale for 34,000 units a year.  As soon as we can

13   get this quality parts to the line, we can spool that up.  The factory is there and ready for 34,000

14   units per annum."  ECF 78 ¶ 358; ECF 78-2 at 5-6 (Statement 4).  On February 14, 2022, Daniel

15   Witt told Arizona State Senator Gabaldón: "We have the capacity to fill all the orders received to

16   date and more."  ECF 78 ¶ 368; ECF 78-2 at 10 (Statement 7).

17       Lead Plaintiff contends that these statements were misleading because, even if it was

18   literally true that Lucid's factory was built for a production capacity of 34,000 vehicles, the

19   company was "nowhere near ready" to fill its actual orders because of "severe internal issues" that

20   Lucid was concealing from investors and the market.  ECF 88 at 20.

21       "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all

22   material information.  Disclosure is required under these provisions only when necessary 'to

23   make . . . statements made, in the light of the circumstances under which they were made, not

24

25   _____

26   [9] Though Lead Plaintiff points to allegations about discussions between FE-2 and Rawlinson that
     took place in February 2022, those statements merely establish knowledge of inventory issues.
27   This is insufficient to establish falsity as to any contemporaneous statements absent an allegation
     that Rawlinson adopted FE-2's views about the inability to meet production targets at that time.
28   *See Wochos*, 985 F.3d at 1194; *In re Talis Biomedical Corp. Sec. Litig.*, 2022 WL 17551984, at
     *15.

misleading.' " *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)).  A statement is misleading by omission if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists."  *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (citation omitted).

Here, Statement 4 gives that impression.  It suggests that once "quality parts" made it "to the line," Lucid was ready to operate at the capacity its manufacturing facility was built for.  Lead Plaintiff's allegations, however, describe a materially different picture of Lucid's actual manufacturing capacity.  Lucid did not have a functioning inventory control and management system, leaving employees with little to no information about how many parts the company had, where they were, and whether they were usable.  ECF 78 ¶¶ 136, 140, 298.  As a result, employees tried to manually track and manage inventory, leading to inaccuracies, inefficiencies, and production delays.  *Id.* ¶ 142.  Lucid's warehouse was also "well over-capacity, which led to parts getting lost or destroyed and constant delays in production" and prevented parts from getting to the "production line in an effective and timely fashion, which resulted in frequent and often elongated production shuts downs."  *Id.* ¶¶ 136, 178, 298.  Lucid "experienc[ed] significant issues with reflashing,[10] sequencing,[11] and quality checks at the Warehouse, which resulted in delays in delivering parts to the line, as well as deficient parts being delivered to the line."  *Id.* ¶ 298.  In addition, "the Lucid Air had design flaws that were preventing Lucid's chosen suppliers from producing parts in the quantity and quality that Lucid required to build the Air."  *Id.* ¶¶ 136, 239.  This meant that while production was in progress, "Lucid was scrambling to redesign parts on the fly and to find temporary workarounds to produce cars with faulty or outdated parts."  *Id.* ¶ 136.

---

[10] FE-9, a contract employee who worked in the Reflashing Department at Lucid's warehouse describes "reflashing" as "the updating of the software component of parts received from a vendor with the most updated software available for the part."  ECF 78 ¶¶ 65, 131.

[11] FE-1, who worked in supervisory and managerial roles concerning logistics at Lucid's warehouse and plant, describes "sequencing" as "the process by which certain parts of vehicles, including bumpers, cameras, and tires, are put together manually".  *Id.* ¶¶ 57, 133.

By the time Rawlinson made Statement 4 on November 16, 2021, Rawlinson had acknowledged that these difficulties meant that Lucid would not meet its upcoming production goal. According to FE-2, at meetings held in October or November 2021, "Rawlinson stated that Lucid would make less than 10,000 vehicles in 2022," and attendees indicated that the reasons why Lucid would miss its production targets included inventory control problems, vehicle redesign, and supply chain issues. *Id.* ¶¶ 288-89. According to FE-1, during "meetings . . . in September 2021 and November 2021," when FE-1 told Rawlinson that Lucid would never meet its production goals because of internal logistics issues, "Rawlinson reacted by nodding his head." *Id.* ¶ 291.

