1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7

IN RE LUCID GROUP, INC.
SECURITIES LITIGATION

Case No. 22-cv-02094-AMO

**ORDER DENYING IN PART AND
GRANTING IN PART MOTION TO
DISMISS; GRANTING REQUEST FOR
JUDICIAL NOTICE**

Re: Dkt. Nos. 120, 122

8

9

10

11

12          This is a securities fraud case about electric car production.  Defendants Lucid Group, Inc.

13    and Chief Executive Officer Peter Rawlinson move to dismiss Lead Plaintiff Sjunde AP-Fonden's

14    amended consolidated class action complaint.  Having found Defendants' motion to dismiss

15    appropriate for determination on the papers, the Court vacated the May 1, 2025 motion hearing.

16    *See* Civil Local Rule 7-1(b).  The Court assumes familiarity with the facts and procedure of the

17    case, as well as the Court's prior Order granting in part and denying in part Defendants' motion to

18    dismiss the consolidated complaint.  Having carefully considered the parties' papers, the relevant

19    legal authority, and good cause appearing, the Court **DENIES** the motion **IN PART** (as to

20    Statements 1-4) and **GRANTS** the motion **IN PART** (as to Statements 5-16) **WITHOUT**

21    **LEAVE TO AMEND**, and **GRANTS** Defendants' accompanying request for judicial notice.

22    **I.        BACKGROUND**

23              **A.        Procedural Background**

24          Lead Plaintiff filed the operative amended consolidated complaint ("AC") on September

25    20, 2024, alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the

26    "Exchange Act"), 15 U.S.C § 78j(b), and Rule 10b-5 promulgated thereunder, 17 U.S.C.

27    § 240.10b-5, and brings a claim against Rawlinson for control person liability under Section 20(a)

28    of the Exchange Act, 15 U.S.C. § 78t(a).  AC (ECF 108) ¶¶ 550-58, 559-65.

United States District Court
Northern District of California

United States District Court
Northern District of California

On December 6, 2024, Defendants filed a motion to dismiss the AC with a request for judicial notice. Motion to Dismiss the AC ("Mot.") (ECF 120); Request for Judicial Notice (ECF 122). Lead Plaintiff filed an opposition to the motion to dismiss on February 5, 2025, including a response to the request for judicial notice. Opposition to Motion to Dismiss the AC ("Opp.") (ECF 123). Defendants' reply followed on March 14, 2025. Reply in Support of Motion to Dismiss ("Reply") (ECF 125).

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 8 requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

To overcome a Rule 12(b)(6) motion to dismiss, the factual allegations in the plaintiff's complaint " 'must . . . suggest that the claim has at least a plausible chance of success.' " *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013) (alterations in original)). In ruling on a Rule 12(b)(6) motion, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citation omitted).

"[A]llegations in a complaint . . . may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)). The court may dismiss a claim "where there is either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal claim." *Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 850 (9th Cir. 2011) (citing *Johnson v. Riverside Healthcare Sys., LP,* 534 F.3d 1116, 1121 (9th Cir. 2008)). "[T]he non-conclusory 'factual content' and reasonable inferences from that content must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) (citation omitted).

United States District Court
Northern District of California

For claims sounding in fraud or mistake, a plaintiff must "state with particularity the circumstances regarding the fraud or mistake." Fed. R. Civ. P. 9(b). A plaintiff must set forth " 'the who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)).

A claim for violations of Section 10(b) and Rule 10b-5 "must meet both the heightened pleading requirements for fraud claims under Fed. R. Civ. P. 9(b) . . . and the exacting pleading requirements . . . of the Private Securities Litigation Reform Act ('PSLRA') . . . ." *In re Quality Systems, Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)). In assessing whether a securities fraud claim meets this heightened pleading standard, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322-23 (citations omitted).

## III.    DISCUSSION

### A.    Defendants' Request for Judicial Notice

Defendants ask the Court to take judicial notice of eight documents, the first seven of which the Court previously took judicial notice, *see* Order (ECF 103) at 5-8, including forms filed with the SEC and earnings call transcripts. *See* Request for Judicial Notice at 3-4. In addition, Defendants ask the Court to take judicial notice of Lucid's Q1 2022 Earnings Presentation, dated May 5, 2022 (Exhibit 8). *Id*. at 4. Lead Plaintiff does not object to Defendants' request that the Court take judicial notice of Exhibits 1-8, to the extent Defendants rely on those documents only to show "certain representations were made to the market." Opp. at 34 n.28.

