**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Shon Morgan (SBN 187736)
865 Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
shonmorgan@quinnemanuel.com

Kurt E. Wolfe (admitted *pro hac vice*)
kurtwolfe@quinnemanuel.com
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202) 538-8100

Ryan P. Gorman (admitted *pro hac vice*)
ryangorman@quinnemanuel.com
111 Huntington Ave, Suite 520
Boston, MA 02199
Tel: (617) 712-7100

*Counsel for Defendants Lucid Group, Inc., and Peter Rawlinson*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re Lucid Group, Inc. Securities Litigation | Case No. 3:22-cv-02094-AMO |
| This Document Relates to: All Actions | CLASS ACTION |
| | **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVE AND CLASS COUNSEL** |
| | Date: July 30, 2026<br>Time: 10:00 a.m.<br>Location: Courtroom 10, 19th Floor<br>Before: Hon. Araceli Martínez-Olguín |

Case No. 3:22-cv-02094-AMO

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE ISSUES PURSUANT TO L.R. 7-4(A)(3) ............................................................. 1

PRELIMINARY STATEMENT ....................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................................... 3

RELEVANT PROCEDURAL HISTORY .......................................................................................... 9

LEGAL STANDARD ................................................................................................................... 10

ARGUMENT .............................................................................................................................. 10

I.      PLAINTIFF IS NOT ENTITLED TO THE *BASIC* PRESUMPTION ......................................... 10

II.     CERTIFICATION IS IMPROPER BECAUSE INDIVIDUAL ISSUES OF RELIANCE PREDOMINATE AND RENDER PLAINTIFF ATYPICAL AND INADEQUATE ................. 16

III.    PLAINTIFF HAS NOT PROPOSED A DAMAGES METHODOLOGY THAT CAN RELIABLY CALCULATE CLASSWIDE DAMAGES ................................................................ 20

IV.     PLAINTIFF'S THEORY LIMITS THE CLASS PERIOD ......................................................... 25

Case No. 3:22-cv-02094-AMO
DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

# TABLE OF AUTHORITIES

## Cases

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) ...............................................................................................17

*In re Apache Corp. Sec. Litig.*,
    2024 WL 532315 (S.D. Tex. Feb. 9, 2024) ..............................................................13

*Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    77 F.4th 74 (2d Cir. 2023) ......................................................................................15

*In re BP p.l.c. Sec. Litig.*,
    2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ...........................................................21

*Brown v. Nat'l Life Ins. Co.*,
    2013 WL 12096508 (C.D. Cal. Oct. 15, 2013) .......................................................19

*Cohen v. Laiti*,
    98 F.R.D. 581 (E.D.N.Y. 1983) ..............................................................................19

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ..................................................................... 10, 20, 21, 23, 25

*Constr. Laborers Pension Tr. for S. California v. Rocket Companies, Inc.*,
    2025 WL 1139113 (E.D. Mich. Apr. 17, 2025) .......................................................16

*In re Enovix Corp. Sec. Litig.*,
    2026 WL 1078569 (N.D. Cal. April 21, 2026)....................................................13, 15

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011) ...................................................................... 10, 17, 18

*In re FibroGen Sec. Litig.*,
    2024 WL 1064665 (N.D. Cal. Mar. 11, 2024) ....................................................14, 15

*Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*,
    301 F.R.D. 116 (S.D.N.Y. 2014)............................................................................21

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    903 F.2d 176 (2d Cir. 1990) ...................................................................................19

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
    594 U.S. 113 (2021) ...................................................................... 11, 13, 15, 16

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)........................................................................10, 11, 13, 17, 18

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) ........................................................................... 18, 19, 20

*In re High-Tech Emp. Antitrust Litig.*,
    985 F. Supp. 2d 1167 (N.D. Cal. 2013) ................................................................20

*IBEW Loc. 98 Pension Fund v. Best Buy Co.*,
    818 F.3d 775 (8th Cir. 2016) ................................................................................12

*In re Key Energy Servs., Inc. Sec. Litig.*,
    166 F. Supp. 3d 822 (S.D. Tex. 2016) ..................................................................14

*Loritz v. Exide Tech.*,
    2015 WL 6790247 (C.D. Cal. 2015) ................................................................21, 25

*Lytle v. Nutramax Lab'ys, Inc.*,
    114 F.4th 1011 (9th Cir. 2024) .............................................................................21

*In re Moody's Corp. Sec. Litig.*,
    274 F.R.D. 480 (S.D.N.Y. 2011) ...........................................................................11

*Mulderrig v. Amyris, Inc.*,
    340 F.R.D. 575 (N.D. Cal. 2021) ....................................................................19, 23

*In re NVIDIA Corp. Sec. Litig.*,
    2026 WL 821418 (N.D. Cal. Mar. 25, 2026) ........................................................12

*Shupe v. Rocket Companies, Inc.*,
    752 F. Supp. 3d 735 (E.D. Mich. 2024) ...............................................................16

*In re Vivendi Universal, S.A. Sec. Litig.*,
    183 F. Supp. 3d 458 (S.D.N.Y. 2016) ...................................................................18

## Other Authorities

L.R. 7-4(a)(3) ..................................................................................................................1

Rule 23 .................................................................................................................*passim*

**STATEMENT OF THE ISSUES PURSUANT TO L.R. 7-4(a)(3)**

Whether the Court should deny class certification where plaintiff's theory lacks the required economic linkage among the alleged misstatements, the information conveyed to the market, and the price movements on which plaintiff relies, and where the alleged misstatements played no actual or constructive causal role in plaintiff's share purchases.

**PRELIMINARY STATEMENT**

Plaintiff's motion attempts to convert a company's evolving production outlook—formed and revised during an unprecedented period of industry-wide disruption—into a theory of securities fraud with classwide effect. But that theory collapses for four independent reasons. ***First***, the alleged misstatements did not convey new information to the market and therefore did not introduce price inflation. ***Second***, the alleged "corrective disclosures" did not reveal prior falsity, but instead reflected forward-looking expectations as conditions evolved. ***Third***, plaintiff has not offered a method to isolate fraud-related price movement from concededly non-fraud information disclosed at the same time. And ***fourth***, plaintiff is not a typical or adequate class representative because ████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████.

At class certification, those failures are dispositive. To invoke the *Basic* presumption, the alleged misstatements must have affected the market price in a manner consistent with plaintiff's theory of liability. A later price decline, standing alone, does not suffice where, as here, the record shows that the alleged statements conveyed no new information, and the alleged corrective disclosures do not reveal prior falsity. The inference of price impact cannot hold.

Plaintiff's theory fails at the front end because the alleged misstatements did not introduce any new, price-relevant information into the market. The 20,000-unit production target was not new in November 2021. It had been repeatedly disclosed for months, evaluated by analysts, and in some instances discounted. Yet plaintiff's expert does not analyze that history or test whether reiterating the same projection conveyed any incremental information to investors. Instead, he assumes price relevance without addressing whether there was anything left for the market to learn. That omission is fatal. In an efficient market, information already disclosed and absorbed cannot be presumed to move price simply

because it is repeated. Plaintiff's theory improperly assumes that the market ignored months of prior disclosures, only to react to the same information on a single selected date.

