United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE LUCID GROUP, INC. SECURITIES LITIGATION

Case No. 22-cv-02094-AMO

**ORDER GRANTING MOTION FOR CLASS CERTIFICATION**

Re: Dkt. No. 174

This is a securities case against Lucid Group, Inc., and its Chief Executive Officer, Peter Rawlinson. Lead Plaintiff Sjunde AP-Fonden ("AP7") alleges Defendants represented that Lucid was on track to produce tens of thousands of vehicles and implied that only external factors could prevent that, even though they knew Lucid suffered from debilitating internal logistics problems. AP7 alleges that Defendants' misrepresentations artificially inflated and/or maintained Lucid's stock price, thereby violating Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5, 17 C.F.R. § 240.10b-5. AP7 now moves to certify a class of investors. For the reasons that follow, AP7's motion is **GRANTED**.

## I. BACKGROUND

A detailed description of AP7's allegations is contained in the orders on Defendants' motion to dismiss. *In re Lucid Grp., Inc. Sec. Litig.*, No. 22-CV-02094-AMO, 2024 WL 3745605, at *1-2 (N.D. Cal. Aug. 8, 2024); *In re Lucid Grp., Inc. Sec. Litig.* ("*In re Lucid II*"), No. 22-CV-02094-AMO, 2025 WL 1474494, at *3-4 (N.D. Cal. May 22, 2025). As a brief summary: Lucid is a luxury electric vehicle manufacturer. Dkt. No. 108 ("AC") ¶ 45. In September 2020, it unveiled a production version of its debut vehicle, the Lucid Air. *Id.* ¶¶ 77-78. Lucid started production in September 2021 and delivered its first Air one month later. *Id.* ¶¶ 129, 131. Even so, Lucid

allegedly faced pervasive internal logistics problems that prevented it from ramping up production. *Id.* ¶¶ 143-302. For instance, Lucid allegedly had ineffective and unreliable inventory systems, a warehouse that operated significantly over capacity, and flaws in the Air that required redesign after production already began. *Id.* ¶¶ 150, 191, 256. As a result, in October or November of 2021, Rawlinson allegedly internally acknowledged that Lucid would produce fewer than 10,000 vehicles in 2022. *Id.* ¶ 327.

Defendants painted a rosier picture for investors. Four alleged misrepresentations remain in this case. *In re Lucid II*, 2025 WL 1474494, at *10. First, in a November 15, 2021 press release announcing Q3 2021 financial results, Rawlinson stated, "We remain confident in our ability to achieve 20,000 units in 2022. This target is not without risk, given ongoing challenges facing the automotive industry with global disruptions to supply chains and logistics." AC ¶ 396. Second, in an earnings call that same day, Rawlinson said, "Even in a challenging environment as COVID-19 continues to present numerous obstacles for the auto industry and supply chain. Lucid is no stranger to this, but we have continued to deliver against our time line . . . ." *Id.* ¶ 397. Third, in an interview on November 16, 2021, Rawlinson stated, "Absolutely. We already have a factory scale for 34,000 units a year. As soon as we can get this quality parts to the line, we can spool that up. The factory is there and ready for 34,000 units per annum." *Id.* ¶ 404. Finally, later in the same interview, Rawlinson said, "That isn't to say we aren't vulnerable to today's supply chain shortages that the entire industry is facing, in fact, many industries are facing, that is something that we are a challenge with . . . ." *Id.* ¶ 406.

AP7 contends that the market learned the truth through two corrective disclosures. First, as part of a press release and earnings call on February 28, 2022, Lucid disclosed it missed its 2021 production target and was "[u]pdating 2022 production outlook for Lucid Air to a range of 12,000 to 14,000 vehicles." *Id.* ¶¶ 489-92. Lucid "cited supply chain constraints and a continued focus on quality" to explain that downgrade. *Id.* ¶¶ 490, 492. AP7 alleges that the truth was fully revealed in a press release and earnings call on August 3, 2022, where Lucid further slashed its production outlook to between 6,000 and 7,000 vehicles while disclosing that "the limitations of our logistics system have compounded the challenge." *Id.* ¶¶ 510-17.