In light of these allegations, the Court finds that Statement 4 "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exist[ed]." *See In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 730 (N.D. Cal. 2022) (internal quotations and citation omitted). While Rawlinson may have been truthfully describing that Lucid had built manufacturing facilities capable of building 34,000 vehicles, he gave the impression that Lucid was in a position to realize that capacity as soon as Lucid could "get . . . quality parts to the line." The allegations set forth above describe circumstances that plausibly show much more than that needed to happen. Rawlinson plausibly knew Lucid did not have the parts, could not find the parts, or could not use the parts that were necessary for that manufacturing capacity to translate to actual vehicles for delivery. Lead Plaintiff has therefore adequately alleged that Statement 4 was false and misleading. *See id.* at 735 (finding that plaintiffs sufficiently alleged that statement was misleading where it suggested that only two major steps remained for product development).

Lead Plaintiff has not, however, adequately pleaded that Statement 7 was false or misleading. It has drawn no similar connection between the allegations detailed above and Daniel Witt, Lucid's Head of State & Local Public Policy, who is the source of Statement 7. Because Lead Plaintiff has failed to allege facts plausibly showing that Witt knew Statement 7 was false and misleading at the time he made it, Lead Plaintiff's current allegations as to Witt's statement are insufficient at this stage. *See Crews*, 2023 WL 4361098, at *8 ("[T]o be actionable, a

United States District Court
Northern District of California

statement must be known to be false or misleading at [the time made] by the people who made them.") (internal quotations and citations omitted; modifications in original). Lead Plaintiff's allegations as to Statement 7 are also insufficient because they are silent as to Witt's authority to speak on behalf of Lucid. *See In re Facebook, Inc. Sec. Litig.*, 87 F.4th at 952 (stating, in the context of analyzing scienter, that "[f]or obvious reasons, an actionably misleading statement must be made by a spokesperson who has actual or apparent authority") (internal quotations and citations omitted). Lead Plaintiff's argument that Lucid, not Witt, is the maker of Statement 7 does not save it from dismissal. Lead Plaintiff's reliance on *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 705-06 (9th Cir. 2021) is misplaced. There, the Ninth Circuit found the allegations sufficient to establish that the CEO knew about operational problems at the time SEC disclosures were made, and thus, the CEO's knowledge could be fairly imputed to the company. *Id.* at 706. Here, Lead Plaintiff seeks to impute knowledge on Lucid through the statement Witt made though Witt's knowledge is insufficiently alleged. While *In re Alphabet* allows Rawlinson's knowledge to be fairly imputed on Lucid, it does not support the same result as to Witt.[12]

Accordingly, Lead Plaintiff has adequately pleaded that Statement 4 is false or misleading but its allegations as to Statement 7 are insufficient.

### c) *Reasons for Delay*

The third category of statements Defendants contend are insufficiently pleaded include: Statement 1 (portion referencing "global disruptions to supply chains and logistics"), 2 (portion mentioning "extraordinary supply chain and logistics challenges that the automotive industry has been facing"), 3 (portion referring to "challenging environment as COVID-19 continues to present numerous obstacles for the auto industry and supply chain"), 5 (portion discussing "today's supply chain shortages that the entire industry" and "many industries are facing"), 9 (referring to "extraordinary supply chain and logistics challenges [Lucid] encountered and [its] unrelenting focus on delivery the highest-quality products"), 10 ("like many manufacturers, [Lucid's]

---

[12] This conclusion applies equally to Statement 6, also made by Witt, and Statement 30, made by Nat Lingo, a "Lucid spokesperson." ECF 78 ¶¶ 337.