A district court may take judicial notice of facts that are "not subject to reasonable dispute" because they are (1) "generally known within the trial court's territorial jurisdiction," or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993). "Accordingly, '[a] court may take judicial notice of matters of public record.' " *Khoja v.*

3

*Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001)). A court cannot, however, "take judicial notice of disputed facts contained in such public records." *Id*. Accordingly, the Court **GRANTS** the request for judicial notice of Exhibits 1-8, which consist of SEC filings, earnings calls transcripts, press releases, and an earnings presentation, for the limited purpose of noting the representations Defendants made to the market and only to the extent Defendants have specifically identified any such representations within those documents. *See Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 872 (N.D. Cal. 2023). The Court does not take judicial notice of the contents of those documents for their truth. *See Khoja*, 899 F.3d at 1000 ("To the extent that the district court judicially noticed the . . . investors' call transcript for the purpose for which was offered, i.e., to determine what the investors knew . . . at that time, the district court abused its discretion.").

## B. Motion to Dismiss

The Court previously determined that Statements 1 to 4 were sufficiently pleaded. *See* Order at 20, 25. Defendants ask the Court to "consider anew" its prior determinations that Statements 3 and 4 are sufficient to survive dismissal. *See* Mot. 9-10, 18-21. The Court rejects Defendants' improper request for reconsideration of any determinations made in its August 8, 2024 order. *See* Civ. L.R. 7-9 (setting out the requirements for filing a motion for reconsideration). Accordingly, Defendant's motion is **DENIED** as to Statements 1 to 4.

Defendants also move to dismiss Lead Plaintiff's Section 10(b) claim and the derivative Section 20(a) claim as to Statements 5-16. Mot. at 13, 32. Because the Section 20(a) claim is derivative, the Court addresses the Section 10(b) claim first.

### 1. Section 10(b) and Rule 10b-5 Claim

Defendants argue that Lead Plaintiff has failed to state a claim under Section 10(b) and Rule 10b-5, which requires that a plaintiff allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.' " *Quality Systems*, 865 F.3d at 1140-41 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)). Specifically, Defendants contend that the

United States District Court
Northern District of California

claim fails for two main reasons: (1) Plaintiff still fails to plead any actionable misstatement or omission, *id.* at 13-26; and (2) Plaintiff has not pleaded particularized facts sufficient to support a strong inference of scienter, *id.* at 26-32.  Because it is dispositive, the Court first addresses whether Plaintiff has sufficiently alleged an actionable misstatement or omission as to Statements 5-16.

"Where the alleged fraud is a material misstatement or omission, 'the complaint shall specify (1) each statement alleged to have been misleading, (2) the reason or reasons why the statement is misleading, and, (3) if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.' " *Khoja*, 899 F.3d at 1008 (quoting 15 U.S.C. § 78u-4(b)(1)).  "In the securities fraud context, statements and omissions are actionably false or misleading if they directly contradict what the defendant knew at that time, or create an impression of a state of affairs that differs in a material way from the one that actually exists[.]" *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948 (9th Cir. 2023) (internal quotations and citations omitted).

Lead Plaintiff alleges that the following statements were false or materially misleading:[1]

- In a November 15, 2021 press release titled *Lucid Announces Third Quarter 2021 Financial Results and Lucid Air Wins MotorTrend Car of the Year*, issued on Form 8-K:

  1. Rawlinson stated: "We see significant demand for the award-winning Lucid Air, with accelerating reservations as we ramp production at our factory in Arizona.  ***We remain confident in our ability to achieve 20,000 units in 2022.  This target is not without risk, given ongoing challenges facing the automotive industry with global disruptions to supply chains and logistics.***  We are taking steps to mitigate these