The theory fails again at the back end. The supposed corrective disclosures do not reveal that Lucid's earlier statements were false when made. They reflect what the market understood them to be: updates to forward-looking expectations in light of evolving supply-chain constraints, logistics challenges, and industry-wide conditions affecting the entire electric-vehicle sector. That distinction matters. The materialization of known risks—or the revision of projections as conditions develop—is not the revelation of previously concealed fraud. Plaintiff identifies no analyst commentary, market evidence, or event-study analysis showing that investors understood these disclosures as exposing prior falsity, rather than as reflecting changing expectations.

That mismatch is compounded by the presence of substantial confounding information. On both the alleged misstatement and corrective disclosure dates, the market was reacting to a mix of company-specific developments and broader industry dynamics, including reservation growth, liquidity, product recognition, and sector-wide conditions. Plaintiff offers no method to isolate the effect of the alleged misstatements from these concededly non-fraud factors. The record therefore lacks any evidentiary basis for the Court to find it is more likely than not that the alleged misstatements caused that movement. That failure independently defeats the *Basic* presumption.

These defects reinforce one another. Plaintiff's theory assumes that the market ignored repeated disclosures of Lucid's production targets and associated risks, only to react to those same disclosures on a particular date, and then later interpreted routine updates reflecting evolving conditions as the revelation of prior fraud. That is not a coherent theory of price impact; it is a hindsight-driven reconstruction untethered to how markets process information in real time. Under *Halliburton* and *Goldman Sachs*, it cannot support classwide reliance.

Certification fails for an independent reason: plaintiff is subject to a dispositive reliance defense, rendering it atypical and inadequate. Plaintiff did not make an investment decision based on Lucid's statements—or any assessment of market price at all. ████████████████████

████████████████████████████████████████████████

████████████████████████████    ████████████████████

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████  The purchase would have occurred in precisely the same manner even if the alleged misstatements had never been made.

That disconnect defeats reliance.  The *Basic* presumption rests on the premise that investors rely, at least indirectly, on the integrity of the market price.  But where a transaction is entirely mechanical—untethered to any assessment of price or information—that premise is absent.  A plaintiff whose purchases were not influenced, even indirectly, by the alleged misstatements severs the link required for the *Basic* presumption and creates a unique, claim-defeating defense. Allowing such a plaintiff to proceed would expand the presumption beyond its rationale and effectively eliminate the reliance requirement for investors whose trades are independent of market information.

Finally, plaintiff's own theory defines—and limits—the class period.  Plaintiff must identify a point at which the market learned that Lucid's November 2021 statements were false when made.  If that occurred in February 2022, the class period ends there; if not, plaintiff cannot rely on the February 2022 disclosure to establish price impact or calculate damages.  The two alleged corrective disclosures do not reveal the same alleged fact, and one cannot extend the other.  At most, a single disclosure can be corrective, and cannot support the class period plaintiff proposes.

## FACTUAL BACKGROUND

***Lucid Launched Commercial Production During an Unprecedented Period of EV Industry Disruption.***  Lucid designs and manufactures luxury electric vehicles.  ¶ 45.[1]  Founded in 2007 under the name Atieva, Inc., Lucid spent its early years developing custom battery pack and battery management software.  ¶ 3.  After initially supplying battery technology for use in other vehicles—such as F1 racing cars—the Company rebranded to Lucid Motors in 2016 to manufacture and sell its own fully-electric sedan, the Lucid Air.  ¶ 4.  Lucid expanded its management ranks with seasoned executives from the automotive, electric-vehicle, and technology sectors.  Peter Rawlinson became Lucid's Chief Technology

---

[1] Citations to "¶ __" are to the Amended Consolidated Complaint, Dkt. 108.  All emphasis is added and internal citations and quotations omitted unless otherwise noted.  Cites to exhibits refer to those attached to the concurrent declaration of Shon Morgan.  Exhibit 1 to that declaration is the expert report of Christopher James, Ph.D., referred to as "James Rep."

Officer in 2013 and was promoted to Chief Executive Officer in 2019. He joined the Company after serving as Tesla's Vice President of Vehicle Engineering, where he oversaw development of Tesla's Model S from 2009-12. ¶¶ 3, 46.

Lucid began ramping up commercial production of the Lucid Air in September 2021. ¶ 13. The launch occurred during a period of extraordinary disruption across the global automotive industry. Manufacturers throughout the electric-vehicle sector were navigating semiconductor shortages, logistics constraints, supplier delays, and pandemic-related disruptions affecting global supply chains. *See, e.g.*, Exs. 2–4. These conditions created significant uncertainty for manufacturers attempting to scale production of new vehicle platforms. During the relevant period, multiple auto manufacturers revised production expectations as supply-chain conditions and operational realities evolved. *See, e.g.*, Exs. 5–8. Public commentary reflected the challenges of scaling manufacturing in an environment marked by component shortages and logistical disruption. *See, e.g.*, Ex. 9.

***In February 2021, Lucid Announced—and Then Repeatedly Reiterated—Its 2022 Vehicle Production Target.*** As Lucid prepared for commercial production of the Air and its public listing, it consistently communicated its expected production trajectory to investors. Those projections reflected management's then-current expectations regarding the pace of the manufacturing ramp and supplier readiness. ¶¶ 113, 119–121, 128–131.

Lucid first disclosed its 2022 production target in connection with a February 23, 2021 announcement that it would go public through a merger, Ex. 10—an accompanying investor presentation *filed with the SEC* included a forecast to produce 20,000 vehicles in 2022, Ex. 11 at 59. In the months that followed—and leading up to the class period—Lucid and its CEO, Peter Rawlinson, repeatedly reaffirmed that same production target in public statements, interviews, and investor communications:

- **May 11, 2021 (CNBC)**: Asked whether Lucid remained "on track for 20,000 vehicles in 2022," Rawlinson responded, "We're very much on track for our plan," reiterating his confidence in the Company's manufacturing outlook. Ex. 12.

- **May 13, 2021 (Financial Times):** Rawlinson again confirmed that Lucid remained "on track" with the production levels outlined in its SPAC materials, including the 20,000-unit target. Ex. 13.

- **June 25, 2021 (CNN):** Rawlinson stated that Lucid was "on track for this year and next year,"

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

emphasizing expected growth into 2022.  Ex. 14.

- **July 13, 2021 (Investor Presentation):** Lucid formally reiterated its previously disclosed production and revenue projections, including the 20,000-vehicle target for 2022.  Ex. 15 at 65.

- **July 26–31, 2021 (Bloomberg; USA Today):** Media reports based on interviews with Rawlinson again reflected that Lucid "remains on track" to produce up to 20,000 vehicles in 2022, a point echoed in contemporaneous analyst coverage.  Exs. 16–19.

- **September 29, 2021 (Citi; Reuters):** Following a production preview event, analysts and press reports indicated continued confidence in Lucid's manufacturing ramp and reiterated that the Company remained on track to meet its 2022 production target.  Exs. 20–21.

This consistent messaging continued immediately before the alleged misstatements.  On November 1, 2021, the Wall Street Journal reported that Lucid planned to produce approximately 575 vehicles in 2021 and increase production to 20,000 in 2022, quoting Rawlinson as focused on "getting the volume ramped up."  Ex. 22.