United States District Court
Northern District of California

AP7 proposes to certify a class of persons or entities who acquired Lucid's stock between November 15, 2021, and August 3, 2022. Dkt. No. 174 at 9.[1] In connection with this motion, AP7 submitted two expert reports from Dr. Zachary Nye, a financial economist at Stanford Consulting Group. Dkt. No. 175-1 ("Nye Report") ¶ 1; Dkt. No. 187-1 ("Nye Reply Report"). In opposition, Defendants submitted an expert report from Professor Christopher James, a finance and economics professor at the University of Florida. Dkt. No. 207-1 ("James Report") ¶ 1.

## II. LEGAL STANDARD

Class certification requires a plaintiff to show, by a preponderance of the evidence, that the four prerequisites of Federal Rule of Civil Procedure 23(a) and at least one of the bases for certification under Rule 23(b) are met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (en banc). A class can only be certified if the court concludes, after a "rigorous analysis," that these requirements have been satisfied. *Wal-Mart*, 564 U.S. at 351; *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). The Rule 23(a) prerequisites are commonly referred to as "numerosity," "commonality," "typicality," and "adequacy." That means: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

If those prerequisites are satisfied, the analysis turns to the three Rule 23(b) bases for certification. Here, AP7 invokes Rule 23(b)(3). Rule 23(b)(3) requires plaintiffs to prove the elements of predominance and superiority, such that "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Predominance requires only "a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in

---

[1] All citations to page numbers in filings on the docket refer to ECF pagination.

favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013). A common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted).

## III. DISCUSSION

As Defendants do not contest, AP7 satisfies the first two Rule 23(a) prerequisites: numerosity and commonality. Since Lucid has "millions of shares trading on a national exchange," numerosity can be inferred. *See In re Twitter Inc. Sec. Litig.*, 326 F.R.D. 619, 626 (N.D. Cal. 2018) (citation omitted); Nye Report ¶ 25. This case will also involve several common questions of fact and law, including whether Defendants' statements were false or misleading, material, made with scienter, and artificially inflated Lucid's stock price. AP7 further satisfies the Rule 23(b)(3) requirement of superiority, as Defendants do not contest. *See In re Twitter*, 326 F.R.D. at 631 (citations omitted).

The parties dispute the remaining requirements of predominance, typicality, and adequacy. Defendants contend that individualized questions of reliance and damages will predominate over common questions. They also contend that AP7 is atypical and inadequate because its trading strategy means it is subject to unique defenses.

### A. Predominance

#### 1. Reliance

Requiring a plaintiff to directly prove reliance "would place an unnecessarily unrealistic evidentiary burden on the Rule 10b–5 plaintiff who has traded on an impersonal market." *Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988). Thus, if stock trades in an efficient market, an investor is rebuttably presumed to have traded in reliance on public material misrepresentations. *Id.* at 246-48. To invoke the *Basic* presumption, a plaintiff must prove: "(1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 118 (2021) (citation omitted).

If they do so, the defendant can rebut that presumption through "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Id.* (quoting *Basic*, 485 U.S. at 248). Courts must be "open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Id.* at 122 (citation omitted). The issue is termed price impact, which "simply refers to the effect of a misrepresentation on a stock price." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 814 (2011). It "can be observed on the 'front-end' (*i.e.*, misstatements causing or maintaining inflation) or on the 'back-end' (*i.e.*, a decline in price caused by the corrective disclosures)." *In re NVIDIA Corp. Sec. Litig.,* 825 F. Supp. 3d 1047, 1068 (N.D. Cal. 2026) (citation omitted). When a plaintiff argues that the latter is observable yet there is a "mismatch" between the misrepresentation and corrective disclosure, like a generic misrepresentation but specific corrective disclosure, the inference that the "back-end price drop equals front-end inflation . . . starts to break down." *Goldman*, 594 U.S. at 123.