United States District Court
Northern District of California

production has been and indeed continued to be impacted by supply chain challenges"),

11 (referencing supply chain issues, components shortages, logistics issues, and insistence on

highest quality parts), 12 (referencing "extraordinary supply chain and supply quality challenges"

and stating that Lucid "could have chosen to build faster, but . . . elected not to sacrifice quality"),

13 (referencing bottlenecks in the supply chain), 14 (stating Lucid "is managing through supply

chain challenges that you've heard about in numerous companies across industries this earning

season"), 15 (referencing supplier issues), 16 (referencing supplier issues and "quality over

volume"), 17 (stating that "bottlenecks were caused by a handful of suppliers" and that Lucid was

"gated by silicon chips," not the "ability to make electric motors"), 18 (stating that Lucid is "not

immune to the challenging global environment that has impacted parts of our supply chain and

logistics"), 20 (indicating progress "despite on-going global supply chain challenges"), 21

("Similar to many companies in our industries, we continue to face global supply chain and

logistics challenges, including Covid-related factory shutdowns in China."), 24 ("COVID

lockdowns in China that's impacting others in the industry are also resulting in some bottlenecks

for us"), 25 (referencing "global supply chain and logistics challenges, including COVID-related

factory shutdowns in China"), 26 (portion reiterating guidance but noting "so long as the supply

chain logistics disruptions aren't material and our mitigation plans are effective"), and 29

("[W]e're facing global supply chain challenges, as is all the auto industry and other industries.").

Lead Plaintiff argues that Statements 1, 3-6, 9-18, 20-22, 24-27, 29[13] were materially false

or misleading because Lucid attributed its production problems to "***global, industrywide*** supply

---

[13] The Court notes that while Defendants did not include Statements 4, 6, 22, and 27 in this third
category, Lead Plaintiff offers arguments as to why they were false and misleading in this context.
The Court has already analyzed Statements 4 and 6 above and will not repeat that analysis here.
As to the portions of Statements 22 ("While any extended disruptions could result in an impact to
our production . . . .") and 27 ("And that's based on the information we have at this point . . . ."),
that the Court has not addressed in the discussion of projection targets, Lead Plaintiff has not
sufficiently alleged why those portions are false and misleading.  In addition, Defendants include
Statement 2 in the third category, but Lead Plaintiff does not address it.  While a party concedes an
argument by failing to respond to it, *see Ardente, Inc. v. Shanley*, No. C 07-4479 MHP, 2010 WL
546485, at *6 (N.D. Cal. Feb. 9, 2010) ("Plaintiff fails to respond to this argument and therefore
concedes it through silence."), that is of no moment here, as the Court's rationale for why
Statement 2 fails to the extent it discusses production targets applies equally to the portion of

1    chain and logistics issues" rather than "fundamental and persistent internal issues preventing mass

2    production."  ECF 88 at 17.

3         As to the risks Rawlinson articulated in Statements 1, 3, and 5, made around the time of

4    the meetings FE-1 and FE-2 describe, the Court finds Lead Plaintiff has adequately alleged a false

5    or misleading statement.  By describing Lucid's production problems as attributable to supply

6    chain and logistics issues stemming from a pandemic that affected the auto industry and others

7    across-the-board, Rawlinson gave the impression that Lucid stood on equal footing with other

8    companies facing the same global supply chain and logistical challenges posed by an

9    unprecedented global health crisis.  This, however, concealed that Lucid's own internal

10   operational failings had materialized, which was something instead unique to Lucid and unrelated

11   to the pandemic.  *See In re Facebook, Inc. Sec. Litig.*, 87 F.4th at 950 ("A company may make a

12   materially misleading statement when it speaks entirely of as-yet-unrealized risks when the risks

13   have already come to fruition.") (citations omitted).

14        As to the remaining statements comprising this category, the Court concludes that they are

15   insufficiently pleaded for the same reasons the statements discussing production targets fail.  *See*

16   *supra* pp. 17-20.

17        Having analyzed each category of statements Defendants challenge, the Court finds that

18   Lead Plaintiff has adequately pleaded falsity as to Statements 1, 3, 4, and 5.  The Court now turns

19   to whether the statements are not actionable on other grounds, i.e., whether they are protected by

20   the PSLRA's safe harbor, are statements of opinion, or constitute mere corporate puffery.