---

[1] Lead Plaintiff excises from the AC the portions of Statements 2, 8, and 10 that the Court previously concluded failed to adequately allege falsity because they "merely concern Lucid's commitment to quality, without relying on quality as an excuse for production delays."  *See* Order at 16; *compare* Appendix to AC (ECF 109) *with* Appendix to Consolidated Complaint (ECF 78-2).  Lead Plaintiff also excises from the AC the portions of Statements 1 and 4 concerning mitigation of challenges and risks which the Court previously determined inadequately alleged falsity.  *See id.*  Lead Plaintiff further omits from the AC the following statements previously raised in the consolidated complaint (and found to be deficient in the Court's August 8, 2024 order): Consolidated Complaint Statements 2, 6, 7, 11, 13, 14, 18, 20, 21, 22, 23, 25, 26, and 30.  *Compare* Appendix to Consolidated Complaint *with* Appendix to AC; *see also* Order at 17-20, 25.

challenges, however, and look forward to the launch of the Grand Touring, Touring, and Pure versions of Lucid Air through 2022."[2]  AC ¶ 396; Appendix to AC at 2.

- During a 3Q21 Earnings Call held November 15, 2021:

  2. Rawlinson stated: "***Even in a challenging environment as COVID-19 continues to present numerous obstacles for the auto industry and supply chain.  Lucid is no stranger to this, but we have continued to deliver against our time line. . . .***"  AC ¶ 397; Appendix to AC at 6.

- During an interview with CNBC's Jim Cramer on November 16, 2021:

  3. Cramer asked: "But you have said, let's be clear about this, you have a lot of demand, 17,000.  And that's not a problem for you to make.  But you have dreams.  Let's hopefully realities [*sic*] of 500,000 production and more."  AC ¶ 403; Appendix to AC at 7.

     Rawlinson responded: "***Absolutely.  We already have a factory scale for 34,000 units a year.  As soon as we can get this quality parts to the line, we can spool that up.  The factory is there and ready for 34,000 units per annum.***"  AC ¶ 404; Appendix to AC at 7.

  4. Cramer also asked: "So if I go under the hood, which fortunately could be in a size of a suitcase, will I find the same Semiconductor shortage problem?  Will I find the labor problem?  I find all the things that are plaguing every other company in the automotive business.  Or would they be looking at, say, an Apple phone and saying, you know what?  Look, we've got the technology, the customers love it, and let's stop worrying about things that don't really mean anything to us."  AC ¶ 405; Appendix to AC at 8.

     Rawlinson responded: "We've been able to mitigate the semiconductor risk because as a tech company, we design all our printed circuit boards, our PCBAs, in house, and that means that we can design for alternative sourcing and different types of chip and that will reduce the risk.  So we've been able to mitigate that risk.  ***That isn't to say we aren't vulnerable to today's supply chain shortages that the entire industry is facing, in fact, many industries are facing, that is something that we are a challenge with and we have mitigation plans for***."  AC ¶ 406; Appendix to AC at 8-9.

- In a February 28, 2022 press release titled *Lucid Announces Fourth Quarter and Full Year 2021 Financial Results, Updates 2022 Outlook*, issued on Form 8-K:

  5. Defendants stated: "***Updating 2022 production outlook for Lucid Air to a range of 12,000 to 14,000 vehicles.***"  AC ¶ 411; Appendix to AC at 12.

---

[2] In the AC, Lead Plaintiff uses ***bold and italics*** to identify the portions of statements that it alleges are actionable and provides additional text for context.  AC at 102 n.6; Appendix to AC at 2 n.2.

United States District Court
Northern District of California

6. Rawlinson stated: "***Looking ahead, we're updating our outlook for 2022 production to a range of 12,000 to 14,000 vehicles.  This reflects the extraordinary supply chain and logistics challenges we've encountered*** and our unrelenting focus on delivering the highest quality products.  AC ¶ 412; Appendix to AC at 14-15.

- During a 4Q21 & FY2021 Earnings Call held February 28, 2022:

7. Rawlinson stated: "In the more immediate term, ***like many manufacturers, our production has been and indeed continued to be impacted by supply chain challenges***.  As you saw from our press release today, ***we have updated our 2022 production outlook for Lucid Air to a range of 12,000 to 14,000 vehicles***."  AC ¶ 414; Appendix to AC at 19-20.

8. Rawlinson also stated: "We accomplished deep deliveries against the backdrop of an extraordinary supply chain and supply quality challenges.  ***Indeed, we could have chosen to build faster***, but we elected not to sacrifice quality, given our unwavering commitment to the highest standards."  AC ¶ 415; Appendix to AC at 24-25.