*Lucid Disclosed Risks to Execution and Production Ramp.* Lucid consistently informed investors, including in public filings, that its production projections were forward-looking and subject to significant uncertainty.  Lucid expressly warned that its ability to meet projections depended on a range of contingencies, including supply-chain constraints, logistics challenges, and the inherent difficulty of scaling automotive manufacturing. *See, e.g.*, Ex. 10 at 9; Ex. 11 at 2; Ex. 15 at 2.

Lucid also emphasized risks specific to its own operations as a first-time manufacturer.  In its Form 10-Q for the third quarter of 2021—issued on November 15, 2021—Lucid disclosed that it was "an early-stage company with a limited operating history" and had "no experience manufacturing or selling a commercial product at scale."  Ex. 23 at 48.  The Company warned that these and related factors could adversely affect its ability to scale production.  Analyst coverage from the time confirms the market factored these disclosed risks into its evaluation of Lucid's production outlook.  For example:

- **September 11, 2021 (CFRA):**  Initiating coverage, CFRA emphasized "significant execution risk" for a company "on the cusp of first vehicle production and sales."  Ex. 19.

- **September 13, 2021 (Morgan Stanley):** Morgan Stanley discounted Lucid's 20,000-vehicle projection to 7,000 units, citing "a host of execution challenges" with an initial production cycle—

particularly "in the current environment of supply shortages and logistics tightness." Ex. 18 at 12.

- **September 29, 2021 (Citi):** Following Lucid's production preview event, Citi characterized the stock as "High Risk," citing "*significant execution risk (supply, manufacturing)*." Ex. 20.

These disclosures and analyst reactions demonstrate that the risks associated with Lucid's production ramp—including supply constraints, logistics challenges, and execution uncertainty—were widely recognized by the market and actively incorporated into investor expectations.

*The Challenged Statements.* On November 15, 2021, Lucid announced its third quarter 2021 financial results and held an earnings call. Exs. 24–25. In its press release, Lucid quoted CEO Peter Rawlinson as stating: "We remain confident in our ability to achieve 20,000 units in 2022," while expressly acknowledging that the target "is not without risk" in light of "ongoing challenges facing the automotive industry with global disruptions to supply chains and logistics." Ex. 24 at 2 ("Alleged Misstatement 1"). During the earnings call, Rawlinson similarly stated that the Company was "optimistic about these goals, even in a challenging environment," emphasizing that COVID-19 continued to present "numerous obstacles for the auto industry and supply chain." Ex. 25 at 4–5 ("Alleged Misstatement 2").

Those statements were among broader disclosures that included both risk factors and new, positive company-specific developments. The November 15 press release highlighted, for example, that Lucid Air had been named MotorTrend Car of the Year; customer reservations increased to more than 17,000; and the Company had approximately $4.8 billion in cash. Ex. 24. Contemporaneous analyst coverage focused on these developments—none of which plaintiff contends was false or misleading—alongside Lucid's reiterated production guidance. For example, Morgan Stanley highlighted Lucid's "stronger than expected cash position," "increasing reservation momentum," and the MotorTrend award as key drivers of investor interest. Ex. 26. Citi similarly described "encouraging momentum," emphasizing reservation growth, order book strength, brand development, and the Company's production outlook in tandem. Ex. 27. Bank of America likewise characterized the increase in reservations as "encouraging." Ex. 28.

The following day, November 16, 2021, Rawlinson appeared on CNBC's Mad Money, where he again addressed Lucid's production outlook in the context of broader industry conditions. In response to a question about supply-chain challenges affecting the automotive sector, Rawlinson acknowledged that Lucid, like other manufacturers, was "vulnerable to today's supply chain shortages," while noting that the

Company had "mitigation plans" in place.  Ex. 29 ("Alleged Misstatement 4").  He also discussed the Company's long-term production capacity, stating that Lucid's factory was "ready for 34,000 units per annum," subject to the availability of necessary parts.  *Id.* ("Alleged Misstatement 3").

Plaintiff contends that these statements were misleading because Lucid allegedly "suffered from debilitating internal logistics issues" that made it impossible to meet its 2022 production target, and that Rawlinson and other executives were aware of those issues at the time.  Mot. 5, 7.

***Early Manufacturing Estimates Involve Ongoing Operational Assessment, Which Lucid Undertook in Good Faith.***   Scaling production of a new vehicle platform is a complex, iterative operational process that requires continuous assessment of manufacturing readiness, supplier capacity, logistics coordination, and production-line throughput.  Manufacturers launching new platforms routinely monitor internal metrics, identify potential bottlenecks, and adjust production planning in response to real-time developments.  Lucid's manufacturing ramp was no exception.  As the Company scaled production of the Lucid Air, management and operational teams continuously evaluated supplier performance, logistics coordination, and manufacturing readiness, while navigating the broader supply-chain disruptions affecting the automotive sector.  In doing so, Lucid relied on internal models—referred to as "ramp curves"—to project manufacturing capacity.  Ex. 30.  These models did not assume a static rate of production.  Instead, they reflected the reality that output increases over time as processes stabilize and efficiency improves.  Early production periods were expected to yield relatively low volumes, with capacity increasing meaningfully in later weeks and months.  *See id.* at 6–7.  There was no expectation that Lucid's manufacturing or logistics systems would immediately support high-volume output at the outset of production.  Consistent with that approach, Lucid's internal ramp curves in November 2021 projected that the Company would produce more than 20,000 Air vehicles in 2022.  *See* Ex. 31 at 2–3 (November 9, 2021 projection of 23,279–25,019 vehicles for 2022). Those projections reflected management's contemporaneous assessment of production capacity based on then-current operational data and assumptions about the pace of the manufacturing ramp.

Plaintiff relies heavily on allegations attributed to former employees to allege defendants knew by fall 2021 that Lucid's production targets were unattainable.  *See, e.g.,* ¶¶ 62–73, 232–44, 303–05, 360–62, 452–56. But those allegations describe internal discussions regarding supplier delays, logistics

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

constraints, and manufacturing bottlenecks—the very issues inherent in any manufacturing scale-up and that Lucid was actively evaluating in real time. Those assessments do not establish Lucid had reached a fixed or settled determination that its production targets could not be achieved.

Indeed, Lucid's contemporaneous internal projections reflected continued confidence in the 2022 production target at the time of the misstatements. *See* Ex. 30 at 7; Ex. 31; Ex. 32 at 11–12, 17, 22. The alleged statements attributed to individual employees do not alter that conclusion. At most, they reflect differing views expressed within the ordinary course of operational management. That is not evidence of falsity; it is evidence of the dynamic and iterative process by which manufacturing plans are evaluated and refined.

***Lucid Revised Its Production Expectations as Industry Conditions and Operational Realities Evolved.*** As Lucid's production ramp progressed, the Company updated its forward-looking production expectations to reflect evolving operational conditions and supply-chain realities.

On February 28, 2022—the date of the first alleged corrective disclosure—Lucid revised its 2022 production target from 20,000 vehicles to a range of 12,000–14,000 vehicles. Ex. 33. As Lucid explained at the time, *id.*, and as reflected in contemporaneous internal documents, Exs. 30 & 34, that revision was driven by the Company's developing understanding of supply constraints that had been affecting production since at least November 2021. Those constraints were not newly discovered in February; they had been part of the operational environment Lucid was monitoring and incorporating into its ramp-curve projections as conditions evolved.