Ultimately, Defendants "bear the burden of persuasion to prove a lack of price impact by a preponderance of the evidence." *Id.* at 117. To do so, they must disprove both front-end *and* back-end price impact, though if a plaintiff advances an inflation maintenance theory, a lack of back-end price impact indicates a lack of front-end price impact. *See id.* at 123; *In re NVIDIA*, 825 F. Supp. 3d at 1071-72. As further discussed below, the converse is also logically true: if a plaintiff advances an inflation creation theory, a lack of front-end price impact implies that any back-end price impact is not attributable to the alleged misrepresentation. *See In re NVIDIA*, 825 F. Supp. 3d at 1071 n.18 (citation omitted).

AP7 has undisputedly satisfied its burden to trigger the *Basic* presumption of reliance. The alleged misrepresentations occurred in a press release, earnings call, and television interview, all of which were public. AC ¶¶ 395-97, 402-06. Lucid's stock trades on the NASDAQ, a "quintessentially efficient market." *See Junge v. Geron Corp.*, No. 20-CV-00547-WHA, 2022 WL 1002446, at *4 (N.D. Cal. Apr. 2, 2022). AP7 and class members purchased Lucid stock between the time the alleged misrepresentations were made and the time the truth was revealed. And at this stage, AP7 is not required to prove materiality. *See Amgen*, 568 U.S. at 470.

The burden therefore shifts to Defendants to rebut the *Basic* presumption by showing a lack of any price impact from the alleged misrepresentations. Plaintiffs advance both inflation creation and inflation maintenance theories, so both front- and back-end price impact must be directly analyzed. Defendants, however, fail to disprove either.

**a. Front-End Price Impact**

Defendants contend that the four alleged misrepresentations could not have had a price impact because they provided the market with no new information. As a threshold matter, it is appropriate to consider the information's "newness" when assessing front-end price impact. *See In re NVIDIA*, 825 F. Supp. 3d at 1069-70 (citations omitted). Some courts have concluded that "a 'newness' analysis is not required when evaluating front-end impact of alleged misrepresentations" because "repetition of a misrepresentation can also avoid a price decrease." *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, No. 17-CV-01580-LGS, 2019 WL 5287980, at *19 (S.D.N.Y. Oct. 18, 2019), *report and recommendation adopted in part*, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020). That logic, though, presupposes that a plaintiff advances an inflation maintenance theory, meaning that the market takes a misrepresentation as confirmation of an already held belief. Under those circumstances, it does not make sense to analyze the information's newness. But if a plaintiff contends that a misrepresentation created the inflation, that requires the market to view the misrepresentation as new information. Otherwise, an efficient market would have already incorporated that information into the price, meaning one would expect no change in the stock price.

Nevertheless, the four alleged misrepresentations contained new information. Even though Lucid had previously confirmed it was on track to produce 20,000 vehicles in 2022, "updates and estimates for project timelines are almost always new information, especially when spread out over months, because they translate the complex progress of a project in the interval time into a simple, quantifiable . . . value." *See Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 623 F. Supp. 3d 470, 492 (E.D. Pa. 2022). Moreover, Defendants concede that then-current market conditions "created significant uncertainty for manufacturers attempting to scale production of new vehicle platforms." Dkt. No. 181-2 at 9. Thus, the market was seemingly unsure that Lucid's

prior statements remained true. When the four alleged misrepresentations reiterated Lucid's 2022 production target and implied it was not experiencing internal logistics problems, the market's fears were assuaged. *See* Nye Report at 133-37; Dkt. No. 187-3 at 3 (describing the market "react[ing] to management confirming production plans for 2022"); Dkt. No. 187-4 at 2 ("The surge in the shares came after Lucid said Monday it remained confident in its ability to produce 20,000 vehicles in 2022."); Dkt. No. 187-5 at 2 (similar). Accordingly, those statements provided the market with new information.