21              ***ii.***      ***Safe Harbor***

22        Defendants assert that Statements 1-10, 13, 15, 17, 19, 22-23, 25-30 are subject to the

23   PSLRA's safe harbor provision.  ECF 83 at 19-21.[14]  Lead Plaintiff argues that the safe harbor

24   _____

25   Statement 2 that discusses reasons for delay.

26   [14] With their opening brief, Defendants submitted a chart purporting to summarize the basis on
     which each statement is challenged.  *See* ECF 83-16.  There are discrepancies between
27   Defendants' brief and the chart.  *Compare* ECF 83 at 1-13 (identifying statements 1-10, 13, 15, 17,
     19, 22-23, 25-30 as forward looking) *with* ECF 83-16 at 8-15 (showing a checkmark in PSLRA
28   safe harbor column for statements 12, 14, 16, 18, 20, 21, 24 in addition to the statements identified

United States District Court
Northern District of California

does not apply because the statements claimed to be protected were statements about problems that "purportedly *had been* or were *currently*" facing Lucid.  ECF 88 at 21.  That is, the statements were not "misleading because they failed to predict the future, but because they concealed or downplayed current facts about Lucid's internal problems."  *Id.*  Lead Plaintiff specifically points to Statements 3-7, 9-16, 18, 21, 25, 27, 29-30.  ECF 21 n.9.[15]  The Court limits its analysis to only those statements as to which Lead Plaintiff has pleaded sufficient facts – Statements 1, 3, 4, and 5 – as discussed above.

The safe harbor provision provides:

> Except as provided in subsection (b), in any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person . . . shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—
> (A) the forward-looking statement is—
> > (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
> > (ii) immaterial; or
> (B) the plaintiff fails to prove that the forward-looking statement—
> > (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or
> > (ii) if made by a business entity; was—
> > > (I) made by or with the approval of an executive officer of that entity; and
> > > (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1).

---

in the opposition brief but showing no checkmark for statement 17).  Where those discrepancies exist, the Court disregards the chart.

[15] Defendants note that Lead Plaintiff "do[es] not dispute . . . that statements ##1-2, 8, 19, 22-23, 26, and 28 are forward-looking."  ECF 94 at 13.  On that basis, they argue that Lead Plaintiff has conceded the issue.  *Id.*  Because the Court is granting leave to amend, it will address whether Statement 1 is forward-looking notwithstanding Lead Plaintiff's failure to specifically address Defendants argument on that point.  In drafting its amended complaint, Lead Plaintiff should consider including only the statements it can fully defend within the default page limits applicable to any future briefing.

A forward-looking statement is "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (citing 15 U.S.C. § 78u(i)). "[A] defendant will not be liable for a false or misleading statement if it is forward-looking and either is accompanied by cautionary language or is made without actual knowledge that it is false or misleading." *Wochos*, 985 F.3d at 1190 (internal quotations and citations omitted). However, "the safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts." *Quality Systems*, 865 F.3d at 1142. It is also not "designed to protect them when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement." *Id*. When "mixed" statements such as these are at issue, "only the forward-looking aspects could be immunized from liability. . . ." *Wochos*, 985 F.3d at 1190 (citing *Quality Systems*, 865 F.3d at 1141-42).

The portion of Statement 1 stating "[w]e remain confident in our ability to achieve 20,000 units in 2022" is a forward-looking statement. *See Wochos*, 985 F.3d at 1192 ("Tesla's goal to produce 5,000 vehicles per week is unquestionably a forward-looking statement . . . .") (internal quotations and citation omitted).

The portions of Statement 1, 3, 4, 5 containing language like "[w]e are taking steps to mitigate these challenges," "we have continued to deliver against our time line and with the highest standard of quality," "[a]s soon as we can get this quality parts to the line, we can spool that up," "the factory is there and ready," or describing existing challenges are not forward-looking statements. This language conveys information about current or past facts, and as such, the statements containing them are not protected by the PSLRA's safe harbor. *See QuantumScape*, 580 F. Supp. 3d at 737 (statement that technology is "ready for commercial deployment as soon as we can scale up production" was not forward-looking); *Wochos*, 985 F.3d at 1193 (statement that Tesla had "stated the installation of Model 3 manufacturing equipment" was not forward-looking).