9. Analyst Itay Michaeli ("Michaeli"), Citigroup Inc., Research Division, Director & Global Head of Autos Sector, asked Rawlinson: "A couple of questions.  Just first, going back to the supply chain pressures.  I was hoping you can maybe articulate it sounds like you expect most of the recovery to happen in the second half of the year.  Maybe talk about how much visibility you have over the next few months with some of the suppliers you mentioned and just the degree of confidence of how to think about the cadence of improvement in production throughout the year."  AC ¶ 416; Appendix to AC at 25-26.

Rawlinson responded: "Yes.  Well, we have an earning focus on addressing some of the supply chain challenges.  We see them to continue for the next few months.  ***But we see an uptake in the second half of the year.  So we're really optimistic that we're going to be able to resolve these.  And again, this is a small handful of suppliers.  We're not talking about fundamental technologies here.  We're talking largely paradoxically commodity suppliers, finishes, carpet, glass and things like that.  And unfortunately, you can't sell a single quality car unless those -- particularly those visible parts are absolutely perfect.  So we're very optimistic that we will resolve, but it's going to take a few months, and the second half of the year, we'll see a significant uptake.  And our guidance is based upon that premise***."  AC ¶ 417; Appendix to AC at 26-27.

10. John Joseph Murphy, BofA Securities, Research Division, MD and Lead United States Auto Analyst, asked: "[A]s you think about the causal factors for the reduction in your planned production this year, I mean, you're citing supply chain.  It appears that maybe some of the capacity expansion and reorganization has put forth or been prioritized over ramping volume in the near term for the benefit in the long term, and there might be some other micro issues that we can't see.  I'm just

wondering if you could kind of bucket those or maybe rank those in order of sort of impact.  And then also as we think about this, does this change your outlook for 2023 volumes?  Or is this sort of short-term pain for long-term gain?"  AC ¶ 418; Appendix to AC at 30-31.

Rawlinson responded: "Those are interesting points.  *I mean, first of all, I would say that we have been primarily constrained.  We've got about 250 suppliers worldwide, notionally about 3,000 parts.  And this has been really a phenomenon of just a small handful of our 250 suppliers.  Paradoxically, we've been mainly impacted in a commodity supply parts.  For example, finished parts, trim parts for the exterior, even glass and carpet.  So it's not the core technologies of the vehicle that have been largely impacting us here.*  And we have – you're right, we've chosen quality over volume."  AC ¶ 419; Appendix to AC at 31-32.

- A March 17, 2022 article entitled *Rising Costs Have Lucid CEO Eyeing Price Hike for Future Electric Cars* stated:

    11. Lucid in February cut its production forecast for this year to a range of 12,000 to 14,000, from its original target of 20,000 vehicles, citing "extraordinary supply chain and logistics challenges."  Its shares slid after that announcement.  AC ¶ 426; Appendix to AC at 33.

        *Rawlinson on Thursday said the bottlenecks were caused by a handful of suppliers for windshield glass, carpeting and some exterior trim parts. "I'm super frustrated because we're not gated by silicon chips, we're not gated by our ability to make electric motors," Rawlinson said.*  AC ¶ 426; ECF 109 at 34.

- In a May 5, 2022 press release titled *Lucid Reports First Quarter 2022 Financial Results*, issued on Form 8-K:

    12. Defendants stated: "*Lucid reiterated its 2022 production volume outlook of 12,000 to 14,000 vehicles*" and Lucid's "*[p]roduction volume outlook for 2022 remains on track at 12,000 to 14,000 vehicles.*"  AC ¶ 430; Appendix to AC at 36.

- During a 1Q22 Earnings Call held May 5, 2022:

    13. Rawlinson stated: "*I do want to highlight that supply chain dynamics are very fluid, and the COVID lockdowns in China that's impacting others in the industry are also resulting in some bottlenecks for us.*"  AC ¶ 431; Appendix to AC at 38.

    14. Itay Michaeli asked: "Any kind of early update on Q2, maybe an April number?"  AC ¶ 432; Appendix to AC at 41.

        Rawlinson responded: "*We're reiterating our 12,000 to 14,000 vehicle production forecast for '22.*  And that's based on the information we have at this point, combined with our current mitigation plans."  AC ¶ 433; Appendix to AC at 41.