Lucid further revised its projections on August 3, 2022—the date of the second alleged corrective disclosure—reducing its 2022 production target to a range of 6,000–7,000 vehicles. Exs. 35–36. That update likewise reflected the Company's continued assessment of real-time operational conditions. As Lucid disclosed, although certain supply-chain pressures had begun to ease, increased parts flow exposed new logistical constraints affecting the transfer of components from Lucid's logistics center to its manufacturing facility. Ex. 36 at 2–3. Those constraints became apparent only as production volumes increased and operations scaled. As with prior projections, the revised target was based on updated ramp-curve modeling reflecting then-current operational data. Ex. 37.

In each instance, Lucid's revised guidance reflected updated forward-looking expectations based

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

on evolving conditions—not the disclosure of previously concealed facts. Its projections changed as its understanding of supply constraints, logistics capacity, and manufacturing readiness developed over time.

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

## **RELEVANT PROCEDURAL HISTORY**

The initial complaint advanced a theory, now abandoned, that the purported corrective disclosure on February 28, 2022, revealed Lucid had concealed, and revealed at that time, "extraordinary supply chain and logistics challenges" that had negatively affected Lucid's production operations.  Dkt. 1 ¶ 8.

Plaintiff then filed a consolidated complaint that challenged 30 statements made between November 15, 2021 and May 26, 2022. Dkt. 78 & 78-2. Among other allegations, plaintiff contended Lucid's reduction of its 2022 production target to a range of 12,000–14,000 vehicles was false or misleading because defendants "knew that the Company would miss even those reduced figures because of the severe issues Lucid was facing." Dkt. 78 ¶ 317.

The Court substantially dismissed, finding 26 of 30 challenged statements unactionable. Dkt. 103. In allowing Alleged Misstatements 1–4 to proceed, the Court emphasized plaintiff's allegations that Rawlinson—the speaker of each challenged statement—at the time "possessed contrary facts and had subscribed to the former employees' views that meeting Lucid's projection goals [of 20,000 vehicles in 2022] was not possible at that time."[2] Further amendment was denied. Dkt. 130.

## LEGAL STANDARD

A plaintiff seeking certification must affirmatively demonstrate compliance with Rule 23. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). That burden requires proof—not mere allegations—that each Rule 23 requirement is satisfied, including typicality, commonality, adequacy, and, for a Rule 23(b)(3) class, predominance. *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 275 (2014). "Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804, 810 (2011). A plaintiff must also show "damages are capable of measurement on a classwide basis" consistent with its theory of liability. *Comcast*, 569 U.S. at 34.

## ARGUMENT

### I.    PLAINTIFF IS NOT ENTITLED TO THE *BASIC* PRESUMPTION

"If every plaintiff had to prove direct reliance on the defendant's misrepresentation, individual issues then would . . . overwhelm[] the common ones, making certification under Rule 23(b)(3)

---

[2]  *See* Dkt. 103 at 19 (as to Alleged Misstatement 1); *id.* at 22 ("By the time Rawlinson made [Alleged Misstatement 4] on November 16, 2021, Rawlinson had acknowledged that these difficulties meant that Lucid would not meet its upcoming production goal."); *id.* at 25 ("As to the risks Rawlinson articulated in [Alleged Misstatements 1, 2, and 3] made around the time of the meetings FE-1 and FE-2 describe … Rawlinson gave the impression that Lucid stood on equal footing with other companies facing the same global supply chain and logistical challenges posed by an unprecedented global health crisis. This, however, concealed that Lucid's own internal operational failings had materialized[.]").

inappropriate." *Halliburton II*, 573 U.S. at 268.  Rather than allege that any investor actually relied on the alleged misrepresentations, plaintiff attempts to invoke the fraud-on-the-market presumption from *Basic*, Mot. 13, under which "the price of stock traded in an efficient market reflects all public, material information—including material misstatements," *Halliburton II*, 573 U.S. at 263.  The essential premise is that "anyone who buys or sells the stock at the market price may be considered to have relied on those misstatements."  *Id.*  But defendants can—and here do—rebut the *Basic* presumption through "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price," *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988), including by showing that the "misrepresentation (or its correction) did not affect the market price," *Halliburton II*, 573 U.S. at 280.  If the misstatements did not impact the stock price, "the basis for finding that the fraud had been transmitted through market price would be gone," *Basic*, 485 U.S. at 248, and there is no basis to presume investors relied on the misstatements, *Halliburton II*, 573 U.S. at 283.

In determining whether a plaintiff is entitled to the *Basic* presumption, the Court "must take into account all record evidence relevant to price impact" and determine whether it is more likely than not that the alleged misrepresentations affected the stock price. *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 124, 127 (2021).  This inquiry requires the district court "to assess all the evidence of price impact—direct and indirect"—including evidence that rebuts the inference of price impact.  *Id.* at 121–22.  And although the defendants bear the burden of persuasion, that burden "will have bite only when the court finds the evidence in equipoise—a situation that should rarely arise."  *Id.* at 127.  That inquiry has concrete implications here. Plaintiff's theory assumes three linked propositions: that the alleged statements introduced new, price-relevant information into the market; that subsequent disclosures revealed the falsity of those statements, rather than reflecting evolving conditions; and that the price movements plaintiff identifies are more likely than not attributable to that sequence.  Where any link in that chain fails, the *Basic* presumption cannot apply.

### A.   The Alleged Misstatements Had No Front-End Price Impact

*First*, when a stock price does not move in a statistically significant manner in response to an alleged misstatement, defendants "sever[] the link" on the front end between the alleged misstatement and price impact.  *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011).  As Dr. Nye

concedes, there was no statistically significant price impact following Alleged Misstatements 3 and 4 on November 16, 2021. *See* Ex. 46 at 115:4–117:4; *see also* James Rep. ¶ 61.

*Second*, with respect to all four Alleged Misstatements, there can be no front-end price impact where, like here, the misstatements did not convey new or at least incremental price-relevant information into the market. Lucid's 20,000-vehicle production target was *not* first disclosed in November 2021 when the alleged class period began. It had been repeatedly communicated to investors in Lucid's investor presentations, public interviews, and media coverage leading up to the Company's public listing, and in the months between that public listing and the alleged misstatements. Ex. 11 at 59 (February 23, 2021); Ex. 12 (May 11, 2021); Ex. 13 (May 13, 2021); Ex. 14 (June 25, 2021); Ex. 15 (July 13, 2021); Exs. 16–17 (July 26–31, 2021); Ex. 21 (September 29, 2021). In an efficient market, information that has already been publicly disclosed cannot be presumed to affect price when it is repeated. *See, e.g.*, *In re NVIDIA Corp. Sec. Litig.*, 2026 WL 821418, at *12 (N.D. Cal. Mar. 25, 2026) (no front-end price impact where "alleged misstatements … reiterated existing public information"). As such, by the time of the alleged misstatements, that target was already well known and incorporated into Lucid's stock price, and further reiterations of the 20,000 projection were consistent with the market's existing understanding. *See, e.g.*, Exs. 18–20, 22. There is thus no basis to conclude that reiterating the same projections and production timeline on November 15, 2021 introduced new information or altered the market's valuation of Lucid.