Turning next to the first and second alleged misrepresentations individually, it is undisputed that the day after those statements, Lucid's stock price increased by a statistically significant amount. Nye Report ¶ 54 n.97; *id.* at 124. Even so, Defendants contend that price increase may have been caused by other information disclosed in the earnings call and press release. But "merely suggesting that another factor *also* contributed to an impact on a security's price does not establish that the fraudulent conduct complained of did not also impact the price of the security." *Waggoner v. Barclays PLC*, 875 F.3d 79, 105 (2d Cir. 2017). Indeed, Defendants have not attempted to show that the other information completely explains the price impact. *See AMI - Gov't Emps. Provident Fund Mgmt. Co. Ltd. v. Alphabet Inc.*, 833 F. Supp. 3d 1034, 1044 (N.D. Cal. 2026). And it is undisputed that some analysts attributed the price increase to Lucid reiterating its 2022 production target. *See* Dkt. No. 187-3 at 3; Dkt. No. 187-4 at 2; Dkt. No. 187-5 at 2. Even the analyst reports that Defendants rely on acknowledged Lucid's statements as cause for optimism. *See* Dkt. No. 179-27 at 2 ("[T]he company reiterated delivery targets for FY21 and FY22 while acknowledging a host of risks."); Dkt. No. 179-28 at 2 ("An encouraging Q3 update highlighted by: . . . (3) company expressed confidence in the 2022 volume target . . . ."); Dkt. No. 179-29 at 2 ("2022 on track for 20k units"). Accordingly, Defendants have not shown it is more likely than not that the first and second alleged misrepresentations had no price impact.

Finally, Defendants contend that the third and fourth alleged misrepresentations had no front-end price impact. AP7 does not contest this. *See* Dkt. No. 186 at 11-12. While this is dispositive as to whether these two alleged misrepresentations created price inflation, it is not dispositive of the entire inquiry because Plaintiffs contend these two alleged misrepresentations

United States District Court
Northern District of California

artificially maintained price inflation, as will be discussed with back-end price impact. Moreover, Defendants have already failed to disprove price impact for the first two alleged misrepresentations, so they have not "sever[ed] the link" between all alleged misrepresentations and the price impact. *See Goldman*, 594 U.S. at 125-26.

**b. Back-End Price Impact**

It is undisputed that the two alleged corrective disclosures were followed by statistically significant drops in Lucid's stock price. Nye Report ¶ 54 n.97; *id.* at 125, 127. Accordingly, Defendants only contend that these drops do not support an inference of front-end price impact because there is a mismatch between the alleged misrepresentations and corrective disclosures. Yet there is no mismatch.

Defendants argue that the February 28, 2022 disclosures could not have been corrective because they did not link the production guidance cut to Lucid's allegedly flawed logistics processes. But "[a]n event can be corrective when it merely discloses a consequence of concealed information (for example, an earnings miss), even if the connection between the cause and the consequence is not made explicitly in the disclosure." *Jaeger v. Zillow Grp., Inc.*, 746 F. Supp. 3d 1025, 1036 (W.D. Wash. 2024) (citing *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-54 (9th Cir. 2018)), *aff'd*, No. 24-6605, 2025 WL 2741642 (9th Cir. Sept. 26, 2025). AP7 alleges that the production figure reduction was the consequence of Lucid concealing its internal logistics issues.[2] Moreover, though Lucid previously disclosed external logistics issues might prevent it from producing 20,000 vehicles, the market did not seem to interpret Lucid's revisions as solely a materialization of those known risks. *See, e.g.*, Nye Report at 143-44 (analyst stating that the revision "was not entirely unexpected directionally, but somewhat surprising in magnitude"); *id.* at 145 ("The guidance was particularly disappointing given the fact the company was expected to produce at a quantity which was considered manageable in light of industry challenges.").