Even if the Statements 1, 3, 4, and 5 were forward-looking in their entirety, they would not be protected under the safe harbor for lack of meaningful cautionary language.[16]  In order to be "meaningful," cautionary language must identify "important factors that could cause actual results to differ materially from those in the forward-looking statement[.]"  15 U.S.C. § 78u-5(c)(1)(A)(i).  "To be adequate . . . , the caution must 'discredit the [allegedly misleading statements] so obviously that the risk of real deception drops to nil.' "  *QuantumScape*, 580 F. Supp. 3d at 737 (quoting *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991)).

The language Defendants rely on here falls short of this standard.  Any purported cautionary language within the statements themselves portrays a global, pandemic-focused picture of the challenges impeding production, rather than specific internal problems unattributable to a circumstance affecting Lucid and its competitors alike.  In the statements themselves, then, the caution does not "precisely and directly address the alleged misrepresentations."  *See id.* (internal quotations, citations, and modifications omitted).

The warnings in SEC filings of hypothetical risks that *could* impact Lucid's operations fare no better.  For example, Lucid's Form 10-Q, filed with the SEC on November 15, 2021 states:

- "We have encountered and expect to continue to encounter risks and uncertainties frequently experienced by early-stage companies in rapidly changing markets, including risks relating to our ability to, among other things . . . establish and refine our commercial manufacturing capabilities and distribution infrastructure[.]"  ECF 83-2 at 6-7.

- "We have experienced and may in the future experience significant delays in the design, manufacture, launch and financing of the Lucid Air, which could harm our business and prospects."  ECF 83-2 at 13.

- "Our plan to commercially manufacture and sell the Lucid Air is dependent upon the timely availability of funds, upon our finalizing of the related design, engineering, component procurement, testing, build-out and manufacturing plans in a timely manner and also upon our ability to execute these plans within the planned timeline."  ECF 83-2 at 14.

---

[16] As discussed in the section discussing production targets, these statements would also not be entitled to protection under the actual knowledge prong, as Lead Plaintiff has sufficiently alleged that Rawlinson made these statements while in possession of facts that contradicted them.  *See Quality Systems*, 865 F.3d at 1142.

- "[W]e rely on third party suppliers for the provision and development of many of the key components and materials used in our vehicles.  To the extent our suppliers experience any delays in providing us with or developing necessary components, we could experience delays in delivering on our timelines."  ECF 83-2 at 14.

- "We cannot provide any assurance as to whether we will be able to develop efficient, automated, low-cost production capabilities and processes and reliable sources of component supply that will enable us to meet the quality, price, engineering, design and production standards, as well as the production volumes, required to successfully mass market our vehicles."  ECF 83-2 at 16.

- "Bottlenecks and other unexpected challenges may also arise as we ramp production of the Lucid Air, and it will be important that we address them promptly while continuing to control our manufacturing costs.  If we are not successful in doing so, or if we experience issues with our manufacturing process improvements, we could face delays in establishing and/or sustaining our production ramps[.]"  ECF 83-2 at 17.

- "[O]ur volume production of the Lucid Air and planned future vehicles will necessitate continued development, maintenance and improvement of our information technology and communication systems in the United States and abroad, such as systems for product data management, procurement, inventory management, production planning and execution, sales, service and logistics, dealer management, financial, tax and regulatory compliance systems. Our ability to operate our business will depend on the availability and effectiveness of these systems.  The implementation, maintenance, segregation and improvement of these systems require significant management time, support and cost.  Moreover, there are inherent risks associated with developing, improving and expanding our core systems as well as implementing new systems, including the disruption of our data management, procurement, manufacturing execution, finance, supply chain and sales and service processes. We cannot be certain that these systems or their required functionality will be effectively and timely developed, implemented, maintained or expanded as planned.  If we are unsuccessful in any of the foregoing, our operations may be disrupted, our ability to accurately or timely report our financial results could be impaired, and deficiencies may arise in our internal control over financial reporting, which may impact our ability to certify our financial results.  If these systems or their functionality do not operate as we expect them to, we may be required to expend significant resources to make corrections or find alternative sources for performing these functions.  Any of the foregoing could materially adversely affect our business, prospects, results of operations and financial condition."  ECF 83-2 at 22.