//
//

8

1
2
3
4
5
6
7
8
9
10
11

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- A slide from a May 5, 2022 1Q22 Earnings Call Presentation stated:

    15. "***Production Volume • 12,000-14,000 vehicles***."  AC ¶ 434; Appendix to AC at 43.

- During a May 20, 2022 Interview with Lara Habib Chamat of Al Arabiya News Channel:

    16. Lara asked: "Let's discuss now your global operations.  We know that the company is facing some issues in delivering the cars due to supply chain disruptions.  We know that Lucid lowered the annual production target to 12,000 cars versus original prediction of 20,000 cars for this year.  When do you expect when do you expect things to look better?"  AC ¶ 439; Appendix to AC at 45-46.

    Rawlinson responded: "Our challenge now is to ramp up the volume of this incredible machine.  ***We're facing global supply chain challenges, as is all the auto industry and other industries.***  And we're working assiduously to overcome our near-term challenges with commodity goods are being resolved and ***we're looking forward to hitting our 12 to 14,000 units that we're targeting for production this year***."  AC ¶ 440; Appendix to AC at 46.

Defendants attack the sufficiency of Lead Plaintiff's allegations with respect to statements about Lucid's production targets (Statements 5, 6, 7, 12, 14, 15, 16) and the reasons for Lucid's production delays (Statements 6, 7, 8, 9, 10, 11, 13, 16).  Mot. at 13-18.  The Court considers each of these categories of statements in turn.

*a.*     ***Production Targets***

The Court previously held that portions of statements concerning Lucid's production targets (Statements 5, 6, 7, 12, 14, 15, and 16),[3] were not adequately pleaded because the complaint "lack[ed] allegations indicating that the speaker possessed contemporaneous knowledge that the statements were false when made": Statements 5 ("Updating 2022 production outlook for Lucid Air to a range of 12,000 to 14,000 vehicles."), 6 ("Looking ahead, we're updating our outlook for production to a range of 12,000 to 14,000 vehicles."), 7 ("[W]e have updated our 2022 production outlook for Lucid Air to a range of 12,000 to 14,000 vehicles."), 12 (" 'Lucid reiterated its 2022 production volume outlook of 12,000 to 14,000 vehicles' and that 'Lucid's [p]roduction

---

[3] Statements 6, 7 and 16 concern both Lucid's production targets and reasons for production delays, so the Court addresses them under both categories.

volume outlook for 2022 remains on track at 12,000 to 14,000 vehicles.' ") (modification in original), 14 ("We're reiterating our 12,000 to 14,000 vehicle production forecast for '22."), 15 ("Production Volume • 12,000-14,000 vehicles."), 16 ("[W]e're looking forward to hitting our 12 to 14,000 units that we're targeting for production this year.").  *See* Order at 20.

The Court's prior order highlighted that the allegation that Rawlinson's acknowledgement (in September or November 2021) that Lucid would make less than 10,000 vehicles in 2022, did not demonstrate that he still held such a view at the time of his 2022 production target statements made in February 2022 (Statements 5, 6, and 7), March 2022 (Statement 11), and May 2022 (Statements 12, 14, 15, and 16).  *See* Order at 20 ("[Statements] discussing projection targets are not adequately pleaded because the complaint lacks allegations indicating that the speaker possessed contemporaneous knowledge that the statements were false when made.").  The Court's prior order also explained that the alleged discussion between a former employee and Rawlinson in February 2022 merely established Rawlinson knew of inventory issues, but did not show falsity as to any contemporaneous statements absent an allegation that Rawlinson had adopted the former employee's views about Lucid's inability to meet production targets at that time.[4]  Order at 20 n.9.

In an effort to sufficiently allege contemporaneous knowledge of falsity, Lead Plaintiff adds two main categories of statements: those that establish that Lucid's internal logistics issues and production shortfalls persisted throughout 2022, and those that support that Rawlinson was aware of Lucid's ongoing logistics issues and production shortfalls.  Opp. at 10.  For example, Lead Plaintiff adds allegations to the AC that (1) FE-1 told Rawlinson in late January or early February 2022 that "Lucid's many internal logistics issues were still present and still stalling production" (AC ¶ 29); (2) Lucid's inventory logistics problems remained acute and persisted from late 2021 through at least mid-2022 (*e.g.*, ¶¶ 145, 156, 159-61, 192, 215, 219-20, 315-16);

---

[4] The prior order, Order at 20 n.9, appears to mistakenly attribute these allegations to FE-2, when they derived from FE-1.  *See* Consolidated Complaint (ECF 78) ¶ 172 ("In particular, in late January or early February 2022, FE-1 met with Rawlinson during his visit to the Warehouse. During their discussion, FE-1 told Rawlinson of the problems at Lucid's warehouse, and why it was failing."); AC ¶ 185 (same).  This potential typographical error does not alter the Court's analysis.