Dr. Nye's analysis does not alter this conclusion. Dr. Nye has conceded ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. 46 at 130:3–25. Dr. Nye cannot invoke the efficient market hypothesis to presume that information is rapidly incorporated into price, while simultaneously assuming without analysis that the market ignored repeated disclosures of that same information until a single selected date. In the efficient market he posits, a statement that merely reiterates information already in the public domain cannot introduce inflation in the stock price, and therefore cannot support the presumption of reliance under *Basic* and *Halliburton*. *See, e.g.*, *NVIDIA*, 2026 WL 821418, at *12; *IBEW Loc. 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782 (8th Cir. 2016) (certification reversed where alleged misstatements that defendant company was "on track" to meet previous guidance "added nothing to what was already public").

*Finally*, plaintiff's theory fails for the independent reason that even if Lucid's stock price did increase at the time of Alleged Misstatements 1 & 2, the Court cannot conclude that it is more likely than not that such movement was attributable to those challenged statements, as opposed to other, concededly non-fraud factors contained within those disclosures. *Cf. Goldman*, 594 U.S. at 127. At the time, investors were reacting to a range of information concerning Lucid's business, including the Company's announcements that (a) customer reservations for the Air had increased to over 17,000; (b) the Company had approximately $4.8 billion in cash; and (c) Lucid Air had been named MotorTrend Car of the Year. *See* Exs. 24–25 (containing Alleged Misstatements 1–2); Exs. 26–28 (analyst coverage). There were also broader developments positively affecting the electric vehicle sector. *See, e.g.*, Ex. 47. No evidence suggests that Lucid's reiterated production targets, rather than these concededly non-fraud factors, caused Lucid's price to increase on November 16, 2021. And Dr. Nye repeatedly testified ██████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ Ex. 46 at 71:17–73:25. In the face of evidence that the alleged misstatements were not "new," *Halliburton* and *Goldman Sachs* do not permit price movement alone to justify finding it "more likely than not that the alleged misrepresentations had a price impact," and plaintiff is not entitled to the *Basic* presumption. *Goldman*, 594 U.S. at 127; *see also In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at *6-7 (S.D. Tex. Feb. 9, 2024) (no front-end price impact where analysts attributed price increase to non-fraudulent information).

**B.    The Alleged Misstatements Had No Back-End Price Impact**

Nor do the alleged corrective disclosures make it more likely than not a stock decline was caused by the alleged misstatements. Under *Halliburton II*, a defendant may rebut the presumption of reliance with "evidence that the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock." 573 U.S. at 279–80. And under *Goldman*, courts must consider all record evidence bearing on price impact—even if "that evidence overlaps with materiality or any other merits issue." 594 U.S. at 123-24. A defendant can rebut any presumption of reliance by showing a mismatch between the contents of the alleged corrective disclosures and plaintiff's theory of fraud. *Id.*; *accord In re Enovix Corp. Sec. Litig.*, 2026 WL 1078569, at *11 (N.D. Cal. April 21, 2026) (denying class certification where "the later 'corrective' disclosures do not match the misstatement").

This case presents just such a mismatch because the disclosures on which plaintiff relies do not "correct" or reveal to be false what plaintiff alleges was falsely stated in November 2021. *See In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *12 (N.D. Cal. Mar. 11, 2024) ("[R]evelations that are not "corrective" cannot form the basis for a corrective disclosure."). Both the February and August 2022 announcements conveyed a combination of updated production expectations, operational developments, and broader industry conditions. Nothing in those disclosures isolates a previously concealed fact or indicates Lucid's earlier statements *were untrue when made*. At most, they reflect a reassessment of forward-looking projections as conditions evolved.

*First*, the February 2022 disclosure did not reveal "corrective" information. When Lucid revised its production guidance to 12,000–14,000 vehicles, it attributed that revision to supply-chain constraints and related operational challenges. *See* Ex. 33 at 1 ("This [update to production outlook] reflects the **extraordinary supply chain and logistics challenges we've encountered**[.]"). But Lucid had already disclosed those **exact** risks when the alleged misstatements were made. *See, e.g.*, Ex. 24 at 2 ("This target is not without risk given ongoing challenges facing the automotive industry, with **global disruptions to supply chains and logistics.**"); Ex. 25 ("That isn't to say we aren't vulnerable to today's **supply chain shortages that the entire industry is facing**."). The February disclosure therefore did not reveal any previously concealed information about Lucid's logistics processes, as plaintiff's theory requires. Instead, it reflected the materialization of risks the Company had already disclosed to the market. Plaintiff contends the February disclosure "continued to conceal the severe internal logistics problems that Lucid was experiencing." ¶ 28. But that speculation only underscores the mismatch point: a disclosure that does not reveal the supposedly concealed information cannot qualify as corrective. "[S]tatements about the materialization of risks that [Lucid] ha[d] previously disclosed and warned against are not corrective disclosures." *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 865 (S.D. Tex. 2016).

*Second*, the August 2022 disclosure similarly does not provide "corrective" information. The disclosure explains that internal logistics constraints became apparent as production scaled and earlier supply issues eased: "[A]lthough we continue to face supply chain constraints, **the resolution of some earlier gauging component supply issues** allowed us to push toward increasing the production rate. And **as we attempted to push**, full of the right, we found that our logistics constraints preventing us from scaling

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

meaningfully **this past quarter**." Ex. 36 at 2–3. That description places the development in time: it reflects what the Company came to understand as conditions unfolded *in 2022*, not what it allegedly knew in November 2021. A later-emerging operational constraint does not alone show that earlier statements were false when made. *See FibroGen*, 2024 WL 1064665, at *13 (information was not corrective where it was not "previously known to Defendants and did not contradict a previously uncorrected misstatement").

Nor does the August disclosure supply a missing link to the February disclosure. The two disclosures address different aspects of Lucid's evolving production challenges. *See Enovix*, 2026 WL 1078569, at *11 (mismatch where alleged corrective disclosure addressed broad performance issues but did not address issues with specific equipment). The first disclosure focuses on supply-chain constraints affecting production targets at that time, Ex. 33 at 1; the second disclosure describes logistics issues that came into focus later as production increased, Ex. 35; Ex. 36 at 2–3. Treating the August 2022 alleged corrective disclosures as a continuation of the February 2022 corrective disclosure would require assuming that both disclosures reveal the same underlying fact. They do not.

The price declines following the alleged corrective disclosures are consistent with a range of possibilities, including changing expectations about Lucid's production trajectory, the impact of ongoing industry-wide constraints (risks Lucid indisputably disclosed), and the emergence of new operational challenges. Plaintiff has not shown the market "more likely than not" understood either disclosure as revealing the alleged misstatements were false when made. *Goldman*, 594 U.S. at 127.

Recent authority from this District confirms that analysis and result. In *Enovix*, the court denied certification where the alleged corrective disclosures addressed broader operational shortcomings but did not correspond to the specific alleged misstatement, which related only to discrete equipment within Enovix's broader manufacturing operations. The court concluded such a mismatch "undermine[s] confidence" that any observed price decline reflects the correction of prior inflation. 2026 WL 1078569, at *13. The same is true here: disclosures about evolving production challenges do not establish that the market learned that Lucid's earlier guidance was knowingly false when made.