As for the August 3, 2022 disclosures, Defendants contend that they only disclosed later-

[2] This was only a partial corrective disclosure, though, so it need not end the class period. *See In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020) (citations omitted).

emerging internal logistics problems, so they could not correct statements implying that it earlier had no such problems. But a corrective disclosure "need not consist of an admission of fraud by the defendant." *See In re BofI*, 977 F.3d at 790 (citation omitted). Accordingly, it is of no moment whether Defendants couched Lucid's internal logistics struggles as recently discovered. *See id.* Further, the cases cited by Defendants are inapposite, as they involved disclosure of information "not previously known to Defendants" or "disclosures . . . about the failure of [a manufacturing line] broadly speaking and not about [one type of] equipment specifically." *See In re FibroGen Sec. Litig.*, No. 21-CV-02623-EMC, 2024 WL 1064665, at *13 (N.D. Cal. Mar. 11, 2024); *In re Enovix Corp. Sec. Litig.*, No. 23-CV-00071-SI, 2026 WL 1078569, at *11 (N.D. Cal. Apr. 21, 2026).

In sum, *Goldman*'s concern that a "specific disclosure [did not] actually correct[] the generic misrepresentation" is simply not present here. *See* 594 U.S. at 123. The disclosure of reduced production figures and internal logistics problems is well connected with allegedly too-rosy prior production figures and implying that only external logistics issues could harm production. "This Court is not persuaded by arguments that this disclosure only mentioned one thing; discussion of that one thing in no way indicates or reveals a problem with this other thing; ergo, no revelation of fraud." *See In re Apple Inc. Sec. Litig.*, No. 19-CV-2033-YGR, 2022 WL 354785, at *9 (N.D. Cal. Feb. 4, 2022) (cleaned up).

**2. Damages**

To gain certification of a Rule 23(b)(3) class, a plaintiff must generally show that "damages are susceptible of measurement across the entire class." *Comcast*, 569 U.S. at 35. "Calculations need not be exact" at this stage. *Id.* Instead, "plaintiffs must show that they will be able to prove their case through common proof *at trial*." *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1024 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1308 (2025). "[P]laintiffs may rely on an unexecuted damages model to demonstrate that damages are susceptible to common proof so long as the district court finds, by a preponderance of the evidence, that the model will be able to reliably calculate damages in a manner common to the class at trial." *Id.*

For instance, in *Lytle*, the plaintiffs sought class certification for consumers who bought a

pet health product that allegedly misrepresented it promoted joint health in dogs. *Id.* at 1019. Plaintiffs' expert proposed using a conjoint survey to measure damages, a "well-accepted technique that is frequently used" in such cases. *Id.* at 1021, 1033. The expert had not conducted that survey. *Id.* at 1021. Instead, he explained the process of conducting a conjoint survey and his opinion that it was "well-suited to the facts of this case." *Id.* The Ninth Circuit found that explanation sufficient for class certification. *Id.* at 1034. It held that novel techniques "demand a greater degree of specificity and completeness." *Id.* at 1033. It was unnecessary to make that showing for a well-accepted technique, because there was no dispute the technique was "capable of measuring classwide damages, at least in the abstract." *Id.* While the defendant insisted that the plaintiffs' expert's implementation of the technique might be flawed, for instance because the "'assumptions underlying [his] economic model' may not account for real-world factors," the Ninth Circuit held that the "speculative possibility that [he] might slip up in executing his model, standing alone, is insufficient to defeat class certification." *Id.*