These disclosures are couched in terms of hypotheticals rather than the concrete risks that Lead Plaintiff alleges Rawlinson knew had materialized by the time he made Statements 1, 3, 4, and 5.  The statements do not engage the specific allegations that Lucid never disclosed the "incompetence in [its] logistics system" that led to "bottlenecks," shipment of wrong parts or those "that had not properly been reflashed or sequenced," and factory shut downs for hours or even

days at a time.  *See, e.g.*, ECF 78 ¶ 267.  Thus, the proffered cautionary statements are too generalized for the safe harbor to apply.  *See In re Facebook, Inc. Sec. Litig.*, 87 F.4th at 951 ("Broad pronouncements without meaningful acknowledgement of the known risks of improper data access and disclosure does not suffice to invoke the safe harbor provision."); *QuantumScape*, 80 F. Supp. 3d at 738 (finding that "a high level of generality about unspecified 'delays' . . . d[id] not adequately warn investors that QuantumScape in fact did not (allegedly) have a battery that would function as promised"); *but see Wochos*, 985 F.3d at 1193 & n.3 (finding that although plaintiffs did not directly challenge the adequacy of Tesla's cautionary statements, such statements were sufficiently detailed and specific, where, among other things, it disclosed past "significant delays or other complications in the design, manufacture, launch and production ramp of new vehicles" and that it could experience "similar challenges with new vehicles").

<em>iii.</em>   <strong><em>Opinions</em></strong>

Defendants also challenge Statements 1-16, 18-19, 21-30 as non-actionable opinion.  ECF 83 at 21.  Lead Plaintiff argues that "[m]any are representations of current facts, and thus, are not opinions," but only identifies four statements in that assertion.  ECF 88 at 23 n.13 (listing statements 5, 10, 11, 14).[17]

"[A] fact is a thing done or existing or an actual happening.  An opinion is a belief, a view, or a sentiment which the mind forms of persons or things.  Most important, a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015) (internal quotation marks, citations, and alterations omitted).

There are "three different standards for pleading falsity of opinion statements."  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615 (9th Cir. 2017.  If a plaintiff relies on a material misrepresentation theory, they "must allege both that 'the

---

[17] Defendants note Lead Plaintiff's failure to address many statements claimed to be nonactionable opinion (1-4, 6-9, 12-13, 15-16, 18-19, and 21-30), and again argue that in failing to address the statements, they have conceded the issue.  ECF 94 at 14.  The Court will nonetheless address whether Statements 1, 3, 4, and 5 are nonactionable opinion.

United States District Court
Northern District of California

speaker did not hold the belief . . . professed' and that the belief is objectively untrue." *Id.* (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015)).  If a plaintiff alleges "that a statement of fact contained within an opinion is materially misleading, the plaintiff must allege that the supporting fact the speaker supplied is untrue." *Id.* (alterations, internal quotations and citation omitted).  Finally, if a plaintiff relies on material omissions, they must allege "facts going to the basis for the [speaker's] opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* (quoting *Omnicare*, 575 U.S. at 194).

With the exception of the portion of Statement 1 expressing Rawlinson's confidence in Lucid's projections, Statements 1, 3, 4, and 5 express certainty about specific issues and their effects on Lucid's operations.  The issues and their effects either exist or not as factual matter.  As such, subject to the exception noted above and discussed below, Statements 1, 3, 4, and 5 do not convey an opinion.  *See QuantumScape* 580 F. Supp. 3d at 739 (concluding that statements about problems company "has addressed" or can address were not opinion).

As to the portion of Statement 1 that reads "[w]e remain confident in our ability to achieve 20,000 units in 2022," Lead Plaintiff has plausibly alleged that Rawlison did not hold that belief and that the belief was objectively untrue.  That is sufficient to allege an actionable opinion statement.  *See Dearborn*, 856 F.3d at 615.

Accordingly, the Court finds that Statements 1, 3, 4, and 5 are not opinion statements.