1    (3) Rawlinson was frequently onsite at the Warehouse in 2022 (*e.g.*, ¶¶ 241-44, 305); (4)

2    Rawlinson was aware of at least some of Lucid's logistics problems in 2022 (*e.g.*, ¶¶ 305, 312-14,

3    320); and (5) various former employees held the belief that Lucid's 2022 production target was

4    impossible (*e.g.*, ¶¶ 313, 317, 319).

5        Lead Plaintiff primarily posits that they have sufficiently alleged contemporaneous

6    knowledge because Lucid's logistics problems continued unabated from the time Rawlinson

7    stated, in late October or early November 2021, that Lucid would produce less than 10,000

8    vehicles in 2022, thus Rawlinson necessarily must have maintained that same view at the time of

9    his statements in February, March, and May 2022.  *See* Opp. at 20, 29-30.  Lead Plaintiff fails to

10   persuade because the new allegations leave open the possibility Rawlinson may have changed his

11   view in the months following his late-2021 view of Lucid's ability to meet its 2022 production

12   targets.  *See Century Aluminum*, 729 F.3d at 1108 (noting that where two explanations are merely

13   possible, "[s]omething more is needed, such as facts tending to exclude the possibility that the

14   alternative explanation is true[.]" (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007)).

15   Lead Plaintiff has not alleged with specificity what information Rawlinson received prior to

16   making the 2022 statements, nor what his reaction to or interpretation was of that specific data.

17   *See Nursing Home Pension Fund Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004)

18   ("The most direct way to show both that a statement was false when made and that the party

19   making the statement knew that it was false is via contemporaneous reports or data, available to

20   the party, which contradict the statement."); *see also Wochos v. Tesla*, 985 F.3d 1180, 1194 (9th

21   Cir. 2021) (holding that defendants failed to plead that Tesla CEO Musk "adopted the

22   conservative timeline for production on which these employees' pessimism was based.").  Thus,

23   Lead Plaintiff's allegations remain insufficient where they do not allege that Rawlinson knew or

24   had contemporaneously adopted the view that, at the time of his statements, Lucid's 2022

25   production targets were impossible.  *See id.*

26        Thus, the production target statements (Statements 5, 6, 7, 12, 14, 15, and 16) remain

27   inactionable for failure to show contemporaneous knowledge of falsity.

28   //

United States District Court
Northern District of California

11

1

**b.** *Reasons for Delay*

Defendants challenge the sufficiency of the allegations regarding Statements 6, 7, 8, 9, 10, 11, 13, and 16, which were all made between February 2022 and May 2022: Statements 6 (referring to "extraordinary supply chain and logistics challenges [Lucid] encountered and [its] unrelenting focus on delivery the highest-quality products"), 7 ("like many manufacturers, [Lucid's] production has been and indeed continued to be impacted by supply chain challenges"), 8 (stating that Lucid "could have chosen to build faster"), 9 (referencing supplier issues), 10 (referencing supplier issues), 11 (stating that "bottlenecks were caused by a handful of suppliers" and that Lucid was "gated by silicon chips," not the "ability to make electric motors"), 13 ("COVID lockdowns in China that's impacting others in the industry are also resulting in some bottlenecks for us"), and 16 ("[W]e're facing global supply chain challenges, as is all the auto industry and other industries.").

The prior Court order found that Lead Plaintiff insufficiently pleaded falsity as to these statements "for the same reasons the statements discussing production targets fail[ed]": Lead Plaintiff failed to allege that Rawlinson had contemporaneous knowledge that his statements about the impact of supply chain challenges on production were false when made. *See* Order at 25, *referring* to pp. 17-20.