Significantly, plaintiff does not and cannot identify *any* analyst commentary or market evidence that interpreted the disclosures as revealing prior falsity. In an efficient market, such a reaction would be expected if the disclosures had in fact exposed previously concealed fraud. *See Arkansas Tchr. Ret. Sys.*

*v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 103–05 (2d Cir. 2023) (affirming rebuttal of *Basic* presumption where analyst reports did not interpret alleged disclosures as revealing prior misrepresentations); *Constr. Laborers Pension Tr. for S. California v. Rocket Companies, Inc.*, 2025 WL 1139113, at *3 (E.D. Mich. Apr. 17, 2025) ("Defendants 'severe[ed] the link between' the change in stock price and the alleged misrepresentations" where no financial analysts referenced the alleged misrepresentations in any reports published throughout class period). Its absence confirms that the market understood these disclosures as reflecting changing conditions, not correcting prior misstatements.

Mere expert assumption cannot save plaintiff's claims. Dr. Nye identifies stock price movements on the relevant dates but does not examine what information the market took from those disclosures or whether that information corresponds to plaintiff's theory of fraud. *See* Nye Rep. ¶¶ 51–56. Nor does he attempt to distinguish between price effects attributable to alleged fraud and those attributable to other information released at the time. *See* Ex. 46 at 73:19–74:16, 133:22–136:12. His analysis assumes, rather than demonstrates, that the observed price declines reflect the correction of fraud-related inflation. That assumption is not enough. On this record, the Court cannot say it is more likely than not that price declines following the alleged corrective disclosures are attributable to the alleged misstatements. *See, e.g.*, *Goldman*, 594 U.S. at 123; *Shupe v. Rocket Companies, Inc.*, 752 F. Supp. 3d 735, 779 (E.D. Mich. 2024) (no back-end price movement where "broader context surrounding [company's] business at the time mitigated any price impact").

Because there is a mismatch between the alleged misstatements and corrective disclosures, the *Basic* presumption is rebutted. Class certification should be denied.

**II.  CERTIFICATION IS IMPROPER BECAUSE INDIVIDUAL ISSUES OF RELIANCE PREDOMINATE AND RENDER PLAINTIFF ATYPICAL AND INADEQUATE**

Plaintiff did not rely on the alleged fraudulent statements in purchasing Lucid stock. ████

[REDACTED]

These facts defeat class certification for three independent reasons.  First, they preclude plaintiff from invoking any presumption of reliance, without which individualized issues would overwhelm any common questions.  *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 462–63 (2013).  Second, they subject plaintiff to a unique, dispositive defense—[REDACTED]—rendering it atypical under Rule 23.  Third, for similar reasons, they render plaintiff inadequate under Rule 23.

### A. Plaintiff Cannot Establish Classwide Reliance Because the *Basic* Presumption Is Rebutted

To certify its proposed class, plaintiff must meet Rule 23(b)(3)'s requirement that "questions of law or fact common to class members predominate over any questions affecting only individual members."  *Amgen*, 568 U.S. at 460.  Evaluating predominance requires examining the elements of the underlying cause of action—including, as relevant here, reliance.  *Halliburton I*, 563 U.S. at 809-10.  To establish predominance, plaintiff must show that it can prove reliance through classwide evidence.

Because direct proof of reliance would require individualized inquiries, plaintiff must rely on *Basic*'s fraud-on-the-market presumption.  *See Halliburton II*, 573 U.S. at 268.  That presumption is rebutted where the evidence shows that the plaintiff would have purchased the security at the same price "even had [it] been aware that the stock's price was tainted by fraud."  *Id.* at 269.

That is exactly the situation here.  Evidence adduced to date shows that [REDACTED]

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████ The trades would have occurred in precisely the same manner, on the same timeline, regardless of any alleged misrepresentation.

Those facts do more than merely rebut the *Basic* presumption—they demonstrate that its underlying premise is absent. The presumption rests on the idea that investors rely, at least indirectly, on the integrity of the market price in making investment decisions. *See Basic*, 485 U.S. at 246–47. But where a transaction is ████████████████████████████████ ████████████████████████████—there is no such reliance, direct or indirect. The trade does not reflect any judgment about price integrity or any understanding of the information incorporated into the market price. Courts applying *Basic* recognize that the presumption cannot stand under "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Basic*, 485 U.S. at 248; *Halliburton II*, 573 U.S. at 269–70; *see also In re Vivendi Universal, S.A. Sec. Litig.*, 183 F. Supp. 3d 458, 467 (S.D.N.Y. 2016) (finding presumption rebutted where the plaintiff's investment advisor was "indifferent to the fraud"). Here, the evidence goes further: it shows not merely indifference, but the absence of any decision-making process that could have been influenced by the alleged misstatements.

At a minimum, these facts defeat predominance. *See Halliburton I*, 563 U.S. at 810. Establishing reliance for ████████████████████████████████ ████████████████████████████ whether the trades would have occurred regardless of any alleged misstatements—inquiries that cannot be resolved through common proof.

**B.    Plaintiff Is Atypical Because Its ███████████████ Strategy Creates a Unique, Dispositive Defense**

"[A] named plaintiff's motion for class certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon*

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

*v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Whether such a defense ultimately succeeds "is not what matters;" rather, it is "the threat of unique defenses to preoccupy class representatives" that defeats typicality. *Mulderrig v. Amyris, Inc.*, 340 F.R.D. 575, 582 (N.D. Cal. 2021).

That is precisely the case here. Plaintiff is subject to a dispositive reliance defense: it would have bought Lucid stock regardless of any alleged misrepresentation. █████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

Those facts give rise to a unique defense that does not apply to investors who made discretionary investment decisions—and underscore why Rule 23(a)(3) bars certification here. Typicality exists to ensure that the named plaintiff's claim will advance the interests of the class as a whole, rather than divert the litigation into plaintiff-specific inquiries. Where, as here, the representative's claim turns on a threshold issue unique to that plaintiff—whether its investment process defeats reliance altogether—the litigation will necessarily focus on that issue. Rather than resolving common questions about the alleged misrepresentation, the case would be consumed by individualized proof concerning ████████████ ████████████████████████████████ That is precisely the circumstance in which courts deny certification. *See Hanon*, 976 F.2d at 508 (typicality lacking where plaintiff's claim is subject to defenses that threaten to dominate the litigation); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990) (same); *Cohen v. Laiti*, 98 F.R.D. 581, 584 (E.D.N.Y. 1983) (denying certification where plaintiff's investment strategy "invites rebuttal" and would consume the litigation); *cf. Brown v. Nat'l Life Ins. Co.*, 2013 WL 12096508, at *6 (C.D. Cal. Oct. 15, 2013) (finding plaintiff atypical where plaintiff "fail[ed] to show that he and the proposed class members experienced misrepresentations or omissions in a uniform fashion," and "the reason [plaintiff] maintained his investments … ha[d] not been shown to be typical").

Plaintiff cannot avoid this result by invoking cases in which investors pursued particular strategies that included exposure to the challenged security. Those cases involve affirmative investment choices—decisions to pursue a strategy because of its anticipated exposure or characteristics. ████████████ ████████████████████████████████████████████████████████████████████████

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████. *See* Ex. 39 at 54:8–21; Exs. 44–45. That distinction is dispositive.  It marks the difference between investors whose claims rise and fall with the alleged misrepresentation and a plaintiff whose transactions were entirely independent of it.