The circumstances here are analogous to *Lytle*. Nye proposes using the "out-of-pocket" method, which uses an event study to calculate classwide damages. Nye Report ¶¶ 61-67. This is the "standard measurement of damages in Section 10(b) securities cases." *City of Mia. Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, No. 17-CV-00554-YGR, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) (citations omitted). The method "isolate[s] the Company-specific price movement caused by the revelation of true facts and/or the materialization of risk concealed by the alleged fraud from price movement caused by other factors, if any." Nye Report ¶ 63. If any confounding information was released on the same day as the corrective disclosures, "it is widely recognized that an event study can be fashioned . . . to isolate and control for the effects of such information." Nye Reply Report ¶ 23. That is because an event study combines regression analysis with techniques such as discounted cash flow modeling and content analysis to perform disaggregation. *Id.* ¶ 24. After calculating the total price inflation caused by the misrepresentations, "a Class member's actual trading activity in the security can be used to mechanically calculate damages on an individual basis." Nye Report ¶ 66. Courts routinely accept similar outlines of the out-of-pocket method as sufficient to show damages are susceptible

of classwide calculation. *See AMI*, 833 F. Supp. 3d at 1046 (first citing *Junge*, 2022 WL 1002446, at *6 (collecting cases); and then citing *City of Mia.*, 2018 WL 4931543, at *3-4). Further, given Nye's familiarity with conducting event studies, the possibility he will "slip up in executing his model" is just speculation. *See Lytle*, 114 F.4th at 1033; Nye Report ¶ 51.

Nonetheless, Defendants insist that AP7 is merely "gesturing at a model," which would be insufficient to gain class certification. *See Lytle*, 114 F.4th at 1032. James identifies a host of objections to Nye's methodology, roughly categorized into two buckets: (1) that Nye does not propose a method to parcel out the price impact of non-actionable information; and (2) that Nye does not identify a method to account for price impact changing throughout the class period. James Report ¶¶ 22, 44, 63. Some of these objections blur into the issue of loss causation, which is "reserve[ed] . . . entirely for the merits phase." *See In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 608-09 (7th Cir. 2020) (cited approvingly by *Goldman*, 594 U.S. at 122 n.2, and discussing how to disentangle price impact from materiality and falsity); *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 687 (5th Cir. 2015) (holding that addressing an issue related to loss causation as part of the *Comcast* analysis "is in tension with *Halliburton I* 's holding that no proof of loss causation is required at the class certification stage"). To the extent that the objections are properly considered now, Nye persuasively explains that they are either non-issues or are issues that event studies address as a matter of course. *See* Nye Reply Report ¶¶ 11-14, 19-20, 23-52.

Defendants also rely on a recent decision from the Fourth Circuit holding that a similar description of the out-of-pocket method could not support class certification. *Off. of Gen. Treasurer on behalf of Emps. Ret. Sys. v. Boeing Co.*, 182 F.4th 422, 442-44 (4th Cir. 2026). The Fourth Circuit required plaintiffs to provide a concrete "methodology that explains how the plaintiff will measure damages in line with [a] legal description" of damages, identification of a theory of liability at the class-certification stage, and a detailed description of an "actual approach that [the expert] would use or how he specifically planned to calculate damages based on that approach." *Id.* Defendants contend that *Boeing* merely applies the requirements of *Lytle* to securities litigation. But those demanding requirements seem inconsistent with the Ninth Circuit's holding that "well-accepted technique[s]" (like the out-of-pocket method) do not require extensive

United States District Court
Northern District of California

explanation at class certification. *See Lytle*, 114 F.4th at 1033. Defendants identify only one case from this circuit in support of their argument, which contained minimal analysis and was decided well before *Lytle*. *See Loritz v. Exide Techs.*, No. 13-CV-02607-SVW, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015). Otherwise, courts in this circuit uniformly accept similar explanations of the out-of-pocket method as sufficient for class certification. Defendants' argument ultimately reflects how they believe the Ninth Circuit ought to interpret *Comcast*, not how it previously has. The Court is unpersuaded and declines Defendants' invitation.

**B. Typicality**

A named plaintiff is typical if their claims "are reasonably co-extensive with those of absent class members; they need not be substantially identical." *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1238 (9th Cir. 2024) (citation omitted). Even so, typicality is absent if "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Id.* (citation omitted).