### iv.    Puffery

In the Ninth Circuit, "vague, generalized assertions of corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws" because no reasonable investor would rely on such statements.  *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1063 (N.D. Cal. 2012) (quoting *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096) (citing *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003)); *see In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives") (citation omitted).  This is because "[w]hen

valuing corporations, . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *In re Cutera*, 610 F.3d at 1111.  However, even "general statements of optimism, when taken in context," may be misleading "when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *Quality Systems*, 865 F.3d at 1143.

Statements 1, 3, 4, and 5 are not statements of corporate puffery.  As discussed above, the statements convey concrete facts about matters affecting the core of Lucid's business.  While, "[u]ltimately, the difference between a statement of fact and mere puffery rests in the specificity or generality of the claim," *see QuantumScape*, 580 F. Supp. 3d at 740, here, Defendants cannot credibly minimize Statements 1, 3, 4, and 5 as statements that cannot be expected to induce reliance given the relevant context.  The Court thus finds that Statements 1, 3, 4, and 5 are not puffery.

### b.    Scienter

In addition to its arguments about why Lead Plaintiff has failed to allege an actionable false or misleading statement, Defendant also seeks dismissal on the ground that Lead Plaintiff does not plead particularized facts supporting a strong inference of scienter.  ECF 83 at 23-28.

To establish scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  The required state of mind is "a mental state that not only covers 'intent to deceive, manipulate, or defraud,' but also 'deliberate recklessness.' "  *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (internal citations omitted).  Deliberate recklessness is " 'an extreme departure from the standards of ordinary care,' which 'presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' "  *In re Alphabet*, 1 F. 4th at 701 (emphasis in original) (quoting *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020)).  The "strong inference" required by the PSLRA "must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 551 U.S. at 324.  "Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable

inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012).  "A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009); *see Nguyen*, 962 F.3d at 415.  In evaluating whether a complaint satisfies the "strong inference" requirement, courts must consider the allegations and other relevant material "holistically," not "scrutinized in isolation."  *In re VeriFone Holdings*, 704 F.3d at 701-02 (citing *Tellabs*, 551 U.S. at 323, 326).  Because scienter is a subjective inquiry, "the ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity."  *Gebhart v. SEC*, 595 F.3d 1034, 1042 (9th Cir. 2010).

To establish scienter, Lead Plaintiff relies, in part, on information from former employees. ECF 88 at 24-28.  Information provided by former employees to establish scienter must "pass two hurdles."  *Zucco*, 552 F.3d at 995.  "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. . . .  Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter."  *Id.* (citation omitted).

The Court limits this part of its analysis to the two former employees – FE-1 and FE-2  – whose reports provide the core basis for Lead Plaintiff's allegations about Lucid's inability to meet production goals and the conditions at Lucid's facilities.  For both of these former employees, the allegations in the consolidated complaint cover job titles, job responsibilities, and details of specific interactions with Rawlinson and other members of Lucid management.  *See* ECF 78 ¶¶ 56, 58.  The allegations establish that these former employees' accounts, complete with approximate dates and substantive details about the topics of discussion, are consistent.  *See id.* ¶¶ 289, 291.  They align even in their descriptions of Rawlinson's reactions to certain parts of the conversations; in one instance, Rawlinson "nodding his head," *see id.* ¶ 291, in another,

instructions to FE-2 along the lines of keeping the information discussed "confidential" and in the "belt loop[,]" *see id.* ¶ 289, instructions which are themselves indicative of scienter. *See Weston*, 669 F. Supp. 3d at 885.

In addition to the information from former employees, Lead Plaintiff also relies on allegations of financial gain. "[M]otive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference . . . ." *Tellabs*, 551 U.S. at 325 (citation omitted). The allegations in the complaint detail the pressure on Rawlinson to maintain certain capitalization thresholds, absent which he would not receive the lucrative stock options that he described as "what motivates and drives [him]." *See* ECF 78 ¶ 309. As alleged in the consolidated complaint, by concealing the truth from investors, Rawlinson was able to obtain billions in funding from multiple sources, which would allow Lucid to continue its operations and allow him to receive the equivalent of hundreds of millions of dollars in compensation. These financial motives help support an inference of intent to defraud, irrespective of whether Rawlinson realized any profit from the stock options he received. *See QuantumScape*, 580 F. Supp. 3d at 741-42 (finding scienter where defendant had raised hundreds of millions of dollars and thus had financial incentive to represent that its products were farther along and less risky than they were); *but see Webb v. Solarcity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018) (lack of stock sales cut against a finding of scienter where executives purchased additional stock during class period).