In an attempt to cure this deficiency, Lead Plaintiff adds to the AC categories of statements demonstrating that Lucid's internal logistics issues and production shortfalls persisted throughout 2022, and that Rawlinson was aware of Lucid's ongoing logistics issues and production shortfalls. Opp. at 10.  In addition, Lead Plaintiff adds allegations to the AC that additional former employees held the view that Lucid's internal logistics problems were causing 90% of Lucid's production delays in 2022.[5]  *See* Opp. at 13; *see also*, *e.g.*, AC ¶¶ 31 (FE-11, who worked from

---

[5] The consolidated complaint raised similar allegations about FEs' perceptions that Lucid's production delays in 2022 were attributable to their internal logistics issues.  *See* Consolidated Complaint ¶ 263 (now AC ¶ 282) (FE-8, who worked for Lucid from mid-2021 until early 2022, believed that 90% of the production delays were caused by internal logistics problems because "that's where the bottleneck was."); *id*. ¶¶ 269 (now AC ¶ 289) (FE-3, who was employed in Lucid's Warehouse from start of 2022 through late summer 2022 (Consolidated Complaint and AC ¶ 64), and FE-4, who was employed in Lucid's Warehouse from late 2021 through mid-2022

United States District Court
Northern District of California

1    Lucid from fall 2021 to late 2022 (AC ¶ 72), stated that it was common knowledge within Lucid

2    that it could never hit the 12,000 to 14,000 product target "given its pervasive and deeply

3    ingrained internal logistics issues"); 321 (FE-12, who worked as a manager for a third-party

4    logistics contractor at Lucid's Warehouse from summer 2021 to early spring 2022 (AC ¶ 73),

5    estimated that 90% of the time, Lucid blamed the Warehouse not getting parts to the production

6    line as the reason that Lucid was missing its production targets).

7            Lead Plaintiff further alleges that Rawlinson must have known of the impact of the

8    logistics issues on Lucid's ability to meet its production targets given Rawlinson's frequent onsite

9    presence and the existence of daily meetings discussing Lucid's production shortfalls and logistics

10   challenges in 2022, at least some of which Rawlinson attended and the contents of which would

11   have been escalated to him.  *See*, *e.g.*, AC ¶¶ 359 (describing how Rawlinson stated during an

12   earnings call held in May 2023 that he was on site "night and day" throughout 2022 "to resolve

13   logistics and supply chain issues"); 313 (FE-11, who was a shift supervisor at Lucid's Warehouse

14   from fall 2021 to late 2022 (AC ¶ 72), describing daily 7 a.m. logistics meetings, from which

15   executives would "escalate" information to Rawlinson, and stating that the executives made

16   comments such as "Rawlinson is upset with this" or "Rawlinson is aware of this and looking for a

17   solution").

18           Even with these additional allegations, the Court finds that Lead Plaintiff still insufficiently

19   alleges that Rawlinson himself knew or shared the perception held by others that it was Lucid's

20   internal logistics issues (versus external supply chain or pandemic-related issues) that were the

21   primary cause of Lucid's production delays at the time of his 2022 statements.  Without more

22   detailed allegations as to what specific reports Rawlinson received, when precisely he received

23   them, and how he reacted to or interpreted those reports, the pleadings do not sufficiently allege

24   that Rawlinson had contemporaneous knowledge of falsity at the time of his 2022 statements.  *See*

25   *Khoja*, 899 F.3d at 1008 ("Falsity is alleged when a plaintiff points to defendant's statements that

26   directly contradict what the defendant knew at that time.") (citations omitted).

27   _____

28   (Consolidated Complaint and AC ¶ 65), alleged that Lucid's production delays were blamed on
     internal logistics problems).

13

United States District Court
Northern District of California

1    Thus, Statements 6, 7, 9, 10, 11, 13, and 16 – all of which alluded to past and future supply

2    chain and pandemic-related issues – are not actionably false.  Unlike the previously-upheld

3    Statements 3 and 4, which were made close-in-time to Rawlinson's late-2021 acknowledgement

4    that Lucid's internal logistics issues were preventing Lucid from meeting its production targets,

5    Lead Plaintiff alleges no similar close-in-time expressions of opinion or belief by Rawlinson, or

6    adoption of others' interpretation of the cause of Lucid's production delays, to allege

7    contemporaneous knowledge of falsity at the time of making these statements.