Allowing plaintiff to serve as class representative would defeat the purpose of Rule 23(a)(3).  Rule 23 does not permit certification on that basis.  Accordingly, even if the Court were to find that plaintiff has satisfied predominance (it has not), certification should be denied on this independent ground.

**C.   Plaintiff's Lack of Reliance Renders It Inadequate to Represent the Class**

Plaintiff also fails to satisfy Rule 23(a)(4)'s adequacy requirement, which demands that the class representative "fairly and adequately protect the interests of the class."  This inquiry overlaps with typicality and is designed to ensure that the representative's interests are aligned with those of absent class members and that the litigation will be conducted with the class's interests in mind.

That standard is not met here.  A plaintiff whose transactions were entirely independent of the alleged misstatements—and who would have bought the securities despite any alleged fraud—does not have the same stake in proving reliance as investors whose claims depend on it.  Nor can such a plaintiff be expected to litigate reliance issues in a manner that fairly represents those investors.  This scenario risks subordinating the interests of absent class members to defenses unique to the representative. *See Hanon*, 976 F.2d at 508 (class representative inadequate if "subject to unique defenses which threaten to become the focus of litigation" because "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to [the representative]").

**III.  PLAINTIFF HAS NOT PROPOSED A DAMAGES METHODOLOGY THAT CAN RELIABLY CALCULATE CLASSWIDE DAMAGES**

The Court should deny plaintiff's motion for the independent reason that plaintiff fails to provide "evidentiary proof" of a methodology capable of measuring damages on a classwide basis consistent with plaintiff's theory of liability. *Comcast*, 569 U.S. at 33.  After *Comcast*, "[i]t is now indisputably the role of the district court to scrutinize the evidence" of plaintiff's proposed damages methodology "before granting certification," including through analysis that may overlap with the merits and "a hard look at the soundness of statistical models." *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1187

(N.D. Cal. 2013). Although damages need not be calculated with precision now, plaintiff must offer a model that can measure damages "consistent with its liability case"—not merely describe a general framework in the abstract. *Comcast*, 569 U.S. at 35. An expert's unelaborated "say-so" does not suffice. *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014).

Plaintiff fails to meet that standard. Dr. Nye does not propose a case-specific methodology capable of isolating damages attributable to the alleged fraud. Instead, he invokes a generic event-study framework and asserts that inflation "may be measured" by examining stock-price reactions to alleged corrective disclosures or the "materialization of previously concealed risks." Nye Rep. ¶ 63. But he does not explain how that framework can be applied to plaintiff's theory in this case. Nowhere in his report does he discuss the kinds of non-fraud factors that must be disaggregated to isolate the effect of any alleged misrepresentations—or even identify the specific tools he would use for such disaggregation, much less explain how he would apply those tools to calculate damages under plaintiff's theory of liability. *See id.* ¶¶ 30-31, 63–65; Ex. 46 at 68:11–72:7, 71:25–72:7, 138:5–140:19, 147:9–152:18.

Dr. Nye's understanding of plaintiff's theory boils down to one paragraph in his report in which he generally recites the elements of a Section 10(b) class action, without any discussion of the alleged misstatements or corrective disclosures at issue. *See* Nye Rep. ¶ 64; Ex. 46 at 99:2–102:4. At bottom, Dr. Nye asserts that, because this is a securities class action, and event studies are routinely used to measure damages in such actions, his proposed framework "███████████" can measure damages on a class-wide basis. Ex. 46 at 87:20–92:13 ("█████████████████████████████████████████████████████████████████████████████"). This level of abstraction is insufficient. Courts routinely reject damages models that "discuss general techniques" without "propos[ing] one model explaining how [the expert] would use the[] techniques in concert to calculate damages in this case." *Loritz v. Exide Tech.*, 2015 WL 6790247, at *22 (C.D. Cal. 2015) (denying motion for class certification); *see also Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1032 (9th Cir. 2024) ("Merely gesturing at a model or describing a general method will not suffice to meet this standard. Rather, plaintiffs—or their expert—must chart out a path to obtain all necessary data and demonstrate that the proposed method will be viable as applied to the facts of a given case."); *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013) ("Without a more complete explication of how Plaintiffs propose to use an event study to calculate class

members' damages, and how that event study will incorporate—and, if necessary, respond to—the various theories of liability, the Court cannot certify this litigation for class action treatment.").

This failure begins at the threshold. A damages model must be anchored to a showing that the alleged misstatements introduced inflation into the stock price. Yet Dr. Nye does not analyze whether the November 2021 statements conveyed any incremental information in light of the market's repeated prior awareness of the same 20,000-unit production target, and has not explained how he would do so. *See* Nye Rep. ¶¶ 51–56, 63–65. Indeed, Dr. Nye testified that ████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████████████ Dr. Nye has thus failed to explain how he would account for earlier disclosures of Lucid's 20,000-vehicle production target when measuring inflation attributable to Lucid's November 2021 reiteration of that target.

Nor does Dr. Nye explain how he would account for the substantial confounding information disclosed at the time of the alleged misstatements, including positive company-specific developments and broader industry conditions. James Rep. ¶¶ 58–61. On November 15, 2021, Lucid announced increased reservations, a strengthened cash position, and that the Air had won MotorTrend Car of the Year award, *see* Ex. 21—each of which analysts identified as significant drivers of market reaction, *see* Exs. 26–28. Despite this, Dr. Nye testified that ████████████████████████████████████ ████████████████████. *See* Ex. 46 at 73:4–18. His model assumes that the alleged misstatements affected price without considering how to isolate that effect from concededly non-fraud factors. James Rep. ¶ 60.

Second, assuming that Dr. Nye intends to measure artificial inflation by analyzing the effects of the alleged corrective disclosures, Dr. Nye similarly has not explained how his framework can isolate damages where the purported corrective events on which he relies reflect a mix of fraud and non-fraud information. *See* James Rep. ¶¶ 18–19, 27–34. Both alleged corrective disclosures were accompanied by—and explicitly attributed to—non-fraud factors, including industry-wide supply chain constraints and evolving logistics challenges. When Lucid revised its production targets in February 2022, it cited

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

"supply chain challenges," including component shortages. Ex. 49 at 4. Analyst coverage focused extensively on those constraints. *See* James Rep. ¶ 29.[3] The August 2022 revision likewise reflected continuing supply chain pressures, compounded by newly identified logistics constraints. Ex. 36 at 2–3. Analysts again attributed the revision to both industry-wide and company-specific factors. *See* James Rep. ¶ 31.[4] Dr. Nye does not (1) address the potential effects of any concededly non-fraud information included in the corrective disclosures, nor (2) identify a single tool he would use to disentangle such information. *See* Ex. 46 at 138:5–140:19, 147:9–152:18.

Nor does Dr. Nye propose a damages methodology to reliably isolate price effects of the materialization of supposedly ***concealed*** risks from effects of the materialization of ***known*** risks. Even at this stage of the case, it is clear that any damages methodology will need to disaggregate the price effect of the materialization of ***known*** supply-chain or logistics risks that Lucid indisputably disclosed on November 15, 2021. *See* James Rep. ¶¶ 35–43. Plaintiff does not contend Lucid misrepresented the existence of supply chain challenges, and the Court has already ruled that plaintiff's allegations of misrepresentations on and after February 28, 2022 are unactionable. *See* Dkt. 130 at 8–14; James Rep. ¶¶ 23–26. Yet Dr. Nye's report fails entirely to consider whether he will need to disentangle the price effects stemming from the materialization of known risks unrelated to the alleged fraud. *See* Nye Rep. ¶¶ 63–65. Dr. Nye similarly has not proposed a damages methodology that would isolate the difference between the market's perceived risk of logistics issues from the "true" severity of that risk that was supposedly concealed. *See* James Rep. ¶¶ 42–43. Indeed, Dr. Nye testified that ███████████ ███████████████████████████████████████. *See* Ex. 46 at 160:21–164:12. These assumptions and failures are incompatible with *Comcast*: a damages model must isolate the effect of the theory of liability, not simply attribute the entire price movement to it. *Cf. Mulderrig*, 340 F.R.D.

---

[3] *See also* Ex. 50 (Citi analysts noting Lucid attributed reduced production "mostly []to select supplier shortages"); Ex. 51 (Guggenheim analysts noting Lucid's commentary that the revised target was "due to issues with some suppliers delivering quality product in certain commodity-like categories, as well as logistics disruptions").

[4] *See also* Ex. 52 (Citi analysts commenting that Lucid's "latest constraints are both a function of industry supply-chain challenges and Lucid specific logistics issues"); Ex. 53 (Redburn analysts noting Lucid's reference to "industry-wide supply chain issues as well as Lucid-specific logistics problems" as the cause of the revision).

at 590 (holding that out-of-pocket event study could not support materialization of risk theory).

Third, Dr. Nye fails to offer any method to measure inflation across the class period consistent with plaintiff's theory. *See* James Rep. ¶¶ 44–61. His approach infers inflation solely by back-casting from price movements on the alleged corrective disclosure dates. *See* Nye Rep. ¶ 63. That method assumes—without analysis—that (1) the information allegedly concealed is equivalent to what was later disclosed, and (2) the impact of that information on price remained constant over time. *See* James Rep. ¶¶ 46–49. Dr. Nye provides no method to test either assumption, and testified ███████████████ ████████████████████████ *See* Ex. 46 at 176:8–177:2.

Those assumptions are untenable given plaintiff's theory of liability. Plaintiff contends that Lucid should have disclosed that it would produce "fewer than 10,000 vehicles in 2022." Mot. 2. The market impact of such a disclosure would necessarily depend on when it was made. *See* James Rep. ¶ 48.[5] Likewise, any alleged logistics constraints evolved over time as Lucid's production ramp progressed. As Lucid explained in August 2022, certain logistics constraints became apparent only after earlier supply constraints eased. Ex. 36 at 2–3. A hypothetical disclosure in November 2021 would have differed in scope and significance from later disclosures, and would not have the same price impact. *See* James Rep. ¶¶ 46–49, 54–55. Dr. Nye fails to explain how he would assess the impact of these differences.

Finally, Dr. Nye does not account for changes in market expectations over time. Throughout the class period, analysts actively assessed risks to Lucid's production capabilities, including risks inherent in scaling a first-time manufacturing operation; those assessments evolved based on publicly available, non-fraudulent information. *See* James Rep. ¶¶ 50–57. A reliable damages model must account for how such evolving expectations would affect the price impact of any hypothetical disclosure. Dr. Nye offers no model that would do so, and ██████████████████████ ██████████████████████ *See* Ex. 46 at 173:15–174:2.

In short, Dr. Nye's model does not connect the alleged misrepresentation, the information

---

[5] "For example, suppose Lucid could and should have disclosed as of February 28, 2022 that its internal estimates were to produce "less than 10,000 units in 2022," as plaintiff alleges. Then the stock price reaction to such a disclosure may well have been smaller than the combined stock price reaction to the alleged corrective disclosures (through which Lucid provided even lower forecasts, of 6,000 to 7,000 vehicles). Using the stock price reactions to the two alleged corrective disclosures as a basis for measuring inflation would therefore overstate inflation." James Rep. ¶ 48.

Case No. 3:22-cv-02094-AMO

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

purportedly concealed, and the price movements on which plaintiff relies. It assumes that connection rather than demonstrating it. That failure to "tie [his] theory[] to the facts of this case" is fatal under *Comcast*. *Loritz*, 2015 WL 6790247, at *22. Because plaintiff has not proposed a method capable of measuring classwide damages consistent with its theory of liability, individualized issues will predominate, and certification must be denied. *Comcast*, 569 U.S. at 34–35.

## IV.    PLAINTIFF'S THEORY LIMITS THE CLASS PERIOD

As explained above, plaintiff has not shown that either the February or August 2022 disclosures revealed the alleged fraud. Both disclosures reflect changes in production expectations in light of supply-chain conditions and operational developments. That conclusion alone defeats certification. Even setting it aside, however, plaintiff's theory cannot support the class period it proposes.

Plaintiff's theory requires it to identify a point at which the market learned that Lucid's November 2021 statements were false when made. Once that occurs, any alleged inflation is removed, and the class period ends. If the February 2022 disclosure is treated as corrective, the class period necessarily ends there. That disclosure directly addresses the 20,000-vehicle production guidance at issue and indisputably reflects the market's reassessment of Lucid's inability to meet that target. In an attempt to extend the class period, plaintiff invokes the August 2022 disclosure, which references internal logistics constraints. In doing so, plaintiff attempts to frame the August disclosure as a more developed account of earlier issues. Mot. 2. But the August 2022 disclosure does not describe a continuation or completion of what was disclosed in February. It explains that certain logistics constraints became apparent only as production scaled and earlier supply constraints eased. Ex. 36 at 2–3. That is a different development at a later point in time, not a further revelation of the same alleged misconduct. The February and August disclosures address different drivers of Lucid's evolving production outlook, and neither can be treated as completing or extending the other for purposes of defining the class period.

The consequences of this disconnect for class certification are straightforward. Either plaintiff has not identified any disclosure that revealed the alleged fraud, in which case certification must be denied, or a single disclosure—at most—can be treated as corrective, in which case the class period ends at that point. What plaintiff cannot do is combine the February and August 2022 disclosures into a continuing, extended class period based on the same alleged misstatement.

DATED: May 1, 2026

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Shon Morgan*

QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
Shon Morgan (SBN 187736)
865 Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
shonmorgan@quinnemanuel.com

Kurt E. Wolfe (admitted *pro hac vice*)
kurtwolfe@quinnemanuel.com
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202) 538-8100

Ryan P. Gorman (admitted *pro hac vice*)
ryangorman@quinnemanuel.com
111 Huntington Ave, Suite 520
Boston, MA 02199
Tel: (617) 712-7100

*Counsel for Defendants Lucid Group, Inc. and Peter Rawlinson*

Case No. 3:22-cv-02094-AMO
DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

**CERTIFICATE OF SERVICE**

I hereby certify that on May 1, 2026, an unredacted copy of **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVE AND CLASS COUNSEL** was served via electronic mail to counsel for Lead Plaintiff.

DATED: May 1, 2026                    QUINN EMANUEL URQUHART &
                                      SULLIVAN, LLP


                                By */s/ Ryan P. Gorman*
                                    Ryan P. Gorman