Defendants contend that AP7 is atypical because it bought Lucid stock as part of an investment strategy designed to track third-party indices.[3] They assert that means that AP7 did not "rely[] . . . on the integrity of the market price," so the premise underlying the *Basic* presumption is absent here. *See Basic*, 485 U.S. at 247. Courts have uniformly rejected similar arguments. *See, e.g.*, *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 602 (C.D. Cal. 2009) ("[I]ndex purchases rely *exclusively* upon the market to impound any representations (including misrepresentations) into securities' prices. This is close to perfect reliance on market price-setting . . . .") (citations omitted); *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 578 (N.D. Cal. 2009) (citation omitted). Defendants also say AP7's trading strategy means it would have bought Lucid stock at the same price "even had [it] been aware that the stock's price was tainted by fraud," thereby rebutting the *Basic* presumption. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573

[3] Defendants also contend that "[a]t a minimum, these facts defeat predominance." Dkt. No. 181-2 at 23. But predominance only focuses on the interplay between inquiries that can be conducted classwide and inquiries that must be conducted individually. *See Tyson Foods*, 577 U.S. at 453-54 (citations omitted). If the vast majority of class members would not be subject to a particular defense but the class representative would, that is an issue of typicality, not one of predominance. *See id.*; *DZ Rsrv.*, 96 F.4th at 1238.

U.S. 258, 269 (2014) (citing *Basic*, 485 U.S. at 248-49); *see also Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 432 (7th Cir. 2015) ("*Basic* was very clear that the way to rebut the presumption is to show that the investor would have paid the same *price*."). To the extent that Defendants suggest a scenario where the alleged fraud was widely known, that information would have been incorporated into the market price and therefore into the price that AP7 (and all other market traders) paid. To the extent that Defendants imply a scenario where only AP7 or its investment managers would have known about the alleged fraud, they provide no evidence that its trading strategy would require mechanically purchasing stocks known to have fraudulently inflated prices. To the contrary, AP7 submits evidence that one of its investment managers would not do that. Dkt. No. 188-3 at 6-7.

Defendants have not shown a risk that AP7's trading strategy would create a unique defense. And AP7 is otherwise typical of putative class members, since it purchased Lucid stock during the class period. Accordingly, AP7 has established typicality.

### C. Adequacy

Adequacy concerns whether: (1) "the named plaintiffs and their counsel have any conflicts of interest with other class members"; and (2) "the named plaintiffs and their counsel [will] prosecute the action vigorously on behalf of the class." *Kim v. Allison*, 87 F.4th 994, 1000 (9th Cir. 2023) (citation omitted). Neither concern is present here. AP7 does not appear to have any conflict of interest with the putative class. It has also been vigorously prosecuting this action with counsel experienced in securities litigation. Defendants contend that the possibility of unique defenses prevents AP7 from being an adequate class representative, but unique defenses are generally not an adequacy concern. *See DZ Rsrv.*, 96 F.4th at 1238. Moreover, Defendants' unique defense argument has already been rejected.

## IV. CONCLUSION

AP7's motion for class certification is **GRANTED**. The following class is certified:

> All persons and entities, excluding (i) Defendants; (ii) present and former directors or executive officers of Lucid, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing individuals' or entities' legal representatives, heirs, successors, or assigns; and (iv)

United States District Court
Northern District of California

> any entity in which any Defendant has or had a controlling interest, or which is related to or affiliated with, any Defendant, who purchased or otherwise acquired Lucid common stock between November 15, 2021 and August 3, 2022, both dates inclusive (the "Class Period").

*See* Dkt. No. 174 at 9. AP7 is appointed as class representative. Kessler Topaz is appointed as class counsel.

**IT IS SO ORDERED.**

Dated: September 25, 2026

ARACELI MARTÍNEZ-OLGUÍN
United States District Judge