In addition, Lead Plaintiff relies on the core operations doctrine to establish scienter. The "core operations" doctrine allows the knowledge of certain facts that are critical to a business's "core operations" to be attributed to a company's key officers. *Webb*, 884 F.3d at 854. "Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). "[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter – at least absent some additional allegation of specific information conveyed to management and related to the fraud." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008).

34

Lead Plaintiff makes sufficient allegations to support the corporate operations inference in this case. Rawlinson admitted to Lucid employees that the company would not make its projections, instructed employees to keep the information confidential, and was aware of specific internal failings that impeded Lucid's ability to make its only product. Indeed, during the hearing on the instant motion, Defendants admitted that "Rawlinson, came to the factory to try and really focus people on addressing these issues." This admission, combined with Lead Plaintiff's other allegations, supports the core operations inference here. *Cf. Webb*, 884 F.3d at 854 (rejecting invocation of core operations doctrine where the plaintiff had not alleged that defendants had "actual access to the accounting formula, but only generalized access to reports that may have documented its application"). Taking Lead Plaintiff's allegations holistically, as to Rawlinson, the inference of intent to defraud here is at least as compelling as an inference of innocent conduct.

As to House and any other speakers, the scienter allegations in the consolidated complaint fall short. Lead Plaintiff ties no allegations to Daniel Witt and Nat Lingo other than to name them as the sources of Statements 6, 7, and 30. *See generally* ECF 78. As to House, Lead Plaintiff's allegations do not approach the level of specificity of those provided for Rawlinson. They describe more sporadic involvement in Lucid's day-to-day operations, *see, e.g.*, ECF 78 ¶ 427 (request made to House for authorization to scrap production materials), ¶ 429 (attendance at one inventory meeting), despite assertions of "unquestionably intimate[] involve[ment]" with Lucid's production guidance and information about the factors affecting Lucid's performance, *see id.* ¶ 437. As such, the allegations concerning House, Witt, or Lingo do not give rise to a strong inference of scienter. For the reasons previously set forth in this order, the Ninth Circuit's decision in *In re Alphabet* does not compel a different conclusion.

### 2.  Section 20(a) Claim

Under Section 20(a) of the Exchange Act, "certain 'controlling' individuals [are] also liable for violations of [S]ection 10(b) and its underlying regulations." *Zucco Partners*, 552 F.3d at 990 (citing 15 U.S.C. § 78t(a)). Because a Section 20(a) claim is derivative, "a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law'

and that 'the defendant exercised actual power or control over the primary violator.' " *Id.* (citation omitted). Because Lead Plaintiff's Section 20(a) claim rises and falls with its claim under Section 10(b), the claim is **DISMISSED WITH LEAVE TO AMEND** to the same extent as the Section 10(b) claim. The Section 20(a) claim otherwise survives consistent with the Court's analysis of the viable portion of the Section 10(b) claim. *See Zaidi v. Adamas Pharms., Inc.*, 650 F. Supp. 3d 848, 865 (N.D. Cal. 2023).

## IV.    CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is **GRANTED IN PART AND DENIED IN PART WITH LEAVE TO AMEND**. Defendants' request for judicial notice is **GRANTED**. Within 30 days, Lead Plaintiff may file an amended complaint curing the deficiencies described in this order. With its amended complaint, Lead Plaintiff shall include a redline. *See* Standing Order for Civil Cases ¶ H.1. A chart with the information required by 15 U.S.C. ¶ 78u-4(b)(1) and (2) is due within 14 days of the filing of the amended complaint. *See id.* ¶ J. Lead Plaintiff shall provide a courtesy copy of the amended complaint, accompanying redline, and chart within 3 days of each filing. *See id.* ¶ H.6.

**IT IS SO ORDERED.**

Dated: August 8, 2024

_____
**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**