8    Statement 8 is distinct from the rest of the production delay-related statements, and merits

9    separate attention.  Statement 8 arose in the context of an Earnings Call held on February 28,

10    2022, in which Rawlinson stated: "***Indeed, we could have chosen to build faster***, but we elected

11    not to sacrifice quality, given our unwavering commitment to the highest standards."  *See* AC

12    ¶ 415; Appendix to AC at 24-25.  Statement 8 could only be actionably false if there were truly no

13    way in which Lucid could have built faster.  *See also Wochos*, 985 F.3d at 1196 ("Tesla's

14    remark . . . that 'great progress' was being made on battery production would potentially be an

15    actionable false statement only if, as the district court put it, Tesla had been 'making no progress

16    at all.'  Plaintiffs pleaded no facts that would establish falsity in that sense.").  Because Lucid

17    conceivably could have built faster, for example by utilizing damaged or noncompliant parts, *see*,

18    *e.g.*, AC ¶ 219 (FE-12 estimating that 5-10% of the parts Lucid received had to be scrapped due to

19    damage), it is possible for Statement 8 to be true, and thus Statement 8 is not actionably false.  *See*

20    *Wochos*, 985 F.3d at 1196.

21    Thus, the contested statements concerning the cause of Lucid's delayed production

22    (Statements 6, 7, 8, 9, 10, 11, 13, 16) are inactionable for failure to show contemporaneous

23    knowledge of falsity.

24    Having found that Lead Plaintiff has failed to adequately plead that Statements 5-16 are

25    false, the Court need not consider whether they are protected by the PSLRA's Safe Harbor

26    provision, are statements of opinion, or constitute mere corporate puffery.[6]

27    _____

28    [6] The Court previously determined that Statements 1-4 are not protected by the Safe Harbor
provision, Order at 27-32, and that Lead Plaintiff adequately pleaded scienter as to those

1

### 2.    Leave to Amend

Defendants ask the Court to dismiss Lead Plaintiff's claims without leave to amend as to Statements 5-16 on the basis that the Court's prior order gave Lead Plaintiff clear guidance on the deficiencies of the claim, and Lead Plaintiff did not cure them in the AC.  Mot. at 32.  Lead Plaintiff requests leave to amend any portion of the AC deemed insufficient.  Opp at 34.

Because Lead Plaintiff has not cured the deficiencies the Court identified in the consolidated complaint, and has failed to identify additional facts Lead Plaintiff would allege in a second amended consolidated complaint that would cure those deficiencies, the Court determines amendment would be futile.  *See Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008) (finding no abuse of discretion in denying leave to amend where the amendment would be futile).  Lead Plaintiff's claims as to Statements 5-16 are therefore **DISMISSED WITHOUT LEAVE TO AMEND**.

### 3.    Section 20(a) Claim

Under Section 20(a) of the Exchange Act, "certain 'controlling' individuals [are] also liable for violations of [S]ection 10(b) and its underlying regulations." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (citing 15 U.S.C. § 78t(a)).  Because a Section 20(a) claim is derivative, "a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.'" *Id.* (citation omitted).

Because Lead Plaintiff's Section 20(a) claim rises and falls with its claim under Section 10(b), this claim is **DISMISSED WITHOUT LEAVE TO AMEND** to the same extent as the Section 10(b) claim (*i.e.*, Statements 5-16).

The Section 20(a) claim otherwise survives consistent with the Court's analysis of the viable portion of the Section 10(b) claim (*i.e.*, Statements 1-4).  *See Zaidi v. Adamas Pharms., Inc.*, 650 F. Supp. 3d 848, 865 (N.D. Cal. 2023).

---

statements, Order at 33-35.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    **IV.    CONCLUSION**

2    For the reasons set forth above, Defendants' motion to dismiss the AC is **DENIED IN**

3    **PART** (Statements 1-4) **AND GRANTED IN PART** (Statements 5-16) **WITHOUT LEAVE**

4    **TO AMEND**.  Defendants' request for judicial notice is **GRANTED**.

5    The Court **SETS** an initial case management conference for July 16, 2025 at 10:00 AM in

6    San Francisco, Courtroom 10, 19th Floor.  The parties **SHALL** file a case management statement

7    by noon on July 8, 2025.

8    **IT IS SO ORDERED.**

9    Dated: May 22, 2025

10

11   **ARACELI MARTÍNEZ-OLGUÍN**
     **United States District Judge